**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CITY OF PHILADELPHIA et al.,

                Plaintiffs,

    vs.

BANK OF AMERICA CORPORATION, et al.,

                Defendants.

Case No.: 19-cv-1608 (JMF)

## PLAINTIFFS' OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

SUMMARY OF FACTUAL ALLEGATIONS ..........................................................4

    A.     The VRDO Market .....................................................................................4

    B.     Defendants' Conspiracy to Inflate VRDO Interest Rates .........................5

    C.     Regulatory Investigations .........................................................................7

    D.     Economic Analyses Demonstrate the Impact of Defendants' Conspiracy ............7

ARGUMENT ...........................................................................................................9

I.     THE COMPLAINT PLAUSIBLY PLEADS A CONSPIRACY ......................9

    A.     Defendants Disregard the Relevant Legal Standards.................................9

    B.     The Complaint Plausibly Alleges the Existence of an Unlawful Agreement ........11

    C.     The Complaint Alleges Numerous "Plus Factors" ..................................17

          1.     Defendants shared a common motive to conspire .....................17

          2.     Defendants engaged in a high level of interfirm communications ...........19

          3.     Defendants engaged in acts against economic self-interest.....................20

          4.     Government investigations also constitute a "plus factor".....................21

    D.     Defendants' Attacks on Plaintiffs' Economic Analyses Are Inappropriate and Meritless ................................................................23

          1.     Plaintiffs' analyses do not suggest that VRDO rates simply "tracked prevailing market conditions" ..................................25

          2.     The Complaint sufficiently explains Plaintiffs' regression models ..........25

          3.     Defendants' purported explanations for the behavior of VRDO rates should be rejected ................................................26

          4.     The results of Plaintiffs' statistical models are not "facially implausible" ....................................................28

          5.     Plaintiffs do not improperly rely on aggregated averages ........................29

II.     DEFENDANTS' CONDUCT WAS PER SE UNLAWFUL ............................................31

III.    PLAINTIFFS' CLAIMS ARE TIMELY ............................................................................35

        A.      Plaintiffs Adequately Plead Fraudulent Concealment ............................................35

        B.      Plaintiffs' State Law Claims Are Timely................................................................41

                1.      Pennsylvania statute of limitations ............................................................41

                2.      Maryland statute of limitations ..................................................................42

IV.     PLAINTIFFS STATE CLAIMS FOR BREACH OF CONTRACT AND
        UNJUST ENRICHMENT ................................................................................................43

        A.      Plaintiffs Have Pleaded Valid Contracts with Defendants. ....................................43

        B.      Plaintiffs State a Claim for Unjust Enrichment as to All Defendants....................45

V.      PLAINTIFFS STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY ..................47

        A.      Both Maryland and Pennsylvania Provide Causes of Action for Breach of
                Fiduciary Duty ........................................................................................................47

        B.      Defendants Owed Fiduciary Duties to Plaintiffs ...................................................48

CONCLUSION ....................................................................................................................................50

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
    651 F. Supp. 2d 155 (S.D.N.Y. 2009) .................................................................... 44

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    2010 WL 10947344 (E.D.N.Y. Sept. 22, 2010) ...................................................... 15

*Alaska Elec. Pension Fund v. Bank of Am. Corp.* ("*ISDAfix*"),
    175 F. Supp. 3d 44 (S.D.N.Y. 2016) ..................... 10, 18, 21, 22, 23, 29, 30, 41, 43, 45, 46, 48

*In re Aluminum Warehousing Antitrust Litigation*,
    2014 WL 4743425 (S.D.N.Y. Sept. 15, 2014), *aff'd*, 833 F.3d 151 (2d Cir. 2016) ................ 45

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
    693 F. Supp. 2d 241 (S.D.N.Y. 2010) .................................................................... 24

*Amendolia v. Rothman*,
    2003 WL 23162389 (E.D. Pa. Dec. 8, 2003) ............................................................ 49

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012) ................................................................... 9, 10, 17

*Apex Oil Co. v. DiMauro*,
    822 F.2d 246 (2d Cir. 1987) ................................................................... 17, 19

*Ault v. J.M. Smucker Co.*,
    2014 WL 1998235 (S.D.N.Y. May 15, 2014) ...................................................... 31

*Axiom Inv. Advisors, LLC by & through Gildor Mgmt., LLC v. Deutsche Bank AG*,
    234 F. Supp. 3d 526 (S.D.N.Y. 2017) .................................................................... 35

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................ 9

*Berringer v. Steele*,
    758 A.2d 574 (Md. Ct. Spec. App. 2000) .............................................................. 42

*Binary Semantics Ltd. v. Minitab, Inc.*,
    2008 WL 763575 (M.D. Pa. Mar. 20, 2008) ........................................................ 49

*BPP Illinois, LLC v. Royal Bank of Scot. Grp. PLC*,
    603 F. App'x 57 (2d Cir. 2015) ................................................................... 40, 41

*Branca v. Nordstrom, Inc.*,
  2015 WL 10436858 (S.D. Cal. Oct. 9, 2015) ...................................................................... 24

*Butcher v. Robertshaw Controls Co.*,
  550 F. Supp. 692 (D. Md. 1981) ......................................................................................... 42

*Canfield v. Statoil USA Onshore Props. Inc.*,
  2017 WL 1078184 (M.D. Pa. Mar. 22, 2017) ..................................................................... 42

*In re Capacitors Antitrust Litig.*,
  106 F. Supp. 3d 1051 (N.D. Cal. 2015) .............................................................................. 34

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
  996 F.2d 537 (2d Cir. 1993) ............................................................................................... 20

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002) ........................................................................................ 11, 41

*Cohen v. S.A.C. Trading Corp.*,
  711 F.3d 353 (2d Cir. 2013) ............................................................................................... 40

*In re Commodity Exch. Inc. Silver Futures and Options Trading Litig.*,
  2013 WL 1100770 (S.D.N.Y. Mar. 18, 2013) .............................................................. 26, 30

*In re Commodity Exch., Inc. Antitrust Litig.*,
  213 F. Supp. 3d 631 (S.D.N.Y. 2016) ...................................................................... 23, 41, 47

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962) ........................................................................................................... 10

*Crouse v. Cyclops Indus.*,
  745 A.2d 606 (Pa. 2000) ............................................................................................... 41, 42

*DeBlasio v. Merrill Lynch & Co.*,
  2009 WL 2242605 (S.D.N.Y. July 27, 2009) ..................................................................... 47

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
  733 F. Supp. 2d 1348 (N.D. Ga. 2010) ............................................................................... 15

*Dennis v. JPMorgan Chase & Co.*,
  343 F. Supp. 3d 122 (S.D.N.Y. 2018) ........................................................................... 35, 36

*DePuy Synthes Sales, Inc. v. Globus Med., Inc.*,
  259 F. Supp. 3d 225 (E.D. Pa. 2017) .................................................................................. 48

*In re Domestic Airlines Travel Antitrust Litig.*,
  221 F. Supp. 3d 46 (D.D.C. 2016) ...................................................................................... 23

*Dover v. British Airways, PLC,*
     2014 WL 317845 (E.D.N.Y. Jan. 24, 2014) .......................................................................... 24

*In re Elec. Books Antitrust Litig.,*
     859 F. Supp. 2d 671 (S.D.N.Y. 2012) .................................................................................. 16

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.,*
     681 F. Supp. 2d 141 (D. Conn. 2009)................................................................................... 34

*Fine v. Checcio,*
     870 A.2d 850 (Pa. 2005)....................................................................................................... 42

*In re Flat Glass Antitrust Litig.,*
     385 F.3d 350 (3d Cir. 2004) ........................................................................................... 17, 20

*In re Foreign Exch. Benchmark Rates Antitrust Litig.,*
     74 F. Supp. 3d 581 (S.D.N.Y. 2015) ................................................................................... 14

*Fort Prods., Inc v. Men's Med. Clinic, LLC,*
     2016 WL 797577 (S.D.N.Y. Feb. 23, 2016).......................................................................... 44

*Fox Int'l Relations v. Fiserv Sec., Inc.,*
     490 F. Supp. 2d 590 (E.D. Pa. 2007) ................................................................................... 49

*Gaerren v. McGraw-Hill Cos., Inc.,*
     690 F. Supp. 2d 254 (S.D.N.Y. 2010) ................................................................................. 48

*Gelboim v. Bank of Am. Corp.,*
     823 F.3d 759 (2d Cir. 2016) ................................................................................................. 23

*Gildor Mgmt., LLC v. Deutsche Bank AG,*
     234 F. Supp. 3d 526 (S.D.N.Y. 2017) ................................................................................. 35

*Gilvary v. Cuyahoga Valley Ry. Co.,*
     292 U.S. 57 (1934)................................................................................................................ 48

*Glob. Network Commc'ns, Inc. v. City of N.Y.,*
     458 F.3d 150 (2d Cir. 2006) ........................................................................................... 11, 26

*In re Graphics Processing Unit Antitrust Litig.,*
     527 F. Supp. 2d 1011 (N.D. Cal. 2007) ............................................................................... 22

*In re GSE Bonds Antitrust Litig.,*
     2019 WL 4071070 (S.D.N.Y. Aug. 29, 2019)................................................. 13, 24, 30, 36, 40

*Harris v. City of New York,*
     186 F.3d 243 (2d Cir. 1999) ................................................................................................. 35

*Heckler & Koch, Inc. v. German Sport Guns GmbH,*
  2014 WL 12756372 (S.D. Ind. May 15, 2014) ...................................................... 24

*In re High Pressure Laminates Antitrust Litig.,*
  2006 WL 1317023 (S.D.N.Y. May 15, 2006) ........................................................ 20

*Higher Educ. Loan Authority of the State of Missouri v. Wells Fargo Bank, N.A.,*
  2011 WL 6010683 (E.D. Mo. Dec. 2, 2011) .......................................................... 50

*Hill v. Cross Country Settlements, LLC,*
  936 A.2d 343 (Md. Ct. App. 2007)........................................................................ 47

*Hinds Cty., Miss. v. Wachovia Bank N.A.,*
  620 F. Supp. 2d 499 (S.D.N.Y. 2009) ................................................................... 22

*Hinds Cty., Miss. v. Wachovia Bank N.A.,*
  700 F. Supp. 2d 378 (S.D.N.Y. 2010) ........................................................ 30, 35, 36

*Int'l Star Class Yacht Racing Ass'n. v. Tommy Hilfiger U.S.A., Inc.,*
  146 F.3d 66 (2d Cir. 1998) ................................................................................... 11

*Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.,*
  340 F. Supp. 3d 285 (S.D.N.Y. 2018) ...................................................... 10, 39, 40

*In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig.,*
  2004 WL 487222 (S.D.N.Y. Mar. 12, 2004) ................................................... 36, 41

*John v. Whole Foods Mkt. Grp., Inc.,*
  858 F.3d 732 (2d Cir. 2017) ................................................................................. 23

*In re LIBOR-Based Fin. Instruments Antitrust Litig.,*
  2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015).......................................................... 46

*In re LIBOR-Based Fin. Instruments Antitrust Litig.,*
  962 F. Supp. 2d 606 (S.D.N.Y. 2013) ............................................................. 45, 46

*In re: LIBOR-Based Fin. Instruments Antitrust Litig.,*
  2016 WL 1301175 (S.D.N.Y. Mar. 31, 2016) ........................................................ 46

*In re Liquid Aluminum Sulfate Antitrust Litig.,*
  2017 WL 3131977 (D.N.J. July 20, 2017).............................................................. 38

*In re London Silver Fixing Ltd., Antitrust Litig.,*
  213 F. Supp. 3d 530 (S.D.N.Y. 2016) .................................................. 12, 23, 25, 30, 39

*Marketplace LaGuardia Ltd. P'ship v. Harkey Enters., Inc.,*
  2008 WL 905188 (E.D.N.Y. Mar. 31, 2008)........................................................... 46

*Mayor of Baltimore v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013) ............................................................ 20

*Merced Irrigation Dist. v. Barclays Bank PLC*,
   165 F. Supp. 3d 122 (S.D.N.Y. 2016) ............................................ 39

*In re Mercedes-Benz Anti-Tr. Litig.*,
   157 F. Supp. 2d 355 (D.N.J. 2001) ................................................ 33

*Morgan v. Petroleum Prod. Equip. Co.*,
   92 A.3d 823 (Pa. 2014) ................................................................... 41

*In re Musical Instruments Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ........................................................ 20

*In re Nasdaq Market-Makers Antitrust Litig.*,
   894 F. Supp. 703 (S.D.N.Y. 1995) ................................................. 23

*Newman v. Warnaco Grp., Inc.*,
   335 F.3d 187 (2d Cir. 2003) ........................................................... 40

*Orthovita, Inc. v. Erbe*,
   2008 WL 423446 (E.D. Pa. Feb. 14, 2008) ................................... 48

*Perelman v. Perelman*,
   545 F. App'x 142 (3d Cir. 2013) .................................................... 41

*In re Pfizer Inc. Secs. Litig.*,
   584 F. Supp. 2d 621 (S.D.N.Y. 2008) ........................................... 24

*In re Platinum & Palladium Antitrust Litig.*,
   2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) ............................... 13

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
   2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) .................................. 36

*In re Propanolol Antitrust Litig.*,
   249 F. Supp. 3d 712 (S.D.N.Y. 2017) ..................................... 15, 21

*In re Roberts' Estate*,
   112 A.2d 394 (Pa. 1955) ........................................................... 46, 47

*Slamon v. Carrizo (Marcellus) LLC*,
   2017 WL 3877856 (M.D. Pa. Sept. 5, 2017) ................................. 42

*Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*,
   366 F. Supp. 3d 516 (S.D.N.Y. 2018) ..................................... 13, 34

*Starr v. Sony BMG Music Entm't,*
    592 F.3d 314 (2d Cir. 2010) ........................................................ 20, 21

*State of N.Y. v. Hendrickson Bros.,*
    840 F.2d 1065 (2d Cir. 1988) ...................................................... 36, 38

*In re Sumitomo Copper Litig.,*
    120 F. Supp. 2d 328 (S.D.N.Y. 2000) ............................................... 41

*Supermarket of Homes v. San Fernando Valley Bd. of Realtors,*
    1983 WL 2199 (C.D. Cal. Sept. 1, 1983) ....................................... 34, 35

*Sweigart v. Sweigart,*
    2015 WL 7760335 (Pa. Super. Ct. Dec. 2, 2015) ........................... 49, 50

*Tobacco Tech., Inc. v. Taiga Int'l N.V.,*
    2007 WL 644463 (D. Md. Feb. 26, 2007) ........................................... 47

