**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE CITY OF PHILADELPHIA, MAYOR AND CITY COUNCIL OF BALTIMORE,<br><br>    Plaintiffs,<br><br>    v.<br><br>BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., BANC OF AMERICA SECURITIES LLC, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., CITIGROUP INC., CITIBANK N.A., CITIGROUP GLOBAL MARKETS INC., CITIGROUP GLOBAL MARKETS LIMITED, GOLDMAN SACHS & CO. LLC, JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, MORGAN STANLEY, MORGAN STANLEY SMITH BARNEY LLC, MORGAN STANLEY & CO. LLC, MORGAN STANLEY CAPITAL GROUP INC., THE ROYAL BANK OF CANADA, RBC CAPITAL MARKETS LLC, WELLS FARGO & CO., WELLS FARGO BANK, N.A., WACHOVIA BANK, N.A., WELLS FARGO FUNDS MANAGEMENT, LLC, WELLS FARGO SECURITIES LLC,<br><br>    Defendants. | No. 19-cv-1608 (JMF)<br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANTS' REPLY IN SUPPORT**
**OF MOTION TO DISMISS**

TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

ARGUMENT ............................................................................................................................... 1

I.      Plaintiffs Fail To Plead A Plausible Antitrust Conspiracy. ............................................. 1

        A.      Plaintiffs fail to plead "direct evidence" of an unlawful agreement. ..................... 1

        B.      Plaintiffs fail to plead circumstantial evidence of an unlawful agreement. ............ 3

                1.      Plaintiffs fail to plead meaningful parallel conduct by Defendants. ........... 3

                2.      Plaintiffs' statistical analysis fails to support their claims. ........................ 6

                3.      Plaintiffs fail to plead meaningful plus factors. ....................................... 10

II.     Plaintiffs' Claim Is Governed By The Rule of Reason, Not The Per Se Rule. ............... 13

III.    Plaintiffs Fail To Overcome The Statutes Of Limitations. ............................................. 16

IV.     Plaintiffs Fail To State A Breach of Contract Claim. ...................................................... 18

V.      Plaintiffs Fail To State A Claim For Unjust Enrichment .................................................. 19

VI.     Plaintiffs Fail To State A Claim For Breach Of Fiduciary Duty. .................................... 20

CONCLUSION .......................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*,
   314 F. Supp. 3d 497 (S.D.N.Y. 2018) ..............................................................................9, 24

*Alaska Elec. Pension Fund v. Bank of Am. Corp*,
   306 F. Supp. 3d 610 (S.D.N.Y. 2018) ...................................................................................19

*Amendolia v. Rothman*,
   2003 WL 23162389 (E.D. Pa. 2003) .....................................................................................20

*Anderson News, LLC v. Am. Media, Inc.*,
   899 F.3d 87 (2d Cir. 2018) ......................................................................................................3

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .................................................................................................................5

*Behrens v. JPMorgan Chase Bank N.A.*,
   2019 WL 1437019 (S.D.N.Y. 2019) ...............................................................................17, 18

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................................ *passim*

*Bona Fide Conglomerate, Inc. v. SourceAmerica*,
   691 F. App'x 389 (9th Cir. 2017) ..........................................................................................10

*Burtch v. Milberg Factors, Inc.*,
   662 F.3d 212 (3rd Cir. 2011) .............................................................................................3, 16

*Butala v. Agashiwala*,
   916 F. Supp. 314 (S.D.N.Y. 1996) ........................................................................................18

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) .................................................................................................................10

*De Sole v. Knoedler Gallery, LLC*,
   974 F. Supp. 2d 274 (S.D.N.Y. 2013) ...................................................................................18

*DeBlasio v. Merrill Lynch & Co.*,
   2009 WL 2242605 (S.D.N.Y. 2009) ......................................................................................19

*Dual Inc. v. Lockheed Martin*,
   383 Md. 151, 857 A.2d 1095 (2004) .....................................................................................16

*Five Smiths, Inc. v. NFL Players Ass'n*,
788 F. Supp. 1042 (D. Minn. 1992) ........................................................................16

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
2017 WL 3600425 (S.D.N.Y. 2017) .................................................................. *passim*

*G.M. Pusey & Assocs., Inc. v. Britt/Paulk Ins. Agency, Inc.*,
2008 WL 2003747 (D. Md. 2008) ...........................................................................20

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000) ......................................................................................9

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
620 F. Supp. 2d 499 (S.D.N.Y. 2009) ................................................................18, 24

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999) ...........................................................................3, 5, 15

*In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*,
213 F. Supp. 3d 631 (S.D.N.Y. 2016) .....................................................................13

*In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*,
2013 WL 1100770 (S.D.N.Y. 2013) .................................................................6, 7, 10

*In re Ethylene Propylene Diene Monomer Antitrust Litig.*,
681 F. Supp. 2d 141 (D. Conn. 2009) .....................................................................15

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
74 F. Supp. 3d 581 (S.D.N.Y. 2015) .................................................................13, 15

*In re GSE Bonds Antitrust Litigation*,
396 F. Supp. 3d 354 (S.D.N.Y. 2019) .....................................................................17

*In re Interest Rate Swaps Antitrust Litig.*,
2018 WL 2332069 (S.D.N.Y. 2018) ..........................................................................7

*In re Interest Rate Swaps Antitrust Litig.*,
261 F. Supp. 3d 430 (S.D.N.Y. 2017) ...............................................................8, 12, 17

*In re Late Fee & Over-Limit Fee Litig.*,
528 F. Supp. 2d 953 (N.D. Cal. 2007) ....................................................................11

*In re Magnesium Oxide Antitrust Litig.*,
2011 WL 5008090 (D.N.J. 2011) ............................................................................16

*In re Mercedes-Benz Antitrust Litig.*,
157 F. Supp. 2d 355 (D.N.J. 2001) .........................................................................15

*In re Mexican Gov't Bonds Antitrust Litig.*,
  2019 WL 4805854 (S.D.N.Y. 2019) ............................................................. *passim*

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) .................................................................... 11

*In re N. Sea Brent Crude Oil Futures Litig.*,
  256 F. Supp. 3d 298 (S.D.N.Y. 2017) ......................................................... 10

*In re Pork Antitrust Litig.*,
  2019 WL 3752497 (D. Minn. 2019) .............................................................. 5

*Int'l Healthcare Mgmt. v. Coal. for Health*,
  332 F.3d 600 (9th Cir. 2003) ...................................................................... 14

*Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*,
  713 F. Supp. 2d 286 (S.D.N.Y. 2010) ......................................................... 16

*Mayor of Baltimore v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013) ................................................................ *passim*

*N.W. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
  472 U.S. 284 (1984) .................................................................................... 15

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
  629 F.3d 697 (7th Cir. 2011) ...................................................................... 16

*Orix Fin. Servs., Inc. v. Brewer*,
  2001 WL 34629830 (S.D.N.Y. 2001) ............................................................ 9

