UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                              :
CITY OF PHILADELPHIA, et al.,                                 :
                                                              :            19-CV-1608 (JMF)
                                      Plaintiffs,             :            19-CV-2667 (JMF)
                                                              :
             -v-                                              :
                                                              :            OPINION AND ORDER
BANK OF AMERICA CORPORATION, et al.,                          :
                                                              :
                                      Defendants.             :
                                                              :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

 Plaintiffs in these consolidated putative class actions allege that, between 2008 and 2016,

remarketing agents at some of the world's largest banks conspired to fix the interest rates for a

type of bond called Variable Rate Demand Obligations ("VRDOs").  *See* ECF No. 107 ("CAC"),

¶¶ 1-2.[1]  Specifically, the City of Philadelphia ("Philadelphia") and the Mayor and City Council

of Baltimore ("Baltimore"), on behalf of themselves and a proposed class of local and state

public entity issuers, bring suit against Bank of America, Barclays, Citigroup, Goldman Sachs,

JPMorgan Chase, Morgan Stanley, the Royal Bank of Canada ("RBC"), and Wells Fargo (and

their various parents, affiliates, subsidiaries, predecessors, and successors) (collectively, the

"Banks" or "Defendants")[2] under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1;

---

[1] All references to the docket are to 19-CV-1608 unless otherwise specified.

[2] The Complaint identifies the following entities as the Municipal Securities Groups or
national banks responsible for remarketing the bonds:  Banc of America Securities LLC;
Barclays Capital, Inc.; Citigroup Global Markets Inc.; J.P. Morgan Securities LLC; Merrill
Lynch, Pierce, Fenner & Smith Inc.; Morgan Stanley; RBC Capital Markets LLC; Wachovia
Bank N.A.; and Wells Fargo Bank, N.A (the "RMA Defendants").  *See* CAC ¶¶ 25-26, 30-31,
33, 37, 44, 46, 52, 55-56.  The rest of the entities are a variety of banking corporations, federally

Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 and 26; and certain state laws. Defendants now move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss all of Plaintiffs' claims.  ECF No. 124 ("Defs.' Mem."), at 1-2.  For the reasons that follow, Defendants' motion is GRANTED in part and DENIED in part.

## BACKGROUND

The following facts — drawn from the Consolidated Class Action Complaint ("Complaint"), and documents attached to, incorporated by reference in, or integral to it — are assumed to be true for purposes of this motion.  *See, e.g.*, *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

### A.  The VRDO Market

VRDOs are a type of bond issued by municipalities and other public or charitable entities, such as schools, hospitals, and community organizations, to raise funds for operating expenses, infrastructure projects, and public services.  CAC ¶¶ 2, 60.  The bonds are issued on a long-term basis, allowing an issuer to borrow money for lengthy periods (typically twenty to thirty years), but they have short-term interest rates that are reset on a periodic basis, typically weekly.  *Id.* ¶¶ 3, 61, 70.  To attract investors, these bonds have a unique, "built-in 'put' feature that allows investors to redeem the bond at any periodic reset date at face value" (that is, at

---

chartered national banking associations, and limited liability companies associated with the RMA Defendants: Bank of America Corporation and Bank of America, N.A. (the "Bank of America Associates"); Barclays Bank PLC; Citigroup, Inc., Citibank N.A., and Citigroup Global Markets Limited (the "Citi Associates"); Goldman Sachs & Co. LLC; JPMorgan Chase Bank, N.A.; Morgan Stanley Smith Barney LLC, Morgan Stanley & Co. LLC, and Morgan Stanley Capital Group Inc. (the "Morgan Stanley Associates"); RBC; Wells Fargo Funds Management, LLC and Wells Fargo Securities LLC (the "Wells Fargo Associates").  *See* CAC ¶¶ 28-29, 33, 35-36, 38, 40, 43, 47-51, 54, 56-58.  The Complaint also names JP Morgan Chase & Co. and Wells Fargo & Co., but Plaintiffs voluntarily dismissed the claims against them.  *See* ECF Nos. 112, 119.

"par") plus any accrued interest.  *Id.* ¶ 3.  That makes them a low-risk and high-liquidity investment.  *Id.*

To manage VRDOs, an issuer contracts with a bank to act as a remarketing agent ("RMA").  *Id.* ¶ 4.  An RMA's obligations are set out in three documents: the remarketing agreement between the RMA and the issuer; the indenture, pursuant to which the actual bonds are issued, which is incorporated by reference into the remarketing agreement; and the official statement, which, although not a contract, is the offering and disclosure material used to market the bonds to investors.  *Id.* ¶¶ 75-76; *see, e.g.*, *id.* ¶ 78 (describing a December 2007 remarketing agreement between Philadelphia and RBC); *id.* ¶ 80 (describing a 2008 remarketing agreement and indenture between Baltimore and Citi).  Pursuant to these documents, an RMA has two primary responsibilities.  First, on each reset date, the RMAs are required to reset the VRDO's interest rate at the lowest rate possible that would permit the bond to trade at par.  *Id.* ¶ 4. Second, when an existing investor exercises the "put" option on the bond, thereby tendering the bond to the RMA, the RMA is required to remarket the VRDO to other investors at the lowest possible rate.  *Id.*  If the RMA cannot find another investor for the VRDO, the obligation to purchase the tendered bond generally falls on a letter of credit provider, which is frequently the RMA itself.  *Id.*  Crucially, if an RMA cannot deliver low rates, the bond issuers, to avoid incurring more costs in financing their operations and infrastructure projects, have the right to replace the RMA with another one who can.  *Id.* ¶ 5.  Thus, in a properly functioning market, RMAs would compete against each other for issuers' business by actively working to set the best — that is, the lowest — possible rates for their customers.  *Id.*

The institutions that serve as RMAs, such as the Defendant Banks here, typically also serve as liquidity providers that enhance the creditworthiness of an issuer by using letters of

credit and standby purchase agreements.  *Id*. ¶ 63.  These letters of credit usually provide an unconditional commitment by a bank to pay investors the principal and interest owed on the VRDOs, even in the case of default, bankruptcy, or downgrade of the issuer.  *Id*. ¶ 73.  In providing a letter of credit, the liquidity provider also agrees to purchase the VRDO if the RMA is unable to find a new investor for the tendered securities.  *Id*. ¶ 74.  Naturally, where the RMA and liquidity provider are one and the same, this poses a dilemma: If an investor exercises the "put" feature and the RMA cannot find a new investor, the RMA (which is also acting as the liquidity provider) is on the hook for the outstanding principal and interest payments due on the bond if the issuer defaults.  *Id*.  The RMA is also forced to carry the VRDO on its balance sheet.  *Id*.  In exchange for these services, the issuers pay liquidity providers annual fees ranging from approximately fifty to 150 basis points of the debt balance of the VRDO, *id.*, and simultaneously pay the RMAs annual fees for their services that, during the Class Period here (February 1, 2008, to June 30, 2016), averaged ten basis points of the VRDO debt balance, *id*. ¶¶ 65, 172.  To illustrate, if a VRDO had a debt balance of $100 million, the issuer would pay the liquidity provider $500,000 to $1.5 million per year and the RMA $100,000 per year.  *Id*. ¶¶ 65, 74.

**B.  The Alleged Conspiracy**

Defendants were, and continue to be, major players in the market for remarketing services.  As of December 2011, for instance, Defendants collectively controlled the majority of outstanding VRDOs.  *Id*. ¶ 97.  During the Class Period, Defendants served as remarketing agents for approximately seventy-five percent of all VRDOs issued in the United States.  *Id*. ¶ 6.  As competitors, Defendants marketed themselves to issuers as the banks best able to fulfill the RMA's responsibilities and achieve the lowest cost of borrowing.  *See, e.g.*, *id*. ¶¶ 78-89.

