**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE CITY OF PHILADELPHIA, MAYOR AND CITY COUNCIL OF BALTIMORE, THE BOARD OF DIRECTORS OF THE SAN DIEGO ASSOCIATION OF GOVERNMENTS, ACTING AS THE SAN DIEGO COUNTY REGIONAL TRANSPORTATION COMMISSION, | Case No.: 19-cv-1608 (JMF) |
| Plaintiffs, | |
| vs. | **AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., BANC OF AMERICA SECURITIES LLC, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., CITIGROUP, INC., CITIBANK N.A., CITIGROUP GLOBAL MARKETS INC., CITIGROUP GLOBAL MARKETS LIMITED, GOLDMAN SACHS & CO. LLC, JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, MORGAN STANLEY, MORGAN STANLEY SMITH BARNEY LLC, MORGAN STANLEY & CO. LLC, MORGAN STANLEY CAPITAL GROUP INC., THE ROYAL BANK OF CANADA, RBC CAPITAL MARKETS LLC, WELLS FARGO BANK, N.A., WACHOVIA BANK, N.A., WELLS FARGO FUNDS MANAGEMENT, LLC, WELLS FARGO SECURITIES LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

**TABLE OF CONTENTS**

**Page**

NATURE OF THE ACTION ........................................................................................... 1

JURISDICTION AND VENUE ...................................................................................... 6

THE PARTIES ................................................................................................................ 8

      A.     Plaintiffs ....................................................................................................... 8

      B.     Defendants .................................................................................................. 11

FACTUAL ALLEGATIONS ........................................................................................ 17

I.      OVERVIEW OF THE VRDO MARKET ......................................................... 17

II.     DEFENDANTS' OBLIGATIONS TO ISSUERS ........................................... 22

III.    DEFENDANTS CONSPIRED NOT TO COMPETE AGAINST EACH OTHER
      IN THE MARKET FOR REMARKETING SERVICES ................................ 31

IV.    ECONOMIC ANALYSIS CONFIRMS THAT DEFENDANTS CONSPIRED
      TO INFLATE VRDO INTEREST RATES ..................................................... 43

      A.     Defendants' VRDO Rates Were Substantially  Inflated During the Class
            Period .......................................................................................................... 44

      B.     Defendants' Collusion Had a Market-Wide Effect .............................. 47

      C.     VRDO Rates Show Significant "Clustering" During the Class Period ............... 52

V.     DEFENDANTS BREACHED THEIR CONTRACTUAL OBLIGATIONS TO
      PLAINTIFFS AND THE CLASS .................................................................... 59

VI.    DEFENDANTS' CONSPIRACY INJURED PLAINTIFFS AND THE CLASS ........... 62

VII.   EQUITABLE TOLLING DUE TO DEFENDANTS' CONCEALMENT ..................... 63

VIII.  CLASS ACTION ALLEGATIONS ................................................................. 65

CLAIMS FOR RELIEF ................................................................................................ 68

      FIRST CLAIM FOR RELIEF ................................................................................ 68

      SECOND CLAIM FOR RELIEF ........................................................................... 68

      THIRD CLAIM FOR RELIEF ............................................................................... 69

PRAYER FOR RELIEF ............................................................................................... 71

DEMAND FOR JURY TRIAL ..................................................................................... 72

Plaintiffs The City of Philadelphia ("Philadelphia"), the Mayor and City Council of Baltimore ("Baltimore"), and the Board of Directors of the San Diego Association of Governments, Acting as the San Diego County Regional Transportation Commission (the "Board of Directors of SANDAG") and collectively with Philadelphia and Baltimore, "Plaintiffs"), individually and on behalf of all persons and entities similarly situated, bring this class action under Section 1 of the Sherman Antitrust Act, Sections 4 and 16 of the Clayton Antitrust Act, and certain state laws, for actual damages, treble damages, declaratory and injunctive relief, costs of suit, pre- and post-judgment interest, and other relief, and allege as follows:

## NATURE OF THE ACTION

1.      This is an antitrust class action charging the Defendant banks with conspiring to inflate the interest rates for a type of bonds often called "Variable Rate Demand Obligations" or "VRDOs."[1] Plaintiffs bring this action on behalf of themselves and a proposed Class of VRDO issuers—mainly state and local public entities such as municipalities, agencies, public universities, and hospitals—to redress the harm inflicted by Defendants, which likely amounts to billions of dollars class-wide.

2.      VRDOs are primarily tax-exempt bonds with interest rates that are reset on a periodic basis, typically weekly. VRDOs are issued by public entities to raise money to fund their operations, as well as critically important infrastructure and public services, such as neighborhood schools, water and wastewater systems, public power utilities, and transportation services. VRDOs are also issued by public entities on behalf of tax-exempt 501(c)(3)

---

[1]  Variable Rate Demand Obligations are also sometimes referred to as Variable Rate Demand Notes ("VRDNs").

organizations—including schools, community organizations, and charities—which use the VRDOs to fund their operations and projects.

3.      VRDOs allow issuers to borrow money for long periods of time while paying short-term interest rates. Investors find VRDOs attractive because the bonds include a built-in "put" feature that allows investors to redeem the bond at any periodic reset date at face value ("par") plus any accrued interest, thus making VRDOs a low-risk and high-liquidity investment. Investors historically have also been willing to invest in tax-exempt VRDOs at an interest rate significantly lower than that of commercial paper.

4.      To manage the bond, VRDO issuers contract with banks—like Defendants here—to act as re-marketing agents ("RMAs"). RMAs have two primary jobs under these remarketing agreements. First, on each reset date, RMAs are required to reset the interest rate of the VRDO at the lowest possible rate that would permit the bonds to trade at par. For the vast majority of VRDOs, the reset date occurs on a weekly basis, typically every Tuesday or Wednesday. Second, when an existing investor exercises the "put" on the bonds and tenders the bond to an RMA, RMAs are required to "remarket" the VRDO to other investors at the lowest possible rate. If the RMA cannot find another investor for the VRDO, the obligation to purchase the tendered bond generally falls on a letter of credit provider—which is frequently the RMA itself. For these ongoing services, issuers pay RMAs remarketing fees. While most VRDOs are tax-exempt, the remarketing function and relationship is the same whether the VRDO is taxable or tax-exempt.

5.      VRDO issuers are motivated to obtain the lowest interest rates for their debt. The higher the rates that VRDO issuers pay, the more costly it is for them to finance their operations and fund infrastructure projects. If an RMA cannot deliver low rates, issuers have the right to replace that RMA with another one who can. Thus, in a properly functioning market, RMAs

would compete against each other for issuers' business by actively working to set the best (*i.e.*, the lowest) possible rate for their customers.

6.      Defendants collectively served as RMAs for approximately 75% of all VRDOs issued in the United States from 2008 through 2016. But they did not work to set the lowest possible VRDO rates for Plaintiffs and the Class.

7.      Since about late 2015, various government authorities have been investigating Defendants' practices in the market for VRDO remarketing services, based on facts that were first brought to their attention by a whistleblower. Among other things, the whistleblower alleges that RMAs (including Defendants here) did not actively and individually market and price VRDOs at the lowest possible interest rates. Instead, they set artificially high rates without regard to the individual characteristics of VRDOs, market conditions, or investor demand. The whistleblower also alleges that RMAs (including Defendants here) were improperly coordinating the rates they set for VRDOs. These allegations were based on the whistleblower's extensive analysis of data available to the whistleblower due to that person's role in the marketplace.

8.      Starting in or about late 2015 and 2016, the whistleblower began to meet and share data with federal authorities, including the Antitrust Division of the U.S. Department of Justice (the "DOJ"). The DOJ subsequently opened a preliminary criminal investigation into Defendants' remarketing practices in connection with VRDOs. That preliminary criminal investigation is ongoing.

9.      Plaintiffs' counsel's investigation of this matter has confirmed that there exists evidence of direct communications *between competing banks* concerning VRDO rate-setting. In these communications, senior personnel sitting within Defendants' Municipal Securities Groups, which housed the Short-Term Products desks on which Defendants ran their VRDO operations,

shared competitively sensitive information that was material to the setting and resetting of VRDO rates.

10.    As a result of Plaintiffs' counsel's investigation, Plaintiffs have further learned that, as early as February 2008, Defendants were agreeing among themselves *not* to compete against each other in the market for remarketing services, but instead were agreeing to keep VRDO rates artificially high, to the detriment of their customers, including Plaintiffs here.

11.    Plaintiffs have confirmed these facts through interviews with numerous well-placed industry sources, including high-level insiders who worked within the Municipal Securities Groups and remarketing desks at the Defendant banks during the Class Period. According to these insiders, employees on Defendants' trading and sales desks communicated with each other on a *daily* basis, including in person, via telephone, and through electronic communications such as electronic chat rooms on Bloomberg.

12.    In these communications, Defendants shared highly sensitive information about the "base rates" that they used to make initial determinations of the interest rates they set for VRDOs, as well as proprietary information about the levels of VRDO inventory they held on their books. Defendants communicated this information using coded phrases, such as asking whether competitors were "going high or going low," "How much cash is in the market?" and "How are things trending?"

13.    Defendants also conspired through the use of third-party VRDO rate "indexing" services, which surveyed Defendants each morning and then distributed to Defendants the average VRDO rate that Defendants intended to set later in the day. Rather than providing information about historical VRDO rates, these services provided information about Defendants' views of and plans for *future* VRDO rate-setting. According to one high-level industry insider,

after receiving this information, Defendants regularly would contact each other to confirm—*before* they reset their rates later that day—that the cartel members' rate resets would align with the third-party pricing index average.

14.     Defendants' overarching objective was to ensure that the cartel members would keep VRDO rates artificially high in order to prevent investors from "putting" the bonds back to Defendants.  When investors tender VRDOs back to RMAs, it triggers the RMAs' obligation to remarket the VRDOs while also forcing the RMAs to carry the bonds in their inventory.  By keeping rates high, Defendants ensured that investors would not exercise their put options on the bonds on a widespread basis.  This allowed Defendants to continue to collect remarketing fees for doing, essentially, nothing.

15.     Economic analysis provides strong support for the existence of this conspiracy.  As detailed below, Plaintiffs' preliminary economic analyses demonstrate that VRDO interest rates were artificially inflated for several years starting as early as 2008 and continuing until late 2015 to early 2016.  This economic analysis also demonstrates the existence of several historical patterns in VRDO rates that are each indicative of an agreement among Defendants not to compete in the market for VRDO remarketing services that began to break in late 2015 to early 2016, around the same time that government authorities began investigating Defendants' practices in the market for VRDO remarketing services.

16.     Defendants' conspiracy restrained competition in the market for VRDO remarketing services and inflicted significant financial harm on Plaintiffs and the Class.  Plaintiffs and the Class paid billions of dollars in inflated interest rates during the Class Period due to Defendants' conspiracy.  By artificially increasing the rates paid by Plaintiffs and the Class, Defendants' conduct necessarily decreased the amount of funding available for critical

public projects and services, as well as the operations of 501(c)(3) organizations.  As a result, Defendants were able to bank hundreds of millions of dollars in the form of remarketing fees and other service fees they charged for effectively doing nothing.

17.     Free-market competition is, and has long been, the fundamental economic policy of the United States.  As the Supreme Court has explained, this policy is enshrined in the Sherman Act,[2] which makes it *per se* illegal for competitors (like Defendants here) to conspire and coordinate with each other to limit competition.  Defendants' conspiracy offends the very core of the antitrust laws.  Defendants were supposed to be aggressively competing with each other for the business of their customers, but they secretly conspired *not* to compete against each other and instead to work together to keep VRDO interest rates high.  Accordingly, Plaintiffs bring this class action to hold Defendants accountable for the injuries they have caused.

## JURISDICTION AND VENUE

18.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries to Plaintiffs and the Class, alleged herein, arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

19.     The Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, as well as pursuant to 28 U.S.C. §§ 1331 and 1337(a).

---

[2]  *See N. Pac. Ry. Co. v. U.S.*, 356 U.S. 1, 4 (1958) ("The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions.").

20.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, as well as pursuant to 28 U.S.C. § 1391(b), (c), and (d), because during the relevant period all the Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein was carried out in this District.

21.     Defendants' activities, and those of their co-conspirators, were within the flow of, were intended to, and had a substantial effect on interstate commerce.

22.     The Court has jurisdiction over Defendants pursuant to the nationwide contacts test provided for by 15 U.S.C. § 22. Most Defendants are subject to personal jurisdiction in the United States because they were formed in or have their principal places of business in the United States. The other Defendants are members of the conspiracy and are subject to personal jurisdiction in the United States because the conspiracy was directed at, carried out in substantial part in, and had the intended effect of, causing injury to Plaintiffs and Class members residing in, located in, or doing business throughout the United States.

23.     Defendants are also subject to personal jurisdiction because each, either directly or through its respective agents or affiliates, transacted business throughout the United States, including in this District, that was directly related to the claims at issue in this action, including by engaging in remarketing and resetting activities with members of the Class in this District.

