UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                         :

CITY OF PHILADELPHIA, et al.,          :

                         :

               Plaintiffs,      :

                         :            19-CV-1608 (JMF)

       -v-                   :

                         :       OPINION AND ORDER

BANK OF AMERICA CORPORATION, et al.,  :

                         :

               Defendants.    :

                         :
-----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      In these consolidated putative class actions, Plaintiffs allege that, between 2008 and

2016, remarketing agents at some of the world's largest banks conspired to fix the interest rates

for a type of bond called Variable Rate Demand Obligations ("VRDOs").  Specifically, three

VRDO issuers — the City of Philadelphia ("Philadelphia"), the Mayor and City Council of

Baltimore ("Baltimore"), and the Board of Directors of the San Diego Association of

Governments ("San Diego") — bring claims on behalf of themselves and a proposed class of

local and state public entity issuers against eight banks (collectively, the "Banks" or

"Defendants").[1]  They allege that the Banks violated Section 1 of the Sherman Antitrust Act, 15

U.S.C. § 1, and breached contractual and fiduciary duties under state law.  In November 2020,

this Court granted in part and denied in part Defendants' first motion to dismiss Plaintiffs'

claims.  *See City of Philadelphia v. Bank of Am. Corp.*, 498 F. Supp. 3d 516 (S.D.N.Y. 2020).  In

particular, to the extent relevant here, the Court concluded that Philadelphia had failed to state a

---

[1]    Plaintiffs also sue various parents, affiliates, subsidiaries, predecessors, and successors of
the Defendant Banks.  For a full list of Defendants, see *City of Philadelphia v. Bank of Am.
Corp.*, 498 F. Supp. 3d 516, 521 n.2 (S.D.N.Y. 2020).

claim for breach of fiduciary duty under Pennsylvania law but declined to dismiss Baltimore's fiduciary-duty claim under Maryland law. *See id.* at 534-36. The Court also rejected Defendants' effort to dismiss the bulk of Plaintiffs' claims as time barred. *Id.* at 538-39.

Following that earlier ruling, the Court granted Plaintiffs' request to consolidate with this case an additional action brought by San Diego. *See* ECF No. 209. Plaintiffs thereafter filed an amended complaint, incorporating San Diego's claims and correcting the inadvertent omission of J.P. Morgan Securities LLC ("JPMorgan") as one of Baltimore's remarketing agents. *See* ECF No. 210 ("Am. Compl."). Defendants now move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss San Diego's breach-of-fiduciary-duty claims and to dismiss Baltimore's fiduciary-duty claim against JPMorgan. ECF No. 231. Defendants also move to dismiss most of San Diego's claims as time barred. *Id.* For the reasons that follow, Defendants' motion to dismiss is GRANTED in part and DENIED in part. In particular, the Court concludes that San Diego's breach-of-fiduciary-duty claims and Baltimore's fiduciary-duty claim against JPMorgan can and must be dismissed but Plaintiffs' allegations of fraudulent concealment are sufficient to reject Defendants' timeliness arguments at this stage of the litigation.

## BACKGROUND

The following facts, drawn from the Amended Consolidated Class Action Complaint ("Amended Complaint"), are presumed to be true for purposes of this motion. *See, e.g.*, *Karmely v. Wertheimer*, 737 F.3d 197, 199 (2d Cir. 2013).

### A. VRDOs and the Alleged Conspiracy

As recounted in this Court's prior opinion, *see City of Philadelphia*, 498 F. Supp. 3d at 521-25, familiarity with which is presumed, VRDOs are a type of bond issued by municipalities and other public or charitable entities, such as schools, hospitals, and community organizations,

to raise funds for operating expenses, infrastructure projects, and public services.  Am. Compl. ¶¶ 2, 63.  These bonds are issued on a long-term basis but have short-term interest rates that are reset on a periodic basis, typically weekly.  *Id*. ¶¶ 3, 64, 72-73.  In order to attract investors, VRDOs have a "built-in 'put' feature that allows investors to redeem the bond at any periodic reset date at face value" (that is, at "par") plus any accrued interest.  *Id*. ¶ 3.  That makes them a "low-risk and high-liquidity investment."  *Id.*

To manage VRDOs, an issuer contracts with a bank to act as a remarketing agent ("RMA").  *Id*. ¶ 4.  An RMA typically has two primary responsibilities.  First, on each reset date, the RMAs are required to reset the VRDO's interest rate at the lowest rate possible that would permit the bond to trade at par.  *Id*.  Second, when an existing investor exercises the "put" option on the bond, thereby tendering the bond to the RMA, the RMA is required to remarket the VRDO to other investors at the lowest possible rate.  *Id*.  If the RMA cannot find another investor for the VRDO, the obligation to purchase the tendered bond generally falls on a letter-of-credit provider, frequently the RMA itself.  *Id*.  Importantly, if an RMA cannot deliver low rates, the bond issuer has the right to replace the RMA with another one who can.  *Id*. ¶ 5.  Thus, in a properly functioning market, RMAs compete against each other for issuers' business by actively working to set the best (that is, the lowest) possible rates for their customers.  *Id*.

The gravamen of Plaintiffs' claims is that Defendants — who together serve as RMAs for the vast majority of the VRDO market, *id*. ¶ 69 — actively conspired *not* to compete against each other in the market for remarketing services.  *Id*. ¶ 96.  Instead, beginning as early as February 2008, they worked together to keep interest rates on VRDOs artificially high.  *Id*. ¶ 97.  These inflated rates benefitted the Banks by helping to keep the VRDOs off their own books.  *Id*. ¶ 109.  They also benefitted money market funds (some of which were managed by the Banks)

that were the predominant holders of VRDOs.  *Id.* ¶ 97.  Absent this coordination, the Banks that

set higher rates than their competitors would have been at risk of losing their clients to those

competitors.  *Id.* ¶ 103.  Plaintiffs claim that, by engaging in this conspiracy, Defendants violated

Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and breached their contractual and

fiduciary duties under different state laws.  *Id.* ¶¶ 186-202.

