UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
                                                :

CITY OF PHILADELPHIA et al.,              :

                                 :

                  Plaintiffs,         :

                                 :          19-CV-1608 (JMF)

        -v-                        :

                                 :      OPINION AND ORDER

BANK OF AMERICA CORPORATION et al.,  :

                                 :

                  Defendants.     :

                                 :
--------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      In these consolidated putative class actions, Plaintiffs — the City of Philadelphia

("Philadelphia"), the Mayor and City Council of Baltimore ("Baltimore"), and the Board of

Directors of the San Diego Association of Governments, Acting as the San Diego Regional

Transportation Commission ("SANDAG") — bring antitrust and contract claims against eight

banks (collectively, the "Banks" or "Defendants"), alleging that, between 2008 and 2016, they

conspired to fix the interest rates for a type of bond called Variable Rate Demand Obligations

("VRDOs").[1]  Now pending are Plaintiffs motion, pursuant to Rule 23 of the Federal Rules of

Civil Procedure, for class certification and Defendants' motions, pursuant to Rule 702 of the

Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), to

preclude some or all of the testimony of two experts upon whom Plaintiffs rely in seeking class

certification.  Defendants raise forceful arguments in opposition to Plaintiffs' experts but, as the

Court will explain, they are not ultimately a basis for preclusion.  That goes a long way toward

---

[1]     The Defendant Banks are Bank of America, Barclays, Citigroup, Goldman Sachs,
JPMorgan Chase, Morgan Stanley, the Royal Bank of Canada, and Wells Fargo.  In addition,
Plaintiffs sue various parents, affiliates, subsidiaries, predecessors, and successors of the
Defendant Banks.

resolving Plaintiffs' motion for class certification as well because Defendants' primary — albeit not only — argument in opposition to Plaintiffs' motion rests on their *Daubert* motions. Accordingly, and for the reasons that follow, Defendants' motions to preclude are denied and Plaintiffs' motion for class certification is granted.

## BACKGROUND

As the Court explained in prior Opinions, *see, e.g.*, *City of Philadelphia v. Bank of Am. Corp.*, 498 F. Supp. 3d 516, 521-25 (S.D.N.Y. 2020), familiarity with which is presumed, VRDOs are bonds issued by municipalities and other public or charitable entities, such as schools, hospitals, and community organizations, to raise funds for operating expenses, infrastructure projects, and public services.  Am. Compl. ¶¶ 2, 63.  They are issued on a long-term basis but have short-term interest rates that are reset on a periodic basis, typically weekly. *Id*. ¶¶ 3, 64, 72-73.  In order to attract investors, VRDOs have a "built-in 'put' feature that allows investors to redeem the bond at any periodic reset date at face value" — that is, at "par" — plus any accrued interest.  *Id*. ¶ 3.  That makes them a "low-risk and high-liquidity investment."  *Id.*

To manage VRDOs, issuers like Plaintiffs contract with a bank that acts as a remarketing agent ("RMA").  *Id*. ¶ 4; *see, e.g.*, ECF Nos. 125-4, 125-5, 125-6, 233-2 (examples of remarketing agreements between Plaintiffs and Defendants).  Under a typical remarketing agreement, an RMA has two primary responsibilities.  First, on each reset date, the RMA is required to reset the VRDO's interest rate at the lowest rate possible that would permit the bond to trade at par.  Am. Compl. ¶ 4.  Second, when an existing investor exercises the "put" option on the bond, thereby tendering the bond to the RMA, the RMA is required to remarket the VRDO to other investors at the lowest possible rate.  *Id*.  If the RMA cannot find another investor for the VRDO, the obligation to purchase the tendered bond generally falls on a letter-of-credit provider,

frequently the RMA itself. *Id.* Importantly, if an RMA cannot deliver low rates, the bond issuer has the right to replace the RMA with another one who can. *Id.* ¶ 5. Thus, in a properly functioning market, RMAs compete against each other for issuers' business by actively working to set the best — that is, the lowest — possible rates for their issuer customers. *Id.*

In 2019, Plaintiffs brought this action alleging that Defendants — who together serve as RMAs for the vast majority of the VRDO market, *id.* ¶ 69 — actively conspired *not* to compete against each other in the market for remarketing services, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and contractual and fiduciary duties under different state laws. *Id.* ¶ 96. According to Plaintiffs, Defendants worked together in two ways to keep VRDO interest rates artificially high between February 1, 2008, and November 30, 2015 (the "Class Period"). *Id.* ¶ 97. First, employees "from the top to the bottom of [Defendants'] VRDO operations . . . communicated regarding proprietary information such as VRDO inventory and planned changes to 'base rates' for VRDOs . . . regularly, almost daily, using the telephone, in-person meetings, Bloomberg messaging technology, and third-party intermediaries." *Id.* ¶ 96. Second, Defendants channeled prospective rate information through third-party pricing services such as J.J. Kenny Drake Inc. *Id.* ¶ 112. Plaintiffs claim that the inflated rates helped Defendants keep the VRDOs off their own books, *id.* ¶ 109, and benefitted Defendants' money market funds, which were the predominant holders of VRDOs, *id.* ¶ 97.

In prior Opinions, the Court granted in part and denied in part two motions to dismiss Plaintiffs' claims. The net result was that Plaintiffs' federal antitrust claims survived, along with their state-law claims for breach of contract and breach of fiduciary duty as to some Defendants. *See City of Philadelphia*, 498 F. Supp. 3d at 539; *City of Philadelphia v. Bank of Am. Corp.*, 609

F. Supp. 3d 269, 275 (S.D.N.Y. 2022).  Following discovery, Plaintiffs now move, pursuant to

Rule 23, for certification of the following class:

> All persons and entities who directly paid interest expenses on VRDOs that had
> interest rates reset on a weekly or daily basis pursuant to remarketing agreements
> with Defendants at any point from February 1, 2008 through November 30,
> 2015 . . . [e]xclud[ing] . . . Defendants and their employees, affiliates, parents,
> subsidiaries, and co-conspirators, and the United States government.

ECF No. 368, ("Pls.' Class Cert. Mem."), at 3.  Plaintiffs also seek certification of the following

sub-class:

> All persons and entities who were party to a remarketing agreement with any
> Counterparty Defendant that applies to VRDOs that had interest rates reset on a
> weekly or daily basis at any point from February 1, 2008 through November 30,
> 2015 . . . . [e]xclud[ing] . . . Defendants and their employees, affiliates, parents,
> subsidiaries, and co-conspirators, and the United States government.

*Id.* (cleaned up).  In support of their motion, Plaintiffs rely heavily on the testimony of two

experts, Dr. William Schwert, *see* ECF No. 369-1 ("Schwert Rep."), and Dr. Rosa Abrantes-

Metz, *see* ECF No. 369-2 ("Abrantes-Metz Rep.").[2]  *See* Pls.' Class Cert. Mem. 19-34.

Defendants move, pursuant to Rule 702 and *Daubert*, to preclude some or all of the testimony of

Plaintiffs' experts and, in part on that basis, oppose Plaintiffs' motion for class certification.  *See*

ECF No. 386.  On August 1, 2023, the Court held oral argument on the motions.  *See* ECF No.

454 ("Oral Arg. Tr.").

## DISCUSSION

The standards governing class certification are well established.  The party seeking

certification must demonstrate by a preponderance of the evidence that all the requirements of

Rule 23 have been met.  *See Levitt v. J.P. Morgan Secs., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013).

---

[2]      An unredacted copy of Dr. Schwert's report is currently sealed.  *See* ECF No. 364-1
("Unredacted Schwert Rep.").

