December 18, 2023

The Honorable Jesse M. Furman
United States District Court for the
Southern District of New York
40 Foley Square, Room 1105
New York, New York 10007

      Re: *City of Philadelphia, et al. v. Bank of America, et al.*, No. 19-cv-1608 (JMF):
          Letter Motion to Compel Defendants to Produce Additional Swaps Data

Dear Judge Furman:

    In accordance with Your Honor's Individual Practice Rule 3.E., Lead Counsel for the certified class respectfully request a conference regarding Defendants' refusal to produce data for interest rate swaps entered into after the conspiracy. The meet and confer process occurred and was unsuccessful.

    **Plaintiffs' Data Request.** As Your Honor is aware, Defendants made certain class members' use of interest rate swaps a focal point of their opposition to class certification, Dkt. 456 (Class Cert. Order) at 25-27, and have already indicated their intent to make swaps among their central defenses at the merits stage. Indeed, since class certification, Defendants have already issued 82 document subpoenas pertaining to swaps as part of "top-off" discovery, *see* Dkt. 485. Despite acting on their own professed need for voluminous swaps discovery, Defendants have flatly rejected Plaintiffs' tailored data requests on the very same subject matter. Defendants cannot have it both ways.

    While Plaintiffs maintain that certain class members' hedging transactions are irrelevant as a matter of law, they also appreciate the Court's guidance that further consideration of swaps may be needed at the merits stage, Dkt. 456 at 25-27. As a result, as part of top-off discovery, Plaintiffs made discrete swaps-related data requests to Defendants that Plaintiffs' experts identified would aid their analysis. *See, e.g.*, Ex. 1 at 1 (10/17/2023 K. Peaslee e-mail to Citi); Ex. 2 at 5-6 (10/19/2023 S. Becker e-mail to Wells Fargo).

    Specifically, we asked Defendants to supplement their prior productions of data for SIFMA and cost-of-funds swaps active during the class period by adding data for any such swaps entered into after the conspiracy through 2020.[1] We followed up with Defendants repeatedly in pursuit of the requested information, *see, e.g.*, Ex. 2 (10/26/23, 11/01/23, and 11/06/23 S. Becker e-mails to Wells Fargo); Ex. 1 at 2 (11/01/23 K. Peaslee e-mail to Citi), only to be rebuffed six weeks later with a flat denial, Ex. 3 at 1 (12/01/23 M. Christian e-mail),

    The relevance of this post-conspiracy data is without serious question. Defendants contend that class members' swaps lowered the damages class members suffered because the conspiracy systematically inflated the variable payments class members received as a result of their swaps.

---

[1] Plaintiffs also asked Defendants to produce LIBOR swaps (for both during and after the class period), but Defendants have since stipulated they will not contend LIBOR swaps are relevant to this action. *See* Ex. 3 at 4-5 (11/10/23 M. Christian e-mail).

But—even leaving aside whether this is a proper legal consideration—Defendants' argument ignores the full picture. Under basic economic theory, the fixed rate that class members paid should equal the expected value of the allegedly inflated variable rate. Therefore, in order to pass on the overcharge class members paid on their VRDOs, class members would need to outwit Defendants and other financial institutions and pay a systematically lower fixed rate than they would be expected to in a rational market.

Plaintiffs and their experts seek this post-conspiracy data precisely to test whether Defendants' pass-on theory holds any water (which it likely does not). In particular, Plaintiffs seek post-conspiracy data to examine whether Plaintiffs were somehow able to receive systemically better deals on their swaps during the conspiracy than after. Regressions, such as these, using a benchmark and dirty period are "widely accepted as a generally reliable econometric technique" in antitrust cases, *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F. 4th 651, 677 (9th Cir. 2022),[2] and, as such, data productions by antitrust defendants from outside the conspiracy period is the norm. Indeed, it is commonplace for defendants to agree to these productions, but, in the rare cases when they do not, courts regularly compel such discovery. *See, e.g.*, *In re Peanut Farmers Antitrust Litig.*, 2020 WL 9216019, at *2 (E.D. Va. July 24, 2020) (compelling the production of clean-period data to allow plaintiffs to "establish[] a benchmark period" in their regression analysis).