*Todd v. Exxon Corp.,*
    275 F.3d 191 (2d Cir. 2001) ............................................................. 34

*Topline Solutions, Inc. v. Sandler Sys., Inc.,*
    2017 WL 1862445 (D. Md. May 8, 2017) ........................................... 42

*Turkish v. Kasenetz,*
    27 F.3d 23 (2d. Cir. 1994) ............................................................... 50

*Twombly v. Bell Atlantic Corp.,*
    425 F.3d 99 (2d Cir. 2005) .............................................................. 22

*U.S. v. Socony-Vacuum Oil Co.,*
    310 U.S. 150 (1940) ........................................................................ 33

*United States v. Apple Inc.,*
    952 F. Supp. 2d 638 (S.D.N.Y. 2013), *aff'd,* 791 F.3d 290 (2d Cir. 2015) ............................ 15

*United States v. Apple, Inc.,*
    791 F.3d 290 (2d Cir. 2015) ...................................................... 3, 9, 33

*United States v. Marr,*
    2017 WL 1540815 (N.D. Cal. Apr. 28, 2017) ..................................... 34

*United States v. Snow,*
    462 F.3d 55 (2d Cir. 2006), *cert. denied,* 549 U.S. 1150 (2007) ............ 10

*United States v. Soc'y of Ind. Gasoline Marketers of Am.,*
    624 F.2d 461 (4th Cir. 1979) ........................................................... 34

*Vincent v. Money Store*,
   304 F.R.D. 446 (S.D.N.Y. 2015) ................................................................ 36

*Wacker v. JP Morgan Chase & Co.*,
   678 Fed. App'x 27 (2d. Cir. 2017) ..................................................... 10, 26

*William Wrigley Jr. Co. v. Waters*,
   890 F.2d 594 (2d Cir. 1989) ...................................................................... 46

*Window Headquarters, Inc. v. MAI Basic Four, Inc.*,
   1993 WL 312899 (S.D.N.Y. Aug. 12, 1993)............................................. 44

*Woori Bank v. Merrill Lynch*,
   923 F. Supp. 2d 491 (S.D.N.Y. 2013) ...................................................... 37

## Statutes and Rules

15 U.S.C. § 78o-4(c)(1) ................................................................................... 48

79 Fed. Reg. 47735, 47912  (Aug. 14, 2014)................................................. 28

F.R.C.P. Rule 12(b)(6).............................................................................. 10, 23

Md. Code, Cts. & Jud. Proc. § 5-203 ............................................................. 42

MSRB Rule G-42............................................................................................. 48

## Additional Authorities

Board of Governors of the Federal Reserve System, *Commercial Paper Funding Facility
   (CPFF)* (February 12, 2016 )....................................................................... 27

*City of Philadelphia, Pennsylvania Airport Revenue Refunding Bonds, Series 2005C*
   (June 2, 2005) ............................................................................................... 19

Federal Reserve Bank of New York*, Commercial Paper Funding Facility: Frequently
   Asked Questions*, https://www.newyorkfed.org/markets/cpff_faq.html (Oct. 19, 2009) ......... 28

## PRELIMINARY STATEMENT

This case involves a conspiracy by Defendants to inflate the interest rates for Variable Rate Demand Obligations ("VRDOs"), which are issued by public entities to raise money to fund their operations, as well as critically important infrastructure and public services.  The interest rates that public entities pay on these primarily tax-exempt bonds are reset on a periodic basis, typically weekly, allowing issuers to borrow money for long periods of time while paying short-term interest rates.  CAC ¶¶ 2-3.  Plaintiffs The City of Philadelphia, the Mayor and City Council of Baltimore, and other members of the proposed class hired Defendants as remarketing agents (or "RMAs") and paid them hundreds of millions of dollars in fees to reset the bonds' interest rates *at the lowest possible rate*.  *Id*. ¶¶ 1-4.  Instead of fulfilling that responsibility and competing against each other for remarketing business, Defendants colluded to *inflate* VRDO rates, to the detriment of issuers such as Plaintiffs and their constituents.  *Id*. ¶¶ 5, 15.

The Complaint (Dkt. No. 107) ("CAC") explains exactly how Defendants (including the specific individuals and business units involved) accomplished this conspiracy by engaging in almost daily communications with one another about the *future* interest rates they planned to set later the same day, and the amount of VRDOs they held in inventory, a key factor driving future rate resets.  *Id*. ¶¶ 91-103, 105.  And the Complaint details Defendants' motive for engaging in their scheme:  by keeping rates artificially high, Defendants prevented investors from exercising their rights to "put" VRDOs back to Defendants on a widespread basis, enabling Defendants to collect remarketing fees from issuers for doing essentially no work, while also ensuring that Defendants would not have to take tendered bonds onto their own balance sheets.  *Id*. ¶¶ 14, 104, 114.  Absent Defendants' active coordination of VRDO rate-setting, a Defendant that set higher rates than its competitors would be at risk of losing its clients to those competitors.  *Id*. ¶ 5.

The Complaint also demonstrates that the conspiracy had its desired economic effect. The detailed statistical analyses set out in the Complaint show that the conspiracy caused the interest rates paid by issuers to be artificially inflated for several years, until the conspiracy broke apart amid burgeoning government investigations into Defendants' rate-setting conduct in late 2015 and 2016.  *Id*. ¶¶ 124-51.  When all of these factual allegations are properly considered as a whole, the Complaint more than satisfies the *Twombly* plausibility standard.

Defendants' own arguments make this clear.  In the face of the Complaint's robust factual allegations, Defendants resort to wholly mischaracterizing the alleged conspiracy.  First, Defendants present the conspiracy as one of such "staggering scope" as to make it fundamentally implausible.  Br. 1.  Defendants argue, for example, that the conspiracy required reaching individual agreements on specific rates for each and "every one" of the VRDOs they remarketed, amounting to "hundreds of thousands of interest rates in all" during the Class Period.  *Id*.  But the Complaint sets forth facts—based on statements from former industry insiders and employees of Defendants—explaining why the alleged conspiracy was staggeringly simple:  by routinely sharing the "base rates" they used as benchmarks for the rates of *all* the individual VRDOs that they remarketed, Defendants were able to easily coordinate and implement artificially high rates for "thousands of VRDO rates in a single stroke."  CAC ¶¶ 102, 155-56.

The Complaint's plausibility is also reflected by Defendants' desperate attempt to discredit Plaintiffs' economic analyses through their own counter-narrative of alternative explanations—premised almost entirely on the improper use of materials outside the Complaint—for the anomalous behavior of VRDO rates during the Class Period.  *See, e.g.*, Br. 7-9, 13-20.  Putting aside that the pleading stage is no place for a *Daubert*-style inquiry into "expert" analysis, Defendants' economic counter-narratives are unpersuasive and misleading.

As just one example, Defendants assert that a Federal Reserve "liquidity backstop" program introduced in 2008 had the effect of distorting commercial paper rates, one of the inputs to Plaintiffs' model, *see* Br. 19-20, but neglect to inform the Court that the program was phased out in 2010—nearly six years before the end of the conspiracy period—and did not even apply to the relevant type of commercial paper analyzed by Plaintiffs.

Defendants also seek to sidestep the Complaint's factual allegations by whitewashing their rampant communications about *future* rate-setting and other competitively sensitive information as nothing more than "pro-competitive" "market intelligence" gathering.  Br. 33. Based on this tortured framing of the allegations, Defendants argue that the rule of reason standard, as opposed to the *per se* rule, should apply.  But far from being "routine market conduct," Br. 28, the communications alleged in the Complaint were the very mechanism through which Defendants implemented a conspiracy designed to ensure artificially high VRDO rates.  Such coordination constitutes a *per se* violation even if Defendants did not "fix" the specific price of each and every VRDO rate.  *See, e.g.*, *United States v. Apple, Inc.*, 791 F.3d 290, 327 (2d Cir. 2015) (recognizing that "*per se* condemnation is not limited to agreements that literally set . . . prices" and finding a "coordinated effort to raise prices across the relevant market" was a *per se* violation).

The Court should reject Defendants' strawman attacks on their own mischaracterizations of the alleged conspiracy.  When the Complaint's allegations are considered as a whole, and reasonable inferences made in Plaintiffs' favor, as is required at the pleading stage, the Complaint easily states a plausible conspiracy claim.  Defendants' arguments that Plaintiffs' claims are time-barred and their attacks on Plaintiffs' state-law causes of action are equally flawed.  Defendants' motion should be denied in its entirety.

## SUMMARY OF FACTUAL ALLEGATIONS

### A.     The VRDO Market

VRDOs are issued by municipalities and other public or charitable entities such as schools and community organizations to raise funds for operating expenses, infrastructure projects, and public services.  CAC ¶ 2.  They are primarily tax-exempt bonds with interest rates reset on a periodic basis, typically weekly.  *Id.*  Notably, the bonds include a built-in "put" feature that allows investors to redeem the bond at any periodic reset date at face value ("par") plus any accrued interest.  *Id.* ¶ 3.

To manage the bonds, issuers of VRDOs like Plaintiffs contract with Defendants to act as RMAs.  RMAs have two primary jobs under these remarketing agreements for each individual VRDO they manage for their issuer-clients:  (1) resetting the interest rate at the lowest possible rate that would permit the bonds to trade at par, and (2) actively remarketing any bonds when prior holders exercise the put right.  *Id.* ¶ 64.  For these services, issuers pay RMAs remarketing fees, which averaged approximately 10 basis points of the VRDO debt balance during the Class Period.  *Id.* ¶ 65.

VRDOs are typically secured by letters of credit, in which liquidity providers agree to purchase the VRDO if the RMA is unable to find a new investor for the tendered securities.  *Id.* ¶¶ 73-74.  On a given VRDO issuance, the liquidity provider and the RMA are often the same entity.  *Id.* ¶ 74.  The letter of credit fees paid by issuers ranged from approximately 50 to 150 basis points of the debt balance of the VRDO during the Class Period.  *Id.*

Defendants—who served as RMAs for approximately 75% of all VRDOs issued in the United States during the Class Period—market themselves to issuers as the banks best able to fulfill the RMA's responsibilities and achieve the lowest cost of borrowing for issuers.  *Id.* ¶¶ 66-68.  For example, Defendant Citi represented that its "approach to remarketing the [VRDOs] will

be to secure the lowest possible interest rates" by offering VRDOs to the "most diverse group of investors possible." *Id*. ¶¶ 67, 89.  Other Defendants' marketing materials were replete with similar representations concerning the active and individualized nature of their respective remarketing approaches.  *Id*. ¶¶ 67-68, 89.

## B.     Defendants' Conspiracy to Inflate VRDO Interest Rates

Rather than use their networks and expertise to remarket bonds at the lowest interest rate, Defendants coordinated their rate resets to ensure VRDO rates were set at artificially high levels. *Id*. ¶¶ 6-13, 91-118.  As discussed below, Defendants accomplished this conspiracy through a variety of methods, but their primary means was by coordinating with each other on the "base rates" that were the basis for their VRDO rate resets.  *Id*. ¶¶ 12, 91, 102, 155.

For example, after a particular VRDO was issued, a Defendant would set that VRDO's rate at a spread of 40 basis points above the base rate; if the base rate increased by two basis points the following week, the Defendant would set the VRDO's rate at 40 basis points above that new base rate.  *Id*. ¶ 102.  Thus, by simply communicating what base rate they intended to apply in upcoming rate resets—and despite their obligation to actively and individually market and price VRDOs at the lowest possible interest rates—the cartel was able to coordinate rate changes for hundreds or even thousands of bonds at a time.  *Id*. ¶¶ 102, 155-56.

According to industry insiders, senior personnel sitting within Defendants' Municipal Securities Groups, which housed the Short-Term Products desks on which Defendants ran their VRDO operations, communicated base-rate information on an almost *daily* basis.  *Id*. ¶¶ 11-12, 91, 96, 99-101.  A former senior RMA personnel at JPMorgan explained that it was a "dirty little secret" that Defendants would talk to each other about rates, including discussing what specific rates they planned to set for particular VRDOs.  *Id*. ¶ 101.

Defendants also communicated base rate information through the use of J.J. Kenny Drake Inc.'s ("J.J. Kenny") indexing service.  J.J. Kenny's Joe Luparello would call Defendants' RMA desks multiple times a week, just prior to the resets for the majority of VRDOs, and ask Defendants what rate they intended to use for their "weekly high grade" VRDOs.  *Id.* ¶ 108. Defendants provided these future rates based on the understanding that other Defendants were doing the same.  *Id.* ¶ 109.  Luparello published the average of all the submitted rates in an email that Defendants would receive *before* they reset their rates at the end of the day.  *Id.* ¶¶ 109-10.

The J.J. Kenny "index" was not simply an aggregation of historical pricing data.  Because it was based on a poll of RMAs that was conducted before their weekly rate resets—and *released prior to* those resets—the index enabled Defendants to confirm where the other Defendants would reset rates *in advance*, and to adjust their own planned VRDO rates accordingly.  *Id.* ¶¶ 107-12.  It is therefore not surprising that Defendants continued to pay for access to the J.J. Kenny service for years after actual *historical* pricing information became available to the market.  *Id.* ¶ 112.

Although the information conveyed by the J.J. Kenny index made it possible for Defendants to coordinate even without speaking directly to each other, Defendants left nothing to chance, and regularly used the results of the index to *explicitly* collude about their rates in direct communications.  *Id.* ¶ 111.  Defendants' use of the J.J. Kenny index to explicitly collude on rates is confirmed by a high-ranking industry insider, who stated that personnel on each of Defendants' sales desks routinely would call salespeople at other Defendant banks to confirm that the rates they would be resetting later that day would be in line with the index.  *Id.*

Senior personnel within the Municipal Securities Groups of each Defendant took further steps to coordinate by routinely sharing proprietary, nonpublic information about the levels of

VRDO inventory they held on their books.  *Id.* ¶¶ 12, 105.  Defendants also exchanged inventory levels through their use of computerized systems such as Dalcomp and Ipreo, which allowed Defendants to share inventory levels instantaneously and without overt communication.  *Id.* ¶ 113.  According to a former senior RMA at Defendant Wells Fargo, knowing the amount of inventory held by a competitor would provide an RMA with a "pretty good idea" of the competitor's planned rate resets, as rate resets were highly correlated to inventory levels.  *Id.* ¶ 105.  Thus, Defendants with low inventory levels were able to set rates high enough to ensure they did not undercut the rates of Defendants with higher inventory levels, who were highly motivated to set rates high in order to reduce their inventory.  *Id.*

> ### C.     <u>Regulatory Investigations</u>

A whistleblower brought Defendants' collusion to the attention of government authorities in late 2015, leading the Securities Exchange Commission ("SEC") to begin an investigation into the whistleblower's claim that RMAs (including Defendants) were engaged in a scheme to defraud issuers through the inflation of VRDO interest rates.  *Id.* ¶¶ 120-22.  In August 2016, the Antitrust Division of the U.S. Department of Justice ("DOJ") launched a criminal investigation into Defendants' remarketing practices.  *Id.* ¶¶ 8, 123.  To date, both the SEC and DOJ investigations remain active.  *Id.*

> ### D.     <u>Economic Analyses Demonstrate the Impact of Defendants' Conspiracy</u>

Two statistical analyses demonstrate that Defendants' conspiracy had the effect of significantly inflating VRDO interest rates to artificially high levels during the Class Period.