*Sarpolis v. Tereshko*,
  26 F. Supp. 3d 407 (E.D. Pa. 2014) ............................................................ 16

*Sharma v. OneWest Bank, FSB*,
  2011 WL 5167762 (D. Md. 2011) ................................................................ 20

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019) .......................................................................... 18

*Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*,
  366 F. Supp. 3d 516 (S.D.N.Y. 2018) ......................................................... 15

*Stein v. JP Morgan Chase Bank*,
  279 F. Supp. 2d 286 (S.D.N.Y. 2003) ........................................................... 9

*Supermarket of Homes v. San Fernando Bd. of Realtors*,
  1983 WL 2199 (C.D. Cal. 1983) ................................................................. 16

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001)...........................................................................................16

*United States v. Marr*,
   2017 WL 1540815 (N.D. Cal. 2017) .........................................................................15

*United States v. U.S. Gypsum Co.*,
   438 U.S. 422 (1978)................................................................................................15, 16

**Statutes**

15 U.S.C. § 78o-4(c)(1) ...............................................................................................20

**INTRODUCTION**

Plaintiffs' Opposition abandons the suggestion that Defendants agreed upon the hundreds of thousands of individual interest rates they set on VRDOs during the proposed class period. (Opp. 12.)  Instead, Plaintiffs argue that they have adequately alleged that Defendants exchanged information about their base rates and inventory levels (Opp. 3, 12), and used this information to carry out some sort of vague agreement to "keep[] VRDO rates artificially high" (*id*.).  The trouble with this argument is that the Complaint lacks any well-pled allegations that Defendants actually entered into an alleged agreement to set artificially-inflated VRDO rates.  Plaintiffs fail to plead any "direct evidence" of such an agreement, any parallel conduct suggestive of such an agreement, or any viable plus factors.  Moreover, the statistical analysis recited by Plaintiffs reflects no more than the natural and predictable effects of the ultra-low interest rate environment, the elephant in the room that Plaintiffs studiously ignore.

Plaintiffs are thus forced to contend that allegations of information exchanges alone are sufficient to sustain their claims.  (Opp. 13.)  But the law is clear that exchanging information is not equivalent to price-fixing, that agreements to exchange pricing information are not *per se* unlawful, and that information sharing should be analyzed under the rule of reason.  Plaintiffs concede that they did not plead a rule-of-reason claim.  (Opp. 31-32.)  The Complaint should therefore be dismissed.

**ARGUMENT**

I.     **Plaintiffs Fail To Plead A Plausible Antitrust Conspiracy.**

   A.     **Plaintiffs fail to plead "direct evidence" of an unlawful agreement.**

Nowhere in Plaintiffs' Opposition do they even *assert* that they have pled any "direct evidence" of conspiracy, *i.e.*, highly specific "smoking gun" evidence "such as a recorded phone call in which two competitors agreed to fix prices at a certain level."  *Mayor of Baltimore v.*

*Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).  Instead, all they purport to plead is evidence of information exchanges that stop far short of any *agreement* to inflate VRDO interest rates.

Plaintiffs argue that the Complaint "identifies the specific personnel … that carried out the conspiracy" and "details specific phrases" that Defendants used when communicating with each other (Opp. 11, 14), but those allegations provide no "direct evidence" of an unlawful agreement.  Plaintiffs' allegations about "specific personnel" are just lists of individuals who are publicly known to have worked for Defendants.  (Compl. ¶¶ 93, 96.)  Their allegations about "specific phrases," in turn, consist solely of *questions* allegedly asked by unidentified individuals at unidentified times.  (*See* Compl. ¶¶ 12, 101, 105 (alleging that unidentified individuals asked questions such as "are you going high or are you going low," "How much cash is in the market," "How are things trending," and "are you heavy or light").)  These mere *questions* are, at most, indicative of lawful information sharing, not *per se* unlawful price-fixing.  *See infra* at 13-16.  If Plaintiffs' unnamed sources had come anywhere close to describing unlawful *agreements* as opposed to information sharing, Plaintiffs would have trumpeted those allegations from the rooftops.  Instead, the Complaint is completely void of such allegations.

Plaintiffs also suggest that information exchanges were the "mechanism" that Defendants used to carry out an unlawful agreement to "keep[] VRDO rates artificially high."  (Opp. 3, 12-13.)  But well-pled allegations of an agreement to "keep rates high" are precisely what is missing here.  The Opposition cites only to vague and conclusory group-pleading allegations that Defendants "were agreeing to keep VRDO rates artificially high," "conspired not to compete against each other," and "conspired to inhibit competition on rates, including by sharing with each other competitively sensitive information."  (Compl. ¶¶ 10, 12, 91, 100, 102, cited at Opp.

12-13.)  These generalized assertions of "conspiracy" and "agreement" are "given no effect at all" at the pleading stage.  *Citigroup*, 709 F.3d at 135-36.

Plaintiffs are thus reduced to asserting that information exchanges alone are sufficient to infer an underlying agreement to inflate VRDO interest rates (Opp. 13), but that is incorrect. *See, e.g., Anderson News, LLC v. Am. Media, Inc.*, 899 F.3d 87, 106 (2d Cir. 2018) (monitoring competitors' prices "is not evidence (much less persuasive evidence) of conspiracy"); *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 223-24, 226 (3rd Cir. 2011) ("the exchange of price information still requires showing that the defendants had an agreement"); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 126 (3d Cir. 1999) ("communications between competitors do not permit an inference of an agreement to fix prices unless those communications rise to the level of an agreement"); *see also infra* at 13-16.[1]

**B.     Plaintiffs fail to plead circumstantial evidence of an unlawful agreement.**

Unable to plead any direct evidence of an unlawful agreement, Plaintiffs rely on allegations of purported parallel conduct, plus factors, and aggregated statistics to try to sustain their claims.  Whether analyzed separately or together, these allegations are insufficient.

**1.     Plaintiffs fail to plead meaningful parallel conduct by Defendants.**

Plaintiffs argue that they have pled parallel conduct suggestive of an antitrust conspiracy by pleading a "high degree of clustering in [VRDO] interest rates" from April 2009 through November 2015.  (Opp. 15.)  But their own allegations confirm that this purported clustering is exactly what one would expect in the *absence* of a conspiracy.  As Plaintiffs recognize, VRDO rates fell to ultra-low levels during the alleged conspiracy period, and there were far more

---

[1] Unless otherwise stated, all emphasis is added, and internal citations and quotations are omitted.

VRDOs outstanding during that period than afterwards.[2]  It is "only natural anyway"—and no basis for inferring an antitrust conspiracy—if more clusters of identical VRDO rates existed in a period when many more VRDOs were outstanding and when VRDO rates were bunched together at ultra-low levels near zero.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 566 (2007); *see also id*. at 567 (parallel conduct is "not suggestive of conspiracy" where there is "an obvious alternative explanation"); *Citigroup*, 709 F.3d at 137 (no inference of conspiracy should be drawn where parallel conduct "could just as easily turn out to be rational business behavior as a proscribed antitrust conspiracy"); Mot. at 14-15 (citing additional authority).