Beginning as early as February 2008, however, Defendants conspired *not* to compete against each other in the market for remarketing services.  *Id*. ¶ 91.  The collusion ran from the top to the bottom of Defendants' VRDO operations, from senior personnel in Defendants' Municipal Securities Groups, to the remarketing desks below these groups, to the personnel on Defendants' sales desks.  *Id*.  As part of this conspiracy, Defendants worked together to keep interest rates on VRDOs artificially high by sharing information regarding proprietary information such as VRDO inventory and planned changes to the VRDOs' base interest rates.  *Id*. ¶¶ 91-92.  Specifically, the baseline rates applied across Defendants' VRDOs and were typically designed to account for prevailing macroeconomic factors impacting VRDOs.  *Id*. ¶ 100.  Each VRDO was set at a particular spread of basis points above the base rate.  *Id*. ¶ 102.  Thus, by simply changing the base rate, Defendants were able to reset tens, hundreds, or even thousands of VRDO rates in a single stroke.  *Id*.  By talking to other RMAs about whether to move the base rate up or down in any given week, the RMAs were able to convey how they planned to move those tens, hundreds, or thousands of VRDOs that week in a process that required minimal effort and could take less than thirty minutes.  *Id*.

Defendants communicated regularly, almost daily, and shared this proprietary information by telephone, in in-person meetings, via Bloomberg messaging technology, and through third-party intermediaries.  *Id*. ¶ 91.  By investigation, Plaintiffs' counsel learned that evidence of Defendants' direct communications exists, including communication among senior personnel sitting within Defendants' Municipal Securities Groups.  *Id*. ¶ 99.  For example, a former managing director at Defendant Citigroup reported that Defendants' RMA staff would call each other on the phone prior to setting rates and ask, "[A]re you going high or are you going low?"  *Id*. ¶ 101.  A former senior RMA official at JPMorgan confirmed that it was a

"dirty little secret" that RMAs would talk to each other about rates and would ask other RMAs questions like, "Are you placing this paper" — referring to a particular VRDO — "and if so, what will be the rate?"  *Id*.  Similarly, a high-ranking insider confirmed that communications were rampant between Defendants' sales desks, with personnel from competing banks asking each other questions that were clear code for what VRDO rates Defendants planned to set, such as whether they expected rates to "spike up," "How much cash is in the market?" or "How are things trending?"  *Id*.  Defendants also exchanged information about inventory levels, using coded questions like "[A]re you heavy or light?" — meaning "[H]ow are your inventory levels looking?"  *Id*. ¶ 105.  And up until 2012, Defendants used a third-party pricing service provided by J.J. Kenny Drake Inc. ("J.J. Kenny") to share their views of, and plans for, future VRDO-rate setting.  *Id*. ¶¶ 107, 112.  J.J. Kenny aggregated the results and shared its pricing index, after which Defendants would call each other to confirm that they would not diverge from the index.  *Id*. ¶¶ 109, 111.  Taken together, such exchanges provided Defendants with enough information to coordinate their resets of VRDO rates each week to set rates high enough so as not to undercut the rates of Defendants with higher inventory levels.  *Id*. ¶¶ 102, 105.

Absent this coordination, Defendants that set higher rates than their competitors would be at risk of losing their clients to those competitors.  *Id*. ¶ 103.  Thus, each Defendant was incentivized to stay in line.  As one former senior RMA stated: "[N]o one want[ed] to stand out" when it came to setting rates.  *Id*.; *see also id*. ¶ 116 (JPMorgan insider explaining that RMAs "would set the rate wherever they had to keep the paper off their balance sheet — and you could understand them needing other banks to set the same rate, otherwise the issuer would move their business.  It was a challenge to be fair.").  According to another insider, the RMAs responsible for setting the VRDOs were under immense pressure from senior management to keep VRDOs

(which are a relatively low-margin product for Defendants) off the Banks' books or else risk losing their job.  *Id.* ¶ 104.  As such, Defendants' RMAs felt compelled to "artificially prop up interest rates" in order to ensure that the VRDOs would stay off their books.  *Id.*

Defendants engaged in efforts to hide the conspiracy from the issuers.  *Id.* ¶ 118.  For example, the RMAs engaged in "window dressing," whereby they temporarily lowered rates on a single issuer in advance of a meeting or making a pitch for more business.  *Id.*  The RMAs would then take that issuer's VRDOs back onto their own balance sheets to hide the lower rate and not disrupt the market.  *Id.*  As a result, for years, Plaintiffs paid artificially inflated interest rates for the VRDOs they issued.  *Id.* ¶ 119.  After a whistleblower complaint in November 2015, the Securities and Exchange Commission ("SEC") contacted Defendants JPMorgan, Citi, Wells Fargo, and Bank of America, and opened a formal investigation.  *Id.* ¶¶ 120-22.  In 2016, the Department of Justice ("DOJ") launched its own investigation.  *Id.* ¶ 123.

**C.  The Statistical Pleadings**

The Complaint includes several empirical analyses intended to show that Defendants' conspiracy had the effect of inflating VRDO interest rates to artificially high levels during the Class Period.  First, Plaintiffs built a regression model to analyze what Defendants' VRDO rates should have been in the period prior to December 2015.  *Id.* ¶ 126.  Plaintiffs fed this model data on Defendants' actual VRDO rates from December 2015 to February 2019 — the period after the SEC began its investigation — on the theory that such data would be relatively free from the impact of the alleged conspiracy.  The model attempts to predict what Defendants' VRDO rates should have been by estimating the ratio of Defendants' VRDO rates to seven-day AA financial

commercial paper.  *Id*. ¶ 127.[3]  Plaintiffs applied the resulting model coefficients that were generated during the "clean" post-December 2015 period to the actual historical values of the model's explanatory factors, including rates for seven-day AA financial commercial paper and the ratio of one-year AAA corporate debt yields to one-year AAA municipal debt yields during the period prior to December 2015.  *Id*. ¶¶ 127-29.  The model demonstrates that Defendants' actual rates during the alleged conspiracy were substantially higher than Defendants' "but-for" rates during the same period, by statistically significant margins.  *Id*. ¶¶ 129-31.

Second, to examine the extent to which Defendants' artificially high rates could be seen across the entire VRDO market, Plaintiffs built a regression model using (1) data from the SIFMA swap index, which tracks the weekly average interest rates for a broad range of highly rated VRDOs and (2) actual SIFMA rates from January 2000 through July 2007.  *Id*. ¶¶ 132-33. When the resulting explanatory variables from the latter "clean" period are applied to the period from August 2007 to February 2019 to generate a "but for" SIFMA index, the results show that, from August 2007 through November 30, 2015, the actual SIFMA index rate was, on average, nearly seventy-five percent higher than the "but-for" SIFMA rate.  *Id*. ¶ 134.  Finally, Plaintiffs

---

[3]     As Plaintiffs explain:

> Because of the core similarities and corresponding risk profiles of these securities, each of which are short-term in nature and backed by major financial institutions, one would not expect the relationship between these two types of securities to change drastically during the Class Period.  Nonetheless, to control for the effect that changes in non-collusive, legitimate market factors might have had on the relationship between these two securities — *e.g.*, changes in the relative demand for municipal debt over time or the perceived relative risk of default by municipal versus corporate issuers — Plaintiffs' model incorporates as an explanatory variable the ratio of the yields for 1-year AAA corporate debt to 1-year AAA municipal debt.

ECF No. 130 ("Pls.' Opp'n"), at 8 (citing CAC ¶ 128).

analyzed the patterns of the VRDO rates set by each Defendant to determine the degree to which they "clustered" together, regardless of the individual characteristics of the VRDOs. *Id*. ¶ 145. This "clustering" analysis, which is represented graphically in twelve charts in the Complaint, shows persistent levels of clustering — at either the exact same interest-rate level or level of week-over-week interest rate changes — beginning as early as April 2009 (the earliest date for which data on Defendants' own rates is available) until early 2016, when the unusual clustering abruptly lessened. *Id*. ¶¶ 146, 151.  In other words, Defendants routinely set their varied VRDOs at the same rates and changed those rates in lockstep until early 2016 — around the time that the SEC and DOJ began their investigations of Defendants' conduct. *Id*. ¶ 151.