24.     Alternatively, to the extent that any Defendant is not subject to jurisdiction in any state's courts of general jurisdiction, this Court has personal jurisdiction over the Defendant pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure because the Court's exercise of jurisdiction is consistent with the United States Constitution and laws.

## THE PARTIES

### A.  **Plaintiffs**

25.     The City of Philadelphia  is a municipal  corporation  organized  under the laws of the Commonwealth  of Pennsylvania,  and is a political  subdivision  of the Commonwealth  of Pennsylvania.  Philadelphia  issued VRDOs whose rates were reset during  the Class Period by Defendants acting as remarketing  agents for the bonds.  Philadelphia  was injured by the Defendants' unlawful conspiracy to inflate the interest rates for those bonds.  The VRDOs issued by Philadelphia,  include  the following:

| Bond | Par Amount | CUSIP | Remarketing Agent |
|---|---|---|---|
| General Obligation  Multi-Modal Refunding  Bonds,  Series 2007B | $314 million | 717813JG5 | RBC Capital Markets LLC |
| General Obligation  Multi-Modal Refunding  Bonds,  Series 2009B | $100 million | 717813LJ6 | Barclays Capital Inc., RBC Capital Markets LLC, Wachovia Bank National Association, Wells Fargo Bank National Association |
| Airport Revenue Refunding Bonds, Series 2005C | $179 million | 717817LN8 | J.P. Morgan Securities LLC |
| | $82 million | 717817RQ5 | J.P. Morgan Securities LLC |
| | $81 million | 717817RR3 | J.P. Morgan Securities LLC, RBC Capital Markets LLC |
| Gas Works Revenue Refunding Bonds, Eighth Series | $50 million | 7178232M9 | J.P. Morgan Securities LLC |
| | $105 million | 7178232P2 | Wachovia Bank National Association, Wells Fargo Bank National Association |
| | $50 million | 7178232R8 | Barclays Capital Inc., Wachovia Bank National Association, Wells Fargo Bank National Association |
| | $50 million | 7178232T4 | Merrill Lynch Pierce Fenner and Smith Inc., RBC Capital Markets, LLC |
| Gas Works Variable Rate Demand Revenue Bonds, | $30 million | 717823U48 | J.P. Morgan Securities LLC |

| Fifth Series A-2 | | | |
|---|---|---|---|
| Water and Wastewater Revenue Refunding Bonds, Variable Rate Series 2003 | $381 million | 717893NP2 | Citigroup Global Markets Inc. |
| Water and Wastewater Revenue Refunding Bonds, Variable Rate Series 2005B | $84 million | 717893NW7 | Banc of America Securities LLC, Citigroup Global Markets Inc. |
| | $84 million | 717893TR2 | Banc of America Securities LLC |
| Water and Wastewater Revenue Bonds, Variable Rate Series 1997B | $70 million | 717893TL5 | Citigroup Global Markets Inc. |

26.     The Mayor and City Council of Baltimore is an independent city in the State of Maryland.  Baltimore issued VRDOs whose rates were reset during the Class Period by Defendants acting as remarketing agents for the bonds.  Baltimore was injured by the Defendants' unlawful conspiracy to inflate the interest rates for those bonds.  The VRDOs issued by Baltimore include the following:

| Bond | Par Amount | CUSIP | Remarketing Agent |
|---|---|---|---|
| Industrial Development Authority of the Mayor and City Council of Baltimore Variable Rate Demand Revenue Bonds, Series 1986 | $100 million | 05922DAA3 | J.P. Morgan Securities LLC |
| Consolidated Public Improvement Bonds, Series 2003C | $23.09 million | 059189QA1 | Citigroup Global Markets Inc. |
| Consolidated Public Improvement Bonds, Series 2003D | $17.155 million | 059189QB9 | Citigroup Global Markets Inc. |
| Taxable Refunding Revenue Bonds (Baltimore City Parking System Facilities), Series 2008 | $77.5 million | 059231TD2 | Citigroup Global Markets Inc. |

27.     The San Diego Association of Governments ("SANDAG") is a legislatively created government agency that functions as the primary planning, transportation, transit construction, and research agency in the San Diego, California region.  As a large, one-county metropolitan planning organization, SANDAG provides a public forum for regional policy decisions about growth, transportation planning, transit construction, environmental management, housing, open space, energy, public safety, and binational topics.

28.     SANDAG is governed by a Board of Directors composed of mayors, councilmembers, and a county supervisor from each of the region's 19 local governments: City of Carlsbad, City of Chula Vista, City of Coronado, City of Del Mar, City of El Cajon, City of Encinitas, City of Escondido, City of Imperial Beach, City of La Mesa, City of Lemon Grove, City of National City, City of Oceanside, City of Poway, City of San Diego, City of San Marcos, City of Santee, City of Solana Beach, City of Vista, and County of San Diego.  Supplementing these voting members are advisory representatives from Imperial County, the U.S. Department of Defense, California Department of Transportation, Metropolitan Transit System, North County Transit District, Port of San Diego, San Diego County Water Authority, Southern California Tribal Chairmen's Association, Mexico, and the San Diego County Regional Airport Authority.

29.     Pursuant to California Public Utilities Code Section 132051, the Board of Directors of SANDAG also acts as the San Diego County Regional Transportation Commission. Organized pursuant to the San Diego County Regional Transportation Commission Act, the San Diego County Regional Transportation Commission was created by the California legislature to help finance the cost of maintaining, acquiring, constructing and developing facilities for transportation systems in the County of San Diego in order to increase economic opportunities,

contribute to economic development, act in the public interest and serve a public purpose, and promote the health, safety and welfare of the citizens of the County of San Diego.

30.     As part of fulfilling this responsibility—including, among others, the financing of the Mid-Coast Trolley project that is set to extend Blue Line Trolley service from Santa Fe Depot in Downtown San Diego to the UC San Diego community—the Board of Directors of SANDAG, acting as the San Diego County Regional Transportation Commission, issued the following VRDOs:

| Bond | Par Amount | CUSIP | Remarketing Agent |
|---|---|---|---|
| San Diego Cnty Calif Regl Transn Commn Sales Tax Rev Var Rev Bds 2008A | $150 million | 797400FF0 | Lehman Brothers, Barclays Capital Inc. |
| San Diego Cnty Calif Regl Transn Commn Sales Tax Rev Var Rev Bds 2008B | $150 million | 797400FG8 | Goldman Sachs & Co. |
| San Diego Cnty Calif Regl Transn Commn Sales Tax Rev Var Rev Bds 2008C | $150 million | 797400FH6 | J.P. Morgan Securities LLC |

**B.     Defendants**

31.     Whenever reference is made to any Defendant entity, such reference includes that entity, its parent companies, subsidiaries, affiliates, predecessors, and successors. In addition, whenever reference is made to any act, deed, or transaction of any entity, the allegation means that the entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

32.     ***Bank of America***. Defendant Bank of America Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of

business in Charlotte, North Carolina. Bank of America Corporation is a multi-national banking and financial services corporation with its investment banking division located in New York, New York.

33.     Defendant Bank of America, N.A. is a federally chartered national banking association with its principal place of business in Charlotte, North Carolina, and is an indirect, wholly owned subsidiary of Bank of America Corporation.

34.     Banc of America Securities LLC was a Delaware limited liability corporation with its principal place of business in New York, New York. On November 1, 2010, it merged into Merrill Lynch, Pierce, Fenner & Smith Inc., with Merrill Lynch, Pierce, Fenner & Smith Inc. as the surviving corporation.

35.     Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. is a corporation organized under the laws of Delaware with its principal place of business in New York, New York, and is a wholly owned subsidiary of Bank of America Corporation.

36.     Defendants Bank of America Corporation, Bank of America, N.A., Merrill Lynch, Pierce, Fenner & Smith Inc., Banc of America Securities LLC, and their subsidiaries and affiliates are referenced collectively in this Complaint as "Bank of America." During the Class Period, Bank of America entered into VRDO remarketing agreements with Class members and served as a letter of credit provider for Class members, including through its subsidiaries and affiliates.

37.     ***Barclays***. Defendant Barclays Bank PLC is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England and branch locations in New York, New York. Defendant Barclays Capital Inc. is a corporation

organized and existing under the laws of the State of Connecticut, with its principal place of business in New York, New York.

38.     Defendants Barclays Bank PLC and Barclays Capital Inc., and their subsidiaries and affiliates, are referenced collectively in this Complaint as "Barclays." During the Class Period, Barclays entered into VRDO remarketing agreements with Class members and served as a letter of credit provider for Class members, including through its subsidiaries and affiliates.

39.     *Citi*. Defendant Citigroup Inc. ("Citigroup") is a Delaware corporation with its principal place of business in New York, New York.

40.     Defendant Citibank N.A. ("Citibank") is a federally chartered, national banking association with its principal place of business in Sioux Falls, South Dakota, and is a subsidiary of Citigroup.

41.     Defendant Citigroup Global Markets Inc. ("CGMI") is a New York corporation with its principal place of business in New York, New York. CGMI is an indirect, wholly owned subsidiary of Citigroup.

42.     Defendant Citigroup Global Markets Limited ("CGML") is a U.K.-registered private limited company with its principal place of business in London, United Kingdom. CGML is an indirect, wholly owned subsidiary of Defendant Citigroup.

43.     Defendants Citigroup, Citibank, CGMI, and CGML, and their subsidiaries and affiliates, are collectively referred to as "Citi" in this Complaint. During the Class Period, Citi entered into VRDO remarketing agreements with Class members and served as a letter of credit provider for Class members, including through its subsidiaries and affiliates.

13

44.     *Goldman Sachs*.  Defendant Goldman  Sachs & Co. LLC is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

45.     Defendant Goldman  Sachs & Co. LLC, and its subsidiaries  and affiliates, are referenced collectively in this Complaint as "Goldman Sachs." During the Class Period, Goldman  Sachs entered into VRDO remarketing agreements with Class members and served as a letter of credit provider for Class members, including through its subsidiaries and affiliates.

46.     *JPMorgan*.  Defendant JPMorgan Chase Bank, N.A. is a federally chartered national banking association with its principal place of business in New York, New York.

47.     Defendant J.P. Morgan Securities LLC (formerly known as "J.P. Morgan Securities Inc.") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

48.     Defendants JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, and their subsidiaries and affiliates, are referenced collectively in this Complaint as "JPMorgan." During the Class Period, JPMorgan entered into VRDO remarketing agreements with Class members and served as a letter of credit provider for Class members, including through its subsidiaries and affiliates.

49.     *Morgan Stanley*.  Defendant Morgan Stanley is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

50.     Defendant Morgan Stanley & Co. LLC, is a wholly owned subsidiary of Morgan Stanley, and is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

51.    Defendant Morgan Stanley Smith Barney LLC, doing business as Morgan Stanley Wealth Management, is a wholly owned subsidiary of Defendant Morgan Stanley & Co. LLC, and is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

52.    Defendant Morgan Stanley Capital Group Inc. is a wholly owned subsidiary of Morgan Stanley, and is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

53.    Defendants Morgan Stanley, Morgan Stanley & Co. LLC, Morgan Stanley Smith Barney LLC, and Morgan Stanley Capital Group Inc., and their subsidiaries and affiliates, are referenced collectively in this Complaint as "Morgan Stanley." During the Class Period, Morgan Stanley entered into VRDO remarketing agreements with Class members and served as a letter of credit provider for Class members, including through its subsidiaries and affiliates.

54.    ***RBC***. Defendant The Royal Bank of Canada is a company organized and existing under the laws of Canada with its principal place of business in Toronto, Canada. The Royal Bank of Canada has substantial operations in the United States, including in New York. The Royal Bank of Canada is a registered broker-dealer with the SEC, a Futures Commission Merchant with the CFTC, registered with FINRA, and licensed by the New York Department of Financial Services. The Royal Bank of Canada is also a registered foreign bank with the Federal Reserve with assets of over $100 billion in the United States.

55.    RBC Capital Markets LLC (formerly known as RBC Capital Markets Corporation) is a business segment of The Royal Bank of Canada incorporated in the United States, with its principal place of business and headquarters located in New York, New York.

56.     Defendants The Royal Bank of Canada and RBC Capital Markets LLC, and their subsidiaries and affiliates, are referenced collectively in this Complaint as "RBC." During the Class Period, RBC entered into VRDO remarketing agreements with Class members and served as a letter of credit provider for Class members, including through its subsidiaries and affiliates.

57.     ***Wells Fargo***. Wells Fargo & Co. is a company organized and existing under the laws of the State of Delaware, with its principal place of business in San Francisco, California.

58.     Defendant Wells Fargo Bank, N.A. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in San Francisco, California. Wells Fargo Bank, N.A. operates as a subsidiary of Wells Fargo & Co.

59.     Defendant Wachovia Bank, N.A. was, from 2002 through 2008, a federally-chartered bank with its principal place of business in Charlotte, North Carolina, and wholly-owned by Wachovia Corporation, a publicly traded company listed on the New York Stock Exchange. In October 2008, Wells Fargo & Co. agreed to acquire Wachovia Corporation, and in March 2010, Wachovia Bank, N.A., merged with Wells Fargo Bank, N.A., making Wells Fargo Bank, N.A., its successor by merger. As used herein, "Wachovia" includes its successor by merger Wells Fargo Bank N.A.