## B.  The Original Consolidated Cases

At the outset, this case was comprised of two consolidated actions: one brought by

Philadelphia, 19-CV-1608 (JMF), and one brought by Baltimore, 19-CV-2667 (JMF).  *See City*

*of Philadelphia*, 498 F. Supp. 3d at 521.  Both cities are issuers of VRDOs that contracted

Defendants to act as their RMAs.  *See* Am. Compl. ¶¶ 25-26.  As noted, in November 2019, this

Court granted in part and denied in part Defendants' motion to dismiss both cities' claims.  *City*

*of Philadelphia*, 498 F. Supp. 3d at 539.  Specifically, the Court dismissed Philadelphia's and

Baltimore's breach-of-contract claims against a subset of Defendants who were not direct

counterparties to any remarketing agreement.  *Id.* at 533-34, 539.  The Court likewise dismissed

Philadelphia and Baltimore's unjust-enrichment claims and breach-of-fiduciary-duty claims in

their entirety, with one exception: Baltimore's fiduciary-duty claims against Citigroup Global

Markets, Inc.  *Id.* at 534-39.  In reaching that conclusion, the Court noted that Defendants had

"waived the argument" that Plaintiffs failed to plead the existence of a fiduciary relationship

"under Maryland law."  *Id.* at 535.  The Court also declined to dismiss Philadelphia's and

Baltimore's federal antitrust claims and breach-of-contract claims against a subset of the

Defendants and rejected Defendants' argument that the bulk of Philadelphia and Baltimore's

claims were time barred.  *Id.* at 532, 534-39.  Following that ruling, the Court entered a Case

Management Plan and the parties commenced discovery.  *See* ECF No. 153.

### C.  San Diego's Action and the Amended Complaint

On June 2, 2021, San Diego filed a complaint asserting similar claims against the same set of Banks.  *See* No. 21-CV-4893 (JMF), ECF No. 1.  In particular, San Diego's initial complaint alleged violations of the Sherman Act, California's Cartwright Act and Unfair Competition Law, and for breach of contractual and fiduciary duties.  *See id*. ¶¶ 172-97.  Approximately two months later, Philadelphia and Baltimore moved to consolidate San Diego's action with their own and to file an Amended Complaint incorporating San Diego's claims.  *See* ECF No. 203.  Defendants did not oppose, but "reserve[d] their right to" "move against the [amended] complaint on grounds not previously available."  ECF No. 208.  On August 4, 2021, the Court granted Plaintiffs' motion and directed Plaintiffs to file a consolidated amended complaint.  *See* ECF No. 209.

Two primary changes to the operative pleadings are relevant here.  First, the Amended Complaint adds San Diego as a named plaintiff and incorporates San Diego's claims for violations of the Sherman Act, breach of contract, and breach of fiduciary duty.  Am. Compl. ¶¶ 27-30, 84-87, 186-202.  Notably, San Diego's claims are based on "the same conduct on the part of Defendants" as that originally alleged by Philadelphia and Baltimore.  ECF No. 240 ("Pls.' Opp'n"), at 4 (citing Am. Compl. ¶¶ 30, 84-87, 92-128, 187-90, 192-95, 197-202).  The fraudulent concealment allegations in the Amended Complaint are also identical to those in the original Consolidated Class Action Complaint ("Original Complaint").  *Compare* Am. Compl. ¶¶ 168-75, *with* ECF No. 107 ("Compl."), ¶¶ 163-70.  Second, the Amended Complaint "correct[s] an inadvertent drafting error" with respect to Baltimore's claims: It replaces Morgan Stanley with JPMorgan as the RMA counterparty for one of Baltimore's VRDOs and eliminates

one of the at-issue VRDOs previously identified by Baltimore.  Pls.' Opp'n 7; *compare* Am. Compl. ¶ 26, *with* Compl. ¶ 26.

Shortly after the Court granted Plaintiffs leave to file their Amended Complaint, the parties filed a joint letter-motion requesting an extension of the fact discovery deadlines and proposing a briefing schedule for Defendants' anticipated motion to dismiss the Amended Complaint.  *See* ECF No. 212.  The proposed briefing schedule provided that "Defendants shall . . . file any single, omnibus motion to dismiss the operative complaint on grounds not previously available."  *Id.*  The Court adopted the parties' proposed briefing schedule, ECF No. 213, and Defendants thereafter timely filed the instant motion to dismiss, ECF No. 231.

## LEGAL STANDARDS

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all facts set forth in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See, e.g.*, *Burch v. Pioneer Credit Recovery, Inc*., 551 F.3d 122, 124 (2d Cir. 2008).  A claim will survive a Rule 12(b)(6) motion, however, only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  A plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully," *id.*, and cannot rely on mere "labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555.  If the plaintiff's pleadings "have not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Id.* at 570.

6

Generally, there is no heightened pleading standard in antitrust cases, and at the pleading stage, the plaintiffs need only "raise a reasonable expectation that discovery will reveal evidence of illegality."  *Wacker v. JP Morgan Chase & Co.*, 678 F. App'x 27, 30 (2d. Cir. 2017) (summary order) (quoting *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013)).  That said, a plaintiff alleging fraudulent concealment for tolling purposes, as Plaintiffs do here, must plead, though not prove, the fraud or mistake with particularity under Rule 9(b) of the Federal Rules of Civil Procedure.  *See Armstrong v. McAlpin*, 699 F.2d 79, 88-89 (2d Cir. 1983); *accord Zirvi v. Flatley*, 838 F. App'x 582, 585 (2d Cir. 2020) (summary order).  That Rule requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  As the Second Circuit has explained, where a claim is subject to Rule 9(b), "the complaint must allege the time, place, speaker, and sometimes even the content of the alleged misrepresentation." *Ouaknine v. MacFarlane*, 897 F.2d 75, 79 (2d Cir. 1990); *accord FAT Brands Inc. v. PPMT Cap. Advisors, Ltd.*, No. 19-CV-10497 (JMF), 2021 WL 37709, at *10 (S.D.N.Y. Jan. 5, 2021).