That means, first, satisfying the "four threshold requirements of Rule 23(a) — numerosity, commonality, typicality, and adequacy of representation." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013). On top of those requirements, the Second Circuit has "recognized an implied requirement of ascertainability." *In re Petrobras Sec.*, 862 F.3d 250, 260 (2d Cir. 2017) (internal quotation marks omitted). If those threshold requirements are met, the moving party must also "demonstrate through evidentiary proof that the class satisfies at least one of the three provisions for certification found in Rule 23(b)." *U.S. Foodservice*, 729 F.3d at 117 (internal quotation marks omitted). Here, Plaintiffs seek certification under Rule 23(b)(3), which means that they "must establish: (1) predominance — that the questions of law or fact common to the class members predominate over any questions affecting only individual members; and (2) superiority — that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* (internal quotation marks omitted). In evaluating whether the moving party has met its burden, the Court must engage in a "rigorous analysis," in which it is permitted to "probe behind the pleadings before coming to rest on the certification question." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

The only Rule 23 requirement that Defendants contest in this case is predominance. Oral Arg. Tr. 4. Whether Plaintiffs satisfy that requirement turns largely — albeit, as discussed below, not entirely — on whether their expert models on class-wide impact are admissible. Thus, the Court will begin with Defendants' motions to preclude those models.

## A.  Defendants' *Daubert* Motions

The admissibility of expert testimony is generally governed by Rule 702 of the Federal Rules of Evidence, which provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" to his or her opinion if:

(a)  the expert's scientific, technical, or other specialized knowledge will help the
trier of fact to understand the evidence or to determine a fact in issue;

(b)  the testimony is based on sufficient facts or data;

(c)  the testimony is the product of reliable principles and methods; and

(d)  the expert has reliably applied the principles and methods to the facts of the
case.

Fed. R. Evid. 702.  In *Daubert*, the Supreme Court emphasized the "gatekeeping role" of district

courts with respect to expert testimony, declaring that "the Rules of Evidence — especially Rule

702 — . . . assign to the trial judge the task of ensuring that an expert's testimony both rests on a

reliable foundation and is relevant to the task at hand."  509 U.S. at 597; *see also Troublé v. Wet

Seal, Inc.*, 179 F. Supp. 2d 291, 302 (S.D.N.Y. 2001) ("[The] proffered testimony . . . must not

only have a reliable foundation but also be relevant in that it 'fits' the facts of this case.").

That said, neither the Supreme Court nor the Second Circuit has definitively resolved

"whether and to what extent *Daubert* applies at the class certification stage."  *Royal Park Invs.

SA/NV v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387, 393 (S.D.N.Y. 2018); *accord U.S.

Foodservice*, 729 F.3d at 129; *cf. In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613

(8th Cir. 2011) ("The main purpose of *Daubert* exclusion is to protect juries from being swayed

by dubious scientific testimony.  That interest is not implicated at the class certification stage

where the judge is the decision maker.").  District courts in this Circuit regularly subject expert

testimony at the class certification stage to *Daubert*, but they limit the inquiry at that stage to

"whether or not the expert reports are admissible to establish the requirements of Rule 23.  In

other words, the question is not whether a jury at trial should be permitted to rely on the expert's

report to find facts as to liability, but rather whether the Court may utilize it in deciding whether

the requisites of Rule 23 have been met."  *Ge Dandong v. Pinnacle Performance Ltd.*, No. 10-

CV-8086 (JMF), 2013 WL 5658790, at *13 (S.D.N.Y. Oct. 17, 2013) (cleaned up); *accord In re*

*Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 28-29 (S.D.N.Y. 2020); *Bowling v. Johnson & Johnson*, No. 17-CV-3982 (AJN), 2019 WL 1760162, at *7 (S.D.N.Y. Apr. 22, 2019) (Nathan, J.); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 407 F. Supp. 3d 422, 429 (S.D.N.Y. 2019); *In re LIBOR-Based Fin. Instr. Antitrust Litig.*, 299 F. Supp. 3d 430, 470 (S.D.N.Y. 2018) ("*LIBOR VII*").  Accordingly, the Court "here applies a *Daubert* analysis to the extent that [Defendants] seek to exclude testimony relevant to the pending class certification motion."  *Aluminum Warehousing*, 336 F.R.D. at 29.

As noted, Defendants challenge the testimony, in whole or in part, of Plaintiffs' two experts, Dr. Schwert and Dr. Abrantes-Metz.  ECF No. 399 ("Defs.' *Daubert* Mem."), at 1-4.  Defendants do not contest the experts' qualifications.  *See* Oral Arg. Tr. 63.  Instead, they contest their methodologies and conclusions, arguing that Dr. Schwert fails to account for key factors and relies on false assumptions (among other things), *see* Defs.' *Daubert* Mem. 7-19, and that Dr. Abrantes-Metz fails to establish causation, *see id.* at 20-25.  The Court will address each expert in turn.

### 1. Dr. William Schwert

In his expert report, Dr. Schwert offers two different regression models that Plaintiffs rely on to measure class-wide impact and damages — a multiple dummy variable model and a backcasting model.  *See generally* Schwert Rep. ¶¶ 39-47.[3]  A regression analysis "is a statistical tool used to determine the relationship between an unknown variable (the 'dependent' variable) and one or more 'independent' variables that are thought to impact the dependent variable."  *In*

---

[3]      Dr. Schwert also ran a third type of regression: a single dummy variable model.  Schwert Rep. ¶¶ 58-62.  But Plaintiffs do not rely on this model in their class certification motion, and Defendants therefore do not challenge it under *Daubert*.  Accordingly, the Court need not and does not address it.

*re Urethane Antitrust Litig.*, 768 F.3d 1245, 1260 (10th Cir. 2014).  "If a regression model uses appropriate independent or explanatory variables, it can test and isolate the extent to which the actual prices paid by plaintiffs are higher because of a defendant's collusive behavior."  *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 671 (9th Cir. 2022) (cleaned up).  As Dr. Schwert describes it, a regression model can be used to "isolate the effect of an alleged conspiracy on prices by comparing prices during a conspiracy period to prices during a non-conspiracy period after controlling for the effects on price of relevant non-conspiratorial factors."  Schwert Rep. ¶ 43.

For his first regression analysis, Dr. Schwert utilizes a multiple dummy variable model. Such a model "uses data from both the conspiracy and non-conspiracy periods to estimate the relation between price, non-conspiratorial economic factors, and a . . . number of dummy variables[] for the conspiracy period."  *Id.*  Each dummy variable represents a separate time period during the alleged conspiracy and "measures the average effect of the conspiracy" during that period.  *Id.* ¶ 45.[4]  Importantly, this "allows for the effect of the conspiracy to vary over time."  *Id.*  A backcasting model (which is sometimes referred to as a prediction model), on the other hand, "uses data from only a non-conspiratorial period to estimate the relation between price and non-conspiratorial economic factors."  *Id.* ¶ 43.  Based on this relation, the model can be used to predict "what prices *would have been* during the conspiracy period but-for the existence of the conspiracy."  *Id.*  The difference between the actual price and the predicted "but-for" price at any point in time is the isolated effect of the conspiracy on the price.  *See id.* ¶ 46.

---

[4]     To quote Schwert's explanation:  "For example, for an alleged conspiracy that lasted one year, a model could be estimated with 52 weekly dummy variables; each dummy variable would measure the effect of the conspiracy during the week corresponding to that dummy variable (*i.e.*, the week in which the dummy variable has the value one)."  Schwert Rep. ¶ 45.