Nor do Defendants seriously contend that Plaintiffs' request would pose an undue burden. Indeed, Defendants have already produced (or agreed to produce) the same categories of swaps data for the much larger class period. And Barclays—the one Defendant who agreed to produce swaps data after the class period—produced post-conspiracy data on one manageable spreadsheet of 51 rows.

**Defendants' Unavailing Arguments**. In order to avoid production—and to obstruct Plaintiffs from subjecting Defendants' swaps theory to empirical scrutiny—Defendants can be expected to make the following arguments, each of which are off-base.

*First*, Defendants will claim swaps data is not organized in a way that allows Defendants to reliably identify swaps that are part of so-called "synthetic rate transactions." Ex. 3 at 1 (12/01/23 M. Christian e-mail). But this purported limitation did not prevent Defendants from producing this very same data for swaps active during the class period, and Defendants have not claimed the post-conspiracy time period presents any new complications. In fact, this supposed hurdle contradicts Defendants' prior representations that producing SIFMA and cost-of-fund swaps was manageable because those swaps were "often issued to municipal issuer counterparties in synthetic fixed rate transactions." Ex. 3 at 4-5 (11/10/23 M. Christian e-mail).

In any event, Defendants' argument is beside the point. Constructing a robust clean period does not require isolating only the SIFMA or cost-of-fund swaps that were used to hedge VRDOs—any post-conspiracy swaps falling into those two categories would be relevant.

*Second*, Defendants conclusorily assert that their post-conspiracy data will not allow Plaintiffs to "reliably construct the clean period analysis." Ex. 3 at 1 (12/01/23 M. Christian e-

---

[2]   *See also* Dkt. 363 (Pls' Class Cert Br.) at 21-22 (collecting cases).

mail). But such arguments about the adequacy of Plaintiffs' analyses are for the merits stage. It is not Defendants' place to make such a claim now, let alone force Plaintiffs or the Court to accept it blindly. Indeed, it is difficult to see how Defendants are even in a position to make such a bold assertion. Defendants have no insight into Plaintiffs' analyses, nor should they. Nor are they aware of what data sources Plaintiffs have procured to construct a robust clean period in conjunction with Defendants' data. Plaintiffs and their experts are well aware of the imperfections of Defendants' data but nonetheless believe it will be a valuable input to their swaps analyses. That suffices for discoverability.[3]

*Finally*, Defendant make the absurd claim that *class members* are the ones "with access to the information Plaintiffs desire … not Defendants." Ex. 3 at 1 (12/01/23 M. Christian e-mail). Defendants have served class members with well over one hundred subpoenas, and Lead Counsel has been in contact with many of them to assist them. Not once has any Plaintiff or class member ever produced or suggested that it possesses anything remotely resembling the breadth of structured data maintained by Defendants, the largest financial institutions in the world.

Accordingly, Plaintiffs respectfully request that Defendants be ordered to promptly produce documents containing their respective swaps data covering the post-conspiracy period of November 30, 2015 to December 31, 2020.

Respectfully submitted,

| /s/ Daniel L. Brockett | /s/ David H. Wollmuth | /s/ William C. Carmody |
|---|---|---|
| Daniel L. Brockett | David H. Wollmuth | William Christopher Carmody |
| **Quinn Emanuel Urquhart & Sullivan, LLP** | **Wollmuth Maher & Deutsch LLP** | **Susman Godfrey LLP** |

Attachments (Exhibits 1-3)

cc:   All counsel of record (via ECF)

> Given the broad definition of relevance for purposes of discovery, Plaintiffs' motion to compel is GRANTED.  Most of Defendants' arguments to the contrary relate to the merits of arguments that Plaintiffs may raise in the future and, thus, are premature.  Defendants shall promptly produce the relevant discovery to Plaintiffs.  With that, "top off" discovery is deemed to be closed.  The Clerk of Court is directed to terminate ECF No. 491.  SO ORDERED.
>
> December 28, 2023

---

[3] Defendants have also suggested Plaintiffs already have "clean" swaps data because Defendants have produced some data for swaps entered into before the start of the class period (to the extent they remained active during the class period). This data, however, is insufficient for Plaintiffs' needs because, as the Court has recognized, "Defendants may well have been conspiring to inflate VRDO rates before the Class Period." Dkt. 456 (Class Cert. Order & Opinion) at 14-15. Plaintiffs' experts, therefore, cannot use this data as a benchmark.