*First*, Plaintiffs built a regression model to analyze what Defendants' VRDO rates *should have* been in the period prior to December 2015.  *Id.* ¶ 126.  Plaintiffs seeded this model with data on Defendants' actual VRDO rates from December 2015 to February 2019, as the data from that period would be relatively free from the impact of Defendants' alleged conspiracy because it

spans the period after which regulatory authorities began investigating Defendants' collusive conduct.

This model predicts what Defendant's VRDO rates should have been by estimating the ratio of Defendants' VRDO rates to 7-day AA financial commercial paper.  *Id*. ¶ 127.  Because of the core similarities and corresponding risk profiles of these securities, each of which are short-term in nature and backed by major financial institutions, one would not expect the relationship between these two types of securities to change drastically during the Class Period. Nonetheless, to control for the effect that changes in non-collusive, legitimate market factors might have had on the relationship between these two securities—*e.g.*, changes in the relative demand for municipal debt over time or the perceived relative risk of default by municipal versus corporate issuers—Plaintiffs' model incorporates as an explanatory variable the ratio of the yields for 1-year AAA corporate debt to 1-year AAA municipal debt.  *Id*. ¶ 128.

Plaintiffs applied the resulting model coefficients that were generated during the "clean" post-December 2015 period to the actual historical values of the model's explanatory factors, including rates for 7-day AA financial commercial paper and the ratio of 1-year AAA corporate debt yields to 1-year AAA municipal debt yields during the period *prior* to December 2015.  *Id*. ¶ 129.  The model demonstrates Defendants' actual rates during the alleged conspiracy were substantially higher than Defendants' "but-for" rates during that same period, by statistically significant margins.  *Id*. ¶ 129-31.

*Second*, to examine the extent to which Defendants' artificially high rates could be seen across the entire VRDO market, Plaintiffs built a similar regression model using (a) data from the SIFMA swap index, which tracks the weekly average interest rates for a broad range of highly-rated VRDOs, and (b) actual SIFMA rates from a broad, multi-year period (January 2000

through July 2007) as the "clean" period data.  *Id*. ¶¶ 132-33.  When the resulting explanatory variables from the "clean" period are applied during the period from August 2007 to February 2019 to generate a "but for" SIFMA index, the results show that from August 2007 through November 30, 2015, the actual SIFMA index rate was, on average, nearly 75% higher than the "but-for" SIFMA rate.  *Id*. ¶ 134.

In addition to these regression models showing artificially high rates, Plaintiffs analyzed the patterns of the VRDO rates set by each Defendant to determine the degree to which those rates "clustered" together, regardless of the individual characteristics of the VRDOs.  *Id*. ¶ 145. This "clustering" analysis, represented graphically in 12 charts in the Complaint, showed persistent levels of clustering—at either the exact same interest rate level or level of week-over-week interest rate changes—beginning at least as early as April 2009 (when data on Defendants' own rates is first available) until early 2016, when the unusual clustering abruptly lessened.  *Id*. ¶¶ 146, 151.  In other words, Defendants were routinely setting their varied VRDOs at the same rates and changing those rates in lockstep, and that clustering abated in early 2016—around the time Defendants' conduct became known to government investigators.  *Id*. ¶ 151.

## ARGUMENT

## I.    THE COMPLAINT PLAUSIBLY PLEADS A CONSPIRACY

### A.    Defendants Disregard the Relevant Legal Standards

An antitrust complaint must "plausibly" allege the existence of an unlawful agreement by setting forth "enough factual matter (taken as true) to suggest that an agreement was made."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007).  Such an agreement may be "tacit or express."  *Apple*, 791 F.3d at 314-15.  In making this determination, the Court must accept factual allegations as true and draw all reasonable inferences and resolve all conflicts and ambiguities in favor of the plaintiffs.  *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162,

184-85 (2d Cir. 2012).  Thus, even if "an innocuous interpretation of the defendants' conduct

may be plausible, that does not mean that the plaintiff's allegation that the conduct was culpable

is not also plausible," and "it is not the province of the court to dismiss the Complaint on the

basis of the court's choice among competing plausible alternatives."  *Id*. at 190; *see also Alaska

Elec. Pension Fund v. Bank of Am. Corp.* ("*ISDAfix*"*)*, 175 F. Supp. 3d 44, 55-56 (S.D.N.Y.

2016) (conspiracy allegations, taken together, satisfied *Twombly* even where "Defendants offer

plausible non-collusive explanations").

 Moreover, in evaluating plausibility, the Complaint must be "read as a whole," *Anderson

News*, 680 F.3d at 190, and should not "be judged by dismembering it and viewing its separate

parts," *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).  There is no

heightened pleading standard in antitrust cases, and at the pleading stage, plaintiffs need only

"raise a reasonable expectation that discovery will reveal evidence of illegality."  *Wacker v. JP

Morgan Chase & Co.*, 678 Fed. App'x 27, 30 (2d. Cir. 2017).

 An antitrust plaintiff can state a plausible claim by alleging either "direct" or

"circumstantial" evidence.  *Anderson News*, 680 F.3d at 184.  Because "conspiracy by its very

nature is a secretive operation," *United States v. Snow,* 462 F.3d 55, 68 (2d Cir. 2006), *cert.

denied,* 549 U.S. 1150 (2007), conspiracies "nearly always must be proven through inferences

that may fairly be drawn from the behavior of the alleged conspirators," *Anderson News*, 680

F.3d at 183.

 On a Rule 12(b)(6) motion to dismiss, "the only facts to be considered are those alleged

in the Complaint, and the court must accept them, drawing all reasonable inferences in the

plaintiff's favor."  *Iowa Public Employees' Retirement Sys. v. Merrill Lynch, Pierce, Fenner &

Smith Inc.*, 340 F. Supp. 3d 285, 311 (S.D.N.Y. 2018).  Courts may, under limited circumstances,

take "judicial notice" of extrinsic materials, but may not consider materials that are subject to reasonable dispute or for "the truth of the matters asserted." *Int'l Star Class Yacht Racing Ass'n. v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998); *see also Glob. Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006) (error to rely on external materials "to make a finding of fact that *controverted* the plaintiff's own factual assertions"). Even then, extrinsic materials should not be consulted unless the Complaint relies upon them heavily for their "terms and effect." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

Defendants consistently flout these established legal principles. They systematically mischaracterize, dismember, or ignore well-pleaded factual allegations and then ask the Court to reject the truth of the Complaint's factual allegations based on their own say-so or "facts" drawn from outside the Complaint's four corners. One particularly egregious example is Defendants' summary of so-called "facts" at pages 6-8 of their memorandum of law, which is based on "facts" found nowhere in the Complaint and includes what amounts to an expert "rebuttal" chart based on extrinsic sources. *See* Br. 8 (including chart of federal funds rate against the SIFMA index). Such improper efforts should be rejected.

### B. The Complaint Plausibly Alleges the Existence of an Unlawful Agreement

Defendants conspired to maintain artificially inflated VRDO rates, forcing issuers to pay higher interest rates than they otherwise would have, and allowing Defendants to earn fees from Plaintiffs and other members of the proposed Class for doing essentially nothing. The Complaint describes multiple means by which Defendants accomplished this conspiracy, including near-daily communications about planned changes to base rates and commercially sensitive information about VRDO inventory levels. CAC ¶¶ 12, 91, 101-02, 105, 113, 155-56. The Complaint identifies the specific personnel and business units that carried out the conspiracy, *id.*

¶¶ 9, 11, 91, 93, 96; quotes specific language Defendants used in their communications, *id.* ¶¶ 12, 101, 105; and describes non-public information regarding the status of government investigations into Defendants' conduct, *id.* ¶¶ 120-23.  These allegations are based on information obtained from high-level insiders, including Defendants' own former employees, *id.* ¶¶ 101, 103-06, 111, 116, 118, and they are buttressed by several robust economic analyses showing the impact of Defendants' conspiracy on VRDO rates, *id.* ¶¶ 124-44.  Read in the context of the entire Complaint, these detailed allegations (among others) are sufficient to plausibly allege the existence of an unlawful agreement.

Defendants argue that the Complaint alleges a conspiracy of "staggering proportions" that would have required Defendants to agree on every interest rate set by Defendants on each bond they remarketed over the entire Class Period.  Br. 1.  Defendants also maintain that the Complaint alleges no "conspiratorial communications" or "meaningful parallel conduct."  *Id.* These arguments ignore the plain allegations of the Complaint, and courts have deemed inappropriate similar attempts to mischaracterize plaintiffs' claims on a motion to dismiss.  *See, e.g.*, *In re London Silver Fixing Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 554 (S.D.N.Y. 2016) ("*Silver*") (rejecting Defendants' attempt to "mischaracterize[] Plaintiffs' claims" on motion to dismiss).

*First*, the Complaint does not allege that Defendants specifically "fixed" every rate set by Defendants for every VRDO they remarketed during the Class Period, nor does it need to. Rather, the Complaint alleges that Defendants agreed not to compete against each other in the market for remarketing services by keeping VRDO rates artificially high.  *See* CAC ¶ 10.  The conspiracy did not require Defendants to reach agreements on the interest rates they set for each and every VRDO.  Rather, they needed only to share the "base rate" that they used to make the

initial rate determinations for VRDOs.  *See id*. ¶¶ 12, 91, 100, 102.  Because Defendants set their

actual VRDO rates at a spread relative to the base rates, sharing changes in base rates allowed

Defendants to coordinate their rate resets on large numbers of VRDOs at a time.  *Id*.  The sharing

of base rates provided Defendants with a simple mechanism by which the conspiracy could be

implemented across thousands of VRDO bonds, without the need to communicate the rates for

every single VRDO in the market.  Far from being "staggering" in scope and complexity,

Defendants' conspiracy was extraordinarily simple to implement and maintain.  *See In re GSE*

*Bonds Antitrust Litig.*, 2019 WL 4071070, at *6 (S.D.N.Y. Aug. 29, 2019) ("*GSE Bonds*")

(finding alleged conspiracy plausible because, "contrary to defendants' claims, this particular

conspiracy does not seem to have required much coordination").

      Here, the Complaint alleges that Defendants communicated regularly (even daily) about

their base rates and other important factors impacting those rates and that their pricing was

supracompetitive.  Courts have regularly found such allegations sufficient to allege a plausible

conspiracy.  *See, e.g.*, *Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp.

3d 516, 519-20 (S.D.N.Y. 2018) (denying motion to dismiss where complaint alleged "that

Defendants collusively shared information to coordinate their [rate] submissions and engaged in

manipulative trading practices to fix the prices . . .  for their collective financial benefit."); *In re*

*Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *12 (S.D.N.Y. Mar. 28, 2017)

(finding conspiracy plausibly alleged where "(1) Defendants engaged in direct exchange of

pricing information during the Fixing Calls; (2) the information exchange occurred among a

small group of dominant market players; [and] (3) the communications between Defendants were private").[1]

*Second*, far from failing to allege any "conspiratorial communications," the Complaint alleges that Defendants engaged in a plethora of communications to carry out their conspiracy. These included direct communications of both base rates and inventory levels among senior personnel within Defendants' Municipal Securities Groups, with the Complaint identifying the specific personnel from each Defendant bank who were party to these communications. CAC ¶¶ 96-99. The conspiratorial communications also included Defendants' VRDO trading and sales personnel, who regularly exchanged base rates and inventory levels in person, on telephone calls, and through Bloomberg chat rooms. *Id.* ¶ 11, 101, 111. Communications among Defendants' sales personnel included regular calls following the release of the J.J. Kenny index, in which these personnel *expressly confirmed* that the rates Defendants would be resetting later that day would be in line with the average rates released by J.J. Kenny. *Id.* ¶ 111.

Even without the benefit of discovery, the Complaint also details specific phrases used in many of these communications, such as asking whether competitors were "going high or going low" with their VRDO rates, or "what will be the rate" they planned to set for specific VRDOs. *Id.* ¶¶ 12, 101. These allegations are based on interviews with high-level insiders who worked within Defendants' Municipal Securities Groups and remarketing desks during the Class Period,

---

[1] *See also In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 591 (S.D.N.Y. 2015) (denying motion to dismiss where complaint alleged that "traders from the Defendant banks used various electronic communications platforms, particularly chat rooms and instant messaging, to share 'market-sensitive information with rivals' including price-information, customer information and their net trading positions before the setting of the [foreign exchange benchmark]").

including a former managing director at Defendant Citi, former senior personnel at Defendant

JPMorgan, and a former RMA at Defendant Wells Fargo.  *See, e.g.*, *id.* ¶ 11, 101, 105-06, 116.

In short, the Complaint alleges not only that Defendants were routinely engaged in

conspiratorial communications regarding the rates they planned to set, but also the employees

involved in these communications, the means they used to communicate, the subject of their

discussions, and even the language they employed.  Such allegations of communications, read in

the context of the entire Complaint, are more than sufficient to allege a plausible conspiracy.[2]

*Third*, the Complaint sufficiently alleges parallel conduct by Defendants.  As an initial

matter, Defendants concede that the Complaint *does* allege parallel conduct:  Defendants'

coordination of rate resets, evidenced by the high degree of clustering in the rates and rate

changes for VRDOs remarketed by Defendants during the Class Period, clustering which

declined by a statistically significant amount in early 2016, around the time Defendants' conduct

became known to government investigators.  *See* Br. 13.  This is highly orchestrated conduct that

would only result from a common plan.  *See United States v. Apple Inc.*, 952 F. Supp. 2d 638,

690 (S.D.N.Y. 2013), *aff'd*, 791 F.3d 290 (2d Cir. 2015) ("An abrupt shift from defendants' past

---

[2]   *See In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 722-23 (S.D.N.Y. 2017)
(plausible conspiracy where plaintiffs alleged meetings at which defendants "discuss[ed] and
share[d] upcoming bids . . . among other competitively-sensitive information," that "defendants'
attendees were responsible for setting drug prices" and that the purpose of defendants' meetings
"were to provide . . . "one-on-one strategic meetings" and "strategic business discussions"); *In re
Air Cargo Shipping Servs. Antitrust Litig.*, 2010 WL 10947344, at *11 (E.D.N.Y. Sept. 22, 2010)
(rejecting defendants' characterization of plaintiffs' allegations "as 'bare conclusions' or 'naked
assertions'" where the "allegations establish who [defendant] spoke with, what was discussed
and agreed upon, and provide a general time frame, although it is extremely broad and covers
most of the life of the conspiracy"); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F.
Supp. 2d 1348, 1362 (N.D. Ga. 2010) (finding that "Plaintiffs' complaint is not lacking in detail"
where plaintiffs alleged "how and when the alleged conspiracy was reached, who was involved
in the alleged collusive communications, the content of the communications," and "the changed
business practices following the collusive communications").

behavior and near-unanimity of action by several defendants may also strengthen the inference."); *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 676 (S.D.N.Y. 2012) (noting the "sudden and dramatic change in the business practices" of defendants).