Plaintiffs counter that even when VRDO rates were "relatively high" in 2009 and 2010, their clustering analysis shows more clustering *during* the alleged conspiracy period than afterwards.  (Opp. 29.)  Not so.  First, the Complaint confirms that VRDO rates were not, in fact, "relatively high" in 2009 and 2010.  Plaintiffs' clustering analysis does not begin until April 1, 2009, and from that date through the end of 2010, VRDO rates were never above 1% and were always substantially *lower* than the rates in Plaintiffs' "after" period.  (*See* Compl. Figs. 1, 4, 6-17.)  Second, Plaintiffs acknowledge that there were roughly three times as many VRDOs outstanding in 2009 and 2010 as there were in Plaintiffs' "after" period (*id*. ¶ 62), and it makes perfect sense that more clusters of at least 20, 50, or 100 identical VRDO rates would exist in a period when many more VRDOs were outstanding.  *Cf. Citigroup*, 709 F.3d at 138 (declining to infer conspiracy from parallel conduct that "made perfect business sense").

---

[2] *See* Compl. Figs. 1, 4 (showing extremely low VRDO rates from April 2009 through November 2015); *id*. ¶ 137 (rates "scraped along … close to zero"); *id*. ¶ 62 (number of outstanding VRDOs dropped from 15,000 to 5,000 from 2009 to 2017); Opp. 28 (rates fell to "a single basis point or lower"); Opp. 29 (acknowledging substantial decline in outstanding VRDOs).

Plaintiffs fare no better with their assertion that Figures 11 through 17 of the Complaint show an "abrupt decline in clustering" in 2016.  (Opp. 29.)  As an initial matter, Figures 11 through 17 at best show a modest decline in clustering—not an "abrupt" decline—after the conspiracy allegedly ended in December 2015.  (Compl. Figs. 11-17.[3])  Indeed, those Figures are *incapable* of showing an "abrupt" decline in clustering because the results they depict are averaged over six-month intervals (*id.*), a period far too long to display the type of sudden or abrupt parallel conduct that sometimes can be suggestive of conspiracy.  *See In re Baby Food*, 166 F.3d at 131-32 (discounting allegations of parallel acts that took place six months apart).  Moreover, 2016 is precisely the time when VRDO rates began rising sharply (Compl. Fig. 1), and it makes perfect sense that there would be less clustering of VRDO rates when rates were rising rapidly than when rates were "scrap[ing] along … close to zero" (*id.* ¶ 137).

Finally, Plaintiffs do not deny that their clustering exhibits lump all Defendants together as a bloc.  (Compl. Figs. 6-17.)  As a result, the exhibits fail to identify whether any individual Defendant engaged in rate-setting conduct that closely mirrored the conduct of any other Defendant.  Worse, the exhibits do not even identify how much of the purported "clustering" is attributable to clusters of rates all set by a *single* Defendant.  The exhibits therefore fail to depict the type of parallel conduct that "might be sufficient under *Twombly's* standard," *i.e.*, "complex and historically unprecedented changes in pricing structure *made at the very same time by multiple competitors*, and made for no other discernible reason."  *Citigroup*, 709 F.3d at 137.[4]

---

[3] *See, e.g.,* Opp. 25 & Compl. ¶¶ 126-129 (treating December 2015 as the start of the "clean" period).

[4] Plaintiffs assert in passing that "the entire conspiracy" involved parallel conduct (Opp. 16), but that bald assertion falls far short of the "well-pleaded, nonconclusory *factual* allegation of parallel behavior" required by *Twombly*.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009); *see also In re Pork Antitrust Litig.*, 2019 WL 3752497, at *8 (D. Minn. 2019) ("Without specific information regarding each Defendant, the Court has no basis to analyze which, how many, or when any of the individual

### 2.    Plaintiffs' statistical analysis fails to support their claims.

As Defendants showed in their opening brief, Plaintiffs' statistical allegations are defective for three main reasons:  (i) they rely on aggregated averages that fail to differentiate among Defendants, (ii) the results they depict are fully consistent with rational market behavior, and (iii) they are not well-pled.  Plaintiffs' responses are wholly unpersuasive.

<u>Aggregation of Defendants</u>.  Plaintiffs do not dispute that their statistical analysis relies on aggregated averages that treat "the Defendants" as a monolithic bloc.  (Opp. 29-30.)  For that reason alone, Plaintiffs' statistics fail to implicate any individual Defendant in the alleged conspiracy.  *See, e.g., In re Mexican Gov't Bonds ("MGB") Antitrust Litig.*, 2019 WL 4805854, at *7 (S.D.N.Y. 2019) (disregarding aggregated statistics because they "obscure any given Defendant's contribution to an observed trend" and "are simply group pleading in another form"); *In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*, 2013 WL 1100770, at *4 (S.D.N.Y. 2013) ("Plaintiffs' statistical analyses reflect generalized fluctuations in the metals markets and … do not include allegations that are sufficiently factual … to connect or link these fluctuations to [defendant].").

Plaintiffs argue that their *other* allegations are sufficient to link individual Defendants to a purported conspiracy (Opp. 30), but apart from mundane lists of employees who worked in Defendants' public finance groups (Compl. ¶¶ 93, 96), those allegations likewise treat Defendants as a bloc.  None of those allegations identifies any "direct evidence" or parallel conduct sufficient to tie a specific Defendant to an unlawful agreement.  *See, e.g., In re MGB*, 2019 WL 4805854, at *7 ("Post-*Twombly* authorities overwhelmingly hold that a complaint that

---

Defendants may have affirmatively acted to reduce the supply of pork.  *And that type of information is vital to pleading parallel conduct*.").

provides no basis to infer the culpability of the *specific* defendants named in the complaint fails to state a claim") (emphasis in original); *In re Interest Rate Swaps ("IRS") Antitrust Litig.*, 2018 WL 2332069, at *15 (S.D.N.Y. 2018) (allegations that treat defendants "as a general collective bloc, or generalized claims of parallel conduct, must also be set aside … as impermissible group pleading").[5]

Rational market behavior.  Plaintiffs' statistics are also unavailing because the results they depict are fully consistent with rational and non-conspiratorial market behavior.  As Plaintiffs recognize, VRDO rates ordinarily are "significantly lower than [those] of commercial paper" (Compl. ¶¶ 3, 61, 127, 138), but the size of this difference narrowed during the low interest rate period (*id*. ¶ 138 & Figs. 1, 4, 5).  Accordingly, when Plaintiffs used the relationship between VRDO rates and commercial paper rates during normal interest rate periods before and after the alleged conspiracy period to try to model "but-for" VRDO rates during the intervening low interest rate period, the results predictably showed that VRDO rates were not as far below commercial paper rates as they were in the "normal" periods.  (*See id*. ¶¶ 127, 129, 137 & Figs. 1, 4, 5.)  The low interest rate period thus provides an obvious explanation for Plaintiffs' statistics:  VRDO rates and commercial paper rates inevitably converged during an unusual historical period when both of those rates fell to extremely low levels.   (*See* Mot. 6-7, 17.[6])

---

[5] Plaintiffs argue that the Complaint "align[s]" with *Silver, ISDAfix,* and *Hinds County* (Opp. 30), but Defendants showed in their opening brief that each of those cases involved specific allegations about specific defendants.  *See* Mot. 22 n.18; *see also In re MGB*, 2019 WL 4805854 at *7 (observing that *Hinds County* involved "a painstaking, defendant-by-defendant analysis of the allegations").