## LEGAL STANDARD

A Rule 12(b)(6) motion tests the legal sufficiency of a complaint and requires a court to determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  When ruling on a Rule 12(b)(6) motion, a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g.*, *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009).  A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  Further, if plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [those claims] must be dismissed." *Id.* at 570.  Crucially, generally, there is no heightened pleading standard in antitrust cases, and at the pleading stage, the plaintiffs need only "raise a reasonable

expectation that discovery will reveal evidence of illegality." *Wacker v. JP Morgan Chase & Co.*, 678 F. App'x 27, 30 (2d. Cir. 2017) (summary order) (quoting *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013). That said, plaintiffs alleging fraudulent concealment for tolling purposes, as Plaintiffs do here, must plead, though not prove, the fraud or mistake with particularity under Rule 9(b) of the Federal Rules of Civil Procedure. *See Armstrong v. McAlpin*, 699 F.2d 79, 88-89 (2d Cir. 1983).

## DISCUSSION

Plaintiffs allege that by sharing competitively sensitive information and conspiring to inflate the VRDOs' interest rates, Defendants intentionally disincentivized investors from exercising their put options; caused Plaintiffs to pay higher interest rates than they otherwise would have paid in a legitimate, free market; and allowed the Banks to keep the bonds out of their inventory and charge Plaintiffs fees for "doing, essentially, nothing." CAC ¶ 14. More specifically, they claim that Defendants participated in a *per se* unlawful scheme to fix prices in violation of the Sherman and Clayton Antitrust Acts. *Id.* ¶¶ 16-18. They also bring state-law claims for breach of contract, breach of fiduciary duty, and unjust enrichment. *Id.* ¶¶ 186-201.

Defendants move, pursuant to Rule 12(b)(6), to dismiss all of these claims. The Court will begin with Plaintiffs' federal antitrust claims and then turn to their state-law claims. The Court will address Defendants' argument that many of Plaintiffs' claims are time-barred.

## A.  The Antitrust Conspiracy

The central question with respect to a conspiracy claim under Section 1 of the Sherman Antitrust Act is whether the alleged conduct "stem[s] from independent decision or from an agreement, tacit or express." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)). To

allege an unlawful agreement, a plaintiff must assert either direct evidence (such as a recorded phone call or email in which competitors agreed to fix prices) or "circumstantial facts supporting the *inference* that a conspiracy existed." *Citigroup*, 709 F.3d at 136 (emphasis in original); *see also Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016) ("At the pleading stage, a complaint claiming conspiracy, to be plausible, must plead 'enough factual matter (taken as true) to suggest that an agreement was made . . . .'" (quoting *Anderson News L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012)).  Because conspiracies "nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators," a lack of direct evidence does not doom a conspiracy claim.  *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 591 (S.D.N.Y. 2015) (quoting *Anderson News*, 680 F.3d at 183); *see also United States v. Snow*, 462 F.3d 55, 68 (2d Cir. 2006) ("[C]onspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with . . . precision . . . ." (internal quotation marks omitted)).

More specifically, a horizontal agreement or conspiracy — the sort of pact alleged here — "may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors." *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (Sotomayor, J.).  Such "plus factors may include: a common motive to conspire, evidence that shows the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Citigroup*, 709 F.3d at 136 (internal quotation marks omitted).  That list, however, is "neither exhaustive nor exclusive, but rather illustrative." *Gelboim*, 823 F.3d at 781 (internal quotation marks omitted).  The ultimate question is whether allegations of parallel

conduct are "placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557.

### 1. Parallel Conduct

Applying the foregoing principles here, the Court concludes that Plaintiffs plausibly allege that Defendants engaged in an antitrust conspiracy. The Complaint alleges that from 2008 to 2016, Defendants collusively shared proprietary information regarding their VRDO inventory levels and base rates to reset the base rates at supracompetitive levels. The parallel conduct is plainly pleaded: The Banks' RMA agents reset the VRDO base rates on a weekly basis, typically every Tuesday or Wednesday, at similarly inflated levels without "regard to the individual characteristics of VRDOs, market conditions, or investor demand." *Id*. ¶¶ 4, 7. As noted, because the interest rate for any particular VRDO was set in reference to the base rate, by altering the base rates on any given reset day, the Banks coordinated the rate reset of a large number of VRDOs "in a single stroke." *Id*. ¶¶ 102-03. In this manner, the Banks' rate-fixing scheme was deceptively simple. As alleged in the Complaint, it was also effective. Statistical analyses set forth in the Complaint indicate that interest rates for VRDOs were nearly seventy-five percent higher than rates would have been in a "but-for" world and exhibited a high degree of clustering between April 2009 and November 2015, abruptly declining in 2016, soon after the SEC and DOJ investigations into the Banks' behavior commenced. *Id*. ¶¶ 134, 145-50.

The Banks urge the Court to reject Plaintiffs' statistical pleadings, arguing that their economic analyses are methodologically flawed and show a convergence between VRDO rates and commercial paper rates from 2008 to 2016 that was "only natural" given interest-rate policies set by the Federal Reserve. *See* Defs.' Mem. 17-21. In support of this argument, the Banks cite *In re Commodity Exchange, Inc., Gold Futures & Options Trading Litigation*, 328 F.

12

Supp. 3d 217, 227 (S.D.N.Y. 2018), for the proposition that courts "declin[e] to credit statistical

charts that 'are as consistent with parallel, market-following behavior . . . as they are with

participation in a price-fixing scheme.'"  Defs.' Mem. 17.  The Court disagrees.  Contrary to the

Banks' contentions, Plaintiffs' three sets of statistical models, taken together, reinforce their

factual allegations that the VRDO rates were substantially inflated during the Class Period.  *See*

CAC ¶¶ 126-151.  Moreover, "[a]t this stage, a statistical analysis, like any other allegation, need

only be plausible.  Merely pointing out that there are problems with the analysis, or that a better

method is available, will not suffice."  *In re GSE Bonds Antitrust Litig*., 396 F. Supp. 3d 354,

364 (S.D.N.Y. 2019) (citing *Wacker v. JP Morgan Chase & Co.*, 678 F. App'x 27, 30 (2d Cir.

2017) (summary order)).  Thus, the Court need not now engage in a *Daubert*-like analysis of

Plaintiffs' statistical pleadings.  Instead, the Court may, indeed must, accept as true Plaintiffs'

"factual assertions regarding pricing and other economic data."  *In re London Silver Fixing, Ltd.,*

*Antitrust Litig.*, 213 F. Supp. 3d 530, 563 (S.D.N.Y. 2016).

Second, in *In re Commodity Exchange, Inc., Gold Futures & Options Trading Litigation*,

the court held that the plaintiffs' statistical analysis did not connect a particular defendant to the

alleged conspiracy for *two* reasons: (1) the analysis did not distinguish between the individual

defendant and the other banks *and* (2) the complaint did not provide plus factors or factual

support that would allow the court to make a logical leap from the general to the specific.  *See*

328 F. Supp. 3d at 226-31; *see also, e.g.*, *In re GSE Bonds*, 396 F. Supp. 3d at 365 (dismissing

antitrust conspiracy claims against some of the defendants where aggregated statistical evidence,

without plus factors, did not plausibly establish each defendant's participation in the conspiracy).

As discussed in more detail below, however, Plaintiffs here allege enough plus factors to support

the inference that each Defendant was part of the alleged conspiracy.  *Cf. Ault v. J.M. Smucker*

*Co.*, No. 13-CV-3409 (PAC), 2014 WL 1998235, at *5 n.4 (S.D.N.Y. May 15, 2014)

("Defendant is correct that Plaintiff cannot rely on generalized statistics to make an inference

about a particular product or person.  But Plaintiff relies on generalized statistics simply to

demonstrate that most vegetable oils contain GMOs.  She then claims that Crisco Oil is one such

oil by alleging facts specific to Crisco Oil.  These allegations allow the Court to make a logical

leap from 'some crops grown in the United States are GMO' to 'the Crisco oils contain GMO

ingredients.'" (internal quotation marks and citations omitted)).