60.     Defendant Wells Fargo Funds Management, LLC, is a wholly owned subsidiary of Wells Fargo & Company, organized and existing under the laws of the State of Delaware, with its principal place of business in San Francisco, California.

61.     Defendant Wells Fargo Securities LLC is a limited liability company organized and existing under the laws of Delaware, with its principal place of business in Charlotte, North Carolina. Wells Fargo Securities LLC is an indirect wholly owned subsidiary of Defendant Wells Fargo & Co.

62.     Defendants Wells Fargo Bank, N.A., Wachovia Bank, N.A., Wells Fargo Funds Management, LLC, and Wells Fargo Securities LLC, and their subsidiaries and affiliates, are collectively referred to as "Wells Fargo" in this Complaint.  During the Class Period, Wells Fargo entered into VRDO remarketing agreements with Class members and served as a letter of credit provider for Class members, including through its subsidiaries and affiliates.

## FACTUAL ALLEGATIONS

## I.     OVERVIEW OF THE VRDO MARKET

63.     VRDOs are long-term securities with short-term interest rate periods.  Interest rates are reset periodically—typically on a weekly basis—by banks, called remarketing agents (or "RMAs"), on behalf of the issuers of the securities.  The primary issuers of VRDOs are state and local public entities such as municipalities, agencies, public universities and hospitals. VRDOs are also issued by public entities on behalf of tax-exempt 501(c)(3) organizations.

64.     VRDOs are attractive to public entity issuers because they allow them to borrow money for long periods of time, typically 20 to 30 years, while paying short-term interest rates. Investors are willing to accept a short-term interest rate on these bonds due to the fact that they include a "put" feature which grants the investor (*i.e.*, the bondholder) the option, at each rate reset, to receive the full amount of principal and accrued interest due on the bond by tendering it back to the RMA. As interest paid on VRDOs is usually exempt from taxation, investors accept lower yields on VRDOs compared to taxable debt instruments, such as corporate bonds.  Public entities then use these borrowed funds to fund infrastructure, their operations, major projects, or to refinance other debt.

65.     VRDOs were first used as a source of municipal finance in the 1980s.  In 2009, the size of the VRDO market exceeded $400 billion par outstanding, with over 15,000 VRDOs outstanding in the United States. Although the size of the market has declined in recent years,

VRDOs remain an extremely important form of public financing. As of December 2017, there were approximately 5,000 VRDOs outstanding with a total of $150 billion in par value.

66.     Aside from issuers, the key participants in the VRDO market are: (i) RMAs, banks responsible for resetting the VRDO interest rate on a periodic basis and reselling VRDOs to new investors; (ii) money market funds ("MMFs"), the primary investors in and holders of outstanding VRDOs; and (iii) liquidity providers, banks that enhance the creditworthiness of an issuer using letters of credit and standby bond purchase agreements. It is also quite common for the same bank to act as both the RMA and liquidity provider for a particular VRDO.

67.     *RMAs*. Issuers typically enter into remarketing agreements with RMAs. Under the remarketing agreements, RMAs have two primary jobs for each particular VRDO they manage: (i) to reset the VRDO interest rate on a periodic basis (typically weekly) at the lowest possible rate that would permit the bonds to trade at par, and (ii) when an investor exercises the put feature, to resell the VRDOs to other investors by actively remarketing the VRDOs—again, at the lowest possible rate that would permit the bonds to trade at par. These obligations are set forth in the governing documents that dictate the relationship between an issuer and remarketing agent as well as in marketing materials distributed by each remarketing agent.

68.     Given the importance of the RMA's role, issuers like Plaintiffs typically paid RMAs high annual fees that amounted to an average of 10 basis points of the VRDO debt balance during the Class Period. For example, if a VRDO has a debt balance of $100 million, an issuer would pay the RMA an annual fee of approximately 0.1% of that amount, or approximately $100,000 per year. Plaintiffs and Class members collectively paid hundreds of millions of dollars' worth of remarketing fees to Defendants during the Class Period. Plaintiffs agreed to pay Defendants these large fees based on Defendants' representations, set forth in the

VRDO transaction documents, that they would actively remarket the VRDO in order to find the lowest possible rate at which they could place the VRDO.

69.     Defendants—which serve as RMAs for the vast majority of the VRDO market—promote themselves to VRDO issuers as being the best RMAs given, among other factors, the size of their investor networks.

70.     For example, in marketing material presented by Defendant Bank of America to the Commonwealth of Massachusetts, Bank of America touted its marketing abilities targeting both "retail buyers" through its "wholly-owned retail distribution system," as well as a marketing "plan [that] will focus on accessing the broadest possible mix of institutional investors." Also in marketing materials presented to the Commonwealth of Massachusetts, Defendant Citi pitched its remarketing advice related to helping identify the "most diverse group of investors possible," as well as helping the Commonwealth structure its commercial paper program, including "strategic selection of [commercial paper] maturity dates." Defendant JPMorgan told Massachusetts it would follow a "five-step process" to ensure the lowest rates, including a commitment to "analyze performance of the program and distribution of buyers." According to a former JPMorgan Managing Director, JPMorgan's marketing materials were designed to convey that JPMorgan would provide "white glove service" to issuers. Defendant Wells Fargo explained that "having a client base to hold these [VRDO] positions provides liquidity and affords us daily pricing information for your securities and market knowledge of what maturities are attractive relative to other retail investment products."

71.     In another example, in marketing material presented by Defendant Bank of America to the City of Los Angeles, Bank of America represented that it "work[ed] actively to diversify the investor base" for issuers' outstanding VRDOs. Also in marketing materials

presented to the City of Los Angeles, Defendant Goldman Sachs touted itself as "a leader in the municipal variable rate market" and described its "ability to reach [] a broad array of investors" as the reason it "outperform[s] other dealers." Defendant JPMorgan told Los Angeles that it would "obtain the best prices for the City's variable rate securities" by reaching "the fullest range of potential investors," touting its "thorough analysis for each remarketing." Defendant Morgan Stanley represented that it would "devote[] special attention to the specific issuer's needs," and that it would "go to extensive lengths" to reach investors and remarket an issuer's bonds. Defendant RBC told the City of Los Angeles that it would "focus individually on each variable rate program on which we serve as remarketing agent" and described its remarketing as a "personalized service."

72.      *Investors*. VRDOs are primarily held by money market funds ("MMFs"), some of which only invest in tax-exempt securities. An MMF is a type of mutual fund whose objective is to earn interest for shareholders while maintaining a net asset value of $1 per share. Institutional investors and individuals invest in MMFs in order to obtain a low-risk and highly liquid, short-term investment offering variable interest payments.

73.      MMFs favor VRDOs due in part to a "put" feature that allows the holder, at each periodic reset date, typically weekly, to redeem the VRDO at face value ("par") plus any accrued interest. If the holder triggers the "put" feature, the holder tenders the VRDO back to the RMA, which then has a period of time to remarket the bond to new investors. If the RMA cannot find a new investor to purchase the bond, it will draw on a liquidity facility, such as a letter of credit or standby bond purchase agreement, described below.

74.     From an investor's perspective, this "put" feature makes VRDOs a highly liquid, short-term investment. The "put" feature not only ensures liquidity but also promises repayment at par, which means the value of a VRDO remains stable.

75.     Many of the largest investors of VRDOs were affiliates of the Defendants. For example, Defendant JPMorgan manages at least five tax-free MMFs, with over $20 billion in assets under management—including VRDOs. Defendant Wells Fargo manages 15 tax-free MMFs with more than $17 billion in assets under management. Defendants Bank of America, Goldman Sachs, and RBC all tout their numerous tax-free MMFs, with many billions of dollars under management for each Defendant, much of which is invested in VRDOs. And Defendant Citibank has partnered with non-party Invesco to market tax-free MMFs. During the Class Period, Morgan Stanley managed a massive tax-free money market portfolio, also heavily invested in VRDOs. As of 2016, for example, Morgan Stanley's New York Municipal Market Trust had assets of $1.2 billion. Following the end of the collusion and artificial inflation of VRDO rates, Morgan Stanley's funds drastically reduced their exposure. As of 2019, that same fund had assets of only $5 million—less than one half of one percent of the fund's size during the Class Period when VRDO rates were inflated. These investors benefited from higher interest rates on VRDOs at the expense of issuers like Plaintiffs.

76.     ***Liquidity Providers***. VRDOs are typically secured by letters of credit or standby bond purchase agreements provided by highly rated commercial banks, such as Defendants. A letter of credit typically provides an unconditional commitment by a bank to pay investors the principal and interest owed on the VRDOs, even in the case of default, bankruptcy or downgrade of the issuer. Thus, a bank acts as a "liquidity provider" by stepping in to make payments to the VRDO holder if the issuer fails to do so. VRDOs are considered highly safe and liquid

investments due to this credit enhancement feature, which improves their perceived creditworthiness and mitigates their default risk.

77.     In providing letters of credit, liquidity providers also agree to purchase the VRDO if the RMA is unable to find a new investor for the tendered securities.[3]  In many cases, the RMA and the liquidity provider are one and the same for a given VRDO issuance.  This creates an additional dilemma for an RMA if an investor exercises the "put" feature and the RMA cannot find a new investor.  In that instance, the RMA (who is also acting as the liquidity provider) is on the hook for the outstanding principle and interest payments due on the bond if the issuer defaults.  The RMA is also forced to carry the VRDO on its balance sheet.  In exchange for these services, issuers pay liquidity providers a fee ranging from approximately 50 to 150 basis points of the debt balance of the VRDO.  In other words, for a $100 million bond, issuers such as Plaintiffs would pay a liquidity provider from $500,000 to $1.5 million annually.

## II.    DEFENDANTS' OBLIGATIONS TO ISSUERS

78.     An RMA's obligations can be found in three types of documents:  remarketing agreements, indentures, and official statements.  The remarketing agreement is the contract between the RMA and the issuer.  In many instances, the obligations of the RMA are not set forth in the remarketing agreement, but instead appear in the indenture and are incorporated by reference into the remarketing agreement.  The indenture is a contract pursuant to which the

---

[3]  As an alternative to using a letter of credit, issuers sometimes use a standby bond purchase agreement ("SBPA") as a credit enhancement, pursuant to which a bank agrees to purchase VRDOs tendered by investors.  However, unlike a letter of credit, under an SBPA the bank does not guarantee that the issuer will pay the principal and interest it owes on the VRDO. Instead, the SBPA only provides that tendered securities will be purchased by the bank so long as the SBPA remains in effect.  Typically, an SBPA is used when the issuer has a strong credit rating or it is coupled with bond insurance.  *See* MSRB, *Guidance on Disclosure and Other Sales Practice Obligations to Individual and Other Retail Investors in Municipal Securities* (July 14, 2009), at http://www.msrb.org/Rules-and-Interpretations/MSRB-Rules/General/Rule-G-17.aspx?tab=2.

actual bonds are issued.  Generally, the obligations regarding how an RMA is supposed to reset the rates for VRDOs and remarket the bonds are specified within this document.

79.     The official statement is the offering and disclosure material used to market the bonds to investors.  Although not contracts, official statements are intended to reflect the terms of the offering and also specify how the RMA is supposed to reset the rates for VRDOs and remarket the bonds consistent with the corresponding remarketing agreement and indenture.

80.     Regardless of which transaction document contains the actual obligations related to resetting and remarketing the rates for VRDOs, the obligation to reset the rates for VRDOs and remarket the bonds at the lowest possible rate is understood throughout the industry and is uniform across, if not identical amongst, Defendants.

81.     A December 2007 remarketing agreement between Philadelphia and Defendant RBC, for example, provides: "The Remarketing Agent shall perform the duties and obligations of the Remarketing Agent with respect to the Bonds as contemplated by the Bond Resolution. . . .  On each optional tender[,] . . . the Remarketing Agent shall offer for sale and use its best efforts to solicit purchasers for the tendered Bonds."

82.     Under the Bond Resolution, the RMA was required to do the following:

*Reset Obligation*.  "The interest rate for the Series 2007B Bonds in the Daily Mode or Weekly Mode shall be the rate of interest per annum determined by the Remarketing Agent on and as of the applicable Rate Determination Date as *the minimum rate of interest* which, in the opinion of the Remarketing Agent under then-existing market conditions, would result in the sale of the Series 2007B Bonds in the Daily Rate Period or Weekly Rate Period, as applicable, at a price equal to the principal amount thereof, plus interest, if any, accrued through the Rate Determination Date during the then current Interest Accrual Period."

*Remarketing Obligation*.  "The Remarketing Agent *shall use its best efforts to offer for sale* . . . all Series 2007B Bonds or portions thereof as to which a Tender Notice has been given . . . ."

83.     Similarly, a 2008 Remarketing Agreement between Baltimore and Defendant Citi required that Citi, as Remarketing Agent, would "determine the rate of interest for the Bonds during each Interest Rate Period . . . as provided in Section 2.04 of the First Supplemental Indenture." The First Supplemental Indenture in turn includes the following terms:

> **Reset Obligation**. "Each Weekly Rate with respect to the Series 2008 Bonds shall be the rate of interest per annum determined by the Remarketing Agent . . . to be the *minimum interest rate* which, if borne by the Series 2008 Bonds, would enable the Remarketing Agent to sell all of the Series 2008 Bonds on the effective date of that rate at a price (without regard to accrued interest) equal to the principal amount thereof."