## DISCUSSION

Defendants move to dismiss three portions of the Amended Complaint.  First, they argue that San Diego fails to state a claim for breach of fiduciary duty under California law.  Second, they contend that Baltimore likewise fails to state a fiduciary-duty claim against JPMorgan under Maryland law.  And, finally, they argue that the bulk of San Diego's claims are time barred.  *See* ECF No. 232 ("Defs.' Mem.").  The Court will address each argument in turn.

## A.  San Diego's Breach-of-Fiduciary-Duty Claim

The Court begins with San Diego's claim for breach of fiduciary duty, which is brought against Defendants Barclays Capital, Inc.; Citigroup Global Markets Inc.; Goldman Sachs & Co

LLC; and J.P. Morgan Securities LLC (the "Fiduciary Defendants").  Defs.' Mem. 3 n.1.  The

parties agree that the claim is governed by California law, *see* Defs.' Mem. 6 n.5; Pls.' Opp'n 10-

13, which is "sufficient to establish choice of law," *Alphonse Hotel Corp. v. Tran*, 828 F.3d 146,

152 (2d Cir. 2016).  To state a claim, a plaintiff must allege (1) "the existence of a fiduciary

relationship," (2) "breach of fiduciary duty," and (3) "damages." *Oasis W. Realty, LLC v.*

*Goldman*, 51 Cal. 4th 811, 820 (2011).  "Before a person can be charged with a fiduciary

obligation, he must either knowingly undertake to act on behalf and for the benefit of another, or

must enter into a relationship which imposes that undertaking as a matter of law." *City of Hope*

*Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 386 (2008) (cleaned up).  An agency

relationship is one "example[]" of a relationship that imposes a fiduciary duty "as a matter of

law." *Id.*; *see also, e.g.*, *Wolf v. Superior Ct.*, 107 Cal. App. 4th 25, 30 (Cal. Ct. App. 2003);

*Michelson v. Hamada*, 29 Cal. App. 4th 1566, 1579 (Cal. Ct. App. 1994) ("An agent *is* a

fiduciary.").

Plaintiffs make two arguments in support of the existence of a fiduciary relationship

between the Fiduciary Defendants and San Diego.  First, they argue that by "act[ing] as RMAs"

for San Diego, those Defendants "entered into agency relationships that subjected them to

fiduciary duties under . . . California law."  Pls.' Opp'n 13.  Second, they argue that "[t]he

Fiduciary Defendants' conduct even apart from their contractual obligations further underscores

the fiduciary nature of their relationship with Plaintiffs." *Id.*  Neither argument is persuasive.

Beginning with the first, under California law, "[a]n agent is one who represents

another . . . in dealings with third persons." *Zimmerman v. Superior Ct.*, 220 Cal. App. 4th 389,

401 (Cal. Ct. App. 2013) (quoting Cal. Civ. Code § 2295).  "One of the chief characteristics of

an agency relationship is the 'authority to act for and in the place of the principal for the purpose

of bringing him or her into legal relations with third parties.'" *DSU Aviation, LLC v. PCMT Aviation, LLC*, No. 07-1478 (SC), 2007 WL 3456564, at *5 (N.D. Cal. Nov. 14, 2007) (quoting *Violette v. Shoup*, 16 Cal. App. 4th 611, 620 (Cal. Ct. App. 1993)); *see also Garlock Sealing Techs., LLC v. NAK Sealing Techs. Corp.*, 148 Cal. App. 4th 937, 964 (Cal. Ct. App. 2007). "The other important aspect in determining the existence of an agency relationship is the degree of control exercised by the principal over the activities of the agent." *DSU Aviation, LLC*, 2007 WL 3456564, at *5. Additionally, for an agency relationship to arise, the agent must "manifest[] assent or otherwise consent[]" to "act on the principal's behalf and subject to the principal's control." *Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 410-11 (Cal. Ct. App. 2007).

Applying the foregoing standards, the Court concludes that Plaintiffs fail to plausibly allege an agency relationship between San Diego and the Fiduciary Defendants. For starters, Plaintiffs do not allege that the Fiduciary Defendants "represent[]" San Diego in *any* "dealings with third parties." *Zimmerman*, 220 Cal. App. 4th at 401 (quoting Cal. Civ. Code § 2295). Plaintiffs contend that "[t]he Fiduciary Defendants were to exercise best efforts to help Plaintiffs remarket their bonds, and *facilitate interactions* with third-party investors." Pls.' Opp'n 15 (emphasis added). But the mere "facilitat[ion of] interactions" between San Diego and third parties, Pls.' Opp'n 15, does not amount to "act[ing] for and in the place of [San Diego] for the purpose of bringing [it] into legal relations with third parties," *DSU Aviation, LLC*, 2007 WL 3456564, at *5.[2] And Plaintiffs cite no other allegations in the Amended Complaint to support

---

[2]     The same goes for Plaintiffs' argument that the Fiduciary Defendants were "tasked with . . . set[ting] VRDO rates at the lowest level to trade at par on behalf of issuers." Pls.' Opp'n 14. That contractual obligation to San Diego does not give the Fiduciary Defendants authority to represent San Diego "for the purpose of bringing [it] into legal relations with *third parties*." *DSU Aviation, LLC*, 2007 WL 3456564, at *5 (emphasis added).

the proposition that the Fiduciary Defendants had the power to represent San Diego vis-à-vis third parties, let alone that the Fiduciary Defendants ever assented to act on San Diego's behalf in such dealings.  *See* Pls.' Opp'n 14-15.  That dooms San Diego's agency argument, as the "power to alter the legal relations between the principal and third persons" is an "essential characteristic[] of an agency relationship."  *Garlock Sealing Techs., LLC*, 148 Cal. App. 4th at 964; *see Huong Que, Inc.*, 150 Cal. App. 4th at 410-11 ("An agent may be distinguished . . . from a service provider who simply furnishes advice and does not interact with third parties as the representative of the recipient of the advice." (cleaned up)); *see also, e.g.*, *Qwest Commc'n v. Herakles, LLC*, No. 2:07-CV-00393 (MCE) (KJM), 2008 WL 3864620, at *5 (E.D. Cal. Aug. 19, 2008) (holding, at the motion to dismiss stage, that the plaintiff had "failed to allege that [the defendant] had the power to alter legal relations between third parties and [the plaintiff]," and thus had failed to adequately allege that the defendant was the plaintiff's "agent and fiduciary").