Dr. Schwert defines the non-conspiracy period as beginning in December 2015, when the Securities and Exchange Commission began investigating Defendants for the practices at issue here, and ending in December 2020, the last month for which Defendants produced data. *Id.* ¶ 48.  To capture the macro- and micro-economic factors that affect VRDO rates, he uses nine explanatory variables.  They include two systemic variables, a "commercial paper premium" and a "municipal bond premium," to account for the general default risk in the economy and seven idiosyncratic variables that are VRDO-specific and account for individual VRDO features.  *Id.* ¶¶ 51-52.[5]  The results of Dr. Schwert's analyses are stark: The multiple dummy variable model estimates, with statistical significance, that 99.3% of weekly-reset VRDOs and 98.8% of daily-reset VRDOs were reset during a week with inflated rates.  Unredacted Schwert Rep. ¶ 69 n.90; *see also* Schwert Rep. ¶¶ 65 n.85, 68 n.88.  That is, *virtually all* VRDOs had their rates inflated at least once during the conspiracy period.  Similarly, the backcasting model estimates that 99.4% of weekly-reset VRDOs and 99.5% of daily-reset VRDOs were reset during a week with inflated rates.  Unredacted Schwert Rep. ¶ 74.

Defendants lodge several objections to Dr. Schwert that, they claim, render his models fundamentally flawed.  First and foremost, they argue that Dr. Schwert failed to account for the effects of lawful factors that influenced VRDO rates, including extreme macroeconomic conditions (namely, the Financial Crisis and the European Sovereign Debt Crisis), changes in the supply and demand of VRDOs, and changes in VRDO inventory levels.  *See* Defs.' *Daubert* Mem. 7-14.  Next, they argue that Dr. Schwert was wrong to include the "commercial paper premium" and "municipal bond premium" variables in his models.  *Id.* at 19-20.  And,

---

[5]     Specifically, the idiosyncratic variables are a VRDO's (1) federal tax status; (2) alternate minimum tax status; (3) issuer state; (4) initial notional amount; (5) general obligation bond status; (6) long-term ratings; and (7) short-term ratings.  *See* Schwert Rep. ¶ 52.

interspersed throughout their objections, they claim that Dr. Schwert's models are unreliable and should be excluded because they generate false positives and mask VRDOs that were never reset to inflated rates. *See id.* at 7-20; *see also* Oral Arg. Tr. 27-29.

Before the Court turns to these arguments, a few background principles warrant mention. First, regression models are routinely used — and accepted — in antitrust cases. *See, e.g.*, *Olean Wholesale Grocery Coop., Inc.*, 31 F.4th at 677 ("In antitrust cases, regression models have been widely accepted as a generally reliable econometric technique to control for the effects of the differences among class members and isolate the impact of the alleged antitrust violations on the prices paid by class members."); *see also, e.g.*, *id.* n.23 (collecting cases); *accord In re Urethane Antitrust Litig.*, 768 F.3d at 1259-61. Second, no complex model is perfect. At the end of the day, a regression model is meant to generate *estimates* for what the modeler is attempting to measure. As a result, disputes about the accuracy of a model often go to weight, not admissibility. *See, e.g.*, *Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 61-62 (2d Cir. 2020) (summary order); *see also, e.g.*, *Chen-Oster v. Goldman, Sachs & Co.*, No. 10-CV-6950 (AT), 2022 WL 814074, at *12 (S.D.N.Y. Mar. 17, 2022). As long as a model is not "so incomplete as to be inadmissible as irrelevant," *Bazemore v. Friday*, 478 U.S. 385, 400 n.10 (1986) (Brennan, J., concurring in part and joined by all members of the Court); does what it claims to do; and is supported by reasoned and sound methodological choices, it will generally survive a *Daubert* challenge. *See, e.g.*, *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 115 (S.D.N.Y. 2015). Put differently, "[t]he real question" is whether Plaintiffs "have established a *workable multiple regression equation*, not whether [their] model actually works." *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 100 (D. Conn. 2009) (emphasis added).

In light of these principles, Defendants' arguments fall short.  As noted, Defendants first contend that Dr. Schwert "ignore[s] a series of factors unrelated to the alleged conspiracy that had a major impact on VRDO rates."  Defs.' *Daubert* Mem. 7.  Most notably, they claim that his models do not account for the Financial Crisis and European Sovereign Debt Crisis and, thus, confuse the effects of these two crises on VRDO rates for an alleged conspiracy to inflate rates.  *See id.* at 2, 7-11; *see also* ECF No. 397 ("Defs.' Class Cert. Opp'n"), at 2-5.  But, as Plaintiffs explain, Dr. Schwert *did* account for these macroeconomic conditions in his regressions — by using the commercial paper premium and municipal bond premium variables.  *See* Pls.' *Daubert* Opp'n 7-8; *see also* ECF No. 428-2 ("Schwert Reply"), ¶¶ 10-12 (explaining that both systemic explanatory variables spiked during the Financial Crisis).  To be sure, Defendants point to a few examples of when the VRDO market sharply diverged from the commercial paper and municipal bond markets during the Financial Crisis.  *See* Oral Arg. Tr. 31-35.  But even if Defendants are correct that Dr. Schwert's explanatory variables do not perfectly capture the effects of the Financial Crisis, the objection boils down to an argument over which reasonable economists can (and apparently do) differ.  Such squabbles are more appropriately resolved later in the litigation.  *See, e.g.*, *In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2016 WL 4077117, at *2 (S.D.N.Y. Aug. 1, 2016) ("[A]lthough expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." (internal quotation marks omitted)); *Daubert*, 509 U.S. at 596 (noting that "the traditional and appropriate means of attacking shaky but admissible evidence" are not exclusion,

but rather "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.").

Defendants further argue that "the relationship between VRDO, commercial paper, and long-term municipal bond rates is unstable" and that this instability undermines Dr. Schwert's core premise that the three rates have a fixed relationship.  Defs.' *Daubert* Mem. 17-19; *see also* Oral Arg. Tr. 31-35.  But Dr. Schwert explains that his regression does *not* depend on such a relationship.  *See* Schwert Reply ¶¶ 29-30.  Instead, he shows that the precise relationship between commercial paper and municipal bond rates does not affect the predicted VRDO rates. *See id.* ¶¶ 31-33.  That is sufficient, at this stage, to allay any concerns about whether his model is "workable."  *Dial Corp.*, 314 F.R.D. at 115.

Defendants also claim that Dr. Schwert's models are flawed because he accounts for neither the supply and demand of VRDOs nor VRDO inventory levels.  *See* Defs.' *Daubert* Mem. 11-17.  Dr. Schwerts counters that he accounted for the former through his two systemic explanatory variables.  *See* Schwert Reply ¶ 48.  Defendants contend that these two variables do not accurately capture VRDO supply and demand levels, but this is merely another good faith dispute over discretionary modeling decisions that is more appropriately resolved at the merits stage of the litigation.  As for inventory levels, Dr. Schwert provides a reasonable explanation for why he chose not to include them as an explanatory variable: because they would introduce errors.  *See id.* ¶ 53.  And in any event, a regression model need not include every possible explanatory variable for it to be deemed reliable.  *See, e.g.*, *Kurtz*, 818 F. App'x at 62.