Defendants' assertion that Plaintiffs' clustering allegations are the only parallel conduct alleged in the Complaint, *see* Br. 13, ignores both the Complaint's allegations and the nature of this case. As the Complaint alleges, the *entire conspiracy* was based on Defendants' agreement to act in parallel fashion to maintain artificially high VRDO rates, which they succeeded in doing throughout the conspiracy. *See, e.g.*, CAC ¶¶ 99-06 (sharing base rates and inventory levels to coordinate rates); *id.* ¶¶ 107-12, (regular use of J.J. Kenny to coordinate their rates and ensure that no Defendant broke ranks from the conspiracy); *id.* ¶ 113 (use of inventory management software systems by all Defendants to permit information sharing without need for direct communication); *id.* ¶¶ 126-31 (statistical analysis showing rates set by Defendants were substantially inflated throughout the conspiracy).

Defendants ignore these allegations and focus solely on Plaintiffs' clustering allegations, which they attempt to dismiss with counter-factual, alternative explanations (improperly based on materials outside the Complaint) for why rates may have clustered at higher levels during the Class Period. As discussed below, *see* Section I.D., Defendants' alternative explanations are not convincing on their merits. Nor can they be taken seriously in light of the Complaint's allegations that Defendants routinely shared their base rates and planned rate changes with each other. Tellingly, Defendants do not (and cannot) offer *any* legitimate, non-conspiratorial explanation for such communications.

The Complaint contains detailed factual allegations that set forth the specific and plausible mechanisms that Defendants used to effectuate the conspiracy and the business units

and employees (including the names of specific employees) who carried it out.  The Complaint

also includes several robust statistical analyses that are probative of collusion and demonstrate

the impact of Defendants' conspiracy.  *Id*. ¶¶ 124-44.  Taking the Complaint's allegations "as a

whole," *Anderson News*, 680 F.3d at 190, as the Court must, the Complaint plausibly alleges the

existence of an unlawful agreement.

       C.      **The Complaint Alleges Numerous "Plus Factors"**

      The Complaint also sets forth a number of "plus factors" that further support the

plausibility of the conspiracy.

           1.    *Defendants shared a common motive to conspire*

      A "common motive to conspire" is indicative of conspiracy.  *Apex Oil Co. v. DiMauro*,

822 F.2d 246, 254 (2d Cir. 1987); *see also In re Flat Glass Antitrust Litig*., 385 F.3d 350, 360

(3d Cir. 2004) (stating that "evidence that the defendant had a motive to enter into a price fixing

conspiracy" is a plus factor indicative of conspiracy).

      Defendants' collusion to achieve artificially high interest rates was designed to

"maximize the likelihood that existing holders of VRDOs would not 'put' their bonds back to

Defendants."  CAC ¶ 114.  When existing holders of VRDOs put those bonds back, it forced the

Defendant RMAs to do two things: (i) spend time and resources remarketing the bonds to *new*

investors, and (ii) hold those bonds in inventory during that remarketing.  *Id*. ¶¶ 14, 114, 157.

Defendants had a common motivation to avoid both these obligations so that they could earn

remarketing and letter of credit fees for doing, essentially, nothing.  *Id*. ¶¶ 114, 157, 174, 193.

The personnel employed on Defendants' remarketing desks were further motivated by fear of

retaliation from senior management, which applied constant pressure on RMAs to "artificially

prop up interest rates" to keep the bonds out of inventory, according to one insider.  *Id*. ¶ 104.

Defendants also knew, however, they could not maintain artificially high rates on their own.  Absent coordination among the competing RMAs, Defendants with rates higher than their competitors would be at risk of losing their clients to those competitors.  *Id.* ¶ 103.  According to one former senior RMA at a Defendant bank, "no one wants to stand out" when it comes to setting rates.  *Id.*  The Complaint's allegations are more than sufficient to satisfy the common-motive plus factor.  *Cf. ISDAfix*, 175 F. Supp. 3d at 55 (plus factor present where plaintiffs alleged defendants shared joint motivation to maximize profits by manipulating benchmark).

Largely ignoring all of this, Defendants maintain that the Complaint sets forth no plausible motive to conspire because it is the liquidity providers, not the RMAs themselves, who had the contractual obligation to purchase VRDOs that had been put back to RMAs and ultimately could not be placed with investors through the RMAs' remarketing efforts.  Br. 23-24.  Defendants' argument is meritless for two reasons.

*First*, regardless of what entity was contractually obligated to purchase bonds that could not be placed by RMAs *after their attempts at remarketing*, keeping rates artificially high ensured that investors would not exercise their put options, which in turn ensured that Defendants would not have to expend time and resources on remarketing tendered bonds in the first place.  *See* CAC ¶¶ 14, 154.  The conspiracy thus ensured that Defendants could continue to collect remarketing fees for doing essentially nothing.  *Id.*

*Second*, even if liquidity providers (which were often the same Defendants who acted as remarketing agents for VRDOs, *see id.* ¶¶ 74, 115) bore the ultimate contractual obligation to purchase bonds that RMAs failed to place in the remarketing process, Defendants do not (and cannot) dispute that it was *Defendants*, in their role as RMAs, who in the first instance purchased VRDOs that were tendered by investors as putbacks.  Indeed, RMAs not only were authorized to

18

purchase bonds that were put back by investors, but RMAs "routinely" did so, acting as liquidity providers of first resort to avoid drawing on the liquidity facility.[3]  *See id.* ¶ 61 (VRDO investors could "receive the full amount of principal and accrued interest due on the bond by tendering it back *to the RMA*" (emphasis added)).  Thus, as the Complaint alleges, preventing investors from putting back VRDOs enabled Defendants to avoid both the cost of carrying and the balance sheet risk of this inventory.  *See id.* ¶ 114; *see also id.* ¶ 116 (former head of Defendant JPMorgan's VRDO desk explaining that RMAs "would set the rate wherever they had to keep the paper off their balance sheet").

### 2.     *Defendants engaged in a high level of interfirm communications*

The Complaint alleges that Defendants engaged in a high level of interfirm communications, a recognized plus factor.  *See Apex*, 822 F.2d at 254 (holding that "a high level of interfirm communications" supports inference of conspiracy).  Indeed, based on information learned from industry insiders and Defendants' former RMA personnel, the Complaint alleges direct communications among senior personnel in Defendants' Municipal Securities Groups and on Defendants' remarketing desks on an almost daily basis about VRDO base rates and other competitively sensitive information, CAC ¶¶ 9, 11-12, 99-101, and communications of future rate changes among Defendants to ensure that their rate changes stayed in line with the J.J. Kenny index, *id.* ¶ 111.  *See supra* at Section I.B.

---

[3]    *See, e.g.*, *City of Philadelphia, Pennsylvania Airport Revenue Refunding Bonds, Series 2005C* (June 2, 2005) at 41, at https://emma.msrb.org/MS277362-MS275466-MD558794.pdf ("The Remarketing Agent is permitted, but not obligated, to purchase tendered 2005C Bonds for its own account and, in its sole discretion, *routinely acquires such tendered 2005C Bonds* in order to achieve a successful remarketing of the 2005C Bonds (*i.e.*, because there otherwise are not enough buyers to purchase the 2005C Bonds) or for other reasons.") (emphasis added).

In light of these allegations, Defendants' assertion that the Complaint contains "[n]o high level of interfirm communications" cannot be taken seriously.  Br. 25.  Numerous courts have found that such allegations (as well as far fewer conspiratorial communications) adequately satisfy this "plus factor."  *See, e.g.*, *In re High Pressure Laminates Antitrust Litig.*, 2006 WL 1317023, at *4 (S.D.N.Y. May 15, 2006) (evidence of interfirm communications as well as the use of trade associations to facilitate communications constituted plus factors despite characterization of the chatter as sharing of normal market information); *see also In re Flat Glass*, 385 F.3d at 369 (affirming that inter-firm communications that facilitate price setting are circumstantial evidence of a conspiracy).  Defendants' assertion that the alleged interfirm communications are not specific enough to be probative finds no basis in applicable law,[4] and is meaningless because it is premised on Defendants' mischaracterization of these allegations as mere "general market communications."  Br. 25.

3.    <u>Defendants engaged in acts against economic self-interest</u>

The alleged conspiracy is premised on Defendants repeatedly acting against their own economic self-interest, another recognized plus factor.  *See Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 327 (2d Cir. 2010) (reversing district court decision dismissing complaint where

---

[4]  Contrary to Defendants' assertion, *Citigroup* does not stand for the proposition that only allegations of "specific communications" may qualify as "interfirm communications" relevant to the plus-factor analysis.  Br. 25.  Rather, the plaintiffs there failed to allege a high level of interfirm communications because the vast majority of communications alleged in the complaint were *"internal* to individual defendants," and hence were not "interfirm."  *Mayor of Baltimore v. Citigroup*, 709 F.3d 129, 139 (2d Cir. 2013).  Defendants' other cases are also distinguishable.  The language from *Capital Imaging* on which Defendants rely, Br. 26, relates not to the plus-factor analysis of interfirm communications at the pleading stage, but rather to weighing evidence of whether defendants actually conspired at summary judgment.  *See* 996 F.2d 537, 545 (2d Cir. 1993).  And *In re Musical Instruments Antitrust Litigation*, 798 F.3d 1186, 1194 & n. 6 (9th Cir. 2015), also cited by Defendants, Br. 26, does not relate to pleading interfirm communications at all.

"plaintiffs have alleged behavior that would plausibly contravene each defendant's self-interest in the absence of similar behavior by rivals"). "[I]n a competitive industry . . . a firm would cut its price with the hope of increasing its market share if its competitors were setting prices above marginal cost." *In re Propanolol Antitrust Litig.*, 249 F. Supp. 3d 712, 720 (S.D.N.Y. 2017).

Such failure to compete on "price"—here, by achieving lower rates for issuers—is exactly what Plaintiffs have alleged. Issuers of VRDOs have the right to replace their RMA if that RMA sets rates that are not competitive with the rates offered for comparable VRDOs across the market. Accordingly, absent the conspiracy, RMAs would be motivated to compete against each other for issuers' business by actively working to set the lowest possible rates for their customers. CAC ¶ 5. Instead, Defendants did exactly the opposite, coordinating their rates and sharing competitively sensitive information, thereby earning massive fees for doing next to nothing. *See ISDAfix*, 175 F. Supp. 3d at 55 (finding plus factor satisfied by allegations that "Defendants shared commercially sensitive information").

Defendants have no serious response to this factor, arguing only that the conduct alleged in the Complaint "is conduct that each Defendant had a contractual obligation to undertake," Br. 25, and thus could not have been adverse to Defendants' economic self-interest. But, again, Defendants simply ignore the Complaint, which alleges Defendants did *not* comply with their marketing promises and contractual obligations to compete against each other by actively remarketing VRDOs to a broad investor base and to set VRDO rates at the lowest possible rate. *See* CAC ¶¶ 152-58, 186-90. Rather, the rates at which Defendants reset VRDOs were artificially (and uniformly) high. *See id.* ¶¶ 10, 124-51.

4.    *Government investigations also constitute a "plus factor"*

The Complaint alleges ongoing investigations by the DOJ and the SEC. *Id.* ¶¶ 8, 121-23. Courts recognize that the presence of ongoing government investigations can bolster the

plausibility of Section 1 conspiracy claims. *See Starr*, 592 F.3d at 324 (finding that investigations by New York State Attorney General and DOJ into defendants' price-fixing supported plausibility of Section 1 claim); *ISDAfix*, 175 F. Supp. 3d at 55 ("The mere existence of [government] investigations is a circumstance that . . . might permit a jury to infer the existence of an agreement.").

Defendants assert that this case is unlike *ISDAfix* because there the CFTC had announced findings of wrongdoing by the time the Court denied the defendants' motion to dismiss. Br. 26. But the Court's finding in *ISDAfix* did not rest on the outcome of the CFTC investigation. Rather, while the Court noted that the Complaint alleged government investigations had turned up "evidence of criminal behavior" by Defendants, the Court found that "the mere existence of such investigations is a circumstance that, when combined with parallel behavior, might permit a jury to infer the existence of an agreement." *ISDAfix*, 175 F. Supp. 3d at 55. The Court also found it "[s]ignificant[]" that the plaintiffs in *ISDAfix* "allege[d] that Defendants abruptly and simultaneously ceased engaging in parallel conduct when they were served with subpoenas in connection with government investigations." *Id*. The Complaint here similarly alleges that Defendants engaged in parallel conduct, demonstrated by econometric analyses of Defendants' VRDO rate-setting practices, that abruptly ceased when government regulators and criminal authorities began to investigate and reach out to Defendants. *See* CAC ¶¶ 124-51.[5]

---

[5]   The cases cited by Defendants are plainly distinguishable. In some cases, the Complaints pleaded only the most conclusory conspiracy allegations, and thus grand jury investigations and subpoenas were insufficient to establish plausibility. *See In re Graphics Processing Unit Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (failing to even allege "that defendants ever met and agreed to fix prices"); *Hinds Cty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 512 (S.D.N.Y. 2009) (alleging only that defendants "issued and sold Municipal Derivatives to members of the Class" or "acted as a broker" in purchases of such securities). Other cases involved complaints that, unlike here, failed to allege the existence of

**D.**     **Defendants' Attacks on Plaintiffs' Economic Analyses Are Inappropriate and Meritless**

Plaintiffs' economic analyses are "factual assertions regarding pricing and other economic data, which courts generally accept at the pleading stage." *Silver*, 213 F. Supp. 3d at 563.  Indeed, courts have repeatedly refused to dismiss allegations of antitrust conspiracies that, unlike here, were based *solely* on statistical evidence.  For example, in *In re Commodity Exchange, Inc*. *Antitrust Litigation* ("*Gold*"), 213 F. Supp. 3d 631 (S.D.N.Y. 2016), and the *Silver* case, Judge Caproni relied on statistical analyses of anomalous data patterns to uphold the plaintiffs' Section 1 claims.  *See Gold*, 213 F. Supp. 3d at 645-47; *Silver*, 213 F. Supp. 3d at 561-64.  Likewise, this Court, in *ISDAfix,* upheld a complaint built largely around analysis of economic data.  *See ISDAfix*, 175 F. Supp. 3d at 54.  These are a few of the many cases, including others in this District, where courts upheld complaints built on economic data.[6]

Nonetheless, Defendants inappropriately treat their motion under Rule 12(b)(6) as one for summary judgment, making a series of critiques about Plaintiffs' data and its presentation.  *See* Br. 17-22.  The Court should disregard these arguments, as a motion to dismiss "is not the proper stage to determine" either "the accuracy" of plaintiffs' allegations or the "methodology" that underlies them.  *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 737 (2d Cir. 2017).  "At this

---

any government investigation, or merely alleged government investigations that had been *closed*. *See Twombly v. Bell Atlantic Corp.*, 425 F.3d 99, 118 n. 14 (2d Cir. 2005) (concerning a report by a consumer group and a letter from two members of Congress *requesting* an investigation); *Gold*, 213 F. Supp. 3d at 649, 662 (closed investigation); *Silver*, 213 F. Supp. 3d at 560-61 (same).  None of these cases justify ignoring the law or the Complaint's allegations.