[6] Plaintiffs note that their model also includes some sort of ratio between 1-year corporate debt and 1-year municipal debt, but they fail to explain why this would cure the model's obvious flaws; they never allege as a factual matter that inclusion of this ratio had any effect on the model's estimates; and they all but concede that it had a negligible effect.  (*See* Compl. ¶ 139 (alleging that the ratio "remained nearly constant," meaning that its inclusion would have little or no effect).)

Plaintiffs' response consists of a baffling assertion that completely misstates their statistical analysis.  Plaintiffs assert that VRDO rates and commercial paper rates (i) "converged" with each other before the purported conspiracy period, (ii) "diverged sharply during the conspiracy period," and then (iii) "converged again once the conspiracy had broken."  (Opp. 25.) But the Complaint alleges exactly the opposite:  it alleges that VRDO rates usually are "significantly lower" than commercial paper rates, that Plaintiffs believe this usual relationship should have persisted during the alleged conspiracy period "due to VRDOs' usual tax-free status," and that contrary to these expectations, VRDO rates were *not* as low as usual "relative to commercial paper" during that period.  (Compl. ¶¶ 3, 127, 138.)  Plaintiffs had it right the first time:  judicially-noticeable public sources confirm that, just as the Complaint alleges, VRDO rates were *significantly* lower than commercial paper rates before and after the alleged conspiracy period, but only *slightly* lower during the intervening low interest rate period.[7] Plaintiffs thus lack a coherent response to an "obvious" explanation for their statistical results, and this "obvious" explanation bars any inference of conspiracy under *Twombly*.  *See Twombly*, 550 U.S. at 567; *In re IRS Antitrust Litig.*, 261 F. Supp. 3d 430, 464 (S.D.N.Y. 2017).

Plaintiffs also argue that the indisputable economic facts that expose their statistics as meaningless are beyond the scope of the Complaint.  (Opp. 11, 24 n.7, 26.)  But the law is clear that courts may take judicial notice of the type of facts presented in Defendants' briefs, *i.e.*, the

---

[7] According to publicly available data, VRDO rates tended to be significantly lower than 7-day commercial paper rates before and after the proposed class period, but were relatively close to commercial paper rates during that period.  The one notable exception is that, when interest rates dipped to unusually low levels in 2003, VRDO rates and commercial paper rates were relatively close to each other—precisely the result that Plaintiffs mistakenly decry as evidence of a conspiracy. The data can be found on the SIFMA and Federal Reserve websites at https://www.sifma.org/resources/research/swap/ and https://fred.stlouisfed.org/series/RIFSPPFAAD07NB.

dates of the Fed's zero interest rate policy and the historical levels of various interest rates.[8]  In any event, the Complaint admits the only facts that matter here:  (i) the alleged conspiracy period mirrors the low interest rate period, and (ii) the usual gap between VRDO rates and commercial paper rates unsurprisingly narrowed when both of those rates fell to ultra-low levels.[9]

      Not well-pled.  Plaintiffs' statistical analysis is not well-pled because Plaintiffs fail to provide enough factual allegations to enable the Court to determine whether their "statistical models" are anything more than statistical sleight-of-hand.  Plaintiffs argue that they provided a high-level description of the general contours of their models (Opp. 25-26), but they do not deny that this rudimentary description is far too incomplete to permit an assessment of even the basic plausibility of the models (Mot. 17-18).  Plaintiffs also suggest that the Court should simply *assume* that their undisclosed mystery models support their claims (Opp. 25-26), but that suggestion ignores the *Twombly* pleading standard.  *Twombly* applies just as much to statistical allegations as to traditional allegations, and it requires a plaintiff to plead sufficient *facts* to permit an evaluation of the plausibility of statistical claims.[10]  No such facts are pled here.

---

[8] *See, e.g., Citigroup*, 709 F.3d at 133, 138 (taking notice of the economic environment created by the financial crisis in antitrust case involving similar bonds); *7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*, 314 F. Supp. 3d 497, 515 n.3 (S.D.N.Y. 2018) (taking "judicial notice of the events constituting the financial crisis" where "[t]he period in which Plaintiff alleges that interest rates rapidly increased … coincides with the height of the 2008 financial crisis"); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000) (judicial notice of  "well publicized stock prices"); *Orix Fin. Servs., Inc. v. Brewer*, 2001 WL 34629830, at *2 (S.D.N.Y. 2001) (same for "Federal Reserve Discount Rate" posted on Federal Reserve website); *Stein v. JP Morgan Chase Bank*, 279 F. Supp. 2d 286, 290 (S.D.N.Y. 2003) (same for "prime rates published in the Wall Street Journal").

[9] *See, e.g.,* Compl. ¶¶ 3, 127, 138 (acknowledging that Plaintiffs' results reflect a narrowing of the usual tax-driven gap between VRDO rates and commercial paper rates); *id*. at Fig. 4 (demonstrating that the alleged conspiracy period dovetails with the ultra-low interest rate period); Opp. 27, 29 (conceding the "low interest rate environment" that existed during the alleged conspiracy period and that VRDO rates fell to extremely low levels during that period).

[10] *See, e.g., 7 W. 57th St. Realty Co.,* 314 F. Supp. 3d at 504-05, 513-14 (disregarding statistical analysis that was not well-pled); *FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, 2017

Plaintiffs also fail to plead sufficient facts to support the central premise of their statistical analysis:  that the relationship between VRDO rates and commercial paper rates "should generally have remained the same" regardless of drastic economic policy changes such as the zero interest rate policy and the deliberate suppression of commercial paper rates through the Federal Reserve's "liquidity backstop" program.[11]  (Compl. ¶ 127.)  Plaintiffs argue that there is "no reason" why a low interest rate environment would prevent VRDO rates from maintaining their usual historical discount to commercial paper rates (Opp. 27), but their own Complaint identifies an obvious reason.  Even in a low interest rate environment, VRDO rates could not fall all the way to the lower bound of zero (Compl. at 43 n.11), so VRDO rates and commercial paper rates inevitably converged as they approached that lower bound.