Along similar lines, the Banks argue that Plaintiffs fail to allege circumstantial evidence

of "meaningful" parallel conduct because the interest rates' alleged clustering behavior from

2009 to 2015 has "obvious alternative explanations."  Defs.' Mem. 10, 14, 17 (citing *Twombly*,

550 U.S. at 567; *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 462, 464

(S.D.N.Y. 2017)).  According to the Banks, after the financial crisis, the Federal Reserve in 2008

adopted a zero interest rate policy that "held the federal funds rate near zero" until 2015, *id.* at 7;

thus, not only were the VRDO interest rates "extraordinarily low for the vast majority of the

proposed class period," *id.* at 8, but also it made "perfect business sense" for the Banks to set

similar rates given there was "far less room for VRDO rates to diverge from each other" at such

ultra-low levels, *id.* at 14 (citing *Citigroup*, 709 F.3d at 138).  The Banks are correct that bare

allegations of parallel conduct alone are insufficient to establish an antitrust conspiracy.  *See*

*Twombly*, 550 U.S. at 553-54; *Citigroup*, 709 F.3d at 138.  But, in contrast to *Twombly* and

*Citigroup*, where the plaintiffs' complaints were dismissed because the plaintiffs "essentially

pleaded *only* parallel conduct, with little more," *Citigroup*, 709 F.3d at 138 (emphasis added);

*accord Twombly*, 550 U.S. at 553, Plaintiffs here set forth several other plus factors that nudge

their allegations across the line to "plausible."

## 2. Plus Factors

For starters, Plaintiffs point to a high level of interfirm communications among Defendants. *See, e.g.*, CAC ¶¶ 9, 11-12, 99-101. Prior to resetting the VRDO interest rates, the Banks routinely — indeed, sometimes daily — shared information about their base rates, inventory levels, and planned rate changes with each other over the telephone and "through electronic communications such as electronic chat rooms on Bloomberg." *Id*. ¶¶ 11, 96-131; *see, e.g.*, *Gold Futures & Options Trading*, 328 F. Supp. 3d at 228 ("[C]ommunications of pricing information among senior executives around the time of observed parallel pricing behavior tends to make it more likely that the parallel prices are the product of an unlawful agreement rather than legitimate, conscious parallelism." (citing *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 67 (2d Cir. 2012)). Plaintiffs allege that the Banks communicated their future rates to each other by, for example, using thinly coded questions like, "[A]re you going high or are you going low?" and "How much cash is in the market?" and "How are things trending?" *Id*. ¶ 101. On occasion, the communications were even more overt: "Are you placing this paper" — referring to a particular VRDO — "and if so, *what will be the rate*?" *Id*. (emphasis added); *see also id*. ¶ 105. And in other instances, the Banks shared information indirectly by using inventory management software systems, *see id*. ¶ 113, and through the short-term index consolidated by J.J. Kenny, *see id*. ¶¶ 107-12. After receiving the J.J. Kenny pricing index before a rate reset, the Banks' sales personnel would call each other "to confirm that the rates they would be resetting later that day would be in line with the index." *Id*. ¶ 111. Thus, the Banks were able to coordinate their rates and ensure that none of them broke ranks from the conspiracy. *Id*. ¶¶ 107-12. All of this, Plaintiffs allege, has been confirmed by high-level insiders who worked at the Banks, including a

former managing director at Citigroup, former senior personnel at JPMorgan, and a former RMA at Wells Fargo.  *Id.* ¶¶ 11, 101, 105-06, 116.

Drawing all inferences in favor of Plaintiffs, the Court concludes that these are not — as Defendants claim, *see* Defs.' Mem. 25 — the innocuous communications of competitors or the kind of information that competitors in a consolidated market for remarketing services would have shared anyway.  Instead, they are the kinds of forward-looking, price-bearing communications that can support an inference that there was a conspiracy to fix prices.  *See, e.g.*, *Gelboim*, 823 F.3d at 782 (finding that an inter-bank conspiracy was plausibly alleged where the plaintiffs pleaded, among other things, "a high number of interfirm communications, including Barclays' knowledge of other banks' confidential individual submissions in advance"); *Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 519-20, 550 (S.D.N.Y. 2018) (denying a motion to dismiss where the complaint alleged "that Defendants collusively shared information to coordinate their [rate] submissions and engaged in manipulative trading practices to fix the prices . . .  for their collective financial benefit."); *In re Platinum & Palladium Antitrust Litig.*, No. 14-CV-9391 (GHW), 2017 WL 1169626, at *12 (S.D.N.Y. Mar. 28, 2017) (finding a conspiracy plausibly alleged where "(1) Defendants engaged in direct exchange of pricing information during the Fixing Calls; (2) the information exchange occurred among a small group of dominant market players; [and] (3) the communications between Defendants were private").

In addition, Plaintiffs plainly plead that Defendants shared a common motive to fix the interest rates for VRDO bonds: namely, to "maximize the likelihood that existing holders of [the] VRDOs would not 'put' their bonds back to Defendants," thus allowing Defendants to avoid (1) the cost of remarketing the bonds to new investors and (2) the cost of holding the bonds in

inventory during that remarketing period.  CAC ¶¶ 14, 114, 157; *see Anderson News, L.L.C. v. Am. Media, Inc.*, 123 F. Supp. 3d 478, 500 (S.D.N.Y. 2015) ("Motive to conspire may be inferred where the parallel 'action taken [by the defendants] had the effect of creating a likelihood of increased profits.'" (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 287 (1968))).  Based on Plaintiffs' counsel's investigations and conversations with former Bank insiders, there is reason to believe that Defendants stood to gain by participating in the rate-fixing scheme and that the scheme was possible only with Defendants' coordinated efforts. As the former head of the VRDO desk at JPMorgan explained, RMAs "would set the rate wherever they had to keep the paper off their balance sheet — and you could understand them needing other banks to set the same rate otherwise the issuer would move their business.  It was a challenge for them to be fair."  CAC ¶ 116.  According to a former senior official at Wells Fargo, the RMAs "discuss[ed] their inventory levels, in order to figure out how they should set their rates to quickly decrease the levels of VRDOs they held in inventory."  *Id.* ¶ 105.  "Absent this coordination, Defendants that set higher rates than their competitors would be at risk of losing their clients to those competitors" and, "[a]s a former senior RMA at one Defendant bank stated, 'no one wants to stand out' when it comes to setting rates."  *Id.* ¶ 103.

Defendants contend that Plaintiffs' theory of a common motive to conspire makes little sense because the RMAs were not contractually obligated to buy or carry unsold VRDOs as inventory but rather possessed, and indeed worked to fulfill, their contractual "obligation to set interest rates that would permit the bonds *to sell at par, i.e.*, rates sufficient to keep the bonds out of inventory."  Defs.' Mem. 2; *see also id.* at 23-24.  But this argument misses the point.  As RMA agents, Defendants were required to use their best efforts to reset a given VRDO bond's interest rate "at the lowest possible rate" that would allow the bond to trade at par.  CAC ¶ 77;

*see, e.g.*, *id.* (noting that the "the obligation to reset the rates for VRDOs and remarket the bonds at the lowest possible rate is understood throughout the industry and is uniform across, if not identical amongst, Defendants"); *id.* ¶¶ 78-87 (listing as examples reset obligations in RMA agreements with RBC, Merrill Lynch, Wells Fargo, JPMorgan, Citigroup, and Morgan Stanley). That is, to the extent Defendants were obligated to keep the bonds out of their inventories, they had to do so primarily by setting the lowest rate that would allow them to achieve that end.  This did not, however, require Defendants to set the rates at zero, as Defendants contend, or to set the rate so low that no investor would want to purchase the bond, thus running the risk of drawing on the liquidity provider.  *See* Defs.' Mem. 21.  Instead, Defendants were simply required to consider prevailing market conditions, which presumably included factoring in investor demand, not setting rates based only on Defendants' inventory levels.  But as Plaintiffs plainly allege, "[b]y keeping VRDO rates artificially high, Defendants largely ensured that investors would continue to retain their VRDO holdings, at greater cost to Plaintiffs and the Class, even if there existed alternative investors willing to purchase the same bonds at a lower interest rate."  CAC ¶ 115.