> **Remarketing Obligation**. "Upon receipt of a notice of tender . . . the Remarketing Agent shall offer for sale and *use its best efforts to sell* such Series 2008 Bonds (including Bank Bonds) on the same date designated for purchase thereof . . . and, if not remarketed on such date, thereafter until sold, at a price equal to par plus accrued interest, with such interest component of the sales price being determined by the Remarketing Agent, with consent of the Tender Agent, in order to best facilitate remarketing."

84.     A remarketing agreement dated March 2008 between the San Diego County Regional Transportation Commission and Defendant Goldman Sachs provides: "In accordance with the Indenture, the Remarketing Agent's responsibilities hereunder for each remarketing of the [bonds] include . . . determining and announcing the interest rates applicable thereto." The Indenture in turn provides:

> **Reset Obligation**. "Each Weekly Rate shall be the rate of interest that, if borne by such 2008 Bonds in the Weekly Rate Period, would, in the judgment of the Remarketing Agent, . . . be *the lowest interest rate* that would enable the Remarketing Agent to place such 2008 Bonds at a price equal to 100% of the aggregate principal amount of such 2008 Bonds (plus accrued interest, if any) on the first day of such Weekly Rate Period."

> **Remarketing Obligation**. "The Remarketing Agent shall thereupon offer for sale and use its best efforts to find purchasers for such Weekly Put Bonds . . . ."

85.     A remarketing agreement dated June 2012 between Western Municipal Water District Facilities Authority and Defendant Merrill Lynch provides: "The Remarketing Agent shall determine the interest rates on, and Interest Periods for, the Bonds in the manner and at the

24

times specified therefor in the Indenture," and "[t]he Remarketing Agent shall use its best efforts to remarket Bonds to be purchased as described in the Indenture." The indenture itself requires the following:

> ***Reset Obligation***. "The interest rate for Daily Rate Bonds, Weekly Rate Bonds, Short-Term Rate Bonds and Long-Term Rate Bonds for each Interest Rate Period shall be determined by the Remarketing Agent as *the lowest rate of interest* that, in the judgment of the Remarketing Agent, will produce as nearly as practical a par bid for the Bonds as of the date of determination, taking into account Prevailing Market Conditions, provided that in no event will the interest rate on the Bonds exceed the Maximum Rate."

> ***Remarketing Obligation***. "Upon the receipt by the Remarketing Agent of (i) notice of tender of Daily Rate Bonds or Weekly Rate Bonds pursuant to Section 3.06, or (ii) notice of mandatory tender of Bonds pursuant to Section 3.08, the Remarketing Agent shall offer for sale and *use its best efforts to solicit purchases of the Bonds* subject to purchase on the Purchase Date at a price equal to the Purchase Price."

86.    Similarly, a remarketing agreement dated March 2015 between Sacramento Transportation Authority and Defendant Wells Fargo provides that "[t]he Remarketing Agent shall determine the interest rates on the Bonds in the manner and at the times specified therefor in the Indenture . . . The Remarketing Agent shall use its best efforts to remarket Bonds to be purchased as described in the Indenture . . . The Remarketing Agent shall perform such other duties as are specifically set forth in this Agreement and the Indenture for the Remarketing Agent." Under the indenture, the RMA was required to do the following:

> ***Reset Obligation***. "*Each Weekly Rate shall be the rate of interest that*, if borne by the Series 2015A Bonds in the Weekly Rate Period, would, in the reasonable judgment of the Remarketing Agent, having due regard for the prevailing financial market conditions for Tax-Exempt Securities that are of the same general nature as the Series 2015A Bonds for which the Weekly Rate is to be determined, or Tax-Exempt Securities that are competitive as to credit and maturity (or period for tender) with the credit and maturity (or period for tender) of the Series 2015A Bonds for which the Weekly Rate is to be determined, *be the lowest interest rate* that would enable the Remarketing Agent to place such Series 2015A Bonds at a price equal to 100% of the aggregate principal amount of the Series 2015A Bonds (plus accrued interest, if any) on the first day of such Weekly Rate Period."

*Remarketing Obligation*. "The Remarketing Agent shall thereupon offer for sale and *use its best efforts to find purchasers for such Weekly Put Bonds*, other than 2015A Liquidity Facility Bonds, which shall be remarketed pursuant to Section 34.13."

87.     The language regarding the reset and remarketing obligations of the RMA is substantially similar in each remarketing agreement that Plaintiffs entered into with Defendants during the Class Period.

88.     Official statements also set forth the same obligations.   For example, in an official statement issued in connection with an offering of Airport Revenue Refunding Bonds, Series 2005C, issued by Philadelphia, the following disclosures were made about JPMorgan's remarketing obligations:

*Reset Obligation*.  "Pursuant to the Remarketing Agreements, the Remarketing Agent is required to use its best efforts to determine the applicable rate of interest that, in its judgment, is *the lowest rate* that would permit the sale of the 2005C Bonds bearing interest at the applicable interest rate at par plus accrued interest, if any, on and as of the applicable rate determination date. The interest rate will reflect, among other factors, the level of market demand for the 2005C Bonds (including whether the Remarketing Agent is willing to purchase 2005C Bonds for its own account)."

*Remarketing Obligation*.  "The 2005C Bonds are being remarketed by the Remarketing Agent, pursuant to Remarketing Agreements, each dated December 23, 2011 (the "Remarketing Agreements") between the City and the Remarketing Agent.  Subject to certain conditions, upon delivery or deemed delivery of 2005C Bonds tendered for purchase by any owners thereof in accordance with the provisions of the 2005C Bonds and the Agreement, the Remarketing Agent will offer for sale and *use its best efforts to remarket such tendered 2005C Bonds*, any such remarketing to be made on the date such tendered 2005C Bonds are to be purchased, at a price equal to 100% of the principal amount thereof plus accrued interest, if any."

89.     Similarly, in an official statement issued in connection with an offering of General Obligation Multi-Modal Refunding Bonds, Series 2009B, issued by Philadelphia, the following disclosures were made about Wachovia's remarketing obligations:

*Reset Obligation*.  "The interest rate for the 2009B Bonds in the Daily Mode or Weekly Mode shall be the rate of interest per annum determined by the

Remarketing Agent on and as of the applicable Rate Determination Date (defined below) as *the minimum rate of interest* which, in the opinion of the Remarketing Agent under then-existing market conditions, would result in the sale of the 2009B Bonds in the Daily Rate Period or Weekly Rate Period, as applicable, at a price equal to the principal amount thereof, plus interest, if any, accrued through the Rate Determination Date during the then current Interest Accrual Period."

***Remarketing Obligation***. "Upon receipt by the Remarketing Agent from the Tender Agent of notice of any optional tender of 2009B Bonds, as required under the Bond Committee Resolution, or if the 2009B Bonds become subject to mandatory purchase, the Remarketing Agent (subject to the provisions of the Bond Committee Resolution and the Remarketing Agreement) will *use its best efforts to sell such Series 2007B Bonds*, at a purchase price equal to the principal amount thereof plus accrued interest, if any, to the Purchase Date. Subject to the provisions of the Remarketing Agreement and the Bond Committee Resolution, the Remarketing Agent also will use its best efforts to sell any Bank Bonds, at a purchase price equal to the principal amount thereof plus accrued interest to the sale date."

90.     Similarly, a 2008 Official Statement relating to VRDOs issued by Baltimore for which it contracted with Defendant Citi as RMA stated that Citi would set interest at a "Weekly Rate," and further specified:

***Reset Obligation***. "The Weekly Rate shall be *the lowest interest rate*, not exceeding the Maximum Rate, which, in the determination of the Remarketing Agent as of the date of determination and under prevailing market conditions, would result as nearly as practicable in the market price for the Remarketed Bonds on the Weekly Effective Rate Date being one hundred percent (100%) of the principal amount thereof."

***Remarketing Obligation***. "[T]he Remarketing Agent will [ ] determine the Weekly Rate on the Series 2008 Bonds and *use its best efforts to remarket* Series 2008 Bonds subject to optional and mandatory tender for purchase."

91.     Another official statement, dated June 2001, pertaining to VRDOs issued by Baltimore and for which it contracted with Morgan Stanley to serve as RMA, likewise contains the following requirements:

***Reset Obligation***. "[T]he interest rate on a series 2001 Bond for a specific Commercial Paper Rate Period will be the rate established . . . as *the minimum rate of interest necessary*, in the judgment of the Remarketing Agent, taking into account the then prevailing market conditions, to enable the Remarketing Agent to sell such Series 2001 Bonds on that day at a price equal to the principal amount thereof."

***Remarketing Obligation***. "Upon the receipt by the Remarketing Agent of any notice relating to purchases of series 2001 Bonds on demand of the Owner thereof, the Remarketing Agent, subject to the terms of the Remarketing Agreement, *shall use its best efforts* to offer for sale and sell the Series 2001 Bonds in respect of which such notice has been given."

92.     Another official statement, dated March 2008, pertaining to several series of VRDOs issued by San Diego County Regional Transportation Commission and for which it contracted with Barclays, Goldman Sachs, and JPMorgan to serve as RMAs, contains the following requirements:

***Reset Obligation***. "Each Weekly Rate is to be the rate of interest that, if borne by the Series 2008 Bonds in the Weekly Rate Period, would, in the judgment of the Remarketing Agent, having due regard for the prevailing financial market conditions . . . , be the *lowest interest rate* that would enable the Remarketing Agent to place the Series 2008 Bonds of each Series at a price equal to 100% of the aggregate principal amount of such Series 2008 Bonds (plus accrued interest, if any) on the first day of such Weekly Rate Period."

***Remarketing Obligation***. "Each Remarketing Agent undertakes, among other things, to use its best efforts to remarket Series 2008 Bonds for which it is the Remarketing Agent that are tendered for purchase."

93.     An RMA's duty to reset rates as low as possible and to use best efforts to actively resell tendered VRDOs is consistently reflected in official statements related to VRDOs issued by members throughout the Class. For example, a 2014 official statement pertaining to the 2014 Series A Bonds issued by the New York State Housing Finance Agency states that Defendant JPMorgan, as Remarketing Agent, "shall determine" the weekly rate by determining "*the lowest interest rate*, not exceeding the Maximum Rate, which would, in the judgment of the Remarketing Agent," enable the bond holder to sell the bond "at a price that is equal to the principal amount thereof plus accrued interest thereon," and that takes into consideration the market conditions for such bonds. This same official statement explains that "The Remarketing Agreements require that the Remarketing Agent *use its best efforts* to sell tendered 2014 Series A Bonds at par, plus accrued interest." In another example, a 2014 official statement pertaining to

2011 Series A, 2011 Series B, and 2012 Series A Bonds issued by the New York City Housing Development Corporation states that Defendant Morgan Stanley, as Remarketing Agent, "is required to determine" the weekly rate using "its judgment" about "*the lowest rate* that would permit the sale of the Remarketed Bonds at par plus accrued interest, if any."

94.     Further confirmation of RMAs' obligations can be seen in the marketing materials that Defendants provided to issuers to induce them to enter into remarketing agreements. In these marketing materials, Defendants consistently touted their ability to devote their full resources to actively remarket the bonds and obtain the lowest possible interest rates for issuers. For example:

- Defendant Bank of America represented that it would "achieve the lowest cost of funds" for clients, and would use "the entire firm's resources to use our best efforts to successfully market and place" VRDOs.

- Defendant Citi represented that "Citi's approach to remarketing the [VRDOs] will be to secure the lowest possible interest rates[.]" Citi also represented that issuers "would benefit from a firm who will actively market" the demand for VRDOs, and promised that it would "strive to achieve" a diverse placement of VRDOs "by carefully managing the program on each reset date."

- Defendant Goldman Sachs represented that it "significantly outperforms many of its peers in today's market" and that it would "set the lowest possible rates to meet market demand." Goldman also represented that it "outperform[s] other dealers" because of its "ability to reach [] a broad array of investors."

- Defendant JPMorgan represented that its "clients' [VRDOs] will trade at the lowest possible interest cost in the market," and that it would "actively" remarket the bonds.

- Defendant Morgan Stanley represented that it would "go to extensive lengths to educate potential investors about [a specific issuer's] credits" and that it would "maintain an active dialogue with investors" as the issuer's RMA.

- Defendant RBC represented that it would provide a "personalized service" that would "focus individually on each variable rate program on which [RBC] serve[s] as remarketing agent."

- Defendant Wells Fargo represented that it "consistently outperform[s] the competition and achieve[s] lower borrowing rates," due to its "close relationships with tier one, tier two, and tier three institutional investors."