Making matters worse, Plaintiffs fail to allege that San Diego possessed sufficient control over the Fiduciary Defendants' activities.  "The right to control, rather than its exercise, is sufficient to meet this standard."  *DSU Aviation, LLC*, 2007 WL 3456564, at *5 (quoting *In re Coupon Clearing Serv., Inc.*, 113 F.3d 1091, 1099 (9th Cir. 1997)).  Here, to demonstrate such control, Plaintiffs rely exclusively on San Diego's "right to remove the RMA at any time pursuant to the contractual terms setting forth their duties."  Pls.' Opp'n 14; *see also* Am. Compl. ¶ 5.  But Plaintiffs do not cite, nor has the Court found, any cases that suggest the right to terminate a contractual relationship at any time, without more, is sufficient to create an agency relationship.  *See* Pls.' Opp'n 14.[3]  To the contrary, greater control over the putative agent's

---

[3]    The one case that Plaintiffs cite in support of this argument, *Michelson v. Hamada*, 29 Cal. App. 4th at 1580, does not suggest otherwise.  In that case, the California Court of Appeal held that an agency relationship was evidenced by, among other things, the parties' "written

activities is required — in addition to evidence that the agent has the power to represent the principal in dealings with third parties.  *See, e.g.*, *In re Coupon Clearing Serv., Inc.*, 113 F.3d at 1100 (holding "no agency relationship existed" under California law because the retailers' "only right of control with respect to [the putative agent] was to require [it] to perform its contracts"); *People v. JTH Tax, Inc*., 212 Cal. App. 4th 1219, 1242 (Cal. Ct. App. 2013) ("It is the right to control the *means and manner* in which the result is achieved that is significant in determining whether a principal-agency relationship exists." (cleaned up)).  Moreover, as Plaintiffs themselves emphasize, the Fiduciary Defendants were contractually obligated to "us[e] their *independent* judgment" to set VRDO interest rates.  Pls.' Opp'n 14 (emphasis added); *see also* Am. Compl. ¶ 84 (quoting one of San Diego's remarketing agreements).  That requirement cuts against Plaintiffs' claim that San Diego exercised sufficient control over its RMAs' activities to manifest an agency relationship.  In short, because the key indicia of an agency relationship under California law are conspicuously absent, the Court concludes that Plaintiffs fail to plausibly allege such a relationship as the source of a fiduciary duty.[4]

---

agreements," pursuant to which the defendant had agreed to "represent[] [the plaintiff] in dealings with third persons, his patients"; the fact that the defendant "perform[ed] billing and collection services" on his behalf; the fact that the defendant had "promised to keep available full, true and accurate records and books of accounts showing [the plaintiff's] billings and collections"; *and* the fact that the plaintiff had the power to "fire" the defendant if he became "dissatisfied with the servicing of his accounts."  *Id.* at 1580 (internal quotation marks omitted). Tellingly, the California Supreme Court case on which *Michelson* relied mentioned the "right to immediately discharge" as only *one* example of the principal's control in that case, along with the right to control various means used to carry out the objectives of the agency relationship. *Malloy v. Fong*, 37 Cal. 2d 356, 370 (1951).

[4]     Plaintiffs' reliance on the fact that the Fiduciary Defendants are referred to as "remarketing *agents*" in the remarketing agreements, does not alter the Court's conclusion.  Pls.' Opp'n 14.  Plaintiffs point to no authority to support the proposition that a mere title — particularly one that is a standard industry term — is sufficient to create an agency relationship. Instead, California courts look to the functional indicia of agency discussed above.

Plaintiffs' second argument — that, "even apart from their contractual obligations," the Fiduciary Defendants' conduct "[c]onfirms [t]heir [f]iduciary [o]bligations to Plaintiffs," Pls.' Opp'n 13, 16 — similarly falls flat.  To establish the existence of a fiduciary duty in the absence of any relationship that would categorically impose such a duty "as a matter of law" (such as an agency relationship), a plaintiff "must allege that [the defendant] . . . knowingly agreed to act on behalf and for the benefit of [plaintiff]."  *World Surveillance Grp. Inc. v. La Jolla Cove Invs., Inc.*, 66 F. Supp. 3d 1233, 1235 (N.D. Cal. 2014); *accord City of Hope*, 43 Cal. 4th at 386.  "The obligation to put the interests of the other party first is why a fiduciary relationship generally does not arise out of ordinary arms-length business dealings."  *World Surveillance*, 66 F. Supp. 3d at 1235.

Here, none of the conduct identified by Plaintiffs indicates that the Fiduciary Defendants "knowingly agreed to act on behalf and for the benefit of" San Diego.  *Id.*; *see* Pls.' Opp'n 16-17.[5]  The fact that the Fiduciary Defendants, for instance, "presented themselves to Plaintiffs as being able to obtain the best rates through their investor networks"; "cloaked themselves with the imprimatur of the Securities Industry Financial Markets Association"; "represented that they were members of . . . the Financial Industry Regulatory Authority;" "provided certificates of non-collusion"; and in some cases "acted as liquidity providers," Pls.' Opp'n 16-17, does not

---

[5]      As the Court noted in its prior opinion, any claim that the Fiduciary Defendants knowingly assented to serve as San Diego's fiduciaries by virtue of their agreement to serve as RMAs is at odds with the Security and Exchange Commission's public position that, generally speaking, RMAs are not municipal advisors.  *See City of Philadelphia*, 498 F. Supp. 3d at 536 (citing Registration of Municipal Advisors, 78 Fed. Reg. 67,468, 67,515 (Nov. 12, 2013) (codified at 17 C.F.R. pts. 200, 240, 249)).  Additionally, Plaintiffs' own use of "'outside advisers' to regularly monitor their VRDOs, . . . undermin[es] any plausible inference that Philadelphia was an inferior party" that placed trust in the Fiduciary Defendants.  *Id.* at 535; *see* Am. Compl. ¶ 174.