Finally, Defendants disagree with Dr. Schwert's use of the commercial paper premium and municipal bond premium explanatory variables.  *See* Defs.' Daubert Mem. 19-20.  But Dr. Schwert's inclusion of these variables is not "methodologically unsound."  *Id.* at 19.  To begin,

Defendants argue that the Financial Crisis uniquely affected VRDOs in a way that was not reflected in the commercial paper market because the Federal Reserve directly intervened in that market. *See* Oral Arg. Tr. 31-35. According to Dr. Schwert, however, the Federal Reserve's intervention reduced commercial paper rates rather than *premiums*, which effectively track "the 'general default risk' in the economy even if an individual liquidity provider is downgraded." Schwert Reply ¶ 96 & n.136. Defendants further argue that Dr. Schwert's selection of a long-term, rather than short-term, municipal bond variable is designed to "ratchet up his damages estimates." Defs.' *Daubert* Mem. 20. Again, however, Dr. Schwert counters that Defendants' model "that replaces [his] municipal bond premium variable with a short-term version" has its own problems, such as "produc[ing] damages that make no economic sense." Schwert Reply ¶ 94. Furthermore, as Plaintiffs explained during oral argument, Dr. Schwert chose a long-term municipal bond index because he wanted to capture systemic risk in the economy, not idiosyncratic VRDO-specific risk. *See* Oral Arg. Tr. 42-43. At this stage, Dr. Schwert's explanations of why his selection of the long-term variable is a "workable methodology" are sufficient. *Dial Corp.*, 314 F.R.D. at 115.

In short, this is not a case where the plaintiffs' models "offer no means of controlling for the effects of economic events and business developments." *LIBOR VII*, 299 F. Supp. 3d at 487. Instead, Dr. Schwert controlled for various external factors that could influence VRDO rates, and he grounded his models in well-supported, reasoned methodology. Although Defendants have forceful, perhaps even meritorious, disagreements with Dr. Schwert regarding his variable selection and model specification, that is not enough to reject his models at this stage. *See Kurtz*, 818 F. App'x at 62 (affirming a decision to admit a regression model even though the model

"fail[ed] to consider some arguably significant variables" because such failures "affect the analysis' probativeness, not its admissibility" (internal quotation marks omitted)).

In addition to the foregoing objections, Defendants claim that Dr. Schwert's models generate false positives. *See, e.g.*, Defs.' *Daubert* Mem. 10-11, 15-16; Defs.' Class Cert. Opp'n 23-26; Oral Arg. Tr. 27-29.[6]  False positives can indeed be fatal to a model.  *See, e.g.*, *Aluminum Warehousing*, 336 F.R.D. at 49 (explaining that a model is "flawed" and may "result in denial of class certification" if it "yields false positives"); *In re Rail Freight Fuel Surcharge Antitrust Litig.* ("*Rail I*"), 725 F.3d 244, 253-55 (D.C. Cir. 2013) (vacating class certification after finding that the plaintiffs' model was "prone to false positives").  But Defendants here do not point to evidence of systemic false positives produced by Dr. Schwert's models.  In other words, to the extent Defendants identify false positives at all, their objection does not undermine the workability of Dr. Schwert's models and goes, once again, to weight, not admissibility.

Defendants assert that Dr. Schwert's models find rate inflation before the conspiracy is alleged to have started.  *See* Defs.' *Daubert* Mem. 11 ("Dr. Schwert's models also manufacture false estimates of 'rate inflation' outside the alleged conspiracy period following the 9/11 terrorist attacks, the 'dotcom' bubble burst of the early 2000s, and during periods of very low interest rates.");  *see also* Oral Arg. Tr. 29, 37-38.  This argument, however, is misleading on two fronts.  First, Dr. Schwert does not state that there was no rate inflation prior to what he treats as the conspiracy period; instead, his assumption (consistent with Plaintiffs' claim) is that "the alleged conspiracy began *no later than* February 2008, not that it began *in* February 2008."  Schwert Reply ¶ 63 (emphases added).  That is, Defendants may well have been conspiring to

---

[6]     Although Defendants primarily raise these arguments in their opposition to class certification, not in their *Daubert* motion, the Court addresses them here.

inflate VRDO rates before the Class Period.  Thus, "there is no basis to conclude that any finding of inflation in the years prior to 2008 is a 'false' positive."  *Id.*; *see also* ECF No. 427 ("Pls.' Class Cert. Reply"), at 7-8.  Second, the "false positives" that Defendants identify were not generated by Dr. Schwert's models, but by modified versions of Dr. Schwert's models put forward by Defendants' rebuttal expert, Dr. Glenn Hubbard.  *See* Schwert Reply ¶¶ 54-62; *see also* Pls.' *Daubert* Opp'n 9.  Defendants cite, and the Court has found, no case where a court looked beyond a model itself to determine whether the model generated false positives.  *Accord Rail I*, 725 F.3d at 250-52.

Defendants also claim that Dr. Schwert's models generate false positives when Defendants held a high inventory of VRDOs.  *See* Defs.' Class Cert. Opp'n 23-24.  But as Plaintiffs correctly note, Defendants "offer no reason why these positives are false."  Pls.' Class Cert. Reply 8.  Instead, Defendants' argument on this point is essentially that it is "economically nonsensical" for VRDO rates to be inflated when investors are unwilling to buy them.  Defs.' Class Cert. Opp'n 24; *see also* Oral Arg. Tr. 30-31.  Defendants highlighted a number of these supposed false positives during oral argument.  *See* Oral Arg. Tr. 27-29.  Plaintiffs, however, offered reasonable explanations of why these potentially cherry-picked examples were misleading snapshots in time and might not genuinely represent false positives.  *See id.* at 53-55.

Defendants' strongest argument on this front pertains to March 2020, the onset of the COVID-19 pandemic.  *See id.* at 28-29.  Notably, Dr. Schwert himself effectively concedes that his model generates false positives for that month.  *See* Schwert Reply ¶ 64 ("[*E*]*xcept for March 2020*, my model predicts no systemic rate inflation during the rest of 2020 . . . ." (emphasis added)); *see also* Pls.' *Daubert* Opp'n 10 ("Schwert's model predicts no systemic rate inflation except for March 2020 . . . ."); Oral Arg. Tr. 19-20 (Plaintiffs' counsel acknowledging that Dr.

Schwert's model went "haywire" for March 2020).  Defendants' point is even more compelling because the Federal Reserve intervened in the VRDO market April 2020, when Dr. Schwert's models stop predicting systemic rate inflation.  *See* Oral Arg. Tr. 28-29.  But the point does not doom Dr. Schwert's models.  The four weeks in March 2020 account for less than 1% of the total conspiracy and non-conspiracy time period.  Defendants do not cite, and the Court has not found, any cases in which a court has thrown out a model because it generated a miniscule number of false positives *wholly outside* of the alleged conspiracy period.

Finally, Defendants argue that Dr. Schwert's models "rely on aggregated averages that mask the existence of unharmed class members."  Defs.' Class Cert. Opp'n 26-27.  But Defendants' argument misses the mark.  There is no requirement in the Second Circuit that *all* putative class members be injured.  "District courts in this and other Circuits have held that a class may be certified so long as a *de minimis* number of class members were uninjured or, conversely, virtually all class members were injured."  *In re Restasis (Cyclosporine Opthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 17 (E.D.N.Y. 2020) (internal quotation marks omitted). Although there is no bright-line definition of "de minimis" in this context, Dr. Schwert's estimate that less than 2% of VRDOs never had an inflated rate clearly falls within its boundaries.  *See id.* at 17-18 (explaining that the consensus of what qualifies as "de minimis" hovers around 5% to 6% and collecting cases); *see also, e.g.*, *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 563 (S.D.N.Y. 2021).  In arguing otherwise, Defendants once again rely on Dr. Hubbard's *modified* versions of Dr. Schwert's models to show significantly higher "non-injury" rates.  *See* Pls.' Class Cert. Reply 9.  But again, Defendants do not cite, and the Court has not found, any case in which a court looked at something other than a model itself to determine whether the model impermissibly masked uninjured plaintiffs.