[6] *See, e.g.*, *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 772, 778 (2d Cir. 2016) (relying in part on statistical analyses to find a conspiracy to suppress LIBOR plausibly pled); *In re Domestic Airlines Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 63-65 (D.D.C. 2016) (upholding complaint that used averages in a variety of data analyses); *In re Nasdaq Market-Makers Antitrust Litig.*, 894 F. Supp. 703, 712-13 (S.D.N.Y. 1995) (plaintiffs "sufficiently pled" an antitrust conspiracy based on analysis of fluctuations in average Nasdaq spreads).

stage, a statistical analysis, like any other allegation, need only be plausible.  Merely pointing out that there are problems with the analysis, or that a better method is available, will not suffice." *GSE Bonds*, 2019 WL 4071070, at *8; *see also Dover v. British Airways, PLC*, 2014 WL 317845, at *2 (E.D.N.Y. Jan. 24, 2014) (an allegation based on data "is a factual allegation the Court must credit" as true on a motion to dismiss); *In re Pfizer Inc. Secs. Litig.*, 584 F. Supp. 2d 621, 635 (S.D.N.Y. 2008) (a motion to dismiss "is not an appropriate vehicle for determination as to the weight of the evidence, expert or otherwise").  Thus, courts reject as "premature" methodological challenges to data analyses in a complaint.  *Branca v. Nordstrom, Inc.*, 2015 WL 10436858, at *7 (S.D. Cal. 2015); *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 272 (S.D.N.Y. 2010) ("To evaluate whether or not" plaintiffs' data analyses "are adequate would require the Court to delve into complex factual disputes that cannot be resolved on a motion to dismiss."); *see also Heckler & Koch, Inc. v. German Sport Guns GmbH*, 2014 WL 12756372, at *11 (S.D. Ind. 2014) ("calling into question [an expert's]. . . methodology. . . [would be] premature").[7]

 While they should not be considered by the Court, Defendants' methodological attacks are flawed and should be rejected for numerous reasons.

---

 [7] In service of their attack on Plaintiffs' analyses, Defendants spend pages attempting to construct a self-serving counter-narrative through the impermissible use of extrinsic materials, even including a chart that amounts to rebuttal "expert" analysis.  *See, e.g.*, Br. 8 (chart showing federal funds rate over time).  This is plainly improper, and the Court should strike Defendants' references to these extrinsic materials, including Defendants' analysis and conclusions regarding the market effects of changes in the federal funds rate, SEC regulations, and a "liquidity backstop" program.  *See* Br. 8, 18-21; *see also infra* at Sections I.D.1-5.

1.      *Plaintiffs' analyses do not suggest that VRDO rates simply tracked*
        *prevailing market conditions*

Defendants wrongly argue that Plaintiffs' analyses simply show that "VRDO rates and

commercial paper rates moved closer together" during the conspiracy period as interest rates

declined, because there was "less room" for them to diverge than there had been in the years

outside the conspiracy period.  Br. 17.  This argument gets Plaintiffs' analyses entirely

backwards.  Plaintiffs' analyses do not show that interest rates for VRDOs and commercial paper

were divergent outside the conspiracy period but *converged* during the conspiracy period.

Rather, they show the opposite: that (i) VRDO rates and commercial paper rates were very

closely related prior to the conspiracy period; then (ii) *diverged* sharply during the conspiracy

period, and then (iii) converged again once the conspiracy had broken, beginning around

December 2015.  CAC ¶¶ 135, 129.  That rates for such similar instruments—short-term

securities (with time to maturity of one week or less), each with credit backed by major financial

institutions, *id.* ¶ 127—would diverge so sharply during a period of falling interest rates actually

corroborates that Defendants' rates were artificially high for reasons that cannot be explained by

normal market factors.

2.      *The Complaint sufficiently explains Plaintiffs' regression models*

Contrary to Defendants' assertions, the Complaint more than adequately describes the

inputs and modeling choices underlying Plaintiffs' regression models.  As the Complaint

explains, Plaintiffs' models incorporate historical data on VRDO rates:  for the first model, the

actual VRDO rates that Defendants set for the bonds they remarketed, *id.* ¶ 127; for the second

model, actual SIFMA rates, *id.* ¶ 133.  The models each incorporate the ratio of historical 1-year

AAA corporate debt yields to 1-year AAA municipal debt yields to "account for the effect that

non-collusive changes in the market could have on the relationship between Defendants' VRDO

rates and 7-day commercial paper rates over time." *Id.* ¶¶ 128, 133.  For each model, the Complaint also identifies the time periods from which all historical data incorporated into the models was sourced.  *Id.* ¶¶ 126, 133.  These explanations of Plaintiffs' dataset are more than sufficient at the pleadings stage, where there is no requirement to submit full-blown expert reports.  *See, e.g.*, *Silver*, 213 F. Supp. 3d at 563 (courts generally accept "Plaintiffs' factual assertions regarding pricing and other economic data . . . at the pleading stage"); *Wacker*, 678 F. App'x at 30 (cautioning against "assessing the choice of benchmark at the pleading stage").[8]

3.   *Defendants' purported explanations for the behavior of VRDO rates should be rejected*

Defendants also attack Plaintiffs' analyses with several alternative explanations for why the relationship between VRDO rates and commercial paper rates changed so drastically during and after the Class Period:  (1) the "zero interest rate policy" adopted by the Federal Reserve in response to the financial crisis in early 2008; (2) the Federal Reserve's use of a "liquidity backstop" program for commercial paper during the Class Period; and (3) the 2016 implementation of new SEC regulations governing money market funds.  *See* Br. 18-21.  The Court should disregard these arguments, which are improper attempts to construct self-serving counter-narratives through extrinsic materials.  *See Glob. Network Commc'ns, Inc.*, 458 F.3d at 156 (judicial notice of extrinsic material was improper where the court "relied on those

---

[8]   Defendants' citation of *In re Commodity Exch. Inc. Silver Futures and Options Trading Litig.*, 2013 WL 1100770 (S.D.N.Y. Mar. 18, 2013) ("*In re Commodity Exchange*")—a silver manipulation case before Judge Patterson, distinct from the data-driven case upheld by Judge Caproni—is unavailing.  In *In re Commodity Exchange*, the court faulted plaintiffs' analyses as insufficiently "factual" because they only alleged "generalized fluctuations" over a mere three days of market activity, *id.* at *4 & n.4, not because the plaintiffs' proposed amended complaint did not sufficiently describe the inner workings of their regression models.

materials to make a finding of fact that *controverted* the plaintiff's own factual assertions"); *see supra* at 10-11.  In any event, these alternative explanations have no merit.

*First*, Defendants' assertion that Plaintiffs fail to explain why the ratio of VRDO rates and 7-day AA commercial paper rates should generally have been stable even with the adoption of the "zero interest rate policy" by the Federal Reserve ignores the Complaint's detailed allegations.  The Complaint explains that both VRDOs and 7-day AA financial commercial paper are short-term instruments (with seven or fewer days' duration) that are backed by the credit of major financial institutions, and thus are fundamentally similar instruments with similar risk profiles.  CAC ¶ 127.  Moreover, Plaintiffs' analyses demonstrate that a highly stable relationship between VRDO rates and commercial paper rates was, in fact, the norm for both the pre- and post-conspiracy periods.  *See id*. ¶¶ 129, 135.  Tellingly, Defendants provide no reason why the ratio between these two instruments should *not* have remained stable in a low interest rate environment—*i.e.*, why such an environment would impact VRDO rates differently than it impacted commercial paper rates.  Defendants' argument is rank speculation, contradicts the allegations in the Complaint, and should be rejected.

*Second*, Defendants maintain that the normal, historical relationship between VRDO rates and commercial paper rates was disrupted by the Federal Reserve's use of a "liquidity backstop" program for commercial paper during the Class Period.  Br. 19-20.  Defendants omit, however, that this "backstop" program was closed in February 2010, and thus could not have had any impact on commercial paper rates for the vast majority of the Class Period.[9]  Moreover, this

---

[9]   *See* Board of Governors of the Federal Reserve System, *Commercial Paper Funding Facility (CPFF)* (February 12, 2016 ), at https://www.federalreserve.gov/regreform/reform-cpff.htm ("The facility was announced on October 7, 2008, began purchases of commercial paper on October 27, 2008, and *was closed on February 1, 2010*." (emphasis added)).

program did not provide a "backstop" for commercial paper generally, as Defendants suggest. Rather, as the "Frequently Asked Questions" document cited by Defendants states, the program was designed to address stress in the market for commercial paper with "longer-dated maturities," and was limited to "eligible *three-month* unsecured and asset-backed commercial paper."[10]  Plaintiffs' analyses use rates for *7-day* commercial paper, a very different instrument.

*Third*, although Defendants claim the 2016 SEC regulation was "likely to have a substantial impact on money market funds," Br. 20, the regulation itself indicates the opposite, stating that the expected impact on tax-exempt money market funds' demand for municipal securities would "likely be relatively small."[11]  Defendants' speculation to the contrary contradicts the Complaint's well-pled allegations, and must be rejected, as the Complaint's allegations must be accepted as true at the pleading stage.

4. *The results of Plaintiffs' statistical models are not "facially implausible"*

Defendants also argue that Plaintiffs' analyses are "facially implausible" because they show that average VRDO rates should have fallen to a single basis point or lower during certain points of the conspiracy.  Br. 21.  But the fact is that average VRDO rates actually *did* fall to those same levels in late 2015, as the conspiracy waned.  *See* CAC ¶ 136-37.[12]  What Plaintiffs' analyses show is that Defendants' rates should have fallen to those levels much *earlier* than they did.  *See id.*

---

[10]  Federal Reserve Bank of New York, *Commercial Paper Funding Facility: Frequently Asked Questions*  (Oct. 19, 2009), at https://www.newyorkfed.org/markets/cpff_faq.html (emphasis added) (cited at Br. 20).

[11]  79 Fed. Reg. 47735, 47912 (Aug. 14, 2014), at https://www.govinfo.gov/content/pkg/FR-2014-08-14/pdf/2014-17747.pdf.

[12]  And, as reflected in Defendants' own chart, *see* Br. 8, actual average VRDO rates remained at these levels into early 2016.

Defendants also argue that the high degree of clustering of VRDO rates and rate changes during the conspiracy period was merely a byproduct of a low interest rate environment.  But Plaintiffs' analyses show higher levels of clustering even during the early years of the conspiracy period, when interest rates were relatively high.  *See id*. ¶¶ 147-50 & companion charts (generally showing high levels of clustering in 2009 and 2010); *see also id*. ¶ 129 & Fig. 1 (showing Defendants' actual rates in 2009 and 2010).  The high levels of clustering during the conspiracy period thus cannot be explained by interest rate levels.

Defendants also argue that "Plaintiffs' clustering allegations are further discredited by their admission that there were far more VRDOs outstanding during the alleged conspiracy than afterwards."  Br 15.  But the level of clustering cannot be explained by the decrease in the total number of VRDOs, because the number of VRDOs gradually declined from 2009 through the end of 2018, and that ongoing decline does not explain the *abrupt decline in clustering* that occurred at the end of 2016.  *See* CAC ¶ 151 & Figs. 11-17.[13]  *See ISDAfix*, 175 F. Supp. 3d at 55 (abrupt changes in Defendants' conduct "strengthen[s] substantially the inference that a conspiracy existed").

5.    *Plaintiffs do not improperly rely on aggregated averages*

Defendants also argue that Plaintiffs' analyses are implausible because they use "aggregated" averages of Defendants' VRDO rates, which they assert do not adequately connect any individual Defendant to the conspiracy.

---

[13]   That there was some clustering of VRDO rates after 2016 is beside the point.  What matters and is strongly probative of the conspiracy is that there was an artificially high amount of clustering during the conspiracy that suddenly fell off when the conspiracy ended.  *See* CAC ¶ 151 & Figs. 11-17 (showing continued clustering after 2016 at much lower levels).

This argument is meritless.  Plaintiffs' analyses, taken together with the Complaint's allegations as a whole, are more than sufficient to connect each Defendant to the conspiracy. The Complaint alleges, among other things, that (i) employees of each Defendant regularly shared their "base rates," effectively sharing future pricing information with horizontal competitors; CAC ¶¶ 12, 102; (ii) these communications included direct communications among personnel (identified by name) from the Municipal Securities Groups of each Defendant, *id*. ¶¶ 11, 96; (iii) each Defendant used the third-party pricing service J.J. Kenny to coordinate their rates with those of the rest of the cartel and ensure that no participant broke ranks, *id*. ¶¶ 107-12; and (iv) personnel on each of Defendants' sales desks routinely communicated with salespeople at the other Defendant banks to confirm that the rates they would be resetting later that day would be in line with the index, *id*. ¶ 111.  On top of these allegations, the Complaint also connects the alleged conduct of each Defendant to the cartel's impact in the market, including through the analyses showing that the actual rates that Defendants charged during the conspiracy period were artificially inflated.[14]  *Id*. ¶¶ 126-31.