### 3.    Plaintiffs fail to plead meaningful plus factors.

In the absence of well-pled allegations of direct evidence or parallel conduct, this Court need not consider whether Plaintiffs have pled viable plus factors.  *See, e.g., Bona Fide Conglomerate, Inc. v. SourceAmerica*, 691 F. App'x 389, 391 (9th Cir. 2017) ("[P]lus factors are relevant only if the complaint adequately alleges parallel conduct among the defendants."); *In re MGB*, 2019 WL 4805854, at *8 ("plus factors in the absence of parallel conduct or direct

---

WL 3600425, at *11 (S.D.N.Y. 2017) (same); *In re N. Sea Brent Crude Oil Futures Litig.*, 256 F. Supp. 3d 298, 318 (S.D.N.Y. 2017) (same); *In re Commodity Exch. Inc. Silver Futures & Options Trading Litig.*, 2013 WL 1100770, at *4 (statistical claims that are not "sufficiently factual" are treated as "mere conclusory statements"), *aff'd*, 560 F. App'x 84 (2d Cir. 2014); *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 36 n.5 (2013) ("[W]hile the data contained within an econometric model may well be 'questions of fact' in the relevant sense, what those data prove is no more a question of fact than what our opinions hold.").

[11] Plaintiffs argue that the Fed's liquidity backstop program artificially suppressed commercial paper rates only from 2008 to 2010 (Opp. 3), but they do not deny that 2008 to 2010 is the only period in which their analysis purports to show a statistically significant difference between *actual* VRDO rates and Plaintiffs' estimated "but-for" VRDO rates.  (*See* Mot. 22 n.17.)

evidence are insufficient to state an antitrust claim").  Regardless, Plaintiffs' assorted plus factor allegations provide no support for their claims.

Common motive to conspire.  Plaintiffs renew their assertion that the Defendant RMAs shared a "common motive" to set VRDO rates at levels sufficient to avoid the prospect of having to carry unsold VRDOs as inventory.  (Opp. 17.)  But Plaintiffs now admit that any RMAs that did not *want* to carry VRDOs in their inventory had an unfettered right to "put" the bonds to liquidity providers, the only parties that had a contractual obligation to take unsold bonds into inventory.  (Opp. 4, 18-19.)  In addition, Plaintiffs allege that each Defendant's RMA contracts required VRDO rates to be set at the lowest rate that "enable[s] the bonds to trade at par," *i.e.*, rates sufficient to keep bonds *out of* Defendants' inventory.  (Mot. 23-24.)

Plaintiffs also rely on their conclusory allegation that Defendants wanted to set high rates that would enable them to place VRDOs easily, without much need to "spend time and resources" marketing the bonds.  (Opp. 17.)  But *any* antitrust plaintiff could *always* make this type of generic allegation that the defendants wanted to "do less work" or "increase profits." Courts therefore reject such assertions as far too general to provide a plus factor.  *See, e.g., In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 n.8 (9th Cir. 2015) ("common motive to increase profits always exists"); *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007) ("if a motive to achieve higher prices were sufficient, every company in every industry could be accused of conspiracy because they all would have such a motive").  To plead a common motive to conspire, a plaintiff must allege that the defendants had a strong motive to act together to engage in conduct *that they would be unlikely to undertake unilaterally.  See Twombly*, 550 U.S. at 566 ("there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway").  Here, by

11

contrast, there was "little urgency to conspire" because each RMA already had a contractual obligation to set rates sufficient to keep VRDOs out of inventory, and each RMA had an absolute right to put bonds to liquidity providers if it did not wish to carry inventory.  *See In re IRS*, 261 F. Supp. 3d at 471 (declining to find a plus factor where there was "little urgency to conspire").

Parallel acts against self-interest.  Similarly, the "acts against self-interest" that Plaintiffs purport to plead—setting VRDO rates high enough to keep bonds out of inventory—in fact are consistent with each Defendant's self-interest because Plaintiffs allege that each Defendant had an obligation to set rates sufficient to sell the bonds at par.  Moreover, Plaintiffs cannot identify the necessary "*parallel* acts . . . against the individual economic self-interest of the alleged conspirators," *Citigroup*, 709 F.3d at 136, because they plead no meaningful parallel conduct.

 Inter-firm communications.  Although Plaintiffs argue that they have alleged "almost daily" communications among Defendants (Opp. 19), they acknowledge that those allegations are highly general (Opp. 20 & n. 4).  Moreover, even these general allegations describe information sharing as opposed to price-fixing (Compl. ¶¶ 12-13, 99, 113), and the alleged information sharing is fully consistent with Defendants' contractual obligations to closely monitor the market and set VRDO rates with "due regard for the prevailing financial market conditions" (*id.* ¶ 82).  Plaintiffs' allegations of inter-firm communications therefore fail to carry significant weight.  *See, e.g., Citigroup*, 709 F.3d at 137 ("'plus factors' … must still lead to an inference of conspiracy"); *In re IRS*, 261 F. Supp. 3d at 471-72 (allegations of a "high level of interfirm communications," without more, "lend only light support to a conspiracy theory").

Government investigations.  Plaintiffs renew their assertion that the government opened some sort of VRDO investigation in 2015 or 2016, but they are *still* unable to identify the entities being investigated, the theory of the investigation, or any finding of wrongdoing even though the

investigation purportedly began *years* before this case was filed.  (Opp. 22.)  Particularly under

these circumstances, mere allegations of a government investigation do not supply a plus factor.

*See, e.g.*, *In re MGB*, 2019 WL 4805854, at *8 (disregarding allegations of government

investigation that did not identify any wrongdoing or any specific entities being investigated); *In*

*re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, 213 F. Supp. 3d 631, 662

(S.D.N.Y. 2016) (allegations that government investigations "have been going on for well over

two years," but have not "advanced to the point of charging any of the Defendants with

colluding," do not provide a plus factor); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*,

74 F. Supp. 3d 581, 592 (S.D.N.Y. 2015) ("[T]he mere fact of pending investigations without

more only raises, but does not respond to, the question of whether concerted wrongdoing

occurred because the outcome and scope of such investigations are pure speculation."); *see also*

Mot. 26-27 (citing additional authority).

## II.    Plaintiffs' Claim Is Governed By The Rule of Reason, Not The Per Se Rule.

Plaintiffs concede that agreements to exchange information, without more, are evaluated

under the rule of reason (Opp. 34), and they further concede that they did not plead a rule-of-

reason claim (Opp. 35).  The survival of Plaintiffs' antitrust claim therefore turns on whether the

Complaint adequately pleads a *per se* claim, which requires alleging not only that Defendants

*exchanged information* about VRDOs, but also that they entered into an underlying *agreement* to

"inflate the interest rates on VRDOs."  (Opp. 32.)  No such agreement is successfully pled here:

the Complaint lacks any allegations of either direct evidence or parallel conduct that support an

inference of a *per se* unlawful agreement to inflate VRDO interest rates.  *See supra* at 1-5.