The Banks further argue that even if they served as liquidity providers, Plaintiffs do not allege that the liquidity providers are "dissatisfied with the substantial interest rates they receive if an issuer draws on its liquidity facility."  Defs.' Mem. 24.  This argument, too, is unavailing. A Bank serving as both RMA and liquidity provider would still be (legitimately) motivated not to frequently draw on letters of credit, as the high fees could drive the issuer to move its business entirely.  Moreover, a defendant's financial motive may be discerned from the total profits it derived from the conspiracy, not just the proceeds it gained in one transaction.  Notwithstanding that a bank as liquidity provider stood to gain substantial letter-of-credit fees, such gains may

have been offset in the short run by the cost of repurchasing the bond and assuming the risk that

the issuer would default on its payments.  *See* CAC ¶ 115.  Further, given how much pressure

there was to keep the VRDO bonds out of inventory yet still offer them as a way to attract more

lucrative business opportunities, it is plausible that the costs of keeping the bonds in inventory

materially contributed to the Banks' motive to fix interest rates.  As an insider explained to

Plaintiff's counsel,

> Banks view VRDOs primarily as a product to attract high-value retail customers
> seeking a secure, tax-free security that will allow the banks to then upsell these
> customers services with better margins for the bank.  In part because of the immense
> pressure to keep VRDOs out of the banks' own inventories, this insider described
> RMAs as a consequently close-knit community across the banks that felt compelled
> to "artificially prop up interest rates" in order to ensure that the VRDOs would stay
> off their books.

*Id.* ¶ 104.

Finally, Plaintiffs plausibly allege a third plus factor: investigations by the SEC and DOJ

based on information from a whistleblower in 2015 and 2016.  *See id.* ¶¶ 8, 121-23; *Starr*, 592

F.3d at 325 (crediting as probative of an antitrust conspiracy the allegation that the government

"launched two new investigations into whether defendants engaged in collusion and price

fixing"); *Hinds County v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 394 (S.D.N.Y. 2010)

("Although pending government investigations may not, standing alone, satisfy an antitrust

plaintiff's pleading burden, government investigations may be used to bolster the plausibility of

[Section] 1 claims.").  Defendants contend that this plus factor does not apply here, as Plaintiffs

fail to adequately plead a related investigation.  Defs.' Mem. 26-27.  But the Court disagrees.

Far from making an inapposite comparison between unrelated investigations, as the plaintiffs did

in *In re Commodity Exchange, Inc., Gold Futures & Options Trading Litigation*, 213 F. Supp. 3d

631 (S.D.N.Y. 2016), Plaintiffs allege that the investigations here concerned the core of their

claim, that Defendants' manipulated VRDO bond interest rates for several years after the

financial crisis.  Notably, Plaintiffs also allege that soon after the SEC and DOJ investigations began, the VRDO interest rates stopped clustering, suggesting that the Banks had stopped coordinating their rate-setting practices.  Taken together, these pleadings support an inference that Defendants acted in parallel to inflate VRDO interest rates from 2008 to 2016.  *See United States v. Apple Inc.*, 952 F. Supp. 2d 638, 690 (S.D.N.Y. 2013) ("An abrupt shift from defendants' past behavior and near-unanimity of action by several defendants may also strengthen the inference."), *aff'd*, 791 F.3d 290 (2d Cir. 2015); *see also Alaska Electr. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 55 (S.D.N.Y. 2016) ("*ISDAfix*") (finding that the allegation "that Defendants abruptly and simultaneously ceased engaging in parallel conduct when they were served with subpoenas in connection with government investigations" strengthened "substantially the inference that a conspiracy existed").

To be sure, Defendants offer plausible non-collusive explanations for many of the facts alleged in the Complaint.  But "[t]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Anderson News, L.L.C.*, 680 F.3d at 185.  Instead, the sole question for the Court is whether Plaintiffs put forward "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  *Twombly*, 550 U.S. at 556.  Taking all of Plaintiffs' allegations together and drawing all reasonable inferences in their favor, as the Court must, *see, e.g.*, *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696 (1962), the Court concludes that Plaintiffs meet that burden on their federal antitrust claims.

### 3.  The Rule of Reason

Defendants' final argument with respect to Plaintiffs' antitrust claims — that they should be dismissed for failure to allege the elements of a "rule of reason" claim — requires only brief

discussion.  *See* Defs.' Mem. 27-33.  It is true, as Defendants note, that "the dissemination of price information is not itself a *per se* violation of the Sherman Act."  *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113 (1975) (emphasis added); *see Todd*, 275 F.3d at 211-12.  But the gravamen of Plaintiffs' claims here — that Defendants collusively inflated the VRDO interest rates without regard to market conditions, which caused Plaintiffs to pay their bondholders more than they otherwise would have — is indeed the "sort of 'paid too much' or 'received too little harm'" that constitutes a *per se* violation when brought about by price fixing.  *ISDAfix*, 175 F. Supp. 3d at 53; *see id*. at 59 (collecting cases affirming the *per se* standard for horizontal price-fix conspiracies); *see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) ("Restraints that are *per se* unlawful include horizontal agreements among competitors to fix prices.").  That is, where, as here, the sharing of information facilitated the alleged conspiracy to fix rates and was not the end itself, the rule of reason does not apply.  *See, e.g.*, *Todd*, 275 F.3d at 198; *see also, e.g.*, *Sonterra Capital Master Fund, Ltd.*, 366 F. Supp. 3d at 550 (finding that the plaintiffs alleged a *per se* antitrust violation where the "Defendants collusively shared information to coordinate their Sterling LIBOR submissions").

## B.  State-Law Claims

In addition to their antitrust claims, Plaintiffs bring claims under state law against all Defendants for breach of contract, breach of fiduciary duty, and unjust enrichment.[4]  The parties

---

[4]     Defendants note that, on July 30, 2019, Plaintiffs agreed in writing "to withdraw the Complaint's allegations related to Morgan Stanley's alleged role as RMA for certain bonds . . . because Morgan Stanley was not, in fact, a remarketing agent for those bonds."  Defs.' Mem. 42 n.37.  Defendants state that, as a result, "Plaintiffs' breach of contract, breach of fiduciary duty, and unjust enrichment claims against the Morgan Stanley defendants, which depend on that mistaken, and now withdrawn, allegation, should be dismissed."  *Id.*  Plaintiffs do not dispute the point, so Plaintiffs' state-law claims against Morgan Stanley and the Morgan Stanley Associates are dismissed.  *See Jennings v. Hunt Cos.*, 367 F. Supp. 3d 66, 69 (S.D.N.Y. 2019) ("A district

do not brief choice of law, although Defendants mention in a footnote, and Plaintiffs do not

contest, that "[a] number of the remarketing agreements" identified in the Complaint contain

choice-of-law provisions requiring the application of Pennsylvania and Maryland law under

governing New York choice-of-law rules.  *See* Defs.' Mem. 46 n.43; *see also Hartford Fire Ins.*

*Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000) (noting a

court must apply the choice-of-law-rules of the state in which it sits and that express choice-of-

law provisions must be enforced "[a]bsent fraud or violation of public policy").  Further,

Defendants contend, and Plaintiffs do not contest, that, even without these contractual

provisions, Pennsylvania and Maryland law would likely govern because they "have the most

substantive relationship to the alleged injury."  *See* Defs.' Mem. 46 n.43 (citing *Fin. One Pub.*

*Co. Ltd. v. Lehman Bros. Special Fin., Inc*., 414 F.3d 325, 337 (2d Cir. 2005) (holding that

interest analysis governs under New York choice-of-law principles); *Krock v. Lipsay*, 97 F.3d

640, 646 (2d Cir. 1996) (noting that the locus of a tort is determinative in interest analysis)).  The

parties therefore appear to agree (if not explicitly, then implicitly) that Pennsylvania and

Maryland law govern the state-law claims.  *See* Pls.' Opp'n 45-50 (considering unjust

enrichment and breach of fiduciary duty claims under Maryland and Pennsylvania law).  *But see*

Defs.' Mem. 48 n.46 (invoking New York law).  Given that, the Court assumes for purposes of

this motion that Pennsylvania and Maryland law apply.  *Cf. Fort Prods., Inc., v. Men's Med.*

*Clinic, LLC*, No. 15-CV-376 (NSR), 2016 WL 797577, *1 n.1 (S.D.N.Y. Feb. 23, 2016) ("Where

both parties rely upon New York law in their briefs, the Court may assume the parties impliedly

consent to the application of New York law.").