95.     The obligations set out in transaction documents are all consistent with industry-standard language prepared by the Securities Industry Financial Markets Association ("SIFMA"). SIFMA is the self-described "voice of the U.S. securities industry,"[4] of which all the Defendants are members.  The SIFMA model disclosures state that RMAs are "required" to reset interest rates at the "lowest rate that permits the sale of the VRDOs at 100% of their principal amount (par) on the interest reset date."[5]  In other words, RMAs were obligated to set the interest rate at the lowest possible rate at which VRDOs can be sold.  As detailed below, however, Defendants did no such thing.

---

[4]  https://www.sifma.org/about/

[5]  *See* SIFMA Model Risk Disclosures Pursuant to MSRB Rule G-17 at 1 (RMA "is *required* to set the interest rate at the rate necessary, in its judgment, as the *lowest* rate that permits the sale of the VRDOs at 100% of their principal amount (par) on the interest reset date.") (emphasis added).

## III.   DEFENDANTS CONSPIRED NOT TO COMPETE AGAINST EACH OTHER IN THE MARKET FOR REMARKETING SERVICES

96.     Since as early as February 2008, Defendants have conspired not to compete against each other in the market for remarketing services.  Defendants' collusion ran from the top to the bottom of their VRDO operations—from the senior personnel in Defendants' Municipal Securities Groups, to the remarketing desks sitting below those groups, to the personnel on Defendants' sales desks.  These personnel, described in more detail below, communicated regarding proprietary information such as VRDO inventory and planned changes to "base rates" for VRDOs.  They communicated regularly, almost daily, using the telephone, in-person meetings, Bloomberg messaging technology, and third-party intermediaries.  Plaintiffs' counsel have confirmed these facts through interviews of high-ranking industry insiders.

97.     Pursuant to this conspiracy, Defendants worked together to keep interest rates on VRDOs artificially high, to benefit themselves and the MMFs that were the predominant holders of VRDOs, and to the detriment of VRDO issuers.  Several of the largest MMFs in the world are managed by the Defendants.  According to Crane Data, Defendants JPMorgan, Goldman Sachs and Wells Fargo all manage MMFs in the top 15 MMFs in terms of assets under management and, as noted above, the other Defendants also either manage their own tax-free MMFs, or have partnered with third-party managers.  At least one Defendant, Morgan Stanley, effectively ended its VRDO investments shortly after the collusion ended and artificial inflation no longer boosted its returns.  Such funds benefited by the inflated rates set by Defendant RMAs on VRDOs in their portfolios, thereby directly benefiting Defendants and their affiliates as well.

98.     During the Class Period, the key personnel on Defendants' remarketing desks included Jim Brewer (Bank of America), Ken Rogers (Bank of America), Dan Blankenship (Bank of America), Patrick Boyer (Barclays), David Lo (Barclays), Rob Toscanini (Citi),

Cynthia Klein (Goldman), Drew Rowley (Morgan Stanley), Peter McCarthy (JPMorgan), Craig Laraia (RBC), Julie Chavez (Wells Fargo), and Laurie Mount (Wells Fargo). These and other VRDO personnel regularly met face to face, including at industry events and through clubs.

99.    For example, The Bond Buyer, a reporting outlet serving the municipal finance community, hosted regular municipal bond conferences around the country, including the National Muni Bond Summit, an annual three-day conference beginning in 2009 marked by social events and municipal finance panels, and the California Public Finance Conference, another three-day conference held annually since 1990. Attendees at these municipal bond conferences have included representatives from Defendants Bank of America, Barclays, Citi, Goldman Sachs, JPMorgan, RBC, and Wells Fargo. Similarly, the Municipal Bond Club of New York, and Municipal Women's Bond Club of New York, hosted parties and happy hour events where investment funds and remarketing agents would meet for drinks, in addition to hosting annual multi-day events which might be attended by hundreds of municipal bond professionals, occasional substantive panels such as the "Short Term Muni" panel hosted in June 2015, and an annual Municipal Bond school.

100.    These conferences and events offered the RMAs employed by Defendants ready opportunities to meet face-to-face, and Defendants' coordination was easy to accomplish and conceal given the relatively small number of individuals at each bank that are directly involved in the market for remarketing services. In fact, each Defendant generally employed between one and three individuals that handled the relevant remarketing function on a day-to-day basis.

101.    VRDO coordination meetings and communications also occurred among senior personnel sitting within Defendants' Municipal Securities Groups, which housed the Short Term Products desks on which Defendants ran their VRDO operations. During the Class Period, these

personnel included Mona Payton (Bank of America), Robert Taylor (Barclays), Peter Bartlett (Citi), Dan Bingham (Goldman), Kyle Pulling (JPMorgan), J.R. McDermott (Morgan Stanley), Chris Hamel (RBC), Todd Bleakney (Bank of America and Wells Fargo), and Martin Bingham (Wells Fargo).

102.     According to the former head of the VRDO desk at Defendant JPMorgan, due to the failure and consolidation of banks during the 2008-2009 financial crisis, the "club" of the most influential RMAs became smaller, and information was more concentrated. Indeed, a relatively small number of firms provided remarketing services for the majority of VRDO bonds. From 2009 through 2013, Defendants Bank of America, Barclays, Citi, Morgan Stanley, and Wells Fargo were among the top 10 remarketing agents in the market; and a SIFMA report shows that as of December 2011, Defendants collectively served as remarketing agents for a majority of the outstanding VRDO bonds.

103.     Provision of liquidity (largely through letter of credit services) is and has been similarly concentrated among a handful of firms, with Defendants providing such services for much of the VRDO market. For instance, just three of Defendants—Bank of America, JPMorgan, and Wells Fargo—alone accounted for approximately 40% of the VRDO-credit-support market in each of 2011, 2012, and 2013. As of 2013, RBC, Barclays, and Citi similarly each ranked in the top ten credit-support providers. For that reason, Defendants' conspiracy as to VRDO rates took hold and flourished during the Class Period, when it was easier to coordinate their efforts.

104.     Through their investigation, Plaintiffs' counsel has learned that there exists evidence of *direct communications* between personnel at competing banks, in which they shared competitively sensitive information that was material to the setting and resetting of VRDO rates.

This included communications among senior personnel sitting within Defendants' Municipal Securities Groups, which housed the Short-Term Products desks on which Defendants ran their VRDO operations.

105.    In these illicit communications, Defendants conspired to inhibit competition on rates, including by sharing with each other competitively sensitive information regarding their inventory levels and base interest rates—that is, the baseline rates that applied across Defendants' VRDOs and were ostensibly designed to account for prevailing macroeconomic factors impacting VRDOs (as opposed to the individual characteristics of a specific VRDO that would also impact the rates for that specific VRDO).

106.    For example, Plaintiffs have learned from a former managing director at Defendant Citi that Defendants' RMA staff would call each other on the phone prior to setting rates, and ask "are you going high or are you going low." According to former senior RMA personnel at JPMorgan, it was a "dirty little secret" that RMAs would talk to each other about rates, and would ask other RMAs questions, like, "Are you placing this paper [referring to a particular VRDO], and if so, what will be the rate?" A high-ranking industry insider further confirms that communications were rampant between sales desks of Defendant banks, who stayed in regular contact and asked each other questions that were clear code for what VRDO rates Defendants planned to set, such as whether they expected rates to "spike up," "How much cash is in the market?" or "How are things trending?"

107.    Such exchanges provided Defendants with more than enough information to coordinate their re-sets of VRDO rates each week. This is because Defendants set their VRDO rates relative to "base rates," with the rate for each VRDO CUSIP set at a particular spread of basis points above that "base rate." Thus, by a simple change in the base rate, and without

expending any real remarketing resources attempting to get the lowest possible VRDO rates, Defendants were able to reset tens, hundreds, or even thousands of VRDO rates in a single stroke. For example, after a particular VRDO was issued, a Defendant might set that VRDO's rate at a spread of 40 basis points above the bank's base rate; if the base rate increased by two basis points the following week, the VRDO's rate would be set at 40 basis points above that new base rate. Because Defendants used these base rates, and fixed spreads off those base rates, by talking to other RMAs about whether to move the base rate up or down in any given week the RMAs were actually able to convey how they planned to move tens, hundreds, or thousands of VRDO CUSIPs that week—in a process that required minimal effort and could take less than thirty minutes.

108.    Rather than seek to obtain the lowest rates for each VRDO based on the VRDO's individual characteristics (such as the issuer and the letter of credit provider), Defendants shared such information to collectively ensure the rates they set were at high enough levels to benefit all Defendants. Absent this coordination, Defendants that set higher rates than their competitors would be at risk of losing their clients to those competitors. As a former senior RMA at one Defendant bank stated, "no one wants to stand out" when it comes to setting rates.

109.    According to one insider, the RMAs responsible for setting VRDO rates at the Defendant banks have an additional motive to conspire to keep interest rates high: They are under immense pressure from senior management to keep VRDOs—which are a relatively low-margin product for Defendants—off the banks' books or else risk losing their jobs. As this insider explained, banks view VRDOs primarily as a product to attract high-value retail customers seeking a secure, tax-free security that will allow the banks to then upsell these customers services with better margins for the bank. In part because of the immense pressure to

keep VRDOs out of the banks' own inventories, this insider described RMAs as a consequently close-knit community across the banks that felt compelled to "artificially prop up interest rates" in order to ensure that the VRDOs would stay off their books. They coordinated to do so through phone calls, through an instant messenger application built into the Bloomberg terminal used across banks, and by the other means described here.

110.    Defendants also discussed other commercially sensitive information beyond VRDO rates in an effort to ensure that rates remained high enough to benefit all Defendants. For example, according to a former RMA from Wells Fargo, the Wells Fargo RMA would call RMAs from other banks and ask "are you heavy or light?", meaning "how are your inventory levels looking?" By sharing proprietary information regarding their inventory levels, Defendants with low inventory levels were able to set rates high enough to ensure that they did not undercut the rates of Defendants with higher inventory levels (*i.e.*, those most likely to offer higher rates in order to reduce their inventory). According to the former senior RMA at Wells Fargo, one RMA would "have a pretty good idea" of the rate resets of another RMA if it knew the other RMA's inventory level. Indeed, that former RMA believed that the VRDO reset rates were highly correlated to Wells Fargo's inventory levels, and informed Plaintiffs that, particularly at points where the banks' VRDO inventories increased, the RMAs from different banks would discuss their inventory levels, in order to figure out how they should set their rates to quickly decrease the levels of VRDOs they held in inventory.

111.    There is no reason for Defendants at competing RMA banks to discuss VRDO rates and other competitively sensitive information. Defendants knew what they were doing was against the law, and they took steps to keep their conduct secret. For example, according to former senior RMA personnel at Defendant JPMorgan, RMAs would talk to each other primarily

in-person or by telephone—and would try to specifically avoid using methods that would leave an easily-searchable record, such as e-mail or Bloomberg messages.

112.    Defendants also coordinated using third-party pricing services, such as J.J. Kenny Drake Inc.  During the Class Period, RMAs from all the major banks used the J.J. Kenny short-term index services, including RMAs from Barclays, Bank of America, Citi, Goldman Sachs, JPMorgan, Merrill Lynch, Morgan Stanley, and Wachovia, and the RMAs from RBC's predecessor firms.  Plaintiffs' counsel's investigation has revealed that these indexing services did not simply provide information on historical VRDO rates, but instead involved an exchange of information about Defendants' views of and plans for *future* VRDO rate-setting.  The services thus enabled Defendants to adjust their planned VRDO rates after first obtaining information about the plans their so-called competitors had for VRDO rates over the coming days.

113.    Because VRDO pricing resets typically took place on Tuesdays and Wednesdays of each week, employees of these pricing services, including Joseph Luparello at J.J. Kenny, would make phone calls to the RMAs on Monday, Tuesday, and Wednesday of *each week* to inquire about their *future* plans for VRDO rate-setting over the following days, including phone calls to RMAs from Barclays, Bank of America, Citi, Goldman Sachs, JPMorgan, Merrill Lynch, Morgan Stanley, Wachovia, Wells Fargo, and others.  Luparello would begin making phone calls around 8:00 a.m., and during each call would ask the RMAs, for example, "Where are you going to be on your weekly high grades today?"  Luparello was specifically asking where the RMAs planned to reset their weekly rates later that day for their "high grade" VRDOs—those VRDOs that had received higher ratings from the credit rating agencies, and were believed to be a lower default risk.

114.    Each Defendant provided this information with knowledge and common understanding that the other Defendants were also doing so.  After surveying the Defendants, Luparello would then call other RMAs to ask the same question.   Luparello would typically finish making such phone calls by about 9:15 a.m., and following discussion with all of these RMAs, by about 9:30 a.m. Luparello would sent out a single email to all recipients of the pricing index—including Defendants—reporting the average planned VRDO rate that had been communicated to him by the RMAs.  For at least part of the Class Period, Luparello's email included the names of all the recipients in the "to" line, so that Defendants knew who was receiving the information.   These average rates operated as a mechanism by which Defendants could communicate and coordinate future plans for their high grade, intermediate grade and low grade VRDO rates *before* they set those rates later that day.