indicate the Fiduciary Defendants "knowingly agreed" "to act in [San Diego's] best interest[s] rather than in [their] own," *World Surveillance*, 66 F. Supp. 3d at 1235.  Nor does "impl[icitly]" agreeing to "keep in confidence" certain information.  Pls.' Opp'n 16; *see, e.g.*, *Scognamillo v. Credit Suisse First Bos. LLC*, No. C03-2061 (TEH), 2005 WL 2045807, at *2 (N.D. Cal. Aug. 25, 2005) ("The mere fact that in the course of their business relationships the parties reposed trust and confidence in each other does not impose any corresponding fiduciary duty."), *aff'd* 254 F. App'x 669 (9th Cir. 2007).  Instead, Plaintiffs' allegations reveal a "mutually beneficial arrangement" between "sophisticated parties of substantial bargaining power" — banks, on the one hand, and municipal entities on the other.  *City of Hope*, 43 Cal. 4th at 386, 389; *see* Am. Compl. ¶¶ 25-30.  Absent a factual basis to conclude the Fiduciary Defendants voluntarily undertook to "act[] primarily for the benefit of [San Diego]," such an arrangement does not rise to the level of a fiduciary relationship.  *City of Hope*, 43 Cal. 4th at 386; *see, e.g.*, *id.* at 386-89 (finding no fiduciary relationship between a medical research center and a company that had entered into a "mutually beneficial" agreement where there was "no indication . . . that [the company had] entered into it with the view of acting primarily for the benefit of [the research center]"); *World Surveillance*, 66 F. Supp. 3d at 1235-36 (same where "the transactions described in the amended complaint" were "arms-length business dealings").

Finally, Plaintiffs' contention that the existence of an agency or fiduciary relationship is "generally . . . a question of fact" and thus ill-suited for resolution on a motion to dismiss, Pls.' Opp'n 15, 17-18, does not save San Diego's claim.  Courts routinely rule on whether a plaintiff has plausibly alleged an agency or fiduciary relationship under California law at the motion to dismiss stage, taking all facts alleged in the operative complaint as true and drawing all inferences in favor of the plaintiff.  *See, e.g.*, *Akins v. Seterus, Inc.*, No. 2:16-CV-01656 (TLN)

(KJN), 2019 WL 4243221, at *4-5 (E.D. Cal. Sept. 6, 2019); *World Surveillance*, 66 F. Supp. 3d

at 1236; *Scognamillo*, 2005 WL 2045807, at *4; *Cruz v. United States*, 219 F. Supp. 2d 1027,

1039 (N.D. Cal. 2002).  Plaintiffs are even more off base in suggesting that Defendants must

demonstrate "that Plaintiffs 'can prove no set of facts entitling [them] to relief on a breach of

fiduciary theory.'"  Pls.' Opp'n 18 (quoting *Negrete v. Fid. & Guar. Life Ins. Co.*, 444 F. Supp.

2d 998, 1004 (C.D. Cal. 2006)).  That pleading standard, which comes from *Conley v. Gibson*,

355 U.S. 41, 47 (1957), was "retir[ed]" over a decade ago by *Twombly* and *Iqbal*.  *E.E.O.C. v.*

*Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 253 (2d Cir. 2014).  In short, because Plaintiffs do not

plausibly allege facts that would give rise to a fiduciary relationship between San Diego and the

Fiduciary Defendants, San Diego's fiduciary-duty claims fail as a matter of law and must be

dismissed.[6]

**B.  Baltimore's Breach-of-Fiduciary-Duty Claim**

Next, the Court turns to Baltimore's fiduciary-duty claim against JPMorgan.  Plaintiffs

raise two threshold arguments that warrant brief discussion at the outset.  First, they argue that

the "Court's prior ruling on Defendants' motion to dismiss Baltimore's fiduciary duty claim

constitutes the 'law of the case'" and should not be revisited.  Pls.' Opp'n 5.  "The law of the

case doctrine commands that 'when a court has ruled on an issue, that decision should generally

---

[6]    The parties spill much ink comparing California and Pennsylvania law governing
fiduciary-duty claims in an effort to leverage or distinguish, as the case may be, the Court's prior
decision dismissing Philadelphia's breach-of-fiduciary-duty claim.  *See* Defs.' Mem. 6-8; Pls.'
Opp'n 10-13; ECF No. 243 ("Defs.' Reply"), at 1-3.  In particular, the parties dispute whether
California has an analogue to Pennsylvania's "gist of the action doctrine," which bars fiduciary-
duty claims that "essentially duplicate[] a breach of contract claim."  *City of Philadelphia*, 498 F.
Supp. 3d at 535-36 (internal quotation marks omitted); *see* Pls.' Opp'n 10; Defs.' Reply 2.  In
light of the Court's conclusion that Plaintiffs fail to allege the existence of a fiduciary
relationship between San Diego and the Fiduciary Defendants, the Court need not and does not
resolve the issue.

be adhered to by that court in subsequent stages in the same case' unless 'cogent and compelling reasons militate otherwise.'" *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) (quoting *United States v. Quintieri,* 306 F.3d 1217, 1225 (2d Cir. 2002).  But where, as here, a plaintiff has filed an amended complaint following an earlier ruling, the law of the case doctrine does not apply "to the extent that [the p]laintiff has offered new claims or factual allegations." *Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 316-17 (S.D.N.Y.), *aff'd*, 626 F. App'x 20 (2d Cir. 2015) (summary order).  Indeed, a court cannot be said to have "ruled on" an issue if the issue is presented for the first time in an amended complaint.  *Johnson*, 564 F.3d at 99.  That inherent limitation to the law of the case doctrine is dispositive here.  The Amended Complaint includes a new factual allegation that is central to Baltimore's fiduciary duty claim against JPMorgan: It alleges for the first time that Baltimore contracted with JPMorgan to serve as the RMA for one of its VRDOs.  *Compare* Am. Compl. ¶ 26, *with* Compl. ¶ 26.  More specifically, the Amended Complaint substitutes JPMorgan for Morgan Stanley as the RMA counterparty for Baltimore's Series 1986 issuance.  *See id.*  According to Plaintiffs, they made this change in order to "correct[] an inadvertent drafting error."  Pls.' Opp'n 7.  Regardless of the reason, however, this new allegation renders the law of the case doctrine inapplicable to Baltimore's breach of fiduciary duty claim against JPMorgan in its capacity as Baltimore's RMA.  *See, e.g.*, *Weslowski*, 96 F. Supp. 3d at 316-17.[7]