In conclusion, although Defendants raise any number of forceful arguments in response to Dr. Schwert's analysis, they are not enough to exclude his models at this stage of the litigation. Accordingly, their *Daubert* motion with respect to him must be and is denied.

### 2. Dr. Rosa Abrantes-Metz

As noted, Defendants also challenge Plaintiffs' second expert, Dr. Abrantes-Metz. In her report, Dr. Abrantes-Metz offers two studies to prove class-wide impact — a qualitative market-structure analysis and a rate study. *See generally* Abrantes-Metz Rep. ¶¶ 58-188. In the former, Dr. Abrantes-Metz analyzes six different factors that characterize the VRDO industry and concludes that "a conspiracy [among Defendants] to increase VRDO rates would be effective . . . [and] that Defendants had a readily available mechanism for effectuating that conspiracy: coordination on their base rates." *Id.* ¶ 130; *see also id.* ¶¶ 123-129. Notably, "[s]imilar market analyses have been accepted by courts as a source of common evidence of impact." *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 (JG), 2014 WL 7882100, at *48 (E.D.N.Y. Oct. 15, 2014), *adopted*, 2015 WL 5093503 (E.D.N.Y. July 10, 2015); *see also In re Blood Reagents Antitrust Litig.*, No. 09-MD-2081, 2015 WL 6123211, at *31 (E.D. Pa. Oct. 19, 2015) (explaining that "[m]any courts have accepted market-structure analyses in finding predominance with respect to antitrust impact" and collecting cases).

Dr. Abrantes-Metz's rate study includes both qualitative and quantitative components. The qualitative component examines the record to determine how Defendants calculated their VRDO reset rates and concludes that they did so nearly uniformly "by reference to a base rate." Abrantes-Metz Rep. ¶¶ 132, 151. The quantitative component uses regression models to test whether the base rates and VRDO rates are correlated. *Id.* ¶¶ 152-59. This analysis shows both that "each Defendants' base rate correlates tightly, positively, and in a statistically significant

fashion, with the VRDO rates charged to class members," *id.* ¶ 185, and that "there is a strong co-movement between [] base rates among Defendants," *id.* ¶ 187.  This leads Dr. Abrantes-Metz to conclude that "Defendants set base rates consistent with one another, directionally, and that a conspiracy to inflate VRDO interest rates implemented, in part, by coordinating on base rates had a common and class-wide impact on the VRDO rates charged to class members."  *Id.* ¶ 188. This sort of rate study is also commonly accepted by courts in antitrust price-fixing cases.  *See, e.g.*, *Olean Wholesale Grocery Coop., Inc.*, 31 F.4th at 671, 676.

Defendants raise several challenges to Dr. Abrantes-Metz's models, but they are swiftly rejected.  First, Defendants attack the rate study for not controlling for macroeconomic factors, using aggregated averages, and failing to include daily-reset VRDOs.  *See* Defs.' *Daubert* Mem. 21-22, 25; Defs.' Class Cert. Opp'n 32-34.  But as Plaintiffs point out, Dr. Abrantes-Metz addresses all of these criticisms in her reply report and concludes that they do not change her analyses.  *See* Pls.' *Daubert* Opp'n 22-24; *see also* ECF No. 428-3 ("Abrantes-Metz Reply"), ¶¶ 45-50 (macroeconomic factors), 61-62 (aggregated averages), 67-75 (daily-reset VRDOs). Next, Defendants argue that their rate-setters did not uniformly base VRDO reset rates on base rates.  *See* Defs.' *Daubert* Mem. 23-24.  But this is merely a disagreement with Dr. Abrantes-Metz's interpretation of the record.  *See* Pls.' *Daubert* Opp'n 21 ("In the end, [Defendants'] arguments are not methodological, but rather boil down to a disagreement about what the factual record reflects.").  There is ample evidence in the record that Defendants referenced base rates when setting VRDO rates, *see, e.g.*, Pls.' Class Cert. Mem. 6-12; Pls.' *Daubert* Opp'n 18-19 & n.22, so Dr. Abrantes-Metz's interpretations and conclusions are plausible, if not reasonable. Accordingly, this challenge fails.  *See also, e.g.*, *In re Term Commodities Cotton Futures Litig.*, No. 12-CV-5126 (ALC), 2020 WL 5849142, at *18 (S.D.N.Y. Sept. 30, 2020); *Sumotext Corp.*

*v. Zoove, Inc.*, No. 16-CV-1370, 2020 WL 533006, at *11 (N.D. Cal. Feb. 3, 2020). Finally, Defendants argue that Dr. Abrantes-Metz "ignores important aspects of the market structure that undermine her conclusion that the alleged conspiracy would have been effective." Defs.' Class Cert. Opp'n 31. In reality, though, Defendants implicitly concede that Dr. Abrantes-Metz considered the relevant factors; they merely argue that she misinterpreted the factors. *See* Pls.' Class Cert. Reply 10-11. Given Dr. Abrantes-Metz's thorough and reasoned responses to Defendants' criticisms, *see id.*, the Court is satisfied that her models are "theoretically capable of evidencing a common impact, and [her] factual analysis [] actually do[es] so," *Air Cargo Shipping Servs.*, 2014 WL 7882100 at *48.

Accordingly, Defendants' challenge to Dr. Abrantes-Metz also fails.

## B. Plaintiffs' Class Certification Motion

The Court turns then to Plaintiffs' class certification motion. As noted, Defendants contest only one of the Rule 23 requirements: predominance. The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623 (1997). More specifically, it "calls upon courts to give careful scrutiny to the relation between common and individual questions in a case. An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (cleaned up). To demonstrate predominance, the plaintiff must demonstrate that "the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (internal quotation marks omitted). Significantly,

if that standard is met, "the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.* (internal quotation marks omitted); *see Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405-08 (2d Cir. 2015) (reaffirming the "well-established" principle "that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification under Rule 23(b)(3)" (internal quotation marks omitted)); *Brown v. Kelly*, 609 F.3d 467, 484 (2d Cir. 2010) ("Rule 23(b)(3) requires that common questions predominate, not that the action include only common questions.").

Significantly, Defendants do not dispute that whether they engaged in collusion is an important question common to all class members. *See* Oral Arg. Tr. 4-5. That is for good reason. The predominance requirement is "'a test readily met in certain cases alleging . . . violations of the antitrust laws.'" *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 108 (2d Cir. 2007) (quoting *Amchem Prods., Inc.*, 521 U.S. at 625). In this case, Defendants acknowledge that VRDO rates "behaved during [the Class Period] in a way that is different from all other comparable financial instruments." Oral Arg. Tr. 15, *see* Defs.' *Daubert* Mem. 8. Therefore, the primary dispute is over *why* — specifically, over whether the rates did so because Defendants conspired in violation of the Sherman Act or whether they did so for some other reason, such as the Financial Crisis. *See, e.g.*, Defs.' *Daubert* Mem. 8. The answer to that question turns on whether Defendants' conduct "stem[med] from independent decision or from an agreement, tacit or express," rather than on the actions of individual Plaintiffs. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007). Thus, as in *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686 (S.D.N.Y. 2019), it is likely that "[P]laintiffs' primary claim concerning [the] existence and scope of the alleged conspiracy to fix [interest rates] can be established by

common evidence such as the [] communications and deposition testimony of [Defendants' rate-setters]." *Id.* at 701; *see also Air Cargo Shipping Servs.*, No. 06-MD-1175, 2014 WL 7882100, at *37-38 (S.D.N.Y. Oct. 15, 2014).