The Complaint thus alleges collusive conduct on the part of each Defendant and supports those allegations with statistical analyses showing the impact of Defendants' conduct in the actual market.  Unlike in the *In re Commodity Exchange* case on which Defendants principally rely, these allegations thus align the facts of this case with those in *Silver, ISDAfix, and Hinds II*.

---

[14]   The wealth of Plaintiffs' non-economic allegations against all Defendants distinguish the allegations in *GSE Bonds* that were insufficient to implicate some of the defendants in that case.  There, the court dismissed a statistical-based conspiracy claim against some of the defendants because for those defendants the plaintiffs "failed to plead either parallel conduct or plus factors," *GSE Bonds*, 2019 WL 4071070, at *7, and the plaintiffs' non-statistical allegations against those defendants consisted solely of the conclusory allegation that they were all "directly implicated" in the conspiracy, *id*.  Here, the Complaint contains allegations of parallel conduct by all Defendants, statements from Defendants' former employees implicating them in the conspiracy, and numerous plus factors.

In all three of those cases, as Defendants acknowledge, Br. 22 n.18, statistical analyses were supported by additional allegations of collusive conduct. Defendants may not simply "entirely discount" the allegations in the Complaint and then claim that the remaining statistical allegations alone are insufficient. *Ault v. J.M. Smucker Co.*, 2014 WL 1998235, at *5 n.4 (S.D.N.Y. May 15, 2014). Indeed, in *Ault*, cited by Defendants, Br. 22, while the court agreed with Defendant that "generalized statistics alone" could not show that a defendant sold a particular product, the court further explained that "Defendant entirely discounts the Complaint's allegations." *Ault*, 2014 WL 1998235 at *5. The court then *accepted* the generalized statistics the plaintiffs had offered as allegations necessary for the court to make the "logical leap" to accept the combined allegations in the Complaint. *Id.* at *5 n.4. So, too, should the Court here reject Defendants' attempt to isolate the statistical analyses from the wealth of specific allegations of Defendants' conspiracy to inflate VRDO rates.[15]

## II.   DEFENDANTS' CONDUCT WAS PER SE UNLAWFUL

Seeking to have the conspiracy evaluated under the rule-of-reason standard, Defendants argue that the shocking allegations of their regular communications about competitively sensitive information, including their direct coordination on upcoming base rate determinations, describe nothing more than "pro-competitive" "market intelligence" gathering and "routine" "information sharing." Br. 28, 33. But those self-serving characterizations are at odds with the Complaint's

---

[15]   Defendants' argument that the data obscures the absence of "significant difference[s]" between the relationship between actual and but-for rates inside and outside the conspiracy period, Br. 22 n. 17, misses the point. What matters are not the absolute differences between the but-for and actual rates, but the *relative* differences between them. Plaintiffs' analyses *consistently* show statistically significant difference between Defendants' but-for and actual rates during the conspiracy period, but not outside the conspiracy period. The plausible conclusion is that there actually *was* a difference between those periods.

allegations, which plainly describe a *per se* illegal conspiracy to inflate rates above competitive levels.

Here, the alleged conspiracy involved much more than the mere sharing of information: it involved horizontal competitors (the Defendants) who agreed to a common scheme designed to inflate the interest rates on VRDOs and thereby collect remarketing and letter of credit fees for doing, essentially, nothing.  *See* CAC ¶¶ 1, 10, 14, 91-92, 114, 124-44.  As described in detail in the Complaint, and summarized above, Defendants regularly communicated with each other in order to avoid rate competition and to ensure their rates were all artificially elevated.  For example, the Complaint quotes a former senior remarketing agent at JPMorgan who said that "it was a *'dirty little secret'* that *RMAs would talk to each other about rates*," and explains "according to [an industry] insider, after receiving the J.J. Kenny index results in the morning (before rate resets were finalized), personnel on Defendants' sales desks routinely would call salespeople at other Defendant banks to confirm that the rates they would be resetting later that day would be in line with the index."  *Id.* ¶ 111; *see also id.* ¶¶ 96, 101; *supra* at 6, 14, 30.

These conversations are not "routine market conduct."  And Defendants offer no explanation why it would be "pro-competitive" for them to discuss their rates and inventory levels with their competitors, or how it can be routine "information sharing" or "market intelligence" gathering to coordinate on *future* base rate changes through an intermediary and in direct communication with one another.  Their silence is especially damning in light of the Complaint's allegation that "actual historical pricing information" on VRDO rates became publicly available in the late 1990s.  Defendants themselves claim that in "2008, the MSRB made [rate] data publicly available through an online system known as EMMA, and in 2009, EMMA began publishing real-time interest rate information on VRDOs."  Br. 6.  Given the

availability of that data, there was no apparent need for Defendants to engage in direct communications for the purpose of gathering "information"—unless, as the Complaint alleges, that information consisted of nonpublic, proprietary information, such as what base rate changes Defendants intended to apply in *upcoming* resets.

Defendants try to muddy the waters by arguing that their communications about their inventory levels and interest rates might have resulted in *lower* interest rates.  Br. 28.  However, the Complaint specifically alleges that the purpose of the these conversations was to set rates at a level high enough to avoid having issuers seek lower rates from other Defendants (and to avoid their remarketing obligations).  According to the Complaint, "[a]s a former head of the VRDO desk at Defendant JPMorgan explained, RMAs 'would set the rate wherever they had to keep the paper off their balance sheet—and you could understand them needing other banks to set the same rate otherwise the issuer would move their business.'"  CAC ¶¶ 116-17.  And contrary to Defendants' speculation, Plaintiffs' statistical analyses show that, as an empirical matter, the effect of the conspiracy was to push VRDO rates *higher*, not lower.

However Defendants characterize it, the conduct alleged in the Complaint is squarely subject to *per se* treatment.  "[T]he machinery employed by a combination for price-fixing is immaterial."  *See U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150,  223 (1940); *In re Mercedes-Benz Anti-Tr. Litig.*, 157 F. Supp. 2d 355, 360 (D.N.J. 2001) (rejecting argument that "exchanges of pricing information cannot amount to a *per se* violation" because the "the Complaint and the reasonable inferences to be drawn therefrom allege substantially more than a simple exchange of information"); *Apple, Inc.*, 791 F.3d at 327 (recognizing that "*per se* condemnation is not limited to agreements that literally set . . . prices" and finding a "coordinated effort to raise prices across the relevant market" was a *per se* violation).

Allegations of extensive communications to facilitate price-fixing are routinely subjected to *per se* treatment as part of larger conspiracies.  *See Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 550 (S.D.N.Y. 2018) (finding plaintiffs alleged a per se antitrust violation where "Defendants collusively shared information to coordinate their Sterling LIBOR submissions" in order to facilitate price manipulation); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 176 (D. Conn. 2009) (evidence that "defendants' executives engaged in friendly and frequent communications" during which prices were discussed, and evidence that "the executives attempted to conceal those communications" "would permit a fact-finder to conclude that . . . the defendants participated in a traditional conspiracy to fix prices").[16]

The cases Defendants cite are distinguishable because those cases *only* concerned the sharing of information.  In *Todd v. Exxon Corp.*, the Second Circuit applied the rule of reason because the alleged "violation lies in the information exchange itself—as opposed to merely using the information exchange as evidence upon which to infer a price-fixing agreement," which is exactly what Plaintiffs allege in this case.  275 F.3d 191, 198 (2d Cir. 2001).  In *Supermarket of Homes v. San Fernando Valley Bd. of Realtors*, No. 1983 WL 2199 (C.D. Cal. Sept. 1, 1983), the complaint did "not allege any underlying agreement among brokers to adhere to any particular price schedule," but instead only stated that "the inclusion of commission rates

---

[16]    *See also United States v. Soc'y of Ind. Gasoline Marketers of Am.*, 624 F.2d 461, 464-65 (4th Cir. 1979) (rejecting defendants' "information exchange" argument because the exchange "was merely one of the activities by which the alleged [price-fixing] agreement was effectuated"); *United States v. Marr*, 2017 WL 1540815, at *23 (N.D. Cal. Apr. 28, 2017) (where the conspiracy's focus was to rig bids, the defendants' exchange of information did not make their conduct subject to the rule of reason); *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1067 (N.D. Cal. 2015) (allegation of agreement to exchange information into the future was "enough to meet the *Twombly* pleading standard" for a *per se* claim).

in the MLS listings [defendants' publication of real estate listings] constitute[d] unlawful price fixing." *Id.* at *6. At summary judgment, the court determined the mere inclusion of commission rates in the listings was "not a sufficient basis on which to predicate a claim of a conspiracy to fix commission rates." *Id.* Here, again, the Complaint alleges much more than mere information exchanges. J.J. Kenny's daily publication of rates was just one aspect of the overall scheme to artificially inflate VRDO rates.

Given that Plaintiffs have alleged a conspiracy to fix prices, a *per se* violation of the antitrust laws, Plaintiffs are not obligated to allege the relevant product and geographic markets, or to outline how the anticompetitive effects of the scheme outweigh the procompetitive benefits. Should the Court determine that the alleged conspiracy is not subject to the *per se* standard, the Plaintiffs respectfully seek leave to amend the Complaint on those grounds.

## III.   PLAINTIFFS' CLAIMS ARE TIMELY

Defendants' concealment of their conspiracy not to compete tolls the statute of limitations on all of Plaintiffs' claims. "Because the statute of limitations is an affirmative defense, Defendants carry the burden of showing that Plaintiff[s] failed to plead timely claims." *Axiom Inv. Advisors, LLC by & through Gildor Mgmt., LLC v. Deutsche Bank AG*, 234 F. Supp. 3d 526, 538 (S.D.N.Y. 2017). Plaintiffs' claims cannot be dismissed "on statute of limitations grounds at the pleading stage unless the 'complaint clearly shows the claim is out of time.'" *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 195 (S.D.N.Y. 2018) (quoting *Harris v. City of New York,* 186 F.3d 243, 250 (2d Cir. 1999)).

### A.   Plaintiffs Adequately Plead Fraudulent Concealment

"To survive a motion to dismiss, plaintiffs need only plead, not prove, fraudulent concealment." *Hinds Cty., Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 400 (S.D.N.Y. 2010) ("*Hinds II*"). A plaintiff need only plead "(1) that the defendant concealed from him the

existence of his cause of action, (2) that he remained in ignorance of that cause of action until

some point within four years of the commencement of his action, and (3) that his continuing

ignorance was not attributable to lack of diligence on his part." *State of N.Y. v. Hendrickson*

*Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988).

**Concealment**.  To demonstrate concealment, a plaintiff must plead either that (1) the

conspiracy is self-concealing or (2) the defendants actively concealed the conspiracy.  *Dennis*,

343 F. Supp. 3d at 195.  The Complaint does both.

*First*, in the Second Circuit, price-fixing conspiracies like the one alleged here are

considered "inherently self-concealing."  *In re Issuer Plaintiff Initial Pub. Offering Antitrust*

*Litig.*, 2004 WL 487222, at *4 (S.D.N.Y. Mar. 12, 2004).  According to the Complaint, the

conspiracy was "self-concealing by its very nature" because Defendants knew they had to keep it

secret for it to succeed, because the collusive communications only involved small groups of

Defendants' employees, and because most collusive discussions took place over the phone or

email.  CAC ¶ 164.  Plaintiffs therefore "need not show any additional affirmative acts of

concealment."  *Vincent v. Money Store*, 304 F.R.D. 446, 459 (S.D.N.Y. 2015); *Hinds II*, 700 F.

Supp. 2d. at 399 ("By alleging a price-fixing scheme, the plaintiff sufficiently has alleged the

first prong of fraudulent concealment and there is no need to require the pleading of affirmative

actions taken by the defendants to prevent the plaintiff's discovery of its claim.").[17]

Defendants nevertheless proclaim that the conspiracy was not self-concealing because

"Plaintiffs purport to infer misconduct from publicly available information to which they had

---

[17]   To the extent the Court requires Plaintiffs to satisfy the additional burden of showing that there were private meetings used to cover and obscure the true nature of the conspiracy to demonstrate that it was self-concealing, *see Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011), the Complaint makes those allegations.  *See* CAC ¶¶ 101, 164, 166-67.

access throughout the limitations period" and that Plaintiffs monitored.  Br. 36.  "But requiring potential plaintiffs to conduct exhaustive statistical analysis of millions of transactions, just on the off chance that it would reveal some suspicious behavior, would be absurd."  *GSE Bonds*, 2019 WL 4071070, at *10.  This is true regardless of whether the underlying data is technically "publicly available."  *See infra* at 40-41.

Defendants also argue that Plaintiffs cannot "simultaneously claim that the generalized evidence cited as a basis of their complaint is sufficiently detailed to state a cognizable claim for relief and that, nevertheless, these facts were somehow insufficiently particular to cause the statute of limitations to run."  Br. 37 (citing *Woori Bank v. Merrill Lynch*, 923 F. Supp. 2d 491, 495-96 (S.D.N.Y. 2013)).  But, again, the Complaint does not rely solely on what Defendants call "generalized evidence"—*i.e.*, detailed statistical analyses based on publicly available data.  It is also based on statements from former high-ranking employees at several Defendants about their ongoing scheme to inflate VRDO rates, testimony Plaintiffs were only able to obtain after extensive investigation and discussions with industry insiders.  CAC ¶ 168.  The case is therefore unlike *Woori Bank v. Merrill Lynch*, where "specific facts" made public through extensive media coverage and multiple government investigations rendered the defendants' wrongdoing a matter of public knowledge.  923 F. Supp. 2d at 495-96.

*Second*, even if the conspiracy were not self-concealing, the Complaint alleges specific measures that Defendants employed—in addition to their necessarily covert communications about future rate changes and inventory levels—to ensure their agreement went undetected by issuers.  For example, Defendant Wells Fargo published a "primer on variable-rate demand notes" in 2017 explaining that the VRDO "reset feature ensures that [VRDO] yields reflect the current interest-rate environment" when VRDO rates were in fact inflated because of

Defendants' conspiracy.  CAC ¶ 165.  Defendants also provided Class members with "certificates of non-collusion" that explicitly stated that their proposals to actively remarket VRDOs at the lowest possible rate were made "without collusion," at the same time that Defendants were secretly colluding to avoid their obligation to do just that.  *Id*. ¶ 166; *see In re Liquid Aluminum Sulfate Antitrust Litig.*, 2017 WL 3131977, at *17-18 (D.N.J. July 20, 2017) (concluding that allegations of submissions of certificates of non-collusion sufficed to plead fraudulent concealment).  Further, consistently throughout the Class Period, Defendants made representations upon the issuance of new VRDOs that they would use their best efforts to reset interest rates at the minimum interest rate which would allow the RMAs to clear at par.  CAC ¶¶ 77-90.  Each of these representations was an affirmative act to hide the conspiracy.