When Plaintiffs' conclusory assertions of "agreement" and "conspiracy" are set aside, the

remaining factual allegations assert only that Defendants shared information about inventory

levels and base rates.  (Compl. ¶¶ 12, 91, 100-102, 107-110, 113.)  Plaintiffs allege, for example,

that Defendants participated along with non-Defendants in an index service offered by Standard & Poor's J.J. Kenny subsidiary.  (Opp. 6; Compl. ¶ 107.)  Although Plaintiffs use sinister rhetoric to describe this index, they notably omit any allegation that Defendants "inflated" the index or that Defendants agreed to charge the index rate on any of the individual VRDOs they administered.[12]  Plaintiffs are thus reduced to suggesting that the index had the general purpose and effect of inflating VRDO rates, but that is a classic rule-of-reason claim.  (Mot. 28-29.)

Remarkably, Plaintiffs contend that "Defendants offer no explanation why it would be 'pro-competitive' to discuss their rates and inventory levels with their competitors"—a "silence" they describe as "damning."  (Opp. 32.)  In fact, Defendants spent several pages of their opening brief providing that very explanation.  (Mot. 28-29, 32-33.)  To summarize, RMAs need the best possible information about the VRDO market to comply with their contractual obligations to set rates with "due regard for the prevailing market conditions" and to set the lowest rates sufficient to sell the bonds at par.  (*E.g.*, Compl. ¶¶ 82, 83.)  The alleged information exchanges thus would have the procompetitive effect of enabling RMAs to set rates that accurately reflect prevailing market conditions—rates that could be either higher or lower than those that would be set in the absence of such information.  *See, e.g., Int'l Healthcare Mgmt. v. Coal. for Health*, 332 F.3d

---

[12] Although Plaintiffs include a conclusory group-pleading allegation that "Defendants" used the J.J. Kenny index to "collude about" VRDO rates (Compl. ¶ 111), they fail to identify any specific times, places, or persons involved in the purported "collusion."  Plaintiffs also assert that unnamed individuals communicated with each other at unknown times to "confirm" that rates would be "in line" with the index, but that is just another way of saying that Defendants asked each other *questions* about the direction of the market.  None of these allegations identifies the type of specific "smoking gun" communications that constitute direct evidence of an unlawful agreement.  *See, e.g., Citigroup*, 709 F.3d at 136; Mot. 10-11 (citing cases holding that allegations of "direct evidence" must identify specific persons and communications).  In the absence of any allegations of direct evidence or parallel conduct indicative of an unlawful agreement to inflate VRDO rates, Plaintiffs' allegations of information sharing and inter-firm communications do not sustain their conclusory assertions of "conspiracy."  *See, e.g., Citigroup*, 709 F.3d at 135-36; *In re MGB*, 2019 WL 4805854, at *8 ("plus factors in the absence of parallel conduct or direct evidence are insufficient to state an antitrust claim").

600, 608 (9th Cir. 2003) ("Disseminating information that fosters rational business decisions is pro-competitive."); *In re Baby Food*, 166 F.3d at 126 ("[I]n a highly competitive industry … it makes common sense to obtain as much information as possible of the pricing policies … of one's competitors").  That is doubtless why the MSRB makes information on rates and inventories available on its EMMA system.  (Mot. at 6.)  Exchanging rate and inventory information is therefore far from the type of "manifestly anticompetitive" conduct lacking any conceivable justification that courts evaluate under the *per se* rule.  *See N.W. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1984).

Plaintiffs also assert that allegations of "extensive" information exchanges are sufficient by themselves to support an inference of *per se* unlawful price-fixing.  (Opp. 34.)  Plaintiffs are mistaken.  The cases they cite did not turn on the "extensiveness" of the alleged information exchanges, but rather on the existence of well-pled allegations that the information sharing was accompanied by a price-fixing agreement.[13]  In information exchange cases like this one in which the plaintiffs *fail* to include well-pled allegations of a price-fixing agreement, courts apply the rule of reason, not the *per se* rule.  *See, e.g.*, *United States v. U.S. Gypsum Co.*, 438 U.S. 422,

---

[13] *See, e.g., In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d at 591-92 (finding that the complaint offered "direct evidence" of conspiracy, including "penalties and fines levied by regulators" and "specific allegations of chat room participants congratulating each other about the manipulation"); *In re Mercedes-Benz Antitrust Litig.*, 157 F. Supp. 2d 355, 358, 360-61 (D.N.J. 2001) (alleging price-fixing conspiracy in which competing dealers agreed not compete on price; manufacturer enforced conspiracy by, *inter alia*, threatening dealers who cut prices); *Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 551 (S.D.N.Y. 2018) (alleging a conspiracy to make false rate submissions and manipulate an interest rate benchmark, and noting regulatory admissions of wrongdoing by at least one defendant); *In re Ethylene Propylene Diene Monomer Antitrust Litig.*, 681 F. Supp. 2d 141, 176 (D. Conn. 2009) (alleging that defendants not only exchanged information, but also discussed how each defendant would respond to price increases and which defendant would lead a price increase); *United States v. Marr*, 2017 WL 1540815, at *23 (N.D. Cal. 2017) (rejecting rule of reason instruction in criminal trial because indictment charged bid rigging, not just information sharing).

441 & n.16 (1978); *Burtch*, 662 F.3d at 223-24; *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001); *Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*, 713 F. Supp. 2d 286, 299 (S.D.N.Y. 2010); *see also supra* at 3.[14]   Indeed, in *Gypsum*—controlling Supreme Court precedent that Plaintiffs never mention—the government won at trial on the theory that exchanges of current and future pricing information were *per se* unlawful, but the Supreme Court reversed, finding that agreements to exchange pricing information can be procompetitive and efficient.  *See* 438 U.S. at 428-29, 441 n.16.[15]

### III.   Plaintiffs Fail To Overcome The Statutes Of Limitations.

Plaintiffs fail to demonstrate that they have pled the concealment and due diligence elements of the fraudulent concealment doctrine under either state or federal law.[16]

Concealment.  Plaintiffs' conclusory pronouncement that a price-fixing conspiracy is inherently self-concealing (Opp. 36) misstates the law and ignores their burden to plead a "self-concealing" conspiracy with particularity.  *See In re Magnesium Oxide Antitrust Litig.*, 2011 WL 5008090, at *22 (D.N.J. 2011) (rejecting "self-concealing" allegations where, as here, they were

---

[14] Plaintiffs incorrectly argue that the cases cited by Defendants "*only* concerned the sharing of information." (Opp. 34.)  In reality, the plaintiffs in those cases *attempted* to plead that information sharing was part of a price-fixing agreement, but the courts found that the plaintiffs failed to allege sufficient *facts* to support the existence of such an agreement.  *See, e.g.*, *Burtch*, 662 F.3d at 223-24; *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 709-11 (7th Cir. 2011); *Todd*, 275 F.3d at 199; *Five Smiths, Inc. v. NFL Players Ass'n*, 788 F. Supp. 1042, 1048 (D. Minn. 1992); *Supermarket of Homes v. San Fernando Bd. of Realtors*, 1983 WL 2199, at *6 (C.D. Cal. 1983).

[15] Plaintiffs ask in passing for leave to amend their complaint to assert a rule-of-reason claim.  (Opp. 35.)  This request should be denied because this Court already granted Plaintiffs a use-it-or-lose-it opportunity to amend (ECF No. 126), and Plaintiffs declined that opportunity (ECF No. 129).  Plaintiffs have not shown good cause for the Court to reverse its prior order.