---

court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a
defendant's arguments that the claim should be dismissed." (internal quotation marks omitted)).

### 1. Breach of Contract

The Court begins with Plaintiffs' breach-of-contract claim.  To state a claim for breach of contract under Pennsylvania and Maryland law, a plaintiff must allege (1) an agreement, (2) breach by the defendant, and (3) damages.  *See, e.g.*, *Ware v. Rodale Press, Inc*., 322 F.3d 218, 225 (3d Cir. 2003) (citing *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).  In light of these elements, Plaintiffs' claims must be dismissed with respect to the following Defendants: the Bank of America Associates, Barclays Bank PLC, the Citi Associates, Goldman Sachs & Co. LLC, JPMorgan Chase Bank, N.A., RBC, and the Wells Fargo Associates (the "Non-Counterparty Defendants").  *See supra* note 2.  As Defendants argue, the Complaint does not allege that any of these entities entered into contracts with Plaintiffs, served as their RMAs, or otherwise had any role in facilitating a contractual relationship with Plaintiffs.  *See* Defs.' Mem. 41-42 & 41 n.38.  Plaintiffs do not even respond to the argument and, thus, can be said to have abandoned their contract claims against these Defendants.  *See Jennings*, 367 F. Supp. 3d at 69.  And even if they had not been abandoned, the claims would fail as a matter of law because Defendants are correct: The Complaint does not allege an agreement between any Plaintiff and any Non-Counterparty Defendant.  The mere fact that some of the latter may be related to other Defendants is not, in itself, sufficient to state a contract claim.  *See, e.g.*, *S.M. v. Oxford Health Plans (N.Y.)*, *Inc.*, 644 F. App'x 81, 85 (2d Cir. 2016) (summary order); *ISDAfix*, 175 F. Supp. 3d at 61-62.

By contrast, Plaintiffs bring plausible contract claims against Banc of America Securities LLC; Barclays Capital, Inc.; Citigroup Global Markets Inc.; J.P. Morgan Securities LLC; Merrill Lynch, Pierce, Fenner & Smith Inc.; RBC Capital Markets LLC; Wachovia Bank N.A.; and Wells Fargo Bank, N.A. (the "Counterparty Defendants").  As Defendants concede, *see* Defs.'

Mem. 41 & n.36; *see also* Pls.' Opp'n 43 n.20, Plaintiffs allege that they entered remarketing

agreements with each of these Defendants, *see* CAC ¶¶ 25-26.  The essential terms of these

contracts — that Plaintiffs agreed to pay Defendants remarketing fees and, in exchange, the

Counterparty Defendants agreed to remarket Plaintiffs' VRDO bonds and reset their interest

rates — are adequately pleaded.  *See id.* ¶ 187; *see also id.* ¶¶ 75-88 (alleging that the

remarketing agreements contain largely identical terms and set forth nearly identical

obligations).[5]  And Plaintiffs plausibly allege both breach and resulting injury.  With respect to

the former, for example, Plaintiffs allege that the Counterparty Defendants failed to fulfill a

contractual obligation to use their best efforts to reset the interest rates of the VRDOs based on

prevailing market conditions and to remarket the bonds at the lowest rate possible that would

allow the bonds to trade at par.  *See* CAC ¶¶ 115, 118, 153-57, 187.  These allegations are

sufficient to state a claim that the Counterparty Defendants breached their commitment to set

interest rates in accordance with the law.  *Cf. ISDAfix*, 175 F. Supp. 3d at 62-63.

### 2. Breach of Fiduciary Duty

Next, Plaintiffs raise claims for breach of fiduciary duty against all Defendants.

Defendants contend that these claims should be dismissed as duplicative of the breach-of-

contract claims under Maryland and Pennsylvania law.  *See* Defs.' Mem. 46-47.  With respect to

the claims under Pennsylvania law, Defendants made an additional argument for dismissal: that

Plaintiffs fail to plead a fiduciary relationship under federal or Pennsylvania law.  *See id.*

---

[5]    *Window Headquarters, Inc. v. MAI Basic Four, Inc.*, Nos. 91-CV-1816 (MBM), 92-CV-5283 (MBM), 1993 WL 312899 (S.D.N.Y. Aug. 12, 1993), upon which Defendants rely, *see* Defs.' Mem. 42-43, does not suggest otherwise.  In that case, the court dismissed the contract claims not because the complaint failed to specify the terms, but because the complaint failed to allege the existence of an enforceable contract at all (or to allege other material facts relevant to its construction).  *See Window Headquarters, Inc.*, 1993 WL 312899, at *2-4.

At the outset, Plaintiffs' claims against the Non-Counterparty Defendants must be dismissed because, conclusory allegations aside, the Complaint does not adequately allege that Plaintiffs were in any fiduciary or confidential relationship with any of them. *See Adobe Sys., Inc. v. Gardiner*, 300 F. Supp. 3d 718, 726 (D. Md. 2018); *Certainteed Ceilings Corp. v. Aiken*, No. 14-3925 (MMB), 2015 WL 410029, at \*9 (E.D. Pa. Jan. 29, 2015).  By contrast, Defendants' motion to dismiss Baltimore's fiduciary-duty claims against Citigroup Global Markets Inc. is easily denied.  Defendants make only one argument for dismissal of these claims: that Maryland law does not recognize a separate tort for breach of fiduciary duty.  *See* Defs.' Mem. 46-47.  But in July 2020, after briefing on the present motion was complete, the Maryland Court of Appeals held in *Plank v. Cherneski*, 231 A.3d 436, 465-67 (Md. 2020), that "a breach of fiduciary duty may be actionable as an independent cause of action," abrogating prior decisions that had suggested the contrary.[6]  As noted, Defendants do also contend that Plaintiffs fail to plead a fiduciary relationship, but they cite only Pennsylvania case law for this point.  *See* Defs.' Mem. 47-48.  Notably, in their brief, Plaintiffs contend that Defendants "do not raise Maryland law" on this point "and thus waive any such argument," Pls.' Opp. 48, a point that Defendants make no attempt to rebut, *see* Defs.' Reply 20.  For purposes of this motion, therefore, the Court concludes that Defendants have indeed waived the argument under Maryland law.

Philadelphia's fiduciary-duty claims against its Counterparty Defendants present a close question, but they ultimately must be dismissed.  To state a claim of breach of fiduciary duty under Pennsylvania law, a plaintiff must first "establish that a fiduciary or confidential relationship existed between [the plaintiff] and the defendants," *Baker v. Family Credit Counseling Corp.*, 440 F. Supp. 2d 392, 414-15 (E.D. Pa. 2006), whether derived from statute,

---

[6]     Strangely, the parties did not notify the Court of this supplemental authority.

common law, or the fact-specific nature of the relationship, *Sweigart v. Sweigart*, No. 2371 EDA

2014, 2015 WL 7760335, at *5 (Pa. Super. Ct. Dec. 2, 2015).  "A fiduciary is a special kind of

agent who, as a result of a relationship of trust between the parties, has a duty to act primarily for

the benefit of the principal and all of their undertakings."  *Cont'l Life Ins. Co. v. Shearson

Lehman Hutton, Inc.*, No. 88–9279, 1992 WL 6750, *3 (E.D. Pa. Jan. 14, 1992); *see also Baker*,

440 F. Supp. 2d at 414 (noting that a confidential relationship "exists whenever one occupies

toward another such a position of advisor or counselor as reasonably to inspire confidence that

he will act in good faith for the other's interest" (quoting *Silver v. Silver*, 219 A.2d. 659, 662 (Pa.