115.    In addition to sending out a single email to all pricing service participants, Luparello would also make phone calls to some banks reporting the results.  And after the RMAs had received the morning price index email, Luparello would sometimes make a second round of phone calls to the RMAs in the afternoon, when they had a more informed view of their plans for setting rates for the subsequent day.  After these rounds of phone calls and receipt of the pricing index email providing the average planned VRDO rate, the RMAs would have until the end of the day to submit their final VRDO rates to EMMA, a website run by the Municipal Securities Rulemaking Board ("MSRB") that serves as the official source for municipal securities data and disclosure documents.  This daily process provided Defendants advance notice if their planned rates were out of line with other Defendants' plans, and an opportunity to change their plans before finalizing their rates at the end of the day.

116.    The J.J. Kenny rate index also enabled Defendants to coordinate their rates and resets before printing the final rate and ensure that no participant broke the agreement. Although the information conveyed by the index made it possible for Defendants to coordinate even without speaking directly to each other, one high-ranking industry insider confirms that Defendants regularly used the results of the index to *explicitly* collude about their rates in direct communications. According to the insider, after receiving the J.J. Kenny index results in the morning (before rate resets were finalized), personnel on Defendants' sales desks routinely would call salespeople at other Defendant banks to confirm that the rates they would be resetting later that day would be in line with the index.

117.    Unsurprisingly, Defendants continued to pay for access to the J.J. Kenny pricing index "service" even *after* actual historical pricing information became available to the market via the Public Securities Association (now known as SIFMA) in the 1990s. J.J. Kenny continued to offer the pricing index until at least 2012.

118.    In addition to these communications, Defendants employed computerized platforms that permitted the sharing of this information instantaneously and without direct communication. For example, a computer software system called "Dalcomp," later acquired by Ipreo, helped RMAs manage their VRDO programs. Specifically, Ipreo offered (among other things) a Variable Rate Trading System ("VRTS"), and a "Position Monitor" designed for use with "variable interest rate securities." In marketing materials, Ipreo touted its platform's "[a]bility to show inventory to other firms on our system." Systems like Dalcomp would allow Defendants to perpetuate the coordination on many days even without telephone calls, by sharing their inventory levels with the other Defendants, thereby telegraphing any moves in the base rate.

And with this information about base rates, all other rates could be easily inferred, and prevent outliers from alerting anyone to the conspiracy.

119.     Defendants' agreement to refrain from competing on rates in this manner was designed to maximize the likelihood that existing holders of VRDOs would not "put" their bonds back to Defendants. Keeping VRDOs in the hands of existing holders allowed Defendants to substantially avoid the obligations and risks triggered when investors exercise the "put" feature of a VRDO and tender the bond to an RMA. When an investor tenders a VRDO to an RMA, the RMA is obligated to spend the time and resources to remarket the bond to new investors, and to hold the tendered VRDO in inventory while it remarkets the bond.

120.     In addition, when (as is often the case) the RMA is also the liquidity provider, and the RMA fails to find a buyer for the tendered VRDO, the RMA is obligated to repurchase the bond and assume the risk that the issuer will default on its payments. By keeping VRDO rates artificially high, Defendants largely ensured that investors would continue to retain their VRDO holdings, at greater cost to Plaintiffs and the Class, even if there existed alternative investors willing to purchase the same bonds at a lower interest rate.

121.     As a former head of the VRDO desk at Defendant JPMorgan explained, RMAs "would set the rate wherever they had to keep the paper off their balance sheet—and you could understand them needing other banks to set the same rate otherwise the issuer would move their business. It was a challenge for them to be fair." And in those instances where a put was exercised, Defendants were at least able to earn the higher interest rates generated by the conspiracy while the VRDO remained on their books.

122.     In the absence of their coordinated efforts, it would have been impossible for Defendants to keep their rates high because the issuers—who are able to see the rates obtained

by other issuers—would push their RMAs to obtain the lowest rate possible, under threat of switching to a different agent of similar size and resources. By ensuring that all Defendants—the largest and most creditworthy RMAs in the market—"stayed in line," the agreement ensured that issuers would not know they could obtain lower rates from the other major RMAs. For most issuers, only Defendants were acceptable RMAs due to their size, asserted experience, and credit ratings. For that reason, the existence of RMAs other than Defendants did not pose a realistic threat to the conspiracy as long as Defendants in the cartel did not break ranks.

123.    Defendants went to great lengths to hide the conspiracy from the issuers. For example, a former senior RMA at one Defendant acknowledged that RMAs would engage in "window dressing," by temporarily lowering rates on a single issuer in advance of a meeting or making a pitch for more business. A former senior RMA at JPMorgan confirmed the practice, also adding that when an RMA engaged in this "window dressing" practice, it would frequently take those VRDOs back onto its own balance sheet to hide the lower rate in order "to not disrupt the market." This practice of "window dressing" shows that the RMAs could have obtained lower rates for issuers, which was required by the remarketing agreements. And the practice of hiding the low rates from the market shows that the Defendants knew that any failure to publicly "stay in line" could endanger the conspiracy.

124.    As a direct and proximate result of the conspiracy, Plaintiffs and each Class member were forced to pay artificially inflated interest rates for VRDOs they issued. At the same time, Defendants continued to collect fees for remarketing services that were never received by Plaintiffs.

125.    As noted above, government authorities have been investigating Defendants'

practices in the market for VRDO remarketing services since late 2015, based on facts that were

brought to authorities' attention by a whistleblower.

126.    In November 2015, the whistleblower filed a whistleblower complaint with the

Securities and Exchange Commission (the "SEC"), alleging, based primarily on the

whistleblower's extensive analysis of economic data, that RMAs (including Defendants here)

were engaged in a scheme to defraud issuers by keeping VRDO rates artificially high despite

those RMAs' obligation to do the opposite. Immediately thereafter, the SEC began investigating

the industry in response to the whistleblower's allegations. In December 2015 and/or January

2016, the SEC contacted at least the following RMAs regarding their conduct in the VRDO

market: JPMorgan, Citi, Wells Fargo, and Bank of America.

127.    The SEC proceeded to open a formal investigation, which remains active to this

date. In September 2018, the *Bond Buyer* reported that the SEC was conducting a "sweep" of

the major RMAs in the VRDO market, including Defendants.[6] The SEC has sent Defendants

and other RMAs letters seeking information and documents regarding their remarketing and rate-

resetting practices, in order to determine whether they have engaged in "fraudulent practices or

collusion in the resetting of VRDO or variable rate demand note rates."[7]

128.    In August 2016, the whistleblower met and shared the whistleblower's data

analysis with the DOJ. The DOJ subsequently authorized an investigation into Defendants'

remarketing practices, and has made approximately 10 follow-up requests for data from the

---

[6]  Lynn Hume, *SEC conducting sweep of top 12 VRDO remarketers*, THE BOND BUYER
(Sept. 6, 2018), https://www.bondbuyer.com/news/sec-conducting-sweep-of-top-12-vrdo-
remarketers.

[7]  *Id.*

whistleblower and interviewed numerous market participants. The DOJ continues to actively pursue its investigation.

## IV.     ECONOMIC ANALYSIS CONFIRMS THAT DEFENDANTS CONSPIRED TO INFLATE VRDO INTEREST RATES

129.    As has been well-documented by Congressional testimony and academic publications, "screens" are statistical tools based on economic models that use data such as prices, bids, quotes, spreads, market shares, and volumes to identify the existence, causes, and scope of conspiratorial behavior. For instance, "screens" were part of an analysis that led to the discovery of the Libor rate-setting conspiracy that to date has cost the Libor-panel banks several billion dollars in regulatory fines worldwide. In the context of Libor, journalists and economists uncovered anomalous behavior in the benchmark as compared to movements in other publicly available data points (data points that were independent of the banks' purported individualized judgment).[8] Screens also led to the initial detection, in the summer of 2013, of the foreign exchange conspiracy, which resulted in over $3 billion in settlements by banks in the United States, the United Kingdom, and Switzerland in November 2014.[9]

130.    Plaintiffs used a series of statistical models and screens to analyze historical rate data for the VRDO market. These analyses confirm the presence of collusive behavior in the VRDO market over several years prior to late 2015 to early 2016. As shown below in greater detail, these analyses confirm that Defendants' rates were supracompetitive (*i.e.*, significantly higher than what they should have been) during this period.

---

[8]    *See generally* Testimony of Rosa M. Abrantes-Metz on behalf of the Office of Enforcement Staff, Federal Energy Regulatory Commission (Sept. 22, 2014), at http://elibrary.ferc.gov/idmws/doc_info.asp?document_id=14274590.

[9]    *See* Liam Vaughan and Gavin Finch, *Currency Spikes at 4 P.M. in London Provide Rigging Clues*, Bloomberg (Aug. 27, 2013), at http://www.bloomberg.com/news/2013-08-27/currency-spikes-at-4-p-m-in-london-provide-rigging-clues.html.

A.    **Defendants' VRDO Rates Were Substantially Inflated During the Class Period**

131.    Plaintiffs analyzed whether VRDO rates were higher than they should have been in a properly-functioning VRDO market. To do this, Plaintiffs constructed a regression model that is principally built on the data of Defendants' actual VRDO rates from December 2015 to February 2019—the "after" benchmark period during which Defendants' collusive conduct had become known to regulatory authorities, a fact that likely caused Defendants' collusion to cease—in order to determine what VRDO rates should have been in the pre-December 2015 period "but for" Defendants' collusion.[10]

132.    To calculate these "but-for" rates the model incorporates the ratio of Defendants' VRDO rates to 7-day AA financial commercial paper. 7-day AA financial commercial paper is the security most equivalent to VRDOs for two reasons. First, both are backed by financial institutions, and the perceived credit risk of VRDOs is primarily a function of the credit risk of the large financial institutions that provide the letters of credit that guarantee the liquidity of VRDOs. Second, both are short-term in nature (*i.e.*, 7-days). Given these core similarities, before and after December 2015, the relationship between VRDO rates and 7-day AA financial commercial paper should generally have remained the same absent collusion even across periods of changing macroeconomic conditions. In absolute terms, VRDO rates should have remained lower than commercial paper due to the VRDOs' usual tax-free status.

133.    To further increase the reliability of the results, the model also incorporates the ratio of 1-year AAA corporate debt yields to 1-year AAA municipal debt yields. The

---

[10]    As Defendants' collusion likely persisted to some degree during the post-December 2015 benchmark period, Plaintiffs' economic analyses are conservative as the benchmark period would be tainted by the conspiracy and reflect supracompetitive rates, causing the model to predict higher "but-for" rates during the pre-December 2015 period.

incorporation of this variable into the model helps account for the effect that non-collusive changes in the market could have on the relationship between Defendants' VRDO rates and 7-day commercial paper rates over time, such as the relative demand for municipal debt securities over time and perceived relative risk of default by the municipal issuers as compared to corporate issuers.

134.    Plaintiffs then compared the resulting "but-for" VRDO rates calculated by the model to Defendants' actual VRDO rates to assess whether Defendants' actual rates were higher than they should have been during the pre-December 2015 period. The results of the model are summarized below in **Figure 1**, which compares Defendants' "but-for" rates to Defendants' actual rates, with a vertical line separating the "before" and "after" periods. The "before" period begins in April 2009 because that is the earliest period for which Defendants' rates data were available to Plaintiffs. As Figure 1 shows, Defendants' actual rates were substantially inflated above Defendants' "but-for" rates for the entire "before" period, by statistically significant margins.

Figure 1[11]



135.   Similarly, **Figure 2** below is a simple bar chart comparing Defendants' average actual rates to Defendants' average "but-for" rates.  The chart shows that, on average, Defendants' rates during the collusive period were 20 basis points, or 16 times, higher than they would have been but for Defendants' collusion.   This gap is statistically significant.

---

[11]   To be clear, Defendants' average but-for rates were never at zero during the period measured in Figure 1.

**Figure 2**



136.   The difference between the "but-for" rates and the rates charged by Defendants during the Class Period, depicted in Figures 1 and 2, strongly suggests that Defendants were engaged in a conspiracy to inflate the rates they set for issuers—which conspiracy appears to have ended when the regulators and criminal authorities began to investigate.

**B.     Defendants' Collusion Had a Market-Wide Effect**

137.   Plaintiffs also constructed a model to examine the extent to which Defendants' artificially high rates could be seen across the entire VRDO market, as seen through the SIFMA swap index, which tracks the average interest rates for a broad range of highly-rated VRDOs reset on a weekly basis.  Plaintiffs considered the entire VRDO market, which was the entire market for variable rate municipal securities during the Class Period.  There is no competing substitute for VRDOs in this market.

138.   For this analysis, Plaintiffs used historical SIFMA data from January 2000 through July 2007 to estimate the model parameters.  As in Plaintiffs' analysis of Defendants'

own VRDO rates, Plaintiffs considered the historical ratios of (i) SIFMA to 7-day AA financial commercial paper, and (ii) 1-year AAA corporate debt yields to 1-year AAA municipal debt yields. Plaintiffs then applied the resulting model coefficients that were generated during the "clean" period to the actual historical values of 7-day AA financial commercial paper, 1-year AAA corporate debt yields, and 1-year AAA municipal debt yields to generate the values for the "but-for" SIFMA index rate for every month from August 2007 to February 2019.