Second, Plaintiffs contend that the argument JPMorgan seeks to make was "previously available to all Defendants when making their first motion to dismiss" but not raised and, as

---

[7]     In any event, "the law of the case doctrine is discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment."  *Aramony v. United Way of Am.*, 254 F.3d 403, 410 (2d Cir. 2001).

such, JPMorgan's "attempt to raise [it] now contravenes this Court's [August 12, 2021

Scheduling] Order." Pls.' Opp'n 5 (citing ECF No. 213). The Court disagrees. In its

Scheduling Order, the Court adopted the parties' proposal that Defendants be permitted to "file

any . . . motion to dismiss the [Amended Complaint] on grounds not previously available." ECF

No. 213. The Court will not construe this language so narrowly as to bar JPMorgan from raising

an argument that it had no reason to make in its first motion to dismiss. After all, Baltimore

added allegations identifying JPMorgan as an RMA for one of its VRDOs for the first time in the

Amended Complaint. *Compare* Am. Compl. ¶ 26, *with* Compl. ¶26; *see also City of

Philadelphia*, 498 F. Supp. 3d at 534 (dismissing "Plaintiffs' claims against the Non-

Counterparty Defendants" (i.e., Defendants that had not entered into remarketing agreements

with Plaintiffs) "because, conclusory allegations aside, the Complaint [did] not adequately allege

that Plaintiffs were in any fiduciary or confidential relationship with any of them"). The Court

will therefore consider JPMorgan's challenge to Baltimore's fiduciary-duty claim.

     Baltimore's claim is governed, the parties agree, by Maryland law (although, as will be

seen, there is substantial similarity between that law and California law). *See* Defs.' Mem. 10-

12; Pls.' Opp'n 4, 7-9, 13-18. "To establish a breach of fiduciary duty as an independent cause

of action" under Maryland law, "a plaintiff must show: (i) the existence of a fiduciary

relationship; (ii) breach of the duty owed by the fiduciary to the beneficiary; and (iii) harm to the

beneficiary." *Plank v. Cherneski*, 469 Md. 548, 599 (2020) (internal quotation marks omitted).

"A fiduciary relationship, . . . involves a duty on the part of the fiduciary to act for the benefit of

the other party to the relation as to matters within the scope of the relation." *Buxton v. Buxton*,

363 Md. 634, 654 (2001). This feature "distinguish[es]" fiduciary relationships from "merely

confidential relation[s]," which "exist[] between two persons when one has gained the

confidence of the other and purports to act or advise with the other's interest in mind." *Id.* Thus, although the terms are sometimes used "interchangeably" by Maryland courts, Maryland's highest court, the Court of Appeals, has made clear that even where "[a] confidential relation may exist," "there [may be] no fiduciary relation." *Id.* at 654-55. "Well-known examples of habitual or categorical fiduciary relationships include those between . . . agents and principals." *Plank*, 469 Md. at 598.[8]

For reasons similar to those articulated above with respect to San Diego's claim, the Court concludes that Baltimore fails to plausibly allege the existence of a fiduciary relationship under Maryland law. To begin, Baltimore fails to plausibly plead that JPMorgan was Baltimore's agent. "[T]he creation of [an] agency relationship" requires "some manifestation or indication by the principal to the agent that he consents to the agent's acting for his benefit; and . . . consent by the agent to act for the principal." *Green v. H & R Block, Inc.*, 355 Md. 488, 505 (1999); *accord Broadway Servs., Inc. v. Comptroller of Maryland*, 478 Md. 200, 216 (2022). "[T]hree [additional] characteristics . . . hav[e] particular relevance to the determination of the existence of a principal-agent relationship: (1) the agent's power to alter the legal relations of the principal; (2) the agent's duty to act primarily for the benefit of the principal; and (3) the

---

[8]     As they did with respect to California law, Plaintiffs point out that, "[n]ormally, the determination of whether a fiduciary relationship exists between two individuals is a question of fact" under Maryland law. *McElwee v. Williams*, 2020 WL 6748799, at *3 (Md. Ct. Spec. App. Nov. 17, 2020); *see* Pls.' Opp'n 15. But, as was the case with California law, courts can and do regularly rule on the sufficiency of fiduciary-duty allegations under Maryland law at the motion to dismiss stage. *See, e.g.*, *Nix v. NASA Fed. Credit Union*, 200 F. Supp. 3d 578, 591 (D. Md. 2016) (granting a motion to dismiss a breach-of-fiduciary-duty claim under Maryland law on the ground that the plaintiff had failed to plausibly allege "the existence of a fiduciary relationship"); *Shahin v. Delaware Fed. Credit Union*, 602 F. App'x 50, 53 (3d Cir. 2015) (unpublished opinion) (affirming the dismissal of a breach-of-fiduciary-duty claim under Maryland law because the plaintiff had "failed to properly plead her breach of fiduciary duty claim" and, more specifically, had failed to allege a "fiduciary relationship").

principal's right to control the agent." *Green*, 355 Md. at 503.  As discussed in detail above, Plaintiffs fail to plausibly allege that the Fiduciary Defendants, including JPMorgan, "consent[ed] . . . to act for" Baltimore, let alone consented to act "primarily for the benefit of" Baltimore. *Id.* at 503, 505-06; *see* Pls.' Opp'n 13-15.  Plaintiffs also fail to identify any allegations indicating that JPMorgan had the "power to alter the legal relations" of Baltimore in dealings with third parties.  *Green*, 355 Md. at 503; *see* Pls.' Opp'n 13-15.  And, although Maryland law appears to be somewhat less demanding than California law when it comes to the degree of control a principal must exercise over its agent to support an agency relationship, *see Green*, 355 Md. at 507-10; *Broadway Servs.*, 478 Md. at 224-25, Plaintiffs cite, and the Court has found, no authority indicating that Baltimore's "right to remove [JPMorgan as its] RMA at any time pursuant to the contractual terms" is sufficient, without more, to create an agency relationship under Maryland law.  Pls.' Opp'n 14.