Defendants instead focus their fire on whether Plaintiffs "can prove, through common evidence, that all class members were in fact *injured* by the alleged conspiracy." *Rail I*, 725 F.3d at 252 (emphasis added); *see also* Oral Arg. Tr. 4-5 (defense counsel stating that Defendants "agree that the existence of the alleged conspiracy is a common question" but "do not agree that the *effects* of the alleged conspiracy is a common question" (emphasis added)); *see generally In re Rail Freight Fuel Surcharge Antitrust Litig. - MDL No. 1869*, 934 F.3d 619, 623 (D.C. Cir. 2019) ("*Rail II*") ("To establish liability under section 4 [of the Clayton Act], each plaintiff must prove not only an antitrust violation, but also an injury to its business or property and a causal relation between the two."). Defendants' principal arguments on that score rest on their *Daubert* motion. *See* Def. Class Cert. Opp'n. 18-33. The denial of that motion thus weighs heavily in favor of granting Plaintiffs' class certification motion. *See, e.g.*, *Tyson Foods*, 577 U.S. at 459 ("Once a district court finds evidence to be admissible, its persuasiveness is, in general, a matter for the jury."). That does not end the analysis, however, as Defendants make four other arguments in opposition to Plaintiffs' motion for class certification: first, that even if Plaintiffs' expert testimony is admissible, resolution of their claims will require individualized inquiries, *see* Defs.' Class Cert. Opp'n 14-18; second, that proof of injury and damages will require individualized inquiries into synthetic fixed rate transactions, *see id.* at 35-43; third, that proof of class membership and antitrust standing will require individualized inquiries to determine the direct payors of interest on VRDOs given the prevalence of "conduit" issuances, *see id.* at 43-45;

21

and fourth, that individualized inquiries will be necessary to determine if class members' claims are timely, *see id.* at 45-49.  The Court will address each of these arguments in turn.

### 1.  Individualized Inquiries

Defendants' "main argument" against class certification is that "individual fact-specific showing of no rate inflation . . . would occur thousands of times for thousands of VRDOs" should the Court grant Plaintiffs' motion.  Oral Arg. Tr. 6-8; *see also* Defs.' Class Cert. Opp'n 14-18.  According to Defendants, rate-setters considered each VRDO's "credit quality, inventory levels, historical performance, notional size, tax status, and industry sector" in making individualized judgments about the appropriate rate.  Defs.' Class Cert. Opp'n 14.  They argue that, as a result, "[a]ll of these differentiating factors must be individually examined to determine whether the rates that were set on any given VRDO are fully explained by the specific circumstances of that particular bond."  *Id.* at 15.

For the most part, however, this argument falls with Defendants' *Daubert* motion.  *Cf.* Defs.' Class Cert. Opp'n 12-32 (tying argument to criticism of Dr. Schwert's and Dr. Abrantes-Metz's expert reports).  Plaintiffs submitted Dr. Schwert's and Dr. Abrantes-Metz's testimony to establish the existence of class-wide injury.  The Court's acceptance of their testimony therefore undermines Defendants' arguments about individualized adjudication.  Of course, it remains an open question "whether, assuming Plaintiffs paid supra-competitive [interest], that payment was *caused* by" Defendants' allegedly anti-competitive behavior, as opposed to the other factors emphasized by Defendants.  *Dial Corp.*, 314 F.R.D. at 120.  Whatever the answer to this question may be, however, it is a *common* question.  As the Supreme Court has put it: "When, as here, the concern about the proposed class is not that it exhibits some fatal dissimilarity but, rather, a fatal similarity — an alleged failure of proof as to . . . the plaintiffs' cause of action —

22

courts should engage that question as a matter of summary judgment, not class certification."

*Tyson Foods*, 577 U.S. at 457 (cleaned up).

To be sure, the Court may indeed have to "make individualized inquiries with respect to some of the plaintiffs." *Brown v. Kelly*, 609 F.3d at 483. But this "does not render certification inappropriate," as "Rule 23(b)(3) requires that common questions predominate, not that the action include only common questions." *Id.* at 484; *In re Asacol Antitrust Litig.*, 907 F.3d 42, 52 (1st Cir. 2018) ("A class may be certified notwithstanding the need to adjudicate individual issues so long as the proposed adjudication will be both administratively feasible and protective of defendants' Seventh Amendment and due process rights." (internal quotation marks omitted)). The Supreme Court's decision in *Tyson Foods* is especially instructive. *See* 577 U.S. at 454-55. There, meat processing workers sought to recover overtime pay for time spent donning and doffing their protective gear. The defendants argued that, because "each employee must prove that the amount of time spent donning and doffing" pushed into overtime hours, "these necessarily person-specific inquiries into individual work time predominate[d] over the common questions raised by [the plaintiffs'] claims, making class certification improper." *Id*. at 454. The Supreme Court disagreed and held that class certification was appropriate because "each class member could have relied on [the plaintiffs' representative] sample to establish liability if he or she had brought an individual action." *Id.* at 455. The same is true here. Even if Defendants are correct that VRDO rate-setting was an individualized process involving multiple factors, each class member could rely on Dr. Schwert's and Dr. Abrantes-Metz's testimony to support a finding of antitrust liability in a hypothetical individual action. That is sufficient at this stage.

Defendants' arguments to the contrary rest heavily on *Rail II*, *Asacol*, and *Aluminum Warehousing*, *see* Defs.' Class Cert. Opp'n 12-13, but all three cases are distinguishable. In *Rail*

*II*, the plaintiffs' own model indicated that 2,037 putative class members, or 12.7% of the proposed class, were uninjured.  934 F.3d at 624-25.  In *Asacol*, "the reports of both sides' experts" made clear that "approximately ten percent of class members had not been injured by [the defendant's] allegedly anticompetitive conduct."  907 F.3d at 46-47; *see id.* at 53 ("[T]his is a case in which any class member may be uninjured, and there are apparently thousands who in fact suffered no injury.  The need to identify those individuals will predominate and render an adjudication unmanageable.").  Here, by contrast, Dr. Schwert found that, "[o]verall, 99.3% of VRDOs had at least one reset in a week where Defendants were inflating VRDO reset rates."  Pls.' Class Cert. Mem. at 21.  And Defendants offer no counter-estimate of how many individualized inquiries would be required.  Thus, the record here is a far cry from the records in *Rail II* and *Asacol*.  *See Cyclosporine Opthalmic Emulsion*, 335 F.R.D. at 17-18 (explaining that the consensus of what a "de minimis" percentage of uninjured members is hovers around 5% to 6% and collecting cases).  "That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate."  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014).

    *Aluminum Warehousing* is similarly distinguishable.  There, the plaintiffs' case for class certification was impaired by "non-uniform . . . views" by class members and expert models that the court refused to accept due to a "range of significant methodological infirmities."  336 F.R.D. at 50, 63.  Accordingly, Judge Engelmayer concluded that the plaintiffs "lack[ed] common proof of antitrust injury caused by the alleged conspiracy" and that injury would be "provable only via individualized inquiries keyed to each particular purchaser."  *Id.* at 63.  Here, as discussed, the Court has accepted Plaintiffs' expert testimony as common proof of antitrust injury.  Defendants' reliance on *Aluminum Warehousing* is therefore inapposite for reasons the Court has already

discussed at length.  *See, e.g.*, *Tyson Foods*, 577 U.S. at 459 ("Once a district court finds

evidence to be admissible, its persuasiveness is, in general, a matter for the jury.").