The Complaint also alleges that Defendants went so far to hide their actions as to temporarily alter their behavior prior to meetings with issuers to pitch new business by lowering their interest rates to give the false impression that they were competing with other remarketing agents.  *Id.* ¶ 118.  Defendants disguised these lower "window dressing" rates by taking those bonds on their own books, thus ensuring that the higher VRDO rates achieved by their conspiracy prevailed in the trading market.  *Id.*  These allegations suffice to show that Defendants "took affirmative steps to prevent the plaintiff's discovery" of Defendants' scheme to inflate VRDO rates.[18]  *Hendrickson Bros.*, 840 F.2d at 1083.

---

[18]   Defendants claim that Plaintiffs' allegations of "window dressing" are "devoid of detail."  Br. 35.  But that ignores, among other things, that the so-called window dressing allegations were confirmed by a former senior RMA at Defendant JPMorgan.  CAC ¶ 118.  Defendants also argue that the lower rates they set as window dressings should be not be considered separate acts of concealment because the lower rates were "temporary rate reductions" that were part of the price-fixing conspiracy.  Br. 35.  But the Complaint alleges that Defendants not only set lower rates as window dressing before marketing new issues, but also that Defendants took those lower-rate VRDOs into their own inventory *specifically in order to*

***Lack of Prior Notice or Knowledge***.  Plaintiffs did not have any reason to suspect collusive activity until completing an investigation commenced in the middle of 2016, when a whistleblower came forward with information concerning government investigations into collusive activities between remarketing agents.  CAC ¶¶ 7-8, 168.  This information prompted Plaintiffs to interview industry insiders and conduct extensive data analyses which lead the Plaintiffs to uncover Defendants' collusion.  *Id.* ¶ 168.  At the pleading stage, these allegations suffice to show lack of prior knowledge or notice.  *See Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 136 (S.D.N.Y. 2016) ("For purposes of this Motion, the Complaint's pinpointing of the precise date when Merced became aware of the violation satisfies the second prong of the test."); *Silver*, 213 F. Supp. 3d at 572-73 (S.D.N.Y. 2016) (finding allegation that plaintiffs "could not have discovered [the alleged manipulation] by the exercise of due diligence" prior to January 2014 sufficient to withstand dismissal).

***Exercise of Reasonable Diligence***.  Plaintiffs can demonstrate reasonable diligence "by showing that[ ] the circumstances were such that a reasonable person would not have thought to investigate."  *Iowa Pub. Employees' Ret. Sys.*, 340 F. Supp. 3d at 337.  Defendants argue that Plaintiffs were not diligent in discovering the conspiracy because a 2014 qui tam action filed in Cook County, Illinois made Defendants' inflation of VRDO rates public.  Br. 38-39.  As an initial matter, as discussed above, the 2014 Illinois qui tam lawsuit itself could not have put Plaintiffs on notice for the simple reason that it was *filed under seal*.  Further, the Illinois action and the related 2014 Massachusetts qui tam action, both of which Defendants offer as exhibits to their brief, were False Claims Act cases, in which no antitrust violations were pleaded.  *See*

---

*not disturb the conspiracy*.  CAC ¶¶ 117-18.  Even if the one-off lower rate resets were not themselves acts of concealment (which they were), Defendants' separate moves to take the lower-rate VRDOs into inventory were affirmative acts to conceal the conspiracy.

Ruffino Decl. Exs. 2, 3.  Both cases were premised on allegations that Defendants automatically reset VRDO interest rates ("robo-resetting") without assessing the creditworthiness of individual issuers as their agreements with issuers required them to do, which are not the allegations of the Complaint.  *See* Ruffino Ex. 2 at 8-9; Ruffino Ex. 3 ¶¶ 2, 42-43.

More importantly, neither the Illinois nor the Massachusetts complaint employed the same sort of economic analysis used in the Complaint.  Defendants' "notice" arguments thus do not warrant dismissal of the Complaint because they do not provide "uncontroverted evidence" that Plaintiffs should reasonably have known to investigate a claim.  *Newman v. Warnaco Grp., Inc.*, 335 F.3d 187, 194-95 (2d Cir. 2003) ("Inquiry notice exists only when uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct."); *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 363 (2d Cir. 2013) ("While hindsight shows that the fraud could have been discovered, that fact does not support the conclusion that, on reasonable inquiry, the fraud would have been discovered.").

Defendants also argue that the Complaint is based on analyses of publicly available data.  Br. 38.  But the mere existence of public data does not make a conspiracy readily discernible.  *GSE Bonds*, 2019 WL 4071070, at *10 (potential plaintiffs not required to conduct statistical analysis of data on the "off chance" it reveals suspicious conduct).  Here, Plaintiffs monitored VRDO rates, including through outside advisors.  CAC ¶ 169.  When a conspiracy is self-concealing, "a reasonable person would not have thought to investigate above and beyond the standard activities of investment and news monitoring that Plaintiffs engaged in.  At this stage of the litigation, requiring more from Plaintiffs would be 'premature.'"  *Iowa Pub. Employees' Ret. Sys.*, 340 F. Supp. 3d at 337 (quoting *BPP Illinois, LLC v. Royal Bank of Scot. Grp. PLC*, 603 F. App'x 57, 59 (2d Cir. 2015)).  That Plaintiffs' monitoring did not uncover the conspiracy sooner

does not mean that Plaintiffs were insufficiently diligent.  Uncovering the conspiracy required

"extensive and expensive analysis of VRDO data over several years [conducted by] a full team

of experts," CAC ¶ 168, which itself is further evidence that Plaintiffs' prior diligence was

reasonable.  *See Gold*, 213 F. Supp. 3d at 675 (diligence adequately pleaded where collusive

"pattern was only discernable based on [the plaintiffs'] analysis of thousands of days of historical

pricing data").  In these circumstances, Plaintiffs' monitoring efforts constituted reasonable

diligence.  In any event, whether available data is sufficient to provide inquiry notice is a fact-

intensive question and should not be resolved on the pleadings.[19]

    **B.**    **Plaintiffs' State Law Claims Are Timely**

The same allegations that warrant tolling of the Clayton Act's limitation warrant tolling

of the limitations on Plaintiffs' state law causes of action.  *See ISDAfix*, 175 F. Supp. 3d at 66.

    1.    *Pennsylvania statute of limitations*

The allegations suffice to toll Pennsylvania's statutes of limitations under the discovery

rule, which Pennsylvania "applies to all causes of action, including breach of contract."  *Morgan

v. Petroleum Prod. Equip. Co.*, 92 A.3d 823, 828 (Pa. 2014).  Pennsylvania applies the discovery

rule "when the injured party is unable, despite the exercise of due diligence, to know of his

injury or its cause."  *Perelman v. Perelman*, 545 F. App'x 142, 149 (3d Cir. 2013).  "[A] party is

not under an absolute duty to discover the cause of his injury."  *Crouse v. Cyclops Indus.*, 745

A.2d 606, 611-12 (Pa. 2000).

---

[19]  *See, e.g.*, *In re Issuer Plaintiff Initial Pub. Offering*, 2004 WL 487222, at *5 (whether public availability of pricing information "should have put a reasonable plaintiff on notice" of defendants' conspiracy was "a question of fact which cannot be determined on a motion to dismiss"); *In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328, 347 (S.D.N.Y. 2000) ("[S]ince issues of constructive knowledge depend on inferences drawn from the facts of each particular case, summary judgment is often inappropriate on issues of inquiry notice.").

"There must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful.  This is what is meant by reasonable diligence."  *Fine v. Checcio*, 870 A.2d 850, 858 (Pa. 2005).  Tolling applies to contract claims where the breach remained concealed from the plaintiff.  *See, e.g.*, *Slamon v. Carrizo (Marcellus) LLC*, 2017 WL 3877856, at *11-12 (M.D. Pa. Sept. 5, 2017) (although defendant's prices were public, fact question remained as to whether they put plaintiff on notice of breach); *Canfield v. Statoil USA Onshore Properties Inc.*, 2017 WL 1078184, at *15-16 (M.D. Pa. Mar. 22, 2017) (plaintiff was unlikely to be aware of defendant's "private agreement" that caused defendant's breach).

Plaintiffs had no "reason to awaken inquiry" into Defendants' breaches until after they learned the results of an extensive investigation that commenced in mid-2016 upon learning of the whistleblower's allegations and the DOJ investigation.  And, in any event, "the point at which the complaining party should reasonably be aware that he has suffered an injury is a factual issue best determined by the collective judgment, wisdom and experience of jurors." *Crouse*, 745 A.2d at 611 (internal citations omitted).

### 2.   *Maryland statute of limitations*

Similarly, under Maryland law, "when stealth, subterfuge, or other difficulties of detection leave a plaintiff blamelessly ignorant of the facts and circumstances legally entitling him or her to relief, the . . . discovery rule applies."  *Berringer v. Steele*, 758 A.2d 574, 602 (Md. Ct. Spec. App. 2000). "Although the statute of limitations for breach of contract generally commences on the date of breach . . . that date may be extended . . .  by the discovery rule, which provides that the limitations period does not begin until the plaintiff learned or should have learned of the breach." *Topline Solutions, Inc. v. Sandler Sys., Inc.*, 2017 WL 1862445, at *19 (D. Md. May 8, 2017).  In addition, like federal law, Maryland also tolls the limitations period in instances where a defendant has fraudulently concealed the facts either by "an actual

42

concealment" or by fraud "of such a character as to conceal itself." *Butcher v. Robertshaw Controls Co.*, 550 F. Supp. 692, 703-04 (D. Md. 1981) (citing Md. Code, Cts. & Jud. Proc. § 5-203). Thus, tolling under Maryland law is warranted for the same reasons that tolling of the federal antitrust claim is warranted.

## IV.   PLAINTIFFS STATE CLAIMS FOR BREACH OF CONTRACT AND UNJUST ENRICHMENT

### A.   Plaintiffs Have Pleaded Valid Contracts with Defendants.

Defendants admit Plaintiffs have identified valid contracts with specific Defendants in seven of the eight affiliate groups named in the Complaint.[20]  Unable to deny these agreements, Defendants try to avoid Plaintiffs' contract claim on the basis that Plaintiffs "fail to plead specific terms" for some of the alleged contracts.  Br. 42.

Defendants are wrong.  Plaintiffs have (1) identified specific contracts, (2) provided the specific terms of the agreements, and (3) alleged that the agreements entered into between Plaintiffs (and the proposed class) and the various Defendants contain largely identical terms. CAC ¶¶ 25-26, 75-90.  As in *ISDAfix*, Plaintiffs' allegations provide Defendants with "sufficient information to permit them to have a fair understanding of what Plaintiffs are complaining about and to know whether there is a legal basis for recovery, which is all that is required at this stage of the litigation."  175 F. Supp. 3d at 63.

Defendants' citations do not support a different conclusion.  In *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155 (S.D.N.Y. 2009), the court held that "plaintiffs fail[ed] to provide any facts about how th[e] contract was formed, the date of

---

[20]   *See* Br. 41 & n.36 (conceding contracts pleaded with Defendants Banc of America Securities LLC; Barclays Capital, Inc.; Citigroup Global Markets Inc.; J.P. Morgan Securities LLC; Merrill Lynch Pierce Fenner and Smith Inc.; RBC Capital Markets LLC; Wachovia Bank N.A.; and Wells Fargo Bank, N.A.).

formation, the consideration, or the contract's major terms"; they "fail[ed] to plead that the defendants intended to create a binding contract"; and they failed to explain "how plaintiffs accepted these promises." *Id*. at 184.  Here, by contrast, Plaintiffs expressly plead the nature, terms, and consideration set forth in the agreements at issue.  CAC ¶¶ 75-90, 187-89. Defendants also cite *Window Headquarters, Inc. v. MAI Basic Four, Inc.*, 1993 WL 312899 (S.D.N.Y. Aug. 12, 1993), but, as a court in this District recently explained, the Complaint in that case "was dismissed because it failed to refer to *any* contracts with the named defendants and failed to affirmatively state those parties to the contract."  *Fort Prods., Inc v. Men's Med. Clinic, LLC*, 2016 WL 797577, at *3 (S.D.N.Y. Feb. 23, 2016).  Here, Plaintiffs have identified both the relevant contracts and parties.

Forced to contend with the contracts identified in the Complaint, Defendants argue that Plaintiffs nevertheless fail to plead any ***breach*** of those agreements because Plaintiffs supposedly fail to "allege that the lowest rates at which existing investors were willing to hold on to their VRDOs exceeded the rates at which other potential investors might have been willing to buy them."  Br. 43.  But the Complaint alleges exactly that—*i.e.*, that Defendants "breached their obligations as RMAs to reset VRDOs *at the lowest possible rate that would permit the bonds to trade at par*, and to actively remarket the VRDOs at the lowest possible rate."  CAC ¶ 188.

This Court rejected a similar assertion that no breach had been pleaded in *ISDAfix*, where the plaintiffs alleged "that each Defendant engaged in a conspiracy to artificially manipulate ISDAfix throughout the class period in violation of antitrust laws" and further alleged "that Defendants knowingly misrepresented the nature of ISDAfix" as an "objective, market-based rate even though all Defendants knew ISDAfix to be artificially manipulated."  *ISDAfix*, 175 F. Supp. 3d at 63.  The Court held that "[t]hose allegations are plainly sufficient to state a claim that

Defendants breached their commitment to make calculations and payments in good faith and in accordance with the law." *Id.*, 175 F. Supp. 3d at 63.  The same is true here, where Plaintiffs allege that Defendants knowingly misrepresented that they would reset VRDO rates at the "lowest possible rate" that would allow trading at par based on Defendants' good-faith assessment of the market, when in fact Defendants were colluding to inflate rates.  *See, e.g.*, CAC ¶¶ 64, 67-68, 77-90, 102-03; *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 632-33 (S.D.N.Y. 2013) ("*LIBOR II*") (recognizing LIBOR manipulation as a breach of the implied covenant that inheres in every LIBOR-based swap contract).

Finally, Defendants make a last-ditch argument that because Plaintiffs' antitrust claims fail, so must their contract claims.[21]  Br. 43.  As explained above, Plaintiffs have stated valid antitrust claims.  But even were that not the case, the elements of breach of contract are entirely distinct from those required to state a claim for antitrust liability.  Plaintiffs' economic analyses show rates inflated above the "lowest possible" level that would permit trading at par.  *See* CAC ¶¶ 126-58.  Plaintiffs allege these elevated rates were set by Defendants in violation of their contractual commitments to Plaintiffs and other VRDO issuers.  *Id*. at ¶ 158.  Plaintiffs therefore have stated a claim for breach of contract.