[16] Like federal law, Pennsylvania and Maryland law require Plaintiffs to plead active concealment with particularity and that Plaintiffs could not have discovered their causes of action with reasonable diligence.  *Sarpolis v. Tereshko*, 26 F. Supp. 3d 407, 420 (E.D. Pa. 2014), *aff'd*, 625 F. App'x 594 (3d Cir. 2016); *Dual Inc. v. Lockheed Martin*, 383 Md. 151, 170-72, 857 A.2d 1095, 1105-07 (2004).

not supported by specific allegations regarding the circumstances surrounding the concealment).

Moreover, Plaintiffs cannot maintain that the alleged conspiracy was "self-concealing" while

simultaneously alleging that the conspiracy is evident from data and information available to the

public throughout the alleged conspiracy period.  (Compl. ¶¶ 124-51 (alleging that publicly

available VRDO and commercial paper data prove a conspiracy)).)[17]

Nor can Plaintiffs bolster their allegations of concealment by referring to alleged

"statements from former high-ranking employees at several Defendants." (Opp. 37.)  *See In re*

*IRS*, 261 F. Supp. 3d at 489 (dismissing allegations of "secret meeting[s]" as "general and

conclusory" even where plaintiffs cited "insiders who attended the meeting[s]").  In addition,

although Plaintiffs allege that unnamed "industry insider[s]" shared information with each other,

they do not allege who did so, when they did so, or whether the "insiders" even worked for

Defendants during the alleged conspiracy period.  (Compl. ¶¶ 100-01.)

Plaintiffs' efforts at alleging affirmative concealment also fail.  The generic statement

that "[VRDO] yields reflect the current interest-rate environment" (Opp. 37) could not have

concealed the alleged conspiracy because it was made in 2017—*after* the alleged conspiracy

ended.  In any event, a single statement by a single Defendant is insufficient to plead

concealment by *all* Defendants because fraudulent concealment tolls the statute of limitations

"only as to those defendants who committed the concealment."  *Behrens v. JPMorgan Chase*

*Bank N.A.*, 2019 WL 1437019, at *6 (S.D.N.Y. 2019).  Other statements on which Plaintiffs

rely—such as that Defendants "would use their best efforts to reset interest rates at the minimum

interest rate which would allow the RMAs to clear at par" (Opp. 38)—do not reflect the

---

[17] Plaintiffs' citation to *In re GSE Bonds Antitrust Litigation*, 396 F. Supp. 3d 354 (S.D.N.Y. 2019),
is inapposite because that decision sustained the complaint *only* as to those defendants for whom
plaintiffs also alleged specific "smoking gun" chatroom conversations. *Id.* at 361-66.

necessary *affirmative* concealment.  *See Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (finding that generic assertions of compliance were not "actionable assurances of actual compliance"); *De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 319 (S.D.N.Y. 2013) (requiring pleading of acts of concealment separate from the misconduct itself).

 Due diligence.  Plaintiffs' assertion that they could not have discovered the purported misconduct until "consulting with an industry whistleblower" (Compl. ¶ 168) ignores that this same "whistleblower"—who was *not* an "industry insider" but only an analyst armed with the same public data relied upon by Plaintiffs—filed similar claims in Illinois and Massachusetts *over four years earlier* (Mot. 38-39).  Furthermore, pleading that Plaintiffs "regularly monitored" their VRDOs is not enough to allege due diligence.  *See, e.g.*, *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 522 (S.D.N.Y. 2009) (holding that "a brief reference to 'reasonable diligence,' coupled with general allegations of secrecy and deception" was insufficient).  In the end, Plaintiffs' refrain that "inquiry notice is a fact-intensive question" (Opp. 41) does not absolve them of "pleading their own diligence *with particularity*."  *Butala v. Agashiwala*, 916 F. Supp. 314, 319-20 (S.D.N.Y. 1996).  Fatally missing here is any indication of "how [each defendant's] alleged acts of concealment prevented Plaintiffs from learning about the nature of their claims."  *Behrens*, 2019 WL 1437019, at *7.

## IV. Plaintiffs Fail To State A Breach of Contract Claim.

 Plaintiffs admit that they pled no contractual relationship with 14 of 23 Defendants, but argue that they pled contracts with "seven of the eight *affiliate groups* named in the Complaint." (Opp. 43.)  In fact, Plaintiffs withdrew all allegations of a contract with any Morgan Stanley entity and never alleged a contract with a Goldman Sachs entity.  (Mot. 41-42, n.37.)  Moreover, all remaining non-counterparty Defendants should be dismissed because Plaintiffs plead no

justification for imputing a contract with a given Defendant to its "affiliates."  (*See* Mot. 42 &

n.39 (citing *S.M. v. Oxford Health Plans (N.Y.)*, 644 F. App'x 81, 85 (2d Cir. 2016)).)

Plaintiffs defend their failure to plead the terms of their contracts with seven of the nine

"counterparty" Defendants on the ground that those terms are "largely identical" to the contracts

they do plead.  (Opp. 43.)  But a breach of contract claim requires specific allegations of the

terms allegedly breached (Mot. 41-43), and Plaintiffs' premise of "largely identical" contracts is

belied by significant variation in the contract language quoted in their own Complaint.[18]  The

contract claims also fail for each of the remaining reasons discussed in Defendants' opening brief

(Mot. 43-44), none of which is successfully rebutted in Plaintiffs' opposition.

## V.     Plaintiffs Fail To State A Claim For Unjust Enrichment.

Plaintiffs do not deny that their unjust enrichment claims and antitrust claims rise and fall

together.  In addition, Plaintiffs cannot skirt their failure to allege a sufficient relationship with

non-counterparty Defendants (Mot. 44; Opp. 46 n.22) by imputing relationships with *affiliates* of

those Defendants to non-counterparty Defendants themselves.  *See Alaska Elec. Pension Fund v.

Bank of Am. Corp*, 306 F. Supp. 3d 610, 625-626 (S.D.N.Y. 2018) ("[A]bsent a basis to treat

Nomura Securities as NGFP's alter ego," affiliation "is not enough").

Plaintiffs' argument that Defendants received the "direct benefit" necessary to sustain an

unjust enrichment claim because they supposedly were paid "more than they otherwise would

have for remarketing services" (Compl. ¶ 193; Opp. 46) also fails, as it rests on "speculation"

about what Defendants "otherwise would have" earned in a hypothetical but-for world.  *See

DeBlasio v. Merrill Lynch & Co*., 2009 WL 2242605, at *40 (S.D.N.Y. 2009).

---

[18] *Compare, e.g.*, Compl. ¶ 79 (allegedly requiring RBC to set interest rates so that the bonds will
trade "at a price equal to the principal amount thereof, *plus interest, if any, accrued …*") *to* Compl.
¶ 80 (allegedly requiring Citi to price bonds "*without regard to accrued interest*").