1966)).  Under the "gist of the action doctrine," however, "breach of fiduciary duty claims are

barred . . . if there are no allegations of breach of fiduciary duty or duty of loyalty that transcend

or exist outside of the parties' contractual agreements."  *Aiken*, 2015 WL 410029, at *9 (internal

quotation marks omitted).

　　　　Beyond the conclusory assertion that Counterparty Defendants acted as its "municipal

advisors," CAC ¶ 198; Pls.' Opp'n 48, Philadelphia does not allege any facts to show that it had

a special relationship of trust with the Banks that would give rise to a fiduciary duty.  *See Aiken*,

2015 WL 410029, at *11.  First, Philadelphia alleges that its RMAs advised it "to issue VRDOs

and enter remarketing agreements knowing that the RMA would not obtain a low VRDO rate,"

CAC ¶ 199, but this is the same allegation that serves as the basis of its breach-of-contract

claims, *see id*. ¶ 188; *Bohler–Uddeholm Am., Inc. v. Ellwood Grp., Inc*., 247 F.3d 79, 106 (3d

Cir. 2001) (holding that the gist of a claim based on actions prohibited by a contractual

agreement is breach of contract, not tort).  Second, as they themselves allege in the Complaint,

Plaintiffs consulted their own "outside advisers" to regularly monitor their VRDOs, *id*. ¶ 169,

undermining any plausible inference that Philadelphia was an "inferior party" that "place[d]

complete trust in the superior party's advice" and sought "no other counsel," *Tress v. AXA Advisors, LLC*, No. 11-7713, 2013 WL 12248219, at *4 (E.D. Pa. June 6, 2013) (internal quotation marks omitted). Third, Philadelphia does not, and presumably cannot, identify any authority suggesting that Pennsylvania law imposes a fiduciary duty between a remarketing agent and a municipality. Pls.' Opp'n 47-50.

Perhaps recognizing these deficiencies, Philadelphia argues in the alternative that its counterparties' fiduciary duties stem from Rule G-42, 15 U.S.C. § 78o-4(c)(1), as promulgated by the SEC by way of the Municipal Securities Rulemaking Board. CAC ¶ 198; Pls.' Opp'n 48 n.23.[7] Rule G-42 sets out when a person who provides information to a municipal entity must register as a municipal advisor. *See* 15 U.S.C. § 78o-4(c)(1). But Plaintiffs do not point to any controlling authority suggesting that banks act as municipal advisors any time they carry out functions such as resetting interest rates and remarketing tendered bonds.[8] And in fact, the SEC has stated the exact opposite. *See* Registration of Municipal Advisors, 78 Fed. Reg. 67,468, 67,515 (Nov. 12, 2013) (codified at 17 C.F.R. pts. 200, 240, 249) ("Generally, the Commission also would not consider a remarketing agent acting only in its capacity as a remarketing agent to be a municipal advisor because the mere remarketing of bonds likely would not constitute an issuance of municipal securities." (footnote omitted)); *see also* OFFICE OF MUN. SEC., U.S. SEC.

---

[7]     The Complaint erroneously cites to 15 U.S.C. § 18o-4(c)(1), which does not exist. Instead, the parties in their motion papers, and the Court here, consider 15 U.S.C. § 78o-4(c)(1), which addresses certain obligations of municipal advisors.

[8]     The one case that Plaintiffs do point to — *Higher Education Loan Authority of the State of Missouri v. Wells Fargo Bank, N.A.*, No. 4:10-CV-1230 (AGF), 2011 WL 6010683, at *8 (E.D. Mo. Dec. 2, 2011) — is an out-of-circuit district court opinion that did not, as Plaintiffs contend, ultimately find that "remarketing agents do in fact owe fiduciary duties." Pls.' Opp'n 49 n.25. Instead, the court held that "[t]he precise scope of the agency relationship between [the plaintiff] and its remarketing agents awaits further development of the record." *Higher Educ. Loan Auth.*, 2011 WL 6010683, at *8.

& EXCH. COMM'N, REGISTRATION OF MUNICIPAL ADVISORS FREQUENTLY ASKED QUESTIONS 22

(2014), https://www.sec.gov/info/municipal/mun-advisors-faqs.pdf ("The remarketing agent may

be able to perform all of the standard services that are typically covered by the remarketing

agreement and related authorizing documents because these services may not constitute advice.

For example, in the staff's view, the remarketing agent could set the rate, remarket tendered

bonds, and provide factual information regarding current market conditions.").

At bottom, Philadelphia identifies only one type of conduct that allegedly contravened

Counterparty Defendants' fiduciary duty — that is, their alleged failure to set the bonds at the

lowest possible rates to allow the bonds to trade at par — and these allegations "essentially

duplicate[] a breach of contract claim." *Brown & Brown, Inc. v. Cola*, 745 F. Supp. 2d 588, 619

(E.D. Pa. 2010) (internal quotation marks omitted).  In light of that, Philadelphia's breach-of-

fiduciary-duty claim must be and is dismissed.

### 3.  Unjust Enrichment

Last but not least, Plaintiffs raise an unjust enrichment claim against all Defendants.

Under Maryland and Pennsylvania law, a party may pursue alternative claims for unjust

enrichment "only when the validity of the contract itself is actually disputed." *Corsale v.*

*Sperian Energy Corp.*, 374 F. Supp. 3d 445, 458 (W.D. Pa. 2019) (internal quotation marks

omitted); *see, e.g.*, *J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, 115 F. Supp. 3d 593, 608 (D.

Md. 2015) ("Although a plaintiff may plead in the alternative by asserting claims for unjust

enrichment and breach of contract, when doing so the plaintiff's claim for unjust enrichment

*must* include an allegation of fraud or bad faith in the formation of the contract." (internal

quotation marks omitted)).  Neither party disputes the validity of the remarketing agreements as

they exist between Plaintiffs and the Counterparty Defendants.  *See* Defs.' Mem. 41-44 (arguing

that Plaintiffs fail to allege that the Counterparty Defendants *breached* the agreements); Pls.'

Opp'n 43-45 (asserting that Plaintiffs have pleaded valid contracts as to all Defendants).  Thus,

the unjust enrichment claims against the Counterparty Defendants must be and are dismissed as

duplicative.

Defendants' motion must also be granted as to the Non-Counterparty Defendants, *see*

Defs.' Mem. 44-45, because Plaintiffs fail to plausibly allege, as Maryland and Pennsylvania

require, that those Defendants were enriched at Plaintiffs' expense.  *See, e.g*., *Whitaker v. Herr*

*Foods, Inc.*, 198 F. Supp. 3d 476, 492 (E.D. Pa. 2016) (Pennsylvania law); *Dwoskin v. Bank of*

*Am., N.A*., 850 F. Supp. 2d 557, 572 (D. Md. 2012) (Maryland law).  Plaintiffs allege that they

conferred a benefit on the Non-Counterparty Defendants and the liquidity providers, but setting

aside their broad assertion that they "paid hundreds of millions of dollars in remarketing fees to

Defendants," Pls.' Opp'n 47, they do not sufficiently identify which Defendants served as their

liquidity providers or otherwise allege that they participated in any direct transaction with the

Non-Counterparty Defendants, *see, e.g.*, *In re Commodity Exch., Inc.*, 213 F. Supp. 3d at 677.  In

a footnote, Plaintiffs argue that their unjust enrichment claim against the Non-Counterparty

Defendants should survive because, having "alleged a conspiracy among all Defendants, it would

be inequitable to allow one entity to evade liability simply because it benefited from a contract

signed by an affiliate."  Pls.' Opp'n 46 n.22.  But a party may not raise an argument in a footnote

alone.  *See, e.g.*, *Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 314 (S.D.N.Y. 2015) ("[B]ecause the

arguments appear only in footnotes, they are not properly raised, and the Court is under no

obligation to consider them."); *see also United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir.