139.    **Figure 3** below consists of two bar charts that compare actual and "but-for" SIFMA rates in two periods: the period running from August 2007 through November 30, 2015, and the period running from December 2015 through February 2019. These charts show that, during the former period, the actual SIFMA index rate was, on average, 25 basis points higher than the "but-for" SIFMA index rate, or approximately 74% higher than what the model predicts the SIFMA index rate should have been. In the latter period, the actual SIFMA rates were three basis points lower than "but-for" SIFMA rates, a statistically insignificant amount.

**Figure 3**



48

140.    **Figures 4 and 5**, below, compare "but-for" and actual SIFMA index rates on line graphs over time, with a vertical line separating the "before" and "after" periods.  **Figure 4** shows that although artificiality in SIFMA rates varied over time, the actual SIFMA index rate was consistently higher than the "but-for" SIFMA rate from February 2008 until November 30, 2015, when differences between "but-for" and actual SIFMA rates declined to statistically insignificant levels.

**Figure 4**



141.    **Figure 5** zooms into the period from August 2013 through November 30, 2015, to more clearly illustrate the gaps between "but-for" and actual SIFMA rates over that timeframe.

**Figure 5**



142.    **Figure 5** shows how pernicious Defendants' conspiracy was: Even as actual
SIFMA rates scraped along with interest rates close to zero, the effects of the conspiracy could
still be seen in the broad market for VRDOs, with actual SIFMA rates *still* inflated over "but-for"
SIFMA rates.

143.    Plaintiffs also analyzed whether the increase of VRDO rates relative to
commercial paper and the "but-for" rate could be explained by factors other than Defendants'
collusion.   No other explanation was supported by the facts.

144.    *First*, there is no evidence that the market's preference for municipal debt
changed during the Class Period.   Unlike VRDOs, the ratio of yield on municipal bonds to yield
corporate bonds remained nearly constant during the Class Period, at a ratio consistent with the
usual tax advantage of municipal debt.   This demonstrates that there was no market-wide move
away from municipal bonds during the Class Period.

145.     *Second*, there is no evidence of an increase in VRDO defaults during the Class Period that would justify the abnormally high VRDO rates.  Out of the nearly 16,000 municipal borrowers, the default rate was only approximately 5 defaults per year during the Class Period.  This number is only slightly higher than the pre-Class Period, and cannot explain the level of VRDO rates during the Class Period.  This market-wide default rate also overstates the risk for VRDOs themselves, which, in addition to the credit of the issuer, are backed by credit support from financial institutions.   In fact, Plaintiffs are unaware of a single VRDO default during the Class Period.  Thus, there is no reason to believe that any change in VRDO default risk could have caused the observed VRDO rate inflation.

146.     *Third*, the quality of VRDO issuers did not change during the Class Period.  To the contrary, the average VRDO value outstanding actually increased during the Class Period, indicating that larger, more creditworthy borrowers were not exiting the market.  If the credit quality of VRDO issuers changed during the Class Period, a decrease in average issuance size would have been observed.  Thus, a change in credit quality of issuers cannot explain the higher level of VRDO rates during the Class Period.

147.     *Fourth*, there was no excess supply of or decreased demand for VRDOs during the Class Period that could explain the inflated rates.  The collapse of the auction rate securities market in 2008 led to an increase in demand for VRDOs, and according to industry reports during the Class Period, demand for VRDOs was strong.  In June 2014, the Bond Buyer reported:

> Matt Fabian, a managing director at Municipal Market Advisors, said the continuous shrinking of the VRDO market is the result of a variety of factors. Investor demand for VRDOs remains very strong, Fabian said, but there isn't enough supply to go around.  "It is entirely a supply issue," he said.[12]

---

[12]   Kyle Glazier, *MSRB Report: VRDO Market Down Five of Last Six Years*, THE BOND BUYER (June 18, 2014), http://www.bondbuyer.com/news/washington-securities-law/msrb-report-vrdo-market-down-five-of-last-six-years-1063622-1.htm.

Throughout the Class Period, investor demand for VRDOs remained high, and there is no evidence that a decrease in demand could explain the Class Period inflation.

148.    *Fifth*, there was no material change in the quality of VRDO liquidity providers during the Class Period that would explain the level of VRDO rates. VRDO liquidity providers are primarily the large financial institutions that issue commercial paper. While financial institution commercial paper rates (represented by the AA Financial CP index) did increase briefly at the beginning of the Class Period—during the financial crisis—the ratio of financial commercial paper rates to non-financial commercial paper rates returned to its historical average by mid-2009, early in the Class Period. This relationship indicates that the market did not perceive any increase in default risk for financial institutions, including those that provided liquidity backstops for VRDOs. Thus, the rate of inflation during the Class Period cannot be explained by a change in the market perception of liquidity provider risk.

149.    In sum, there is no legitimate, market-based explanation for the inflated VRDO rates that Plaintiffs' statistical analysis has identified. Only collusion can explain the inflation.

### C.    VRDO Rates Show Significant "Clustering" During the Class Period

150.    Plaintiffs' analysis has identified additional evidence of Defendants' agreement not to compete. During the period of Defendants' collusion, rates of VRDOs marketed by Defendants exhibited a high degree of "clustering," in which VRDO bonds with different characteristics cluster together at the exact same interest rates or rate changes. These clustering patterns diminish significantly in early 2016, consistent with a break in Defendants' conspiracy after regulatory authorities were first made aware of Defendants' conduct with respect to VRDOs.

151.    For this analysis, Plaintiffs examined all 7-day rates for all VRDOs remarketed by Defendants from April 2009 through November 2018. This analysis included VRDOs with rates

that reset on Tuesdays and VRDOs with rates that reset on Wednesdays.  For each week, Plaintiffs identified the number of bonds clustered together with exact matches in (i) interest rate levels or (ii) week-over-week interest rate changes.  In each case, Plaintiffs identified persistent clustering that abated beginning in early 2016.

152.   **Figures 6-8**, below, show the clustering patterns in absolute interest rate *levels* among VRDO bonds resetting on Wednesdays.

**Figure 6**



**Figure 7**



**Figure 8**



153. **Figures 9-11**, below, show the clustering patterns in in absolute interest rate *levels* among VRDO bonds resetting on Tuesdays.

**Figure 9**



**Figure 10**



**Figure 11**



154. **Figures 12-14**, below, show the clustering patterns in week-over-week interest rate *changes* among VRDO bonds resetting on Wednesdays.

**Figure 12**



**Figure 13**



**Figure 14**



155. **Figures 15-17**, below, show the clustering patterns in week-over-week interest rate *changes* among VRDO bonds resetting on Tuesdays.

**Figure 15**



**Figure 16**



**Figure 17**



156.     As shown in Figures 11 through 17, Defendants' VRDO rates exhibited

significant levels of clustering beginning at least as early as April 2009 until early 2016, when

the clustering abruptly abated. These patterns all suggest a long-running agreement among

Defendants not to compete with each other in the setting of VRDO rates, which agreement broke

only after regulatory authorities were alerted to Defendants' conduct with respect to VRDOs.

The clustering demonstrates the high degree to which Defendants' rates and resets for divergent

VRDOs moved in unison, pursuant to their agreement not to compete. The abrupt break in

clustering at the end of the Class Period suggests that the clustering was driven by the conspiracy.

## V.     DEFENDANTS BREACHED THEIR CONTRACTUAL OBLIGATIONS TO PLAINTIFFS AND THE CLASS

157.     Defendants also breached their obligations under their remarketing agreements

with Plaintiffs and the Class.

158.     Under these agreements, Defendants were required to actively remarket VRDOs

to achieve the lowest rate of interest for which there were buyers in the market. As discussed

above, Defendants regularly represented to issuers that they would devote their full resources to make these determinations and place the bonds at the lowest possible interest rate.

159.    Defendants have not complied with the requirements of the remarketing agreements. Rather than setting VRDO rates and actively remarketing them with the purpose of finding the lowest possible interest rate, Defendants relied on their conspiracy to keep interest rates on VRDOs artificially high, for the purpose of preventing the widespread exercise of investors' "put" rights so that Defendants could to continue to collect remarketing fees for effectively doing nothing.

160.    For instance, as discussed above, rather than giving individual attention to resetting the rates of each specific VRDO on a weekly basis, Defendants would reset tens, hundreds, or thousands of VRDOs in a process that could take less than thirty minutes, by simply changing the Defendant's "base" rate up or down. For example, a former RMA from Wells Fargo explained that he managed hundreds of daily re-sets of VRDOs, and approximately 1,200-1,300 weekly re-sets. Each time Wells Fargo reset VRDO rates, he would mechanically reset the rate for hundreds of CUSIPs all at once. This employee has admitted that the vast majority of issuers had no understanding of how he actually performed his rate re-sets.

161.    Similarly, Plaintiffs have learned from a former Managing Director at JPMorgan that, far from giving individual attention and analysis as to each VRDO in order to determine the lowest interest rate that could be assigned to it, JPMorgan's RMA would apply the same change in interest rate to large groups of VRDOs in one stroke, in a process that would take approximately 30 minutes. This former JPMorgan Managing Director has said that he does not believe issuers understood their VRDO rates were being reset in this manner, and that there was a significant difference between JPMorgan's marketing materials and the remarketing activities

the bank was actually undertaking—that JPMorgan's marketing materials were intended to convey that JPMorgan would provide issuers with "white-glove service," when in fact the issuers were all lumped together.

162.    In addition, Plaintiffs have learned that Defendants' priority and focus was not on obtaining the lowest possible interest rate for issuers' VRDOs, but was instead on taking whatever steps they could to prevent Defendants from carrying VRDOs in their own inventory—resulting in higher interest rates on VRDOs. For example, as described by a former Managing Director at JPMorgan, the VRDO team's mandate or mission was not to get the lowest possible rates for its issuer clients, but instead to make sure inventory left the bank's balance sheet as quickly as possible. A former RMA from Wells Fargo also explained that, particularly at times of the year when Wells Fargo expected increased putbacks from investors, supervisors instructed the Wells Fargo RMA to "make sure [the RMA] was cheap on this week's reset"—meaning, to make sure that the RMA reset the VRDO interest rates at a high level—to ensure that Wells Fargo would not have to hold VRDOs in inventory. These sorts of instructions would typically come around tax time (April 15), year-end, or when there were market anomalies causing investors to tender VRDOs at a higher rate than normal.

163.    Even putting Defendants' collusion to one side, Plaintiffs' analysis makes clear that Defendants have not complied with their obligations under the remarketing agreements. As demonstrated above, for the duration of the Class Period, Defendants' VRDO rates were significantly inflated above levels that would have been justified by market conditions and the characteristics of the bonds. Defendants were required to use their judgment to reset and remarket VRDOs to obtain the lowest possible rate, and no exercise of "judgment" would justify the artificial inflation of interest rates charged to issuers.

## VI.   DEFENDANTS' CONSPIRACY INJURED PLAINTIFFS AND THE CLASS

164.    Defendants' conspiracy inflicted severe financial harm on Plaintiffs and the Class and restrained competition in the market for remarketing services.

165.    As a direct result of their conspiracy, Defendants inflated their own profits for remarketing services they never provided while setting supracompetitive rates for VRDOs to Plaintiffs and the Class. Defendants injured each Class member through a common scheme resulting in hundreds of millions and potentially billions of dollars in damages.

166.    The conspiracy alleged herein had and is having the following effects, among others:

(a)    The VRDO interest rates paid by Plaintiffs and the Class have been fixed or stabilized at supracompetitive levels;

(b)    Plaintiffs and the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for VRDO remarketing service;

(c)    Competition in establishing interest rates paid in the United States by VRDO issuers has been unlawfully restrained, suppressed, and eliminated; and

(d)    Plaintiffs have incurred and will incur expenses related to the inflated rates, including but not limited to inflated remarketing agent fees, letter of credit fees, accounting fees, and expenses related to disclosures.

167.    By reason of the violations of Section 1 of the Sherman Act alleged in this Complaint, Plaintiffs and the members of the Class have sustained injury to their businesses or property. The injuries sustained by Plaintiffs and the Class consist of the payment of supracompetitive interest rates for VRDOs as a result of Defendants' conspiracy to restrain trade as alleged. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VII.   EQUITABLE TOLLING DUE TO DEFENDANTS' CONCEALMENT

168.   Defendants actively and effectively concealed their collusion, as alleged herein, from Plaintiffs and the Class. As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting Plaintiffs' and the Class' claims have been tolled.

169.   Defendants' conspiracy was self-concealing by its very nature. As explained above, Defendants knew they had to keep it secret in order for it to succeed. The conspiratorial communications thus occurred among only a small group of RMA employees, their supervisors, as well as through third-party pricing services. These discussions occurred primarily over the telephone, via email, and at industry events that are not open to the public. Even at such events, RMA employees were wary of discussing their business with outsiders, and asked questions such as whether they were "being recorded" before engaging in such conversations.

170.   Defendants also actively concealed their conspiracy by making statements intended to misdirect issuers such as Plaintiffs. For example, Defendant Wells Fargo published a "primer on variable-rate demand notes" which states that its "reset feature ensures that VRDN yields reflect the current interest-rate environment."[13] In fact, as Well Fargo knows, VRDO rates were artificially inflated through Defendants' agreement not to compete, irrespective of the current "interest-rate environment" and other market realities.