Plaintiffs likewise fail to plausibly allege that a fiduciary duty existed in the absence of an agency relationship.  Although the term fiduciary duty is "not clearly defined [in] Maryland case law," and in fact may have been left "deliberately vague to avoid a too narrow definition," *Travel Comm., Inc. v. Pan Am. World Airways, Inc.*, 91 Md. App. 123, 161-62 (1992), the Maryland Court of Appeals has made clear that it necessarily "involves a duty on the part of the fiduciary to act for the benefit of the other party to the relation as to matters within the scope of the relation," *Buxton*, 363 Md. at 654; *see also Broadway Servs.*, 478 Md. at 221 ("[A] fiduciary . . . is[] a person having a duty, created by his or her undertaking, to act primarily for the benefit of another in matters connected with his or her undertaking." (cleaned up)); *MacDonald v. Patriot, LLC*, 2017 WL 1788115, at *10 (Md. Ct. Spec. App. May 5, 2017) ("A fiduciary relationship is one in which one party must act for the other's benefit concerning

matters within the scope of the relationship.").  As detailed above, Plaintiffs fail to plausibly

allege that JPMorgan "undert[ook]" to "act primarily for the benefit of" Baltimore as its RMA.

*Broadway Servs.*, 478 Md. at 221.  Moreover, as the Court noted in its prior opinion, the fact that

Plaintiffs "consulted their own outside advisers to regularly monitor their VRDOs, undermin[es]

any plausible inference that" they were "inferior part[ies]" who placed trust and confidence in

their RMAs' advice.  *City of Philadelphia v. Bank of Am. Corp.*, 498 F. Supp. 3d 516, 535

(S.D.N.Y. 2020) (internal quotation marks omitted); *see* Am. Compl. ¶ 174; *cf. Brass Metal

Prod., Inc. v. E-J Enters., Inc.*, 189 Md. App. 310, 357 (2009) ("The fact that one businessman

trusts another and relies on another to perform a contract does not give rise to a confidential

relationship[.]").  Nor do Plaintiffs identify any authority recognizing RMAs as fiduciaries under

Maryland law.  *See* Pls. Opp'n 7-9, 15-18.  In short, Plaintiffs fail to plausibly allege the

existence of a fiduciary relationship between Baltimore and JPMorgan and, thus, fail to state a

claim for breach of fiduciary duty as a matter of law.

**C.  The Timeliness of San Diego's Claims**

     Finally, Defendants move to dismiss the bulk of San Diego's claims as time barred.  *See*

Defs.' Mem. 12-17.  More specifically, they contend that San Diego's breach-of-contract and

fiduciary-duty claims, as well as San Diego's antitrust claim based on conduct prior to February

21, 2015, are untimely because the "California Attorney General was required to provide [San

Diego] with notice of a *qui tam* action making similar allegations . . . no later than August 2014."

*Id.* at 2, 17.  According to Defendants, the 2014 *qui tam* complaint — of which the Court may

take judicial notice, *see Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157

(2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the

truth of the matters asserted in the other litigation, but rather to establish the fact of such

litigation and related filings.") — "set[] forth theories of liability . . . similar enough to those alleged in this case to put any diligent party on inquiry notice (if not actual notice) of its claims." Defs.' Mem. 13.[9]  It follows, they argue, that tolling for fraudulent concealment is unavailable.

The Court is not persuaded.  "In every relevant jurisdiction," including California, "the statute of limitations is tolled where a plaintiff shows that a defendant committed fraudulent acts intended to conceal its misconduct and that the plaintiff's ignorance of the concealed misconduct was not a product of its own lack of reasonable diligence." *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 66 (S.D.N.Y. 2016) (collecting cases); *see also Platt Elec. Supply, Inc. v. EOFF Elec., Inc.*, 522 F.3d 1049, 1055 (9th Cir. 2008) (applying California law). In resolving Defendants' first motion to dismiss, the Court held — based on an identical set of pleadings regarding fraudulent tolling — that Plaintiffs had "plausibly allege[d] that Defendants concealed their conspiracy." *City of Philadelphia*, 498 F. Supp. 3d at 538; *compare* Am. Compl. ¶¶ 168-75, *with* Compl. ¶¶ 163-70.  More specifically, the Court rejected an argument almost identical to the one Defendants press here — namely, that "Plaintiffs were put on notice of Defendants' misdeeds when *qui tam* suits concerning Defendants' remarketing practices were filed under seal in state courts in Illinois and Massachusetts in 2014." *City of Philadelphia*, 498 F. Supp. 3d at 538.  As the Court explained: "[S]eparate and apart from the fact that these

---

[9]     After briefing on this motion was complete, Defendants filed a supplemental letter notifying the Court that records it had received from the California Attorney General's Office in response to a subpoena "demonstrate that the California Attorney General provided notice of the [2104 *qui tam* complaint] to [San Diego]" via letter on December 30, 2014.  ECF No. 289 ("Defs.' Ltr."), at 1.  Defendants contend that these documents are judicially noticeable as government records whose "accuracy cannot reasonably be questioned."  Defs.' Ltr. 2.  *But see* ECF No. 291 (Plaintiffs' response, arguing that the letter failed to provide sufficient notice).  The Court need not and does not decide whether that is the case, however, because, for the reasons that follow, the new records would not alter the Court's conclusion that Plaintiffs plausibly allege fraudulent concealment at this stage in the case.

complaints were under seal and thus unavailable for Plaintiffs' review, requiring Plaintiffs, 'at

the motion to dismiss stage, to make a showing of reasonable diligence' would be 'premature.'"

*Id.* at 538-39 (quoting *BPP Ill., LLC v. Royal Bank of Scot. Grp. PLC*, 603 F. App'x 57, 59 (2d

Cir. 2015) (summary order)); *see also Alaska Elec. Pension Fund*, 175 F. Supp. 3d at 67.