### 2.  Synthetic Fixed Rate Transactions

Next, Defendants argue that "intensive individualized analysis is necessary to determine

which class members, if any, would have been harmed by VRDO rate inflation in light of their

synthetic fixed rate structures."  Defs.' Class Cert. Opp'n 36.  A synthetic fixed rate transaction

insulates the issuer from fluctuations in the VRDO rate by combining a VRDO bond with one or

more interest swaps.  ECF No. 398-2 ("Chalmers Rep."), ¶ 151.  In essence, the issuer generally

agrees to pay the swap counterparty a fixed interest rate, and the swap counterparty pays the

VRDO issuer a variable or floating rate — called the "floating rate leg" — that is intended to

correspond to the VRDO's variable interest rate.  *Id.* ¶¶ 151, 156.  The floating rate leg is

generally one of: a "cost of funds swap," a "SIFMA swap," or a "LIBOR swap."  *Id.* ¶ 156.  In a

cost of funds swap, the rate the issuer receives is equivalent to the VRDO rate it pays out to the

VRDO investor.  *Id.*  In a SIFMA swap, the rate is tied to the SIFMA Index, "an index calculated

based on an average of eligible weekly VRDO rates."  *Id.*; *see also id.* n.251 (defining the

SIFMA Index).  Finally, a LIBOR swap, as the name suggests, pegs the rate to a set percentage

of LIBOR.  *Id.* ¶ 156.

Relying on *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR V*"), No. 11-

MDL-2262 (NRB), 2015 WL 6696407 (S.D.N.Y. Nov. 3, 2015) — in which Judge Buchwald

dismissed the claims of a plaintiff whose swap agreements "definitely show[ed] that [it] was

never exposed to fluctuations in [the allegedly rigged LIBOR rate] at all," *id.* at *22 —

Defendants argue that because some Plaintiffs "entered into VRDOs as inseparable components

of 'synthetic fixed rate transactions,'" a number of Plaintiffs never paid "inflated" VRDO rates

and therefore suffered no injury, Defs.' Class Cert. Opp'n at 35-38.  More to the point, Defendants contend that "identify[ing] unharmed class members . . . would [result in the] need to engage in thousands of time-intensive, individualized analyses of each VRDO's bond documents to determine whether it was issued as part of a synthetic fixed rate transaction," thus defeating predominance.  *Id.* at 36; *see also* Oral Arg. Tr. 77-78.

There is some force to Defendants' argument, but it is not enough to tip the balance away from a finding of predominance.  No doubt, some individualized swap-related questions — for example, which VRDOs were part of synthetic fixed rate transactions (especially "cost of fund" swaps that perfectly eliminate any exposure to changes in the VRDO rate), when the individual VRDO was issued and when the swap was entered, and whether the issuer was completely hedged against VRDO rate inflation — will have to be addressed at some point in the litigation. *See* Defs.' Class Cert. Opp'n 36-38; *see also* Chalmers Rep. ¶¶ 219-20.   But Defendants have not come close to identifying which or how many class members were never exposed to interest overcharges on account of their participation in swaps.  And their vague observation that "many issuers" entered into synthetic fixed rate transactions, Defs.' Class Cert. Opp'n at 35, without more, is not enough to overcome Plaintiffs' expert testimony establishing the existence of class-wide injury.  This necessarily pushes any swap-related questions into the merits stage and makes them inseparable from the damages inquiry.  And as noted, "the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification under Rule 23(b)(3)."  *Roach*, 778 F.3d at 405 (internal quotation marks omitted)).

Ironically, Judge Buchwald's subsequent opinion in *LIBOR VII* is especially instructive. Like Defendants here, the defendants there cited Judge Buchwald's opinion in *LIBOR V* in opposing class certification.  *See LIBOR VII*, 299 F. Supp. 3d at 592.  Notably, Judge Buchwald

agreed with the defendants that swaps, unlike the "series of purchases like the pharmaceuticals at issue" in *In re Nexium Antitrust Litigation*, 777 F.3d 9 (1st Cir. 2015), may constitute a single transaction, such that corresponding offsets would necessarily inform whether or not there was antitrust injury. *Id.* at 593-94. Even so, she granted the plaintiffs' class certification motion, explaining that, *even if* "[the court] accepted [the] defendants' definition [of injury], . . . . [t]he considerations that underlie this determination of 'injury,' including issues of absorption and netting, are otherwise identical to the determination of damages." *Id.* at 595. That analysis rings even truer here, as Defendants fail to chip away at predominance with even a ballpark estimate of how many class members are likely to be uninjured on account of their participation in swaps, let alone by making a "definitive show[ing]" of no injury for a particular plaintiff. *LIBOR V*, 2015 WL 6696407, at \*22. Thus, "any class member-specific question of fact relating to injury will be reducible to corresponding questions of fact relating to damages." *Id.* at 595. It follows that Defendants' argument is not sufficient, at this stage, to defeat class certification.[7]

### 3. Conduit Issuances

Defendants' next argument, that individualized inquiries will be necessary to determine class membership and antitrust standing given the prevalence of "conduit issuances" — that is,

---

[7]      In light of the foregoing, the Court need not and does not reach Plaintiffs' argument that Defendants' unitary-transaction theory is foreclosed by the Supreme Court's decision in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968). In *Hanover Shoe*, the Court held that a buyer who raises his prices to consumers in response to an illegal price overcharge by a supplier is still entitled to damages from the supplier, even though the buyer may have "passed on" the overcharge and "maintain[ed] his profit level." *Id.* at 489. The offset Defendants identify here is arguably of a different nature — one that they allege occurred *in the same transaction*. *Cf. LIBOR VII*, 299 F. Supp. 3d at 594 ("We are skeptical that . . . exclusion of recoupment attributable to a distant second-order effect should extend to later savings attributable to the same or related transaction." (internal quotation marks omitted)). Moreover, even if VRDOs and swaps should not be considered parts of one transaction, any offset from a swap would still have been "passed on" horizontally, not vertically.

issuances in which a government unit issues bonds on behalf of a third party — is more easily

dispatched.  Defs.' Class Cert. Opp'n 43-44; *see also* Chalmers Rep. ¶¶ 261-62.  At bottom, the

argument is an administrative feasibility argument dressed up in predominance clothing.

Essentially, Defendants argue that it would be difficult and "intensive" to identify the direct

payor in the case of each VRDO.  Defs.' Class Cert. Opp'n 44.  But in a recent case where, like

Defendants here, a party argued that class certification was inappropriate because "the dispute

over which entity was the direct payor for any given transaction will lead to hundreds of

thousands of mini trials," the Second Circuit held that "[that] argument rests on a faulty premise"

because "[r]equiring administrative feasibility is neither compelled by precedent nor consistent

with Rule 23." *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 717 (2d Cir. 2023)

(internal quotation marks omitted).  Ascertaining the direct payor on a VRDO may not be as easy

as Plaintiffs make it out to be, *see* Oral Arg. Tr. 95-96, but Defendants "do not contend that

identifying the direct payor for each transaction is impossible," *Fikes Wholesale, Inc.*, 62 F.4th at

717.  Accordingly, Defendants' "ascertainability argument must fail." *Id.*

### 4.  Timeliness

Finally, Defendants argue that individualized inquiries will be required to determine

which class members' antitrust claims are timely.  *See* Defs.' Class Cert. Opp'n 45-48.  Plaintiffs

counter that the question of fraudulent concealment — which turns on whether Defendants took

affirmative steps to prevent Plaintiffs' discovery of the conspiracy or whether the conspiracy

itself was inherently self-concealing — is a common question that predominates over any

individual question regarding the knowledge or diligence of individual class members.  *See* Pls.'