### B.        Plaintiffs State a Claim for Unjust Enrichment as to All Defendants

Defendants' arguments against Plaintiffs' claim for unjust enrichment fare no better. Defendants first argue—in tension with their position regarding Plaintiffs' supposed failure to plead valid contracts—that "the existence of valid and enforceable written contracts" precludes

---

[21]  Defendants make the same argument with respect to Plaintiffs' claim for unjust enrichment, relying on *In re Aluminum Warehousing Antitrust Litigation*, 2014 WL 4743425, at *4 (S.D.N.Y. Sept. 15, 2014), *aff'd*, 833 F.3d 151 (2d Cir. 2016).  But in that case, the court dismissed the unjust enrichment claim because the plaintiffs failed to plead any factual basis for their claims at all, whether for antitrust or unjust enrichment.  That is not the case here.

recovery in quasi contract.  Br. 44 (citation omitted).[22]  But Defendants ignore well-established

law that permits claims for breach of contract and unjust enrichment to proceed in the alternative.

*See, e.g.*, *ISDAfix*, 175 F. Supp. 3d at 64-65 (allowing breach of contract and unjust enrichment

claims to proceed); *LIBOR II*, 962 F. Supp. 2d at 630 (same).

Defendants next argue that the Plaintiffs cannot pursue unjust enrichment claims because

they allege Defendants received only an "indirect benefit."  Br. 44.  But this argument is belied

by Defendants' concession that Plaintiffs allege "Defendants benefitted by being paid for

allegedly doing less work" than Defendants had agreed to do under the terms of their contracts.

Br. 45.  A party's failure to perform expected work despite receiving payment is precisely the

sort of "direct benefit" redressed by unjust enrichment claims.  *See In re Roberts' Estate*, 112

A.2d 394, 395-97 (Pa. 1955) (where plaintiff "performed all of his obligations under the

settlement agreement, but the other parties thereto failed to perform their obligations . . . . [i]t

would be the most flagrant kind of unjust enrichment to permit [defendant] to retain the

benefits"); *cf. Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 352 (Md. Ct. App. 2007)

("A successful unjust enrichment claim serves to deprive the defendant of benefits that in equity

and good conscience he ought not to keep," including payments to which a defendant was not

entitled).

---

[22]  Defendants do not address how this argument applies to the non-counterparty Defendants, and thereby waive that argument as to those Defendants.  In any event, because Plaintiffs have alleged a conspiracy among all Defendants, it would be inequitable to allow one entity to evade liability simply because it benefited from a contract signed by an affiliate.  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2015 WL 6243526, at *71 (S.D.N.Y. Oct. 20, 2015), *on reargument in part sub nom. In re: LIBOR-Based Fin. Instruments Antitrust Litig.*, 2016 WL 1301175 (S.D.N.Y. Mar. 31, 2016) (recognizing "unjust enrichment as a remedy for damages caused by a counterparty's affiliate"); *see also Marketplace LaGuardia Ltd. P'ship v. Harkey Enters., Inc.*, 2008 WL 905188, at *4 (E.D.N.Y. Mar. 31, 2008) (quoting *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 601 (2d Cir. 1989)) (affiliates held liable "when doing so would achieve an equitable result").

Neither case cited by Defendants helps their cause.  In *Gold*, the plaintiffs had concededly failed to allege *any* direct transaction with *any* of the defendants.  *See* 213 F. Supp. 3d at 677.  Plaintiffs here allege transactions directly with the Defendant banks.  And in *DeBlasio v. Merrill Lynch & Co.*, the plaintiffs failed to allege any nexus between the defendants' "enrichment" and the plaintiffs' "expense."  2009 WL 2242605, at *40 (S.D.N.Y. July 27, 2009) (plaintiffs failed to allege defendants "induced them to deposit their free credit balances at affiliated Sweep Banks but then delayed or refused to return those funds upon request").  Here, Plaintiffs paid hundreds of millions of dollars in remarketing fees to Defendants based on Defendants' representations that they would actively remarket VRDOs to obtain the lowest possible rate that at which the bonds could be placed, but Plaintiffs received no services in return.  CAC ¶¶ 14, 16, 65, 193

## V.      PLAINTIFFS STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY

### A.      Both Maryland and Pennsylvania Provide Causes of Action for Breach of Fiduciary Duty

Defendants incorrectly argue that Maryland does not recognize a separate tort for breach of fiduciary duty when there are breach of contract claims concerning the same agreements.  Br. 46.  Maryland, in fact, does permit simultaneous claims for breach of contract claims and breach of fiduciary duty.  *See Tobacco Tech., Inc. v. Taiga Int'l N.V.*, 2007 WL 644463, at *7 (D. Md. Feb. 26, 2007) (noting that "breach of an agent's duty owed to his principal does provide a claim for breach of fiduciary duty in some form" and upholding plaintiff's claims for both breach of contract and breach of fiduciary duty).  Thus, Plaintiffs should be permitted to plead both claims in the alternative.  *Cf. ISDAfix*, 175 F. Supp. 3d at 64-65 (allowing breach of contract and unjust enrichment claims to proceed in the alternative).

Defendants also argue that Plaintiffs' breach of fiduciary duty claim is barred by Pennsylvania's "gist of the action" doctrine.  But under that doctrine, "claims for breach of fiduciary duty are not barred if the fiduciary duty at issue goes beyond the particular obligations contained in the parties' contract."  *DePuy Synthes Sales, Inc. v. Globus Med., Inc.*, 259 F. Supp. 3d 225, 234 (E.D. Pa. 2017).  As municipal advisors, Defendants had statutory duties beyond those set forth in the contracts or arising under state law.  CAC ¶ 198.[23]  Furthermore, even if the gist of the action doctrine were applicable, the Court should permit Plaintiffs to plead alternate theories of liability.  *See Orthovita, Inc. v. Erbe*, 2008 WL 423446, at *4-5 (E.D. Pa. Feb. 14, 2008) ("[A] court should be slow to dismiss claims under the gist of the action doctrine.  Federal civil procedure allows parties to plead multiple claims as alternative theories of liability.").

### B.      Defendants Owed Fiduciary Duties to Plaintiffs

Defendants argue that Plaintiffs do not plead a fiduciary relationship under Pennsylvania law (they do not raise Maryland law, and thus waive any such argument) because the Complaint only alleges arms-length transactions.  Br. 47.  This argument is meritless.

---

[23]   Defendants' assertion that 15 U.S.C. § 78o-4(c)(1) does not create a private right of action misses the point.  Br. 49.  Regardless of whether the statute creates a private right of action under federal law, the Court may look to federal law to determine the standard of care and duties remarketing agents owed the remarketing agents.  *See, e.g.*, *Gilvary v. Cuyahoga Valley Ry. Co.*, 292 U.S. 57, 60-61 (1934) (federal Safety Appliance Act may provide standard of care for personal injury claims against railroads governed by that statute).  Although no court has yet had occasion to interpret the scope of the duty codified at 15 U.S.C. § 78o-4(c)(1), in the case of other federal statutory fiduciary duties, courts routinely interpret and apply such duties, distinguishing them from state law or contractual duties.  *See, e.g.*, *Gaerren v. McGraw-Hill Cos., Inc.*, 690 F. Supp. 2d 254, 264 (S.D.N.Y. 2010) (concluding that federal ERISA statutory fiduciary duties cannot be abrogated by ERISA plan documents).  The Municipal Securities Rulemaking Board ("MSRB") has promulgated extensive rules regarding the fiduciary duties of municipal advisors, including duties that go beyond common law duties.  *See, e.g.*, MSRB Rule G-42 (setting out, on top of articulation of duties of loyalty and care, extensive fiduciary duties for municipal advisors, including duties regarding disclosures, compensation for services, among other topics).

In Pennsylvania, a fiduciary relationship arises "whenever one occupies toward another such a position of advisor or counselor as reasonably to inspire confidence that he will act in good faith for the other's interest." *Fox Int'l Relations v. Fiserv Sec., Inc.*, 490 F. Supp. 2d 590, 615 (E.D. Pa. 2007), *order corrected* (May 7, 2007).  Although Defendants characterize their role as simply "resetting rates on a periodic basis," Br. 47, their actual duty was to obtain the lowest interest rate possible for Plaintiffs, as issuers of VRDOs, in the interest of Plaintiffs. CAC ¶¶ 4, 64-65, 77, 81, 84, 86, 88-90, 153-54, 158, 166, 187-88.  Plaintiffs placed trust in Defendants to fulfill this responsibility in good faith and in Plaintiffs' interests.  *Id.* ¶ 166.[24]

Defendants incorrectly argue that Plaintiffs' use of outside advisors means that Defendants could not have had a fiduciary relationship with the Plaintiffs.  Br. 47.  But a fiduciary duty does not evaporate simply because a party retains the services of an outside advisor.  *See also Amendolia v. Rothman*, 2003 WL 23162389, at *4 (E.D. Pa. Dec. 8, 2003) (broker's fiduciary relationship not broken when plaintiff brought an insurance agent to meetings with the broker); *Sweigart v. Sweigart*, 2015 WL 7760335, at *5 (Pa. Super. Ct. Dec. 2, 2015) ("[T]he existence of a confidential relationship requires a fact sensitive inquiry not to be disposed rigidly as a matter of law.").[25]

---

[24]    *Binary Semantics Ltd. v. Minitab, Inc.*, 2008 WL 763575, at *2 (M.D. Pa. Mar. 20, 2008), *affirmed on reconsideration*, 2008 WL 1981591, at *3 (M.D. Pa. May 1, 2008) (cited at Br. 47), is distinguishable because the "routine arms-length commercial contract there" was between a software manufacturer and a foreign distributor of software, rather than between a municipality and the remarketing agent responsible for resetting the interest rates the issuer pays on millions of dollars of variable rate bonds.

[25]    Defendants' argument that the SEC's determination that in some circumstances remarketing agents may not be municipal advisors has no bearing on whether Defendants owed Plaintiffs fiduciary duties under the relevant state law.  Indeed, one court has already found that remarketing agents do in fact owe fiduciary duties.  *See Higher Educ. Loan Authority of the State of Missouri v. Wells Fargo Bank, N.A.*, 2011 WL 6010683, at *8 (E.D. Mo. Dec. 2, 2011)

Finally, Defendants' argument that language in certain remarketing agreements disclaims any fiduciary relationship relies on language that is ambiguous and contradictory at best.  Br. 47-48.  For example, Defendants cite language in a remarketing agreement between named Plaintiff Mayor and City Counsel of Baltimore and Citigroup Global Markets, *see* Br. 48 n.45, but Section 4(a) of this agreement specifically states that "[t]he Remarketing Agent will be acting solely as the Issuer's agent in the resale of the Bonds . . . ," indicating the creation of an agent-principal relationship.  Ruffino Decl. Ex. 6, § 4(a).[26]  It would be inappropriate to resolve the meaning of this language in favor of Defendants pre-discovery.  In any event, such a disclaimer would be unenforceable in light of the Complaint's detailed allegations of Defendants' intentional malfeasance.  *See Turkish v. Kasenetz*, 27 F.3d 23, 27-28 (2d. Cir. 1994) ("It is well settled that parties cannot use contractual limitation of liability clause to shield themselves from fraudulent conduct").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss the Complaint in its entirety.[27]

---

[26] The other contract cited by Defendants seemingly disclaims the remarketing agent's fiduciary duty, but the language is tied to Section 19 of the remarketing agreement, "Compliance with MSRB Rule G-34."  Ruffino Decl. Ex. 6, § 19.  Had the parties intended the remarketing agents to be exculpated from any fiduciary obligation to the issuers, they would not have couched this language in that subsection.  Rather, the disclamatory language applies only to Section 19, and the remarketing agent's fiduciary duties should still be upheld as to the remainder of the agreement.

[27] In the event the Court should dismiss any portion of the Complaint, Plaintiffs respectfully request leave to file an amended complaint.

DATED:   New York, New York
         September 30, 2019

QUINN EMANUEL URQUHART &
 SULLIVAN, LLP

By: /s/ Daniel L. Brockett

Daniel L. Brockett
Steig D. Olson
Sami H. Rashid
Thomas Lepri
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Fax: (212) 849-7100
danbrockett@quinnemanuel.com
steigolson@quinnemanuel.com
samirashid@quinnemanuel.com
thomaslepri@quinnemanuel.com

Jeremy D. Andersen
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Fax: (213) 443-3100
jeremyandersen@quinnemanuel.com

*Co-Lead Interim Class Counsel*

CITY OF PHILADELPHIA LAW
DEPARTMENT

Marcel S. Pratt (*pro hac vice* forthcoming)
Diana P. Cortes (*pro hac vice* forthcoming)
Eleanor N. Ewing (*pro hac vice* forthcoming)

City of Philadelphia Law Department
1515 Arch St., 17th Floor
Philadelphia, Pennsylvania 19102
Telephone: (215) 683-5012

WOLLMUTH MAHER & DEUTSCH LLP

By: /s/ David H. Wollmuth

David H. Wollmuth
William A. Maher
Ronald J. Aranoff
Brant Duncan Kuehn
500 Fifth Avenue
New York, New York 10100
Telephone: (212) 382-3300
dwollmuth@wmd-law.com
wmaher@wmd-law.com
raranoff@wmd-law.com
bkuehn@wmd-law.com

*Co-Lead Interim Class Counsel*

Marcel.Pratt@phila.gov
Diana.Cortes@Phila.gov
Eleanor.Ewing@phila.gov

*Counsel for Plaintiff City of Philadelphia*

SUSMAN GODFREY LLP

By: /s/ William C. Carmody
William Christopher Carmody
Arun Subramanian
Seth Ard
1301 Avenue of the Americas, 32nd Fl.
New York, New York 10019
Telephone: (212) 336-8330
Fax: (212) 336-8340
bcarmody@susmangodfrey.com
asubramanian@susmangodfrey.com
sard@susmangodfrey.com

Katherine M. Peaslee
1201 Third Avenue Suite 3800
Seattle, Washington 98101
Telephone: (206) 516-3880
Fax: (206) 516-3883
kpeaslee@susmangodfrey.com

*Co-Lead Interim Class Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 30, 2019, I caused the foregoing document to be served on all Defendants by filing the document electronically using CM/ECF in the United States District Court for the Southern District of New York.

<u>*/s/ Daniel L. Brockett*</u>
Daniel L. Brockett

53