## VI.    Plaintiffs Fail To State A Claim For Breach Of Fiduciary Duty.

Plaintiffs fail to salvage their fiduciary duty claim for four main reasons.  First, Maryland law does not permit a claim for breach of fiduciary duty where a plaintiff asserts breaches of contract and of fiduciary duty concerning the same agreement.[19]  Second, although Plaintiffs try to escape Pennsylvania's "gist of the action" doctrine by asserting that Defendants had duties as "municipal advisors" under 15 U.S.C. § 78o-4(c)(1), their claims do not arise from any such duties.  As the SEC has explained, "standard services that are typically covered by a remarketing agreement" do not constitute advice pursuant to a municipal advisory duty.[20]  Here, Plaintiffs' allegations relate directly to Defendants' "standard services" in their capacity as RMAs.

Third, Plaintiffs' conclusory assertion that they "placed trust in Defendants" to fulfill their contractual duties (Opp. 49) is insufficient to convert a contractual relationship into a fiduciary one because, if that were enough, *all* contracting parties would be fiduciaries.

Finally, Plaintiffs fail to overcome their own allegations that they employed their own "outside advisers," independently monitored Defendants' compliance, and expressly disclaimed any fiduciary relationship with Defendants.  (Compl. ¶ 169; Mot. 47-48.)  *Amendolia v. Rothman*, 2003 WL 23162389, at *4 (E.D. Pa. 2003), is inapposite because that case turned on a finding that the broker at issue was a fiduciary as a matter of Pennsylvania law.

### CONCLUSION

The Complaint should be dismissed with prejudice in its entirety.

---

[19] *See, e.g.,* Mot. 46 (citing authorities); *Sharma v. OneWest Bank, FSB*, 2011 WL 5167762 (D. Md. 2011) ("Maryland does not recognize a separate tort action for breach of fiduciary duty."); *G.M. Pusey & Assocs., Inc. v. Britt/Paulk Ins. Agency, Inc*., 2008 WL 2003747 (D. Md. 2008) ("Maryland does not recognize an independent cause of action for breach of fiduciary duty.").

[20] *See* Registration of Municipal Advisors Frequently Asked Questions, U.S. Sec. & Exch. Comm'n, *available at* https://www.sec.gov/info/municipal/mun-advisors-faqs.pdf.

Dated: November 14, 2019

| | |
|---|---|
| **WILMERHALE** | **SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP** |
| By: David S. Lesser* | By: Boris Bershteyn* |
| David S. Lesser<br>7 World Trade Center<br>250 Greenwich Street<br>New York, NY 10007<br>Telephone: (212) 230-8851<br>Fax: (212) 230-8888<br>david.lesser@wilmerhale.com | Boris Bershteyn<br>Lara Flath (*pro hac vice*)<br>Mollie Kornreich<br>Four Times Square<br>New York, NY 10036-6522<br>Telephone: (212) 735-3834<br>Fax: (917) 777-3834<br>boris.bershteyn@skadden.com<br>lara.flath@skadden.com<br>mollie.kornreich@skadden.com |
| Jonathan G. Cedarbaum<br>1875 Pennsylvania Avenue, NW<br>Washington, DC 20006<br>Telephone: (202) 663-6315<br>jonathan.cedarbaum@wilmerhale.com | |
| Heather Nyong'o<br>950 Page Mill Road<br>Palo Alto, CA 94304<br>Telephone: (650) 858-6134<br>heather.nyong'o@wilmerhale.com | *Attorneys for Defendants Barclays Bank PLC and Barclays Capital Inc.* |
| *Attorneys for Defendants Bank of America Corporation, Bank of America, N.A., and Merrill Lynch, Pierce, Fenner & Smith Incorporated (including as successor in interest to Banc of America Securities LLC)* | |

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By: <u>Kenneth A. Gallo*</u>

Kenneth A. Gallo
Jane B. O'Brien
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7356
Fax: (202) 204-7356
kgallo@paulweiss.com
jobrien@paulweiss.com

Brad S. Karp
Susanna M. Buergel
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3553
Fax: (212) 492-0553
bkarp@paulweiss.com
sbuergel@paulweiss.com

*Attorneys for Defendants Citigroup Inc.,
Citibank, N.A., Citigroup Global Markets
Inc., and Citigroup Global Markets Limited*

**WINSTON & STRAWN LLP**

By: <u>Robert Y. Sperling*</u>

Robert Y. Sperling
35 West Wacker Drive
Chicago, IL 60601
Telephone: (312) 558-5600
Fax: (312) 558-5700
rsperling@winston.com

George E. Mastoris
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Fax: (212) 294-4700
gmastoris@winston.com

*Attorneys for Defendant Goldman Sachs &
Co. LLC*

22

**COVINGTON & BURLING LLP**

By:  Robert D. Wick

Andrew A. Ruffino
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 841-1000
aruffino@cov.com

Robert D. Wick
850 Tenth Street, N.W.
Washington, D.C. 20001
Telephone: (202) 662-6000
rwick@cov.com

*Attorneys for Defendants JPMorgan Chase
Bank, N.A., and J.P. Morgan Securities LLC*

**SHEARMAN & STERLING LLP**

By: Adam S. Hakki*

Adam S. Hakki
Grace J. Lee
599 Lexington Avenue
New York, NY 10022-6069
Telephone:  (212) 848-4000
Facsimile:  (212) 848-7179
adam.hakki@shearman.com
grace.lee@shearman.com

John F. Cove, Jr.
535 Mission Street, 25th Floor
San Francisco, CA 94105-2997
Telephone:  (415) 616-1100
Facsimile:  (415) 616-1199
john.cove@shearman.com

*Attorneys for Defendants Morgan Stanley,
Morgan Stanley Smith Barney LLC, Morgan
Stanley & Co. LLC, Morgan Stanley Capital
Group Inc.*

**O'MELVENY & MYERS LLP**

By: <u>Andrew J. Frackman*</u>

Andrew J. Frackman
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
afrackman@omm.com

Edward N. Moss
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
emoss@omm.com

Sergei Zaslavsky
1625 Eye St, NW
Washington, D.C. 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414
szaslavsky@omm.com

*Attorneys for Defendants The Royal
Bank of Canada and RBC Capital Markets,
LLC*

**JONES DAY**

By: <u>Jayant W. Tambe*</u>

Jayant W. Tambe
250 Vesey Street
New York, NY 10281-1047
Telephone: (212) 326-3604
Fax: (212) 755-7306
jtambe@jonesday.com

Michael P. Conway
77 West Wacker
Chicago, IL 60601-1692
Telephone: (312) 269-4145
Fax: (312) 782-8585
mconway@jonesday.com

*Attorneys for Defendants Wells Fargo & Co.,
Wells Fargo Bank, N.A., Wachovia Bank,
N.A., Wells Fargo Funds Management, LLC,
and Wells Fargo Securities LLC*

\* Signature used with permission pursuant to S.D.N.Y. ECF Rule 8.5(b).