1993) ("We do not consider an argument mentioned only in a footnote to be adequately raised or

preserved for appellate review.").  And, in any event, to maintain an unjust enrichment claim,

proof of a direct benefit is required; absent a basis to treat a Non-Counterparty Defendant as the

alter ego of a Counterparty Defendant, the mere fact that they are affiliated is not enough.  *See,*

*e.g.*, *Montanez v. HSBC Mortg. Corp. (USA)*, 876 F. Supp. 2d 504, 517 (E.D. Pa. 2012)

(dismissing an unjust enrichment claim against the wrongdoer's affiliate because the mortgagor

failed to plead that the affiliate received inflated mortgage payments); *cf. In re LIBOR-Based*

*Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 479-80 (S.D.N.Y. 2014) (dismissing unjust

enrichment claims against non-counterparty defendants).

In fact, the cases on which Plaintiffs rely disprove their point.  *See* Pls.' Opp'n 46 n.22.

In *Marketplace LaGuardia Ltd. Partnership v. Harkey Enterprises*, *Inc.*, No. 07-CV-1003

(CBA), 2008 WL 905188 (E.D.N.Y. Mar. 31, 2008), for example, the court considered a

subleasing agreement between the plaintiff and the defendant's affiliate and ultimately sustained

the plaintiff's alter ego breach-of-contract claim only upon finding that the defendant exerted

complete control over the transaction, thus warranting piercing the corporate veil.  *Id*. at *3-4.

Notably, however, the court dismissed the plaintiff's claim that the defendant was unjustly

enriched by its own use of the premises at issue because, at bottom, the defendant's affiliate, not

the plaintiff, had granted the defendant the right to use the premises.  *Id*. at *6   In refusing to

hold the non-counterparty defendant liable even for the benefit initially conferred to its affiliate,

the court noted that "[t]he result is not altered by virtue of the fact that [the defendant] and [its

affiliate] are corporate relatives."  *Id*. at *6 n.7 (citing *Int'l Customs Assocs., Inc. v. Ford Motor*

*Co.*, 893 F. Supp. 1251, 1258 (S.D.N.Y. 1995) (dismissing an unjust enrichment claim where the

plaintiff had provided services to a subsidiary of the defendant, but not to the defendant

directly)).  Relatedly, in *In re LIBOR-Based Financial Instruments Antitrust Litigation*, No. 11-

MDL-2262 (NRB), 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015), the court was indeed faced

with the question of "whether good conscience requires one corporate entity to make restitution

when it benefits from the misdeeds of its corporate affiliate or shareholder." *Id*. at *77. The

court concluded that an "innocent affiliate" could be ordered to make restitution, but it did so

precisely because the innocent affiliate received a direct benefit. *Id*. As stated above, Plaintiffs

fail to provide non-conclusory allegations suggesting that restitution in this context is "just and

necessary." *Id*. In short, these cases actually support dismissal of Plaintiffs' unjust enrichment

claims against the Non-Counterparty Defendants. Accordingly, they must be and are dismissed.

## C. Timeliness

Finally, Defendants contend that many of Plaintiffs' claims are time barred. Plaintiffs'

antitrust claims are subject to a four-year statute of limitations. *See* 15 U.S.C. § 15b. Depending

on New York choice-of-law rules, Plaintiffs' claims of breach of contract, unjust enrichment, and

breach of fiduciary duty may be subject to limitation periods ranging from two to six years. *See*

Defs.' Mem. 40 (collecting statutes); *see also ISDAfix*, 175 F. Supp. 3d at 66. The Court need

not decide which statutes of limitation apply at this stage, however, because Plaintiffs plausibly

allege that Defendants concealed their conspiracy. *See* CAC ¶¶ 163-70. "In every relevant

jurisdiction, the statute of limitations is tolled where a plaintiff shows that a defendant committed

fraudulent acts intended to conceal its misconduct and that the plaintiff's ignorance of the

concealed misconduct was not a product of its own lack of reasonable diligence." *ISDAfix*, 175

F. Supp. 3d at 66 (collecting cases). Here, Plaintiffs allege that Defendants engaged in a rate-

fixing conspiracy that "was secretive and covert by its very nature." *Id*.; *see also, e.g.*, *In re*

*Issuer Plaintiff Initial Pub. Offering Antitrust Litig*., No. 00-CV-7804 (LMM), 2004 WL 487222,

at *4 (S.D.N.Y. Mar. 12, 2004). Although Plaintiffs "need not show any additional affirmative

acts of concealment," *Vincent v. Money Store*, 304 F.R.D. 446, 459 (S.D.N.Y. 2015), Plaintiffs

do: They allege that Defendants went to great lengths to hide the conspiracy from issuers, for example, by engaging in "window dressing," the practice of "temporarily lowering rates on a single issuer in advance of a meeting or making a pitch for more business."  CAC ¶ 118.

Defendants contend that Plaintiffs cannot avail themselves of the fraudulent concealment doctrine because they failed to exercise reasonable diligence in investigating their claims. Additionally, Defendants argue that Plaintiffs were put on notice of Defendants' misdeeds when *qui tam* suits concerning Defendants' remarketing practices were filed under seal in state courts in Illinois and Massachusetts in 2014.  Defs.' Mem. 37-38.  But separate and apart from the fact that these complaints were under seal and thus unavailable for Plaintiffs' review, requiring Plaintiffs, "at the motion to dismiss stage, to make a showing of reasonable diligence" would be "premature."  *BPP Ill., LLC v. Royal Bank of Scot. Grp. PLC*, 603 F. App'x 57, 59 (2d Cir. 2015) (summary order) (internal quotation marks omitted).  Defendants' argument may win another day, but it does not provide a basis for dismissal at this stage of the litigation.

## CONCLUSION

In sum, Defendants' motion to dismiss Plaintiffs' claims is GRANTED in part and DENIED in part.  In particular, the Court holds as follows:

- Defendants' motion is denied with respect to Plaintiffs' federal antitrust claims;

- Defendants' motion is denied with respect to Plaintiffs' breach-of-contract claims against the Counterparty Defendants, and granted with respect to the breach-of-contract claims against the Non-Counterparty Defendants, Morgan Stanley, and the Morgan Stanley Associates;

- Defendants' motion is denied with respect to Baltimore's breach of fiduciary duty claims against Defendant Citigroup Global Markets Inc. but granted with respect to all other breach of fiduciary duty claims; and

- Defendants' motion is granted with respect to the unjust enrichment claims against all Defendants.

Further, the Court declines to grant Plaintiffs leave to amend their dismissed claims, which they request — but only in passing and in a footnote. Pls.' Opp'n 50 n.27. Although leave to amend a complaint should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), it is "within the sound discretion of the district court to grant or deny leave to amend," *Ahmed v. GEO USA LLC*, No. 15-CV-7486 (JMF), 2015 WL 1408895, at *5 (S.D.N.Y. Mar. 27, 2015) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)). The problems with the dismissed claims are largely, if not entirely, substantive, so amendment would be futile. *See, e.g.*, *Maragh v. Roosevelt Island Operating Corp.*, No. 16-CV-7530 (JMF), 2018 WL 6573452, at *6 (S.D.N.Y. Dec. 13, 2018); *Croft v. AXA Equitable Life Ins. Co.*, No. 17-CV-9355 (JMF), 2018 WL 4007646, at *5 (S.D.N.Y. Aug. 22, 2018). Furthermore, Plaintiffs were on notice of Defendants' arguments when they elected not to file an amended complaint in response to Defendants' motion to dismiss, and Plaintiffs were expressly warned that they would "not be given any further opportunity" to amend the Complaint. ECF No. 126. In light of these circumstances, the Court will not grant leave to amend. *See, e.g.*, *Overby v. Fabian*, No. 17-CV-3377 (CS), 2018 WL 3364392, at *14 (S.D.N.Y. July 10, 2018) ("Plaintiff's failure to fix deficiencies in his previous pleading, after being provided ample notice of them, is alone sufficient ground to deny leave to amend *sua sponte*."); *see also Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first." (alteration and internal quotation marks omitted)).

Unless and until the Court orders otherwise, Defendants shall file an answer with respect to Plaintiffs' remaining claims **within three weeks of this Order**.  By separate Order, the Court will schedule an initial pretrial conference for some time thereafter.

The Clerk of Court is directed to terminate ECF No. 123.

SO ORDERED.

Dated: November 2, 2020
New York, New York

_____
JESSE M. FURMAN
United States District Judge

34