171.   Defendants also provided Class members with "certificates of non-collusion" in connection with their bids to provide remarketing services, in which Defendants stated that their proposals—including their representations and assurances that they would actively remarket VRDOs at the lowest possible rate—were submitted "in good faith and without collusion or

---

[13]   *A primer on variable-rate demand notes*, Wells Fargo (2017), https://www.wellsfargofunds.com/assets/pdf/fmg/icm/primer_vrdns.pdf.

fraud with any other person."  In fact, Defendants were actively working together to artificially inflate VRDO rates.

172.    Further, as explained above, in an attempt to conceal the fact they were not actively competing on rates, Defendants engaged in "window dressing" by temporarily lowering VRDO rates for brief periods of time when marketing themselves to issuers.  But these temporary rate reductions were completed in a manner designed to ensure that they did not impact Defendants' overarching conspiratorial goal to keep VRDO interest rates high.

173.    Plaintiffs were only able to uncover Defendants' conspiracy through an extensive investigation commencing in the middle of 2016 that involved, among other things: (i) consulting with an industry whistleblower; (ii) interviewing numerous industry insiders; and (iii) an extensive and expensive analysis of VRDO data over several years that required a full team of experts to yield the information contained in this Complaint.  Municipalities and other VRDO issuers simply do not have the financial or logistical resources to undertake a comparable investigation, have never done so, and would remain in the dark regarding Defendants' conspiracy if not for Plaintiffs' efforts.

174.    Nonetheless, Plaintiffs have engaged in reasonable due diligence under the circumstances.  For example, Plaintiffs, either directly or through outside advisers they hired, regularly monitored their VRDOs and conducted due diligence to try to avoid being harmed by financial misconduct throughout the Class Period.  Through these efforts, Plaintiffs endeavored to obtain the best rates on their VRDOs.

175.    Because of Defendants' concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiffs or members of the Class have been tolled during the period of concealment.

## VIII.   CLASS ACTION ALLEGATIONS

176.   Plaintiffs, on behalf of themselves and those similarly situated, seek damages against Defendants based on the allegations contained herein.

177.   Plaintiffs bring this action on behalf of themselves and as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking monetary damages on behalf of the following class (the "Class"):

> All persons and entities who (whether as issuers or obligors) paid interest expenses on VRDOs that had interest rates reset pursuant to remarketing agreements with Defendants from February 1, 2008 through June 30, 2016 (the "Class Period"). Excluded from the Class are Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, and the United States government.

178.   ***Numerosity***. Members of the Class are so numerous that joinder is impracticable. Plaintiffs do not know the exact size of the Class, but believe that there are thousands of Class members geographically dispersed throughout the United States.

179.   ***Typicality***. Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants. Specifically, Defendants' wrongdoing caused Plaintiffs and members of the Class to pay inflated interest rates for VRDOs that they issued. Plaintiffs and members of the Class also paid remarketing and letter of credit fees to Defendants for doing, essentially, nothing.

180.   Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiffs are coincident with, and not antagonistic to, those of the Class. Accordingly, by proving their own claims, Plaintiffs will prove other Class members' claims as well.

181.   ***Adequacy of Representation***. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation. Plaintiffs and

their counsel have the necessary financial resources to adequately and vigorously litigate this class action. Plaintiffs can and will fairly and adequately represent the interests of the Class and have no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.

182. **_Commonality_**. There are questions of law and fact common to the Class that relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

(a)     whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, stabilize, and/or otherwise manipulate VRDO interest rates in violation of the Sherman Act;

(b)     the identity of the participants in the conspiracy;

(c)     the duration of the conspiracy;

(d)     the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

(e)     whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiffs and other members of the Class;

(f)     whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiffs and the members of the Class;

(g)     whether Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole;

(h)     the appropriate injunctive and equitable relief for the Class;

(i)     whether Defendants breached their contracts with the Class;

(j)      the appropriate measure of damages sustained by Plaintiffs and other members of the Class.

183.    *Predominance*. During the Class Period, Plaintiffs entered into remarketing agreements with Defendants containing materially similar obligations, and their interests are coincident with and not antagonistic to those of the other members of the Class. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class, thereby making a common methodology for determining class damages as a whole appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

184.    *Superiority*. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated, geographically dispersed persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh any potential difficulties in managing this class action. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.

185.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (Conspiracy to Restrain Trade in Violation of §1 of the Sherman Act)

186.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

187.    Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of §1 of the Sherman Act, 15 U.S.C. §1, *et seq.*

188.    As a direct, material, and proximate result of Defendants' violation of §1 of the Sherman Act, Plaintiffs and members of the Class have suffered injury to their businesses and property, within the meaning of §4 of the Clayton Act, throughout the Class Period.

189.    Plaintiffs and members of the Class are entitled to treble damages for Defendants' violations of §1 of the Sherman Act under §4 of the Clayton Act.

190.    Plaintiffs and members of the Class are also entitled to an injunction against Defendants, preventing and restraining the violations alleged above, under §16 of the Clayton Act.

## SECOND CLAIM FOR RELIEF

### (Breach of Contract)

191.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

192.    Plaintiffs and other members of the Class entered into remarketing agreements with Defendants Banc of America Securities LLC; Barclays Capital, Inc.; Citigroup Global Markets Inc.; J.P. Morgan Securities LLC; Merrill Lynch, Pierce, Fenner & Smith Inc.; RBC Capital Markets LLC; Wachovia Bank N.A.; Wells Fargo Bank, N.A.; and Goldman Sachs & Co.

LLC (the "Counterparty Defendants").  In these agreements, the Counterparty Defendants agreed to remarket and reset the interest rates for Plaintiffs' and the Class' VRDOs in such a manner so as to obtain the lowest possible interest rate.  The terms of these remarketing agreements contain virtually identical language requiring each Counterparty Defendant to remarket and reset the interest rates for VRDOs in substantially the same manner.

193.    Plaintiffs and other Class members complied with all of their obligations under the agreements.  The Counterparty Defendants, on the other hand, breached their obligations as RMAs to reset VRDOs at the lowest possible rate that would permit the bonds to trade at par, and to actively remarket the VRDOs at the lowest possible rate.

194.    As a result of the Counterparty Defendants' breaches of their remarketing agreements, Plaintiffs and Class members suffered economic losses and damages in an amount to be determined at trial, and are entitled to be placed in the same situations as if the Counterparty Defendants had fully performed under the remarketing agreements.

195.    Plaintiffs and Class members have incurred reasonable out-of-pocket expenses, including legal and expert fees, to enforce and protect their rights under their agreements with the Counterparty Defendants, for which they are entitled to be repaid.

## THIRD CLAIM FOR RELIEF

### (Breach of Fiduciary Duty)

196.    Plaintiffs Baltimore and the Board of Directors of SANDAG hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

197.    Plaintiffs Baltimore and the Board of Directors of SANDAG and other members of the Class entered into remarketing agreements with Defendants Barclays Capital, Inc.; Citigroup Global Markets Inc.; Goldman Sachs & Co LLC; and J.P. Morgan Securities LLC (the "Fiduciary Defendants").

198.     During the Class Period, the Counterparty Defendants provided advice to Plaintiffs Baltimore and the Board of Directors of SANDAG and members of the Class. This advice, including the Fiduciary Defendants' use of their judgment in setting rates, whether to issue VRDOs, how to market and remarket VRDOs, which entities to use as liquidity providers and under what terms, what rates were possible to obtain and how to obtain the most favorable rates, was purportedly intended to be particularized to the specific needs, objectives and circumstances of Plaintiffs Baltimore and the Board of Directors of SANDAG and members of the Class.

199.     As municipal advisors, the Fiduciary Defendants owed fiduciary duties to Plaintiffs Baltimore and the Board of Directors of SANDAG and members of the Class under state law.

200.     The Fiduciary Defendants have breached their fiduciary duties to Plaintiffs Baltimore and the Board of Directors of SANDAG by advising Plaintiffs Baltimore and the Board of Directors of SANDAG to issue VRDOs and enter into remarketing agreements knowing that the RMA would not obtain a low VRDO rate, and by actually failing to obtain the lowest rates possible for VRDOs issued by Plaintiffs Baltimore and the Board of Directors of SANDAG and members of the Class. Instead, the Fiduciary Defendants put their own interests above the interest of Plaintiffs Baltimore and the Board of Directors of SANDAG and members of the Class, enriching themselves by the collection of unearned remarketing fees by setting inflated rates at the expense of Plaintiffs Baltimore and the Board of Directors of SANDAG and members of the Class.

201.     Further, the Fiduciary Defendants and their affiliates benefited from these excess fees because they invested in the VRDOs whose rates they had artificially inflated, thus

collecting outsized returns at the expense of the Plaintiffs —the issuers to whom they owed a fiduciary duty under state law.

202.     Plaintiffs and members of the Class were damaged as a direct result of the Fiduciary Defendants' breaches of their fiduciary duties, which caused Plaintiffs Baltimore and the Board of Directors of SANDAG and members of the Class to pay inflated interest rates, as well as other related fees and expenses, throughout the Class Period.

## PRAYER FOR RELIEF

203.     WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class of similarly situated entities, respectfully request that the Court:

(a)     Determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class, and declare Plaintiffs as the representatives of the Class;

(b)     Adjudge and decree that the unlawful conduct alleged herein violates §1 of the Sherman Antitrust Act, 15 U.S.C. §1;

(c)     Permanently enjoin and restrain Defendants from continuing and maintaining the conspiracy alleged in the Complaint under Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26;

(d)     Award Plaintiffs and the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled under Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15, plus interest;

(e)     Award reasonable attorneys' fees and costs;

(f)     Award all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity from the date of service of the initial complaint in this action;

71

(g)     Award Plaintiffs and the Class damages against Counterparty Defendants for their breaches of contract;

(h)     Award Plaintiffs and the Class damages against Fiduciary Defendants for their breaches of fiduciary duty;

(i)     Direct such further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demands a jury trial as to all issues triable by a jury.

DATED:   New York, New York
August 6, 2021

QUINN EMANUEL URQUHART &
   SULLIVAN, LLP

By: /s/ Daniel L. Brockett

Daniel L. Brockett
Steig D. Olson
Sami H. Rashid
Thomas Lepri
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Fax:  (212) 849-7100
danbrockett@quinnemanuel.com
steigolson@quinnemanuel.com
samirashid@quinnemanuel.com
thomaslepri@quinnemanuel.com

Jeremy D. Andersen
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Fax: (213) 443-3100
jeremyandersen@quinnemanuel.com

*Co-Lead Interim Class Counsel*

WOLLMUTH MAHER & DEUTSCH LLP

By: /s/ David H. Wollmuth

David H. Wollmuth
William A. Maher
Ronald J. Aranoff
Brant Duncan Kuehn
500 Fifth Avenue
New York, New York 10100
Telephone: (212) 382-3300
dwollmuth@wmd-law.com
wmaher@wmd-law.com
raranoff@wmd-law.com
bkuehn@wmd-law.com

*Co-Lead Interim Class Counsel*

CITY OF PHILADELPHIA LAW
  DEPARTMENT

Diana P. Cortes (*pro hac vice* forthcoming)
Eleanor N. Ewing (*pro hac vice* forthcoming)
City of Philadelphia Law Department
1515 Arch St., 17th Floor
Philadelphia, Pennsylvania 19102
Telephone: (215) 683-5012
Diana.Cortes@Phila.gov
Eleanor.Ewing@phila.gov

*Counsel for Plaintiff City of Philadelphia*

SUSMAN GODFREY LLP


By: /s/ William C. Carmody
William Christopher Carmody
Arun Subramanian
Seth Ard
1301 Avenue of the Americas, 32nd Fl.
New York, New York 10019
Telephone: (212) 336-8330
Fax: (212) 336-8340
bcarmody@susmangodfrey.com
asubramanian@susmangodfrey.com
sard@susmangodfrey.com

Katherine M. Peaslee
1201 Third Avenue Suite 3800
Seattle, Washington 98101
Telephone: (206) 516-3880
Fax: (206) 516-3883
kpeaslee@susmangodfrey.com

*Co-Lead Interim Class Counsel*

BROWNE GEORGE ROSS
O'BRIEN ANNAGUEY & ELLIS LLP

By: /s/ Nathan J. Hochman
Nathan J. Hochman
Carl Alan Roth
Ryan Q. Keech
Noah S. Helpern
Jason Y. Kelly
James L. Michaels
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697
nhochman@bgrfirm.com
croth@bgrfirm.com
rkeech@bgrfirm.com
nhelpern@bgrfirm.com
jkelly@bgrfirm.com
jmichaels@bgrfirm.com

Joachim B. Steinberg
5 Penn Plaza, 24th Floor
New York, New York 10001
Telephone: (212) 413-2600
Facsimile: (212) 413-2629
jsteinberg@bgrfirm.com

*Counsel for Plaintiff Board of Directors of the*
*San Diego Association of Governments,*
*Acting as the San Diego County Regional*
*Transportation Commission*