That conclusion applies with equal force here.  In any event, even assuming *arguendo*

that San Diego had notice of the 2014 California *qui tam* complaint (the "CFCA Complaint"),

the Court cannot conclude, based on that fact alone, that Plaintiffs were on notice of the

misconduct alleged in *this* case.  The CFCA Complaint alleges that banks serving as remarketing

agents for VRDOs issued by various California governmental entities "engaged in a 'robo-

resetting' scheme where they mechanically set the rates en masse without any consideration of

the individual characteristics of the bonds or the associated market conditions or investor

demand."  ECF No. 233-1 ("CFCA Compl."), ¶ 2; *see also id.* ¶¶ 37-41.  That conduct, the

CFCA Complaint alleges, violated the banks' obligation to "actively and individually market and

price [the VRDOs] at the lowest possible interest rates."  *Id.* ¶¶ 2-3, 37.  Critically, the CFCA

Complaint does not allege any collusion on the part of the defendant banks in setting VRDO

interest rates.[10]  *See id.* ¶¶ 1-7, 141-47.  Nor does it bring any antitrust, breach of contract, or

fiduciary-duty claims.  *See id.* ¶¶ 141-47.  Instead, it brings claims exclusively under the

---

[10]     Defendants' claim that the CFCA Complaint "implied that the defendants' rate-setting
conduct was the product of a 'conspiracy, contract or agreement' between remarketing agents at
different banks," is belied by the pleadings.  Defs.' Reply 8 (citing CFCA Compl. 31); *see also*
Defs.' Mem. 5.  The only mention of any "conspiracy" or "agreement" *between* defendants in the
CFCA Complaint is contained in a boilerplate request for relief "[e]njoining and restraining
defendants from engaging in any conduct, conspiracy, contract or agreement, and from adopting
or following any practice, plan, program, scheme, artifice or device similar to, or having a
purpose and effect similar to, the conduct complained of above."  CFCA Compl. 31.  That
language does not allege, or even "impl[y]," that the defendants were in fact engaged in a
conspiracy regarding VRDO rate-setting.  Defs.' Reply 8.

California False Claims Act based on the defendant banks' individual use of "robo-setting" to set VRDO rates.  *Id.* ¶ 37.  By contrast, the pleadings in the Amended Complaint center on Defendants' alleged *conspiracy* "to inflate the interest rates for" VRDOs.  Am. Compl. ¶ 1; *see also id.* ¶ 9 (alleging "direct communications *between competing banks* concerning VRDO rate-setting"); *id.* ¶¶ 96-128 ("Defendants' *collusion* ran from the top to the bottom of their VRDO operations — from the senior personnel in Defendants' Municipal Securities Groups, to the remarketing desks sitting below those groups, to the personnel on Defendants' sales desks." (emphasis added)).  The lack of allegations in the CFCA Complaint regarding the central claims in the Amended Complaint here is fatal to Defendants' argument.  Drawing all inferences in Plaintiffs' favor, the Court cannot conclude on this record that San Diego's "continuing ignorance [of Defendants' misconduct was] attributable to lack of diligence on [San Diego's] part" based solely on the CFCA Complaint (assuming San Diego even received notice of it).  *State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988); *cf. Ezra Charitable Tr. v. Frontier Ins. Grp., Inc.*, No. 00-CV-5361 (LMM), 2002 WL 87723, at *4-5 (S.D.N.Y. Jan. 23, 2002) (holding that the plaintiffs who brought suit under the Securities Exchange Act of 1934 had inquiry notice where another Exchange Act action had been filed by "some of the same plaintiffs' lawyers" and "relied on many of the same documents as plaintiffs in the current litigation"), *aff'd sub nom. LC Cap. Partners, LP v. Frontier Ins. Grp., Inc*., 318 F.3d 148 (2d Cir. 2003).

That is not to say there is no overlap between the two Complaints.  For example, two of the VRDOs issued by San Diego and identified in the Amended Complaint are referenced in the CFCA Complaint.  *See* Am. Compl. ¶ 30 (listing CUSIP numbers 797400FF0 and 797400FH6); CFCA Compl. 36, 69 (same).  The two complaints also include similar allegations regarding the

"artificially high" interest rates that resulted from the alleged misconduct, Am. Compl. ¶ 97;

CFCA Compl. ¶ 116, and the banks' failure to "giv[e] individual attention to resetting" VRDO

rates, Am. Compl. ¶ 160, CFCA Compl. ¶¶ 37-38.  But, as noted, the Amended Complaint

alleges that these inflated rates were the result of an alleged "conspiracy," whereas the CFCA

Complaint alleges that they resulted from defendants' use of "robo-setting."  Am. Compl. ¶ 97;

CFCA Compl. ¶ 116.  And while the banks' failure to reset VRDO rates on an individual basis

plays, at best, a minor role in the Amended Complaint, it is *the* central allegation in the CFCA

Complaint.  *See* Am. Compl. ¶¶ 159-61; CFCA Compl. ¶¶ 1-7, 31-38.  Given the limited

substantive overlap between the two complaints, and that the Court must draw all reasonable

inferences in Plaintiffs' favor at this stage in the litigation, the Court cannot conclude that

Plaintiffs fail to plausibly allege reasonable due diligence, even assuming (without deciding) that

they were on notice of the CFCA Complaint in 2014.  As the Court said in its earlier ruling,

"Defendants' argument may win another day, but it does not provide a basis for dismissal at this

stage of the litigation."  *City of Philadelphia*, 498 F. Supp. 3d at 539.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and

DENIED in part.  In particular, Defendants' motion to dismiss San Diego's breach-of-fiduciary-

duty claim in its entirety and Baltimore's fiduciary-duty claim against JPMorgan is GRANTED.

Defendants' motion to dismiss the bulk of San Diego's claims as time barred, however, is

DENIED.  The Clerk of Court is directed to terminate ECF No. 231.


SO ORDERED.

Dated: June 28, 2022
       New York, New York

_____
JESSE M. FURMAN
United States District Judge