Class Cert. Mem. 37-40.  The weight of authority is firmly on Plaintiffs' side. *See, e.g.*, *In re*

*NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 520 (S.D.N.Y. 1996) ("Courts have

overwhelmingly held that, even when the issue of fraudulent concealment involves both common and individual questions, the common question of whether Defendants successfully concealed the existence of the alleged conspiracy predominates over any individual questions regarding the knowledge or diligence of individual plaintiffs." (citing cases)); *see also, e.g.*, *Fire & Police Pension Ass'n of Colorado v. Bank of Montreal*, 368 F. Supp. 3d 681, 707 (S.D.N.Y. 2019)*; In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 913 (S.D.N.Y. 2018); *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 134 (S.D.N.Y. 2014); *Pub. Emps.' Ret. Sys. of Mississippi v. Merrill Lynch & Co.*, 277 F.R.D. 97, 116 (S.D.N.Y. 2011).

To be sure, most of these cases arise in the securities-fraud context, not the antitrust context. But the differences in relevant analysis notwithstanding, *compare In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-CV-7789 (LGS), 2016 WL 5108131, at *15 (S.D.N.Y. Sept. 20, 2016) (antitrust), *with Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 361-62 (2d Cir. 2013) (securities), Defendants fail to explain why the arguments they press here could not be tabled or organized in the way that these cases contemplated. For example, Defendants argue that *qui tam* actions "filed in at least California, New York, Illinois, and Massachusetts . . . should have caused a reasonably diligent class member to investigate the possibility of improper rate inflation." Defs.' Class Cert. Opp'n at 47. Whether that is true, however, may be a common question in itself. *Pub. Emps.' Ret. Sys. of Mississippi*, 277 F.R.D. at 116 ("If . . . civil complaints attached as exhibits to Defendants' moving papers were sufficient, either singly or in combination, to place a reasonable investor on inquiry notice of Defendants' . . . violations, then the claims of all class members are time-barred [and] [t]his is the very definition of generalized proof."). And in any event, if individualized inquiry proves to be necessary, "Rule 23 gives the

29

district court flexibility to certify subclasses as the case progresses and as the nature of the proof

to be developed at trial becomes clear." *U.S. Foodservice*, 729 F.3d at 129 (quoting *Marisol A.

v. Giuliani,* 126 F.3d 372, 379 (2d Cir.1997)).[8]  The same is true with respect to Defendants'

claim that the jury in this case would "need to consider individualized evidence that some class

members were on inquiry notice because they closely monitored the performance of the VRDO

rates."  Defs.' Class Cert. Opp'n 48.  Defendants offer no reason why the Court could not certify

subclasses — perhaps of class members who had the necessary "tools and information" and of

those who did not, *id.* — later in the litigation.  *See In re Currency Conversion Fee Antitrust

Litig.*, 264 F.R.D. 100, 116 (S.D.N.Y. 2010) ("To the extent . . . potential defenses could present

some individual issues, there are many ways in which this Court can deal with those issues when

they arise.").

In short, a statute-of-limitations "defense may arise and may affect different class

members differently." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 138 (2d

Cir. 2001).  But this occurrence "does not compel a finding that individual issues predominate

over common ones." *Id.* (internal quotation marks omitted).

### 5.  **Class and Sub-Class Definitions and Class Counsel**

In sum, the Court finds that Plaintiffs satisfy the predominance requirement of Rule

23(b)(3).  As noted, Defendants do not dispute that Plaintiffs also satisfy the requirements of

Rule 23(a) and the "superiority" requirement of Rule 23(b)(3).  Oral Arg. Tr. 4.  The Court

---

[8]      Notably, Defendants appear to agree that those on actual notice can be (or have already
been) easily identified.  *See, e.g.*, Defs.' Class Cert. Opp'n 47 (noting that "third-party discovery
confirmed that class members — including SANDAG — were on notice of [the qui tam] cases
before February 21, 2015").  And as noted above, "[t]hat the defendant might attempt to pick off
the occasional class member here or there through individualized rebuttal does not cause
individual questions to predominate." *Halliburton*, 573 U.S. at 276.

therefore grants Plaintiffs' motion to certify a nationwide Class composed of all persons and entities who directly paid interest expenses on VRDOs that had interest rates reset on a weekly or daily basis pursuant to remarketing agreements with Defendants at any point from February 1, 2008 through November 30, 2015, excluding Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, and the United States government.  The parties agree that Plaintiffs' request for certification of the Class and certification of a Contract Sub-Class "rise and fall together."  Oral Arg. Tr. 100.  It therefore follows that the Court also grants Plaintiffs' request to certify a Contract Sub-Class composed of all persons and entities who were party to a remarketing agreement with any Counterparty Defendant that applies to VRDOs that had interest rates reset on a weekly or daily basis at any point from February 1, 2008 through November 30, 2015, excluding Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, and the United States government.  Finally, the Court also grants Plaintiffs' motion to appoint Quinn Emanuel Urquhart & Sullivan, LLP; Wollmuth Maher & Deutsch LLP; and Susman Godfrey LLP as class counsel.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification is GRANTED and Defendants' motion to preclude Dr. Schwert and Dr. Abrantes-Metz is DENIED.

No later than **two weeks from the date of this Opinion and Order**, Plaintiffs shall file a proposed order consistent with this Opinion and Order and prescribing procedures by which class members will be provided notice and an opportunity to opt out of the class.  By the **same date**, Plaintiffs shall file a letter brief addressing why their proposals for notice and opting out are consistent with the requirements of Rule 23 and due process.

One housekeeping matter remains.  In several prior Orders, the Court granted the parties permission to file documents temporarily under seal.  *See* ECF No. 372, 401, 434, 446.  Both parties filed documents under seal in connection with their respective motions.  *See, e.g.*, ECF Nos. 363-64, 366, 370-71, 387-91, 393-96, 398, 404, 411-14, 423-25, 429-30, 433, 435, 443-44. It is well established that filings that are "relevant to the performance of the judicial function and useful in the judicial process" are considered "judicial documents" to which a presumption in favor of public access attaches.  *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006).  Significantly, assessment of whether the presumption in favor of public access is overcome must be made on a document-by-document basis.  *See, e.g.*, *Brown v. Maxwell*, 929 F.3d 41, 48 (2d Cir. 2019).  And the mere fact that information is subject to a confidentiality agreement between litigants is not a valid basis to overcome that presumption.  *See, e.g.*, *United States v. Wells Fargo Bank N.A.*, No. 12-CV-7527 (JMF), 2015 WL 3999074, at *4 (S.D.N.Y. June 30, 2015) (citing cases).  In light of this Opinion and Order, and to facilitate the Court's review of the parties' requests, the parties shall, **no later than two weeks from the date of this Opinion and Order**, submit a joint letter with a single chart listing each and every document that any party (or third party) believes should remain under seal or in redacted form with a hyperlinked reference to the docket number of the document; the party (or third party) who seeks to keep the document under seal; a *succinct* (i.e., two- or three-word) justification for the request; and a hyperlinked reference to any prior letter-motion that addresses the document.  For the sake of completeness, the parties should include in this chart any document that the Court has already determined should be kept under seal permanently and include a hyperlinked reference to the Court's prior ruling in the chart.  To the extent that the parties (and, as relevant, third parties) agree that a document previously filed under seal or in redacted form can or should be filed

publicly, the parties should include that in the letter, with a hyperlinked reference to the relevant document.

The Clerk of Court is directed to terminate ECF Nos. 362 and 386.

SO ORDERED.

Dated: September 21, 2023
New York, New York

JESSE M. FURMAN
